UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:                                                    :
                                                          :
AMERICAN LAFRANCE, LLC,                                   :        Chapter 11
                                                          :        Case No. 08-10178
                        Debtor.                           :        (Bankr. D. Del.)
                                                          :
------------------------------------------------------- X
                                                          :
FREIGHTLINER LLC,                                         :
                                                          :
                        Plaintiff,                        :        Case No. 08-cv-05625 (BSJ) (DFE)
                                                          :
        - against -                                       :
                                                          :
AMERICAN LAFRANCE, LLC,                                   :
                                                          :
                        Defendant.                        :
                                                          :
-------------------------------------------------------X

## DECLARATION OF JORDAN I. BRACKETT IN SUPPORT OF MOTION OF FREIGHTLINER LLC, PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9027, TO REMAND, OR, IN THE ALTERNATIVE, PURSUANT TO 28 U.S.C. SECTION 1334, TO ABSTAIN

Jordan I. Brackett declares as follows:

1.      I am an associate at Friedman Kaplan Seiler & Adelman LLP, attorneys for

plaintiff Freightliner LLC[1] ("Freightliner"), a member of the bar of this Court, and submit this

declaration in support of Freightliner's Motion, Pursuant to Federal Rule of Bankruptcy

Procedure 9027, to Remand, or, In the Alternative, Pursuant to 28 U.S.C. Section 1334, to

Abstain.

---

[1] Freightliner LLC is now known as Daimler Trucks North America LLC.

2.      Attached as *Exhibit 1* is an Asset Purchase and Sale Agreement, dated as of December 14, 2005 (the "Asset Purchase Agreement"), agreed to by plaintiff Freightliner and defendant American LaFrance, LLC ("ALF").

3.      Attached as *Exhibit 2* is a Transition Services Agreement, dated as of December 14, 2005 (the "Transition Services Agreement"), agreed to by Freightliner and ALF.

4.      Attached as *Exhibit 3* is the complaint whereby Freightliner commenced this action against ALF in New York Supreme Court, New York County (Index No. 604037/07) on December 10, 2007 (the "New York Action").

5.      Attached as *Exhibit 4* is the bankruptcy petition whereby ALF filed for chapter 11 bankruptcy protection in the District of Delaware on January 28, 2008 (Case No. 08-10178) (the "Delaware Bankruptcy").

6.      Attached as *Exhibit 5* is ALF's Fourth Amended Disclosure Statement, filed in the Delaware Bankruptcy, dated March 27, 2008 (the "Disclosure Statement").

7.      Attached as *Exhibit 6* is ALF's Third Amended Plan of Reorganization, filed in the Delaware Bankruptcy, dated March 27, 2008 (the "Plan").

8.      Attached as *Exhibit 7* is the order issued on May 23, 2008 by the Delaware Bankruptcy Court confirming the Plan (the "Confirmation Order").

9.      Attached as *Exhibit 8* is the press release issued by ALF on May 23, 2008 announcing the Confirmation Order, ALF's emergence from bankruptcy, and ALF's ability to "move forward."

2

10.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 21, 2008.

Jordan I. Brackett (JB9306)

630576.1

EXECUTION VERSION

ASSET PURCHASE AND SALE AGREEMENT

dated as of

December 14, 2005,

among

AMERICAN LAFRANCE CORPORATION
AMERICAN LAFRANCE CHASSIS CO. LLC,
LADDER TOWERS, INC.,
R.D. MURRAY INC.
BECKER FIRE EQUIPMENT CO.,
AERO PRODUCTS CORPORATION
and
AMERICAN LAFRANCE NORTHWEST LLC,

as Sellers,

FREIGHTLINER LLC,

as Shareholder

and

AMERICAN LAFRANCE, LLC,

as Purchaser

Table of Contents

ARTICLE I Defined Terms ........................................................................ - 1 -
    Section 1.01. Definitions. .................................................................. - 1 -
ARTICLE II The Purchase and Sale Transaction ................................... - 15 -
    Section 2.01. Purchase and Sale of the Purchased Assets. ............ - 15 -
    Section 2.02. Excluded Assets. ....................................................... - 16 -
    Section 2.03. Assumption of the Assumed Liabilities. ................... - 17 -
    Section 2.04. Retained Liabilities .................................................... - 17 -
    Section 2.05. Employees .................................................................. - 19 -
    Section 2.06. Benefit Plans .............................................................. - 21 -
    Section 2.07. Backlog. ..................................................................... - 21 -
    Section 2.08. Warranties .................................................................. - 22 -
    Section 2.09. Title and Survey Review. ........................................... - 23 -
ARTICLE III Consideration; Adjustments .............................................. - 23 -
    Section 3.01. Consideration. ............................................................ - 23 -
    Section 3.02. Determination of Any Post-Closing Adjustments. .... - 24 -
    Section 3.03. Allocation of Purchase Price for Tax Purposes. ....... - 27 -
ARTICLE IV The Closing; Conditions to Closing .................................. - 27 -
    Section 4.01. The Closing. ............................................................... - 27 -
    Section 4.02. Conditions Precedent to the Obligations of the Sellers. ... - 28 -
    Section 4.03. Conditions Precedent to the Obligations of the Purchaser. ... - 29 -
    Section 4.04. Efforts to Close. ......................................................... - 33 -
    Section 4.05. Transactions to be Effected at the Closing. .............. - 33 -
ARTICLE V Representations and Warranties of the Sellers About the Sellers ......... - 34 -
    Section 5.01. Existence and Power .................................................. - 34 -
    Section 5.02. Authorization; Binding Effect. .................................. - 34 -
    Section 5.03. Contravention. ........................................................... - 34 -
    Section 5.04. Consents ..................................................................... - 35 -
    Section 5.05. Financial Information. ................................................ - 35 -
    Section 5.06. Taxes. ........................................................................ - 36 -
    Section 5.07. Litigation. .................................................................. - 37 -
    Section 5.08. Permits; Compliance with Laws. .............................. - 37 -
    Section 5.09. Absence of Certain Changes or Events. .................... - 37 -

Section 5.10. Assets. .................................................................................- 38 -

Section 5.11. Real Property and Leaseholds. ...............................................- 39 -

Section 5.12. Equipment. ...........................................................................- 40 -

Section 5.13. Scheduled Contracts and Other Assumed Contracts...................- 41 -

Section 5.14. Liens.....................................................................................- 42 -

Section 5.15. Intellectual Property. ............................................................- 42 -

Section 5.16. Books and Records. ...............................................................- 43 -

Section 5.17. Customers and Suppliers.......................................................- 43 -

Section 5.18. Environmental Matters..........................................................- 44 -

Section 5.19. Employees; ERISA. ...............................................................- 45 -

Section 5.20. Employment-Related Matters. ...............................................- 47 -

Section 5.21. Warranties.............................................................................- 47 -

Section 5.22. Brokers, Finders. ...................................................................- 47 -

Section 5.23. Misstatements; Full Disclosure. ...........................................- 47 -

Section 5.24. No Other Parties. ..................................................................- 48 -

ARTICLE VI Representations and Warranties of the Shareholder ...................- 48 -

Section 6.01. Existence and Power................................................................- 48 -

Section 6.02. Authorization; Binding Effect. ..............................................- 48 -

Section 6.03. Contravention. ......................................................................- 48 -

Section 6.04. Consents................................................................................- 49 -

Section 6.05. Litigation. .............................................................................- 49 -

Section 6.06. Title to Securities. .................................................................- 49 -

Section 6.07. Misstatements; Full Disclosure. ...........................................- 49 -

Section 6.08. Solvency................................................................................- 49 -

ARTICLE VII Representations and Warranties of the Purchaser ....................- 49 -

Section 7.01. Existence and Power................................................................- 50 -

Section 7.02. Authorization; Binding Effect. ..............................................- 50 -

Section 7.03. Contravention. ......................................................................- 50 -

Section 7.04. Consents................................................................................- 50 -

Section 7.05. Litigation. .............................................................................- 50 -

Section 7.06. Compliance with Laws...........................................................- 51 -

Section 7.07. Brokers, Finders. ...................................................................- 51 -

Section 7.08. No Reliance............................................................................- 51 -

Section 7.09. Misstatements; Full Disclosure. ................................................- 51 -

ARTICLE VIII Transition Services Agreement; Responsibility for the Business ..................- 52 -

Section 8.01. Transition Services Agreement; Acknowledgements. ...................- 52 -

Section 8.02. Limitations on Responsibilities of the Shareholder and the Sellers. ...............................................................................- 52 -

Section 8.03. Good Faith Resolution of Potential Claims. ..............................- 52 -

Section 8.04. Survival; Indemnification. ......................................................- 53 -

ARTICLE IX Covenants of the Shareholder, the Sellers and the Purchaser ...........................- 53 -

Section 9.01. Public Announcements; Confidentiality ..................................- 53 -

Section 9.02. Tax Matters. ...........................................................................- 53 -

Section 9.03. Non-Competition. ..................................................................- 54 -

Section 9.04. Name Change. .......................................................................- 56 -

Section 9.05. Customer Deposits and Late Delivery Liabilities. ....................- 56 -

Section 9.06. Net Worth. .............................................................................- 56 -

Section 9.07. COBRA. .................................................................................- 56 -

Section 9.08. Donnelly Penman Confidentiality Agreements Not Assigned to Purchaser. ..........................................................................- 56 -

Section 9.09. Performance Bonding. ............................................................- 57 -

ARTICLE X Fees and Expenses ...........................................................................- 59 -

Section 10.01. Fees and Expenses. ...............................................................- 59 -

ARTICLE XI Indemnification ..............................................................................- 59 -

Section 11.01. Indemnification. ...................................................................- 59 -

Section 11.02. Notice and Opportunity to Defend. .......................................- 61 -

Section 11.03. Survival of Indemnification. .................................................- 63 -

Section 11.04. Threshold and Limitation on Liability. ..................................- 64 -

Section 11.05. Fraud Exception. ..................................................................- 66 -

Section 11.06. Set-Off. ................................................................................- 67 -

Section 11.07. Guarantee. ...........................................................................- 67 -

ARTICLE XII Miscellaneous ...............................................................................- 68 -

Section 12.01. Notices. ................................................................................- 68 -

Section 12.02. Counterparts. .......................................................................- 68 -

Section 12.03. Amendment of Agreement .....................................................- 68 -

Section 12.04. Successors and Assigns; Assignability. ..................................- 68 -

Section 12.05. Governing Law. ...................................................................- 68 -

Section 12.06. Integration..................................................................- 68 -

Section 12.07. Severability..................................................................- 68 -

Section 12.08. Further Assurances. ........................................................- 69 -

Section 12.09. No Third-Party Rights. ...................................................- 69 -

Section 12.10. Enforcement; Attorneys' Fees...........................................- 69 -

Section 12.11. Submission to Jurisdiction................................................- 70 -

Section 12.12. Waiver of Jury Trial. ......................................................- 70 -

Section 12.13. No Waiver; Remedies......................................................- 70 -

Section 12.14. Interpretation................................................................- 70 -

Section 12.15. Ambiguities. .................................................................- 70 -

Section 12.16. Incorporation of Schedules...............................................- 71 -

Section 12.17. Conflicts; Terms and References. .......................................- 71 -

Schedules

| | |
|---|---|
| Schedule 2.01 | Additional Purchased Assets Specified by Purchaser |
| Schedule 2.02(d) | Excluded Real Property and Maintenance Equipment |
| Schedule 2.02(j) | Additional Excluded Assets Specified by Purchaser |
| Schedule 2.05(a) | Employees of Sellers |
| Schedule 2.05(b)-I | Purchaser-Assumed Employment Liabilities |
| Schedule 2.05(b)-II | Purchaser-Hired Employees with 2005 Variable Compensation Included in Retention Package |
| Schedule 2.05(f) | Employees to Provide Resignations |
| Schedule 2.07(c) | Late Delivery Liability and Related Methodology |
| Schedule 2.08(a) | Product Actions, Known Recalls and Service Actions |
| Schedule 2.08(b) | Sellers' Policy Commitments |
| Schedule 3.01(b) | Freightliner and Sterling Dealers That Are Condor Dealers |
| Schedule 3.02 | Closing Statement |
| Schedule 3.03 | Allocation of Purchase Price |
| Schedule 4.03(s) | Title Insurance |
| Schedule 4.03(v) | Assignable Donnelly Penman Confidentiality Agreements |
| Schedule 5.04 | Required Consents—Seller Responsibility |
| Schedule 5.05(a) | Financial Statements |
| Schedule 5.05(c) | Inventory Subject to Return Rights |
| Schedule 5.06(c) | Audits |
| Schedule 5.07 | Litigation |
| Schedule 5.08(a) | Permits |
| Schedule 5.08(b) | Compliance with Laws |
| Schedule 5.09(c)(i) | Acquisition of Ownership Interests |
| Schedule 5.09(c)(iii) | Increase in Employee Compensation or Bonus Other Than in Ordinary Course |
| Schedule 5.09(c)(vi) | Adjustment to Inventory or Accounts Receivable |
| Schedule 5.11(a)(i) | Real Property |
| Schedule 5.11(a)(ii) | Leaseholds |
| Schedule 5.11(b) | Certain Real Property Liens |
| Schedule 5.11(d) | Condemnation or Eminent Domain |
| Schedule 5.11(e) | Leasehold Obligations |
| Schedule 5.12(a)(i) | Equipment |
| Schedule 5.13(a) | Scheduled Contracts |
| Schedule 5.14 | Liens |
| Schedule 5.15(a) | Intellectual Property |
| Schedule 5.15(d) | Certain Intellectual Property Matters |
| Schedule 5.17(a) | Customers |
| Schedule 5.17(b) | Vendors and Suppliers |
| Schedule 5.18 | Environmental Matters |
| Schedule 5.19(b) | Employment Agreements |
| Schedule 5.19(c) | Benefits Plans |
| Schedule 5.20(b) | Compliance with Laws |
| Schedule 6.04 | Required Consents—Seller Responsibility |
| Schedule 7.04 | Required Consents—Purchaser Responsibility |
| Schedule 9.09(b) | Existing Bonds |

## Exhibits

| | |
|---|---|
| Exhibit 3.01(b) | Condor Supply Agreement |
| Exhibit 4.02(a) | Form of Closing Certificate of Manager of the Purchaser |
| Exhibit 4.02(e) | Form of Assumption Agreement |
| Exhibit 4.02(f) | Form of Certificate of Manager of the Purchaser |
| Exhibit 4.03(a) | Form of Closing Certificate of Officer of the Shareholder and Each Seller |
| Exhibit 4.03(d)(i) | Form of Bill of Sale |
| Exhibit 4.03(d)(ii) | Form of Assignment Agreement |
| Exhibit 4.03(d)(iii) | Form of Intellectual Property Assignment Agreement |
| Exhibit 4.03(d)(iv) | Form of Special Warranty Deed |
| Exhibit 4.03(f) | Form of Certificate of Secretary or Manager of each Seller and the Shareholder |
| Exhibit 4.30(h) | Opinion of Counsel |
| Exhibit 8.01 | Transition Services Agreement |
| Exhibit 9.09(c) | Forms of Security Agreement and Mortgage |

## ASSET PURCHASE AND SALE AGREEMENT

ASSET PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of December 14, 2005, among AMERICAN LAFRANCE CORPORATION, a Delaware corporation ("Company"), AMERICAN LAFRANCE CHASSIS CO. LLC, a Delaware limited liability company ("Chassis"), LADDER TOWERS, INC. a Pennsylvania corporation ("Ladder"), R.D. MURRAY INC., a New York corporation ("RDM"), BECKER FIRE EQUIPMENT CO., a Wyoming corporation ("Becker"), AERO PRODUCTS CORPORATION, a Florida corporation ("Aero"), and AMERICAN LAFRANCE NORTHWEST LLC, an Oregon limited liability company ("Northwest" and, collectively with the Company, Chassis, Ladder, RDM, Becker and Aero, "Sellers"), FREIGHTLINER LLC, a Delaware limited liability company ("Shareholder"), and American LaFrance, LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

A.    The Sellers own the Purchased Assets (as defined below).

B.    On the terms and subject to the conditions set forth in this Agreement, the Purchaser desires to acquire from the Sellers, and the Sellers wish to sell to the Purchaser, the Purchased Assets, in connection with which the parties will enter into certain other agreements, all as set forth herein.

## AGREEMENT

In consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

### Defined Terms

Section 1.01.  Definitions.  As used in this Agreement, the following terms have the meanings stated:

"Accounts Receivable" means with respect to the Business all (i) invoiced and outstanding accounts receivable and, (ii) all other invoiced rights to payment for goods or services sold, delivered or performed.  For the avoidance of doubt, any item included in Inventory shall not receive a corresponding credit as an Account Receivable and vice versa.

"Action" means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding, whether civil,

criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Body.

"Aero" has the meaning stated in the heading of this Agreement.

"Affiliate" of a Person means any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreed Methodologies" has the meaning stated in Section 3.02(a).

"Assignment Agreement" has the meaning stated in Section 4.03(d)(ii).

"Assumed Liabilities" has the meaning stated in Section 2.03.

"Assumption Agreement" has the meaning stated in Section 4.02(e).

"Backlog" has the meaning stated in Section 2.07(a).

"Backlog Liabilities" has the meaning stated in Section 2.07(a).

"Backlog Report" has the meaning stated in Section 2.07(d).

"Becker" has the meaning stated in the heading to this Agreement.

"Benefit Plan" means, with respect to any Person, any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code, and any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, stock purchase, restricted stock, stock appreciation rights, phantom stock, retirement, supplemental retirement, vacation, severance, termination, disability, death benefit, hospitalization, retiree medical or other plan, program, insurance, arrangement, agreement, commitment or understanding (whether or not legally binding) providing benefits to any current or former employee, officer, director or shareholder of such Person, but does not include a multi-employer pension plan.

"Bill of Sale" has the meaning stated in Section 4.03(d)(i).

"Bonding Agreement" means the General Agreement of Indemnity Agreement, dated as of October 21, 2003 between the Shareholder and DaimlerChrysler Insurance Company.

"Bonding Companies" means, collectively, DaimlerChrysler Insurance Company and The Guarantee Company of North America and "Bonding Company" means either of them.

"Bonding Obligation" means the obligations of any Bonding Company under any Existing Bond with respect to the obligations of the Shareholder or any of the Sellers relating to the Business and the Purchased Assets.

"Business" means the business and operations of the Sellers as conducted by the Sellers on the date of this Agreement, including, without limitation, (a) the manufacture of custom chassis with or without cabs for fire, rescue or refuse vehicles, (b) the manufacture of bodies for fire or rescue vehicles and (c) the manufacture of fire and rescue apparatus.

"Business Day" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized by Law to be closed in New York.

"Chassis" has the meaning stated in the heading of this Agreement.

"Cleanup" means all actions to (a) investigate, characterize, cleanup, remove, treat, encapsulate, cap or otherwise remediate Hazardous Materials present in the Environment, including construction or initial implementation of land use restrictions and engineering controls, but excluding long-term monitoring, inspection or repair requirements or (b) respond to any government directives, orders, requests for information or other documents in any way relating to investigation, cleanup, removal, treatment or remediation or potential investigation, cleanup, removal, treatment or remediation of Hazardous Materials in the Environment.

"Closing" has the meaning stated in Section 4.01(a).

"Closing Date" has the meaning stated in Section 4.01(a).

"Closing Receivables and Inventory" has the meaning stated in Section 3.02(a).

"Closing Shortfall" has the meaning stated in Section 3.02(h).

"Closing Statement" has the meaning stated in Section 3.02(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning stated in the headings of this Agreement.

"Condor Supply Agreement" has the meaning stated in Section 3.01(a).

"Confidential Information" means all information, data, "know-how", documents, reports, agreements, interpretations, plans, studies, forecasts and records (whether in oral

or written form, electronically stored or otherwise) containing or otherwise reflecting information concerning the Purchaser, the Sellers, the Business, the Purchased Assets, the Assumed Liabilities or the Transactions, including, without limitation (a) financial information, books and records, cost information, bidding information and strategies and Contracts, (b) marketing plans and strategies, customer, client, vendor and supplier Contracts, information relating to, and lists of, past, current and prospective customers, suppliers, vendors, business contacts and clients, (c) operating procedures, techniques, systems, processes and methods, (d) all Intellectual Property, product and service information, including research and development and proposed products and services, (e) employee records and information, and (f) other commercial "know-how", trade secrets and information not available to the public generally; provided, however, that "Confidential Information" does not include information that becomes public through no fault of any Seller, the Shareholder or any other Person.

"Confidentiality Agreement" means the existing confidentiality agreement, dated as of June 29, 2005, between Donnelly Penman & Partners and Patriarch Partners, LLC, for the benefit of the Company and Donnelly Penman & Partners.

"Consents" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"Contract" means any agreement, contract, license, lease, instrument, document, note, bond, mortgage, indenture, guarantee, purchase order, letter of credit, undertaking or other legally binding commitment or obligation that is in writing, each as amended or modified from time to time.

"Controlled Group" for any Person at any date means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Person, are treated as a single employer under Sections 414 of the Code.

"Covered Items" has the meaning stated in Section 2.08(a).

"DCX" means DaimlerChrysler AG; provided that the agreements made in this Agreement by DCX are limited to those expressly made by it in Section 9.03(d) and are further limited to DaimlerChrysler Vans LLC and the Commercial Vehicles NAFTA division of DCX, as provided both in Section 9.03(d) and adjacent to the signature of DCX on the signature pages to this Agreement.

"Debt" of a Person at any date means, without duplication (a) all obligations of the Person (i) for borrowed money, (ii) evidenced by bonds, debentures, notes or other similar instruments, (iii) conditional sale, title retention or other similar agreements or arrangements creating an obligation with respect to the payment of the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business, (iv) as lessee under capitalized leases, (v) under letters of credit or guarantees

issued for the account of the Person and (vi) arising under acceptance facilities, (b) all obligations of the type referred to in clause (a) above of others guaranteed by the Person.

"Deed" has the meaning stated in Section 4.03(d)(iv).

"Dollars" and "$" refer to United States dollars and other lawful currency of the United States of America from time to time in effect.

"Donnelly Confidentiality Agreements" has the meaning stated in Section 5.09(c)(iv).

"Effective Time" means  12:01 a.m. New York City time on the Closing Date.

"Employee Pension Benefit Plan" has the meaning stated in ERISA Section 3(2).

"Environment" means surface or subsurface soil or strata, surface waters and sediments, navigable waters, ambient air and groundwater.  The term also includes interior airspace and building surfaces and construction materials to the extent regulated under Environmental Laws.

"Environmental Laws" means all federal, state, local and foreign Laws and common law relating to pollution, human health, safety, industrial hygiene or protection of the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, Cleanup, transport, handling of or exposure to Hazardous Materials and all Laws with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and all similar Laws, as such Laws are in effect as of the date of this Agreement.

"Environmental Liability" has the meaning stated in Section 5.18(a).

"Environmental Noncompliance Liability" has the meaning stated in Section 5.18(a).

"Environmental Permits" means all Permits required under applicable Environmental Laws.

"Environmental Reports" means all written reports, studies, analyses, tests or monitoring possessed or initiated by any Seller pertaining to Hazardous Materials in, on, beneath or adjacent to any Real Property or Leaseholds, or regarding any Seller's compliance with applicable Environmental Laws.

"Equipment" means all tangible personal property of a Seller, including, without limitation,

(a)    all equipment and machinery in all of its forms, wherever located, now or hereafter acquired, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing, and

(b)    any all fixtures appurtenant to Real Property or Leaseholds in all of their forms, wherever located, now or hereafter existing, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing, that are listed on the equipment list of a Seller.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the related regulations and published interpretations.

"Excluded Assets" has the meaning stated in Section 2.02.

"Existing Bond" has the meaning stated in Section 9.09(b).

"Final Cash Payment Amount" has the meaning stated in Section 3.02(b).

"Final Series B Face Amount" has the meaning stated in Section 3.02(b).

"Financial Statements" has the meaning stated in Section 5.05(a).

"FRP License" has the meaning stated in Section 4.03(u).

"Fundamental Representations of Purchaser" means the representations and warranties of the Purchaser set forth in Sections 7.01 (Existence and Power), 7.02 (Authorization; Binding Effect), 7.03 (Contravention), 7.04 (Consents) and 7.08 (No Reliance).

"Fundamental Representations of Sellers and Shareholder" means the representations and warranties of the Sellers set forth in Sections 5.01 (Existence and Power), 5.02 (Authorization; Binding Effect), 5.03 (Contravention), 5.04 (Consents), 5.05(a) (Financial Statements) and 5.10 (Assets) and the representations and warranties of the Shareholder set forth in Sections 6.01 (Existence and Power), 6.02 (Authorization; Binding Effect), 6.03 (Contravention) and 6.04 (Consents).

"Fundamental Representation Indemnification by Sellers and Shareholder" means the Sellers' and the Shareholder's indemnification obligations under Section 11.01(a)(i) with respect to the Fundamental Representations of Sellers and Shareholder.

"Fundamental Representation Indemnification by Purchaser" means the Purchaser's indemnification obligations under Section 11.01(b)(i) with respect to the Fundamental Representations of Purchaser.

"Governmental Body" means any government or any agency, bureau, commission, court, department, official, political subdivision, tribunal, board or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign.

"Guaranteed Obligations" has the meaning stated in Section 11.07(a).

"Guarantor" means the Shareholder.

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law , including, without limitation, any substance, waste or material that is (a) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under the Federal Water Pollution Control Act and/or the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and/or the Emergency Planning and Community Right-To-Know Act, as amended, (b) designated or classified as a "hazardous waste" or "regulated substance" pursuant to the Resource Conservation Recovery Act (a/k/a Solid Waste Disposal Act), (c) designated or classified as a "hazardous material" under the Hazardous Material Transportation Act, as amended, or (d) designated or classified as a "toxic substance" under the Toxic Substances Control Act.

"HSR Act" has the meaning stated in Section 7.04.

"Increase Amount" has the meaning stated in Section 3.02(g)(ii).

"Indemnification Notice" has the meaning stated in Section 11.02(a)(i).

"Indemnified Purchaser Party" means the Purchaser and its Affiliates and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents and Affiliates.

"Indemnified Seller Party" means the Sellers and the Shareholder and the Affiliates of the foregoing and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents and Affiliates.

"Indemnitee" has the meaning stated in Section 11.02(a)(i).

"Indemnitor" has the meaning stated in Section 11.02(a)(i).

"Independent Accounting Firm" means Grant Thornton LLP or, if Purchaser and the Sellers at any time otherwise agree, such other accounting firm of international reputation that is independent of the Sellers, the Shareholder and the Purchaser and is mutually acceptable to the Purchaser and the Sellers.

"Initial Cash Payment Amount" means $39,136,363.64.

"Initial Series B Face Amount" means the Series B Interest having a face amount of $9,363,636.36.

"Intellectual Property" means each Seller's copyrights, uncopyrighted works, trademarks, trademark rights, trademark registrations, patents (including, without limitation, all reissues, divisions, continuations and extensions thereof), patent rights, service marks, logos, trade names, trade name rights, corporate names, computer software licenses, design and engineering data, software, trade secrets, know-how, designs, methods, concepts, plans, specifications, schematics, formulas, inventions, other property rights and engineering drawings, together with applications and licenses for, and the goodwill of the Business relating to, any of the foregoing.

"Intellectual Property Assignment Agreement" has the meaning stated in Section 4.03(d)(iii).

"Inventory" means with respect to the Business all of Sellers' finished products, work in process, raw materials, goods in transit, demos, goods at customer sites, goods at vendor or supplier sites and other inventory or goods held for sale in all of its forms, wherever located, now or hereafter existing.

"June 30, 2005 Accounts Receivables and Inventory" has the meaning stated in Section 5.05(a).

"Knowledge" means, with respect to any Seller, the actual knowledge, after reasonable inquiry, of the following persons:

(a)    John Stevenson and Sanjiv Khurana; and

(b)    solely for the indicated Seller, each of the persons set forth across from such Seller's name:

| Seller | Person |
|--------|--------|
| Ladder | Michael Blouch, Doran Getz |
| Becker | Carl Becker, Annette Green |
| Aero | Angel Rivera, Daphne Lugo |
| RDM | William Savage, Lou Fabrizi |

Each Seller represents and warrants that such identified persons collectively perform the functions of chief executive officer, chief financial officer, chief operating officer, controller and plant manager, or comparable functions, within such Seller

"Known Environmental Indemnification" means the indemnification under Section 11.01(a)(iii).

"Known Environmental Matters" means

(a)     Environmental Liabilities and Environmental Noncompliance Liabilities identified on Schedule 5.18; and

(b)     Environmental Liabilities referenced in the records of any of the Sellers as of the Closing Date, whether or not disclosed on Schedule 5.18, but only to the extent such Environmental Liabilities relate to the presence of Hazardous Materials in the Environment at, on or under the Real Property or Leaseholds, or migrating therefrom, that: (i) constituted, as of the Closing Date, a violation of an applicable Lease or violation of applicable Environmental Laws or (ii) removal or remedial action is required to meet applicable commercial or industrial remediation standards with respect to such presence of such Hazardous Materials or legally could be required by any Governmental Body under applicable Environmental Laws.

The term "Known Environmental Matters" shall include contamination reasonably associated with the conditions identified prior to the Closing Date, even if such contamination is different from the conditions thought to be present on the Closing Date.

"Ladder" has the meaning stated in the heading of this Agreement.

"Late Delivery Liability" has the meaning stated in Section 2.07(b).

"Law" means each applicable treaty, statute, law, rule, regulation, order by any Governmental Body, central bank or comparable agency and any request or directive (whether or not having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person and includes, without limitation, Environmental Laws.

"Leaseholds" means all real property interests of any Seller as lessee, sublessee, licensee or mere occupant, together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to those interests and improvements on or to those interests, but excluding all such interests in the real properties identified in Schedule 2.02(d).

"Leases" means all lease agreements, sublease agreements, license or occupancy agreements or other written instruments pursuant to which a Leasehold of any Seller arises or exists.

"Lien" means any security interest, lien (statutory or otherwise), claim, pledge, mortgage, deed of trust, hypothecation, charge, easement, deposit arrangement, preference, priority, license, lease, covenant, conveyance of any right, option, right of first refusal or offer, restriction or encumbrance of any kind, including, without limitation, any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, and the filing of or agreement to give any financing

statement under the Uniform Commercial Code or comparable law of any jurisdiction to evidence any of the foregoing.

"Losses" means any and all liabilities, obligations, losses, damages, costs, expenses, claims, penalties, Actions, judgments, disbursements of any kind or nature whatsoever, interest, fines, Cleanup costs, costs incurred to correct Environmental Noncompliance Liabilities identified on Schedule 5.18, settlements, costs of preparation and investigation, costs incurred in enforcing the indemnification provisions of this Agreement and reasonable attorneys' fees and expenses.

"Material Adverse Effect" means (a) a material adverse effect upon any of (i) the Business, management, employees, results, operations, the Purchased Assets, the liabilities, condition (financial or otherwise) of the Sellers or the Business or (ii) the legality, validity or enforceability of the Sale Documents or any material Scheduled Contract, (b) the impairment, hindrance or adverse effect in any material respect upon the ability of any Seller or the Shareholder to perform any of their obligations under the Sale Documents or to consummate the Transactions, (c) the reasonable likelihood of material civil or criminal liability of any officer or director of any Seller related to conduct in such capacity or (d) a material adverse effect on the value of the Business or the Purchased Assets.

"Material Intellectual Property" has the meaning stated in Section 5.15(a).

"Mortgage" means the Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Financing Statement (with Fixture Filing), dated the date hereof, granted in favor of the Shareholder by the Purchaser and secured by the Real Property, in order to secure the Purchaser's obligation to reimburse the Shareholder for Reimbursement Expenses in accordance with Section 9.09 hereof.

"Net Worth" means, with respect to any Person for any date of determination, the amount by (a) the Total Assets of such Person exceed (b) the Total Liabilities of such Person, in each case, as of the such date.

"Non-Compete Period" means the period of seven and one-half (7.5) years beginning on the Closing Date.

"Northwest" has the meaning stated in the heading of this Agreement.

"Other Assumed Contracts" has the meaning stated in Section 5.13(a).

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permit" has the meaning stated in Section 5.08(a).

"Permitted Encumbrances" means those Liens and other exceptions to title affecting the Real Property or Leaseholds to be conveyed or assigned hereunder that are approved or deemed approved by Purchaser.  Purchaser shall be deemed to have approved (i) Liens for Real Property Taxes on such Real Property or Leasehold which Taxes are not yet due and payable, (ii) Assumed Liabilities, (iii) any Liens, exceptions and matters disclosed by surveys of the Real Property or Leaseholds approved or deemed approved by the Purchaser pursuant to Section 2.09 and (iv) any Liens created by or arising out of actions of the Purchaser.

"Person" means any individual, corporation, partnership, limited liability company, association, joint venture, trust or any other entity or organization, including, without limitation, any Governmental Body.

"Policy" has the meaning stated in Section 2.08(b).

"Purchased Assets" has the meaning stated in Section 2.01.

"Purchase Price" means the sum of the Final Cash Payment Amount and the Purchaser-Assumed Employment Liabilities.

"Purchaser" has the meaning stated in the heading of this Agreement, and its successors and permitted assigns.

"Purchaser-Assumed Employment Liabilities" has the meaning stated in Section 2.05(b).

"Purchaser-Hired Employees" means each of the employees of any Seller as of the Closing Date who becomes an employee of the Purchaser as of the Closing Date.

"Purchaser-Responsibility Warranty Liabilities" has the meaning stated in Section 2.08(b).

"Purchaser's Accountants" means Plante & Moran, PLLC.

"Put Agreement" means the Put Agreement dated the date hereof, between the Shareholder and Ark II CLO 2001-1, Limited with respect to the Shareholder's right to put the Series B Interest to Ark II CLO 2001-1, Limited.

"RDM" has the meaning stated in the heading of this Agreement.

"Real Property" means all real property interests of any Seller (other than as lessee, sublessee, licensee or mere occupant), together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to those interests and improvements and Equipment constituting fixtures on or to those interests, but excluding all such interests in the real properties identified in Schedule 2.02(d).

"Reimbursement Expense" has the meaning stated in Section 9.09(c).

"Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Materials.

"Relevant Property" means all sites, facilities, locations, real property and leaseholds (a) presently or formerly owned, leased , used, occupied or operated by any Seller (whether or not such properties are currently owned, leased, used, occupied or operated by any Seller) or (b) at which any Hazardous Material has been used, generated, transported, disposed, treated, stored or Released by or on behalf of any Seller.

"Required Consents—Purchaser Responsibility" means the Consents set forth on Schedule 7.04.

"Required Consents—Seller Responsibility" means the Consents set forth on Schedule 5.04 and Schedule 6.04.

"Retained Liabilities" has the meaning stated in Section 2.04.

"Sale Documents" means this Agreement, each other document, agreement and instrument to be executed and delivered by any of the Shareholder, any Seller or the Purchaser pursuant to Article IV, all other documents and instruments by which the Purchased Assets are transferred by the Sellers to the Purchaser, the Confidentiality Agreement, the Condor Supply Agreement, the Transition Services Agreement, the Subscription Agreement and the Put Agreement.

"Scheduled Contracts" has the meaning stated in Section 5.13(a).

"Security Agreement" means the Security Agreement dated the date hereof, between the Shareholder and the Purchaser, pursuant to which the Purchaser is granting the Shareholder a security interest in the Collateral (as defined therein) to secure the Purchaser's obligation to reimburse the Shareholder for Reimbursement Expenses in accordance with Section 9.09 hereof.

"Sellers" has the meaning stated in the heading of this Agreement.

"Sellers' Accountants" means KPMG International.

"Seller-Responsibility Warranty Liabilities" has the meaning stated in Section 2.08(a).

"Seller-Retained Employment Liabilities" has the meaning stated in Section 2.05(c).

"Series B Interest" means the Series B Preferred Interest issued by the Purchaser to the Shareholder in accordance with this Agreement and the Limited Liability Company Agreement of the Purchaser dated December 14, 2005.

"Shareholder" has the meaning stated in the heading of this Agreement.

"Shareholder Bond Payment" has the meaning stated in Section 9.09(b).

"Solvent" means, with respect to a Person, that as of the date of determination both (a)(i) the sum of such Person's Debt (including contingent liabilities) does not exceed all of its property, at a fair valuation, (ii) the present fair saleable value of the property of such Person is not less than the amount that will be required to pay the probable Liabilities of such Person's then existing Debts as they become absolute, and matured, (iii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction, and (iv) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, Debt beyond its ability to pay such Debt as they become due, and (b) such Person is "solvent" within the meaning given that term and similar terms under applicable Laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Subscription Agreement" means the Subscription Agreement, dated the date thereof, between the Purchaser and the Shareholder with respect to the issuance of the Series B Interest to the Shareholder by the Purchaser.

"Tax" or "Taxes" means all taxes, charges, fees, levies, duties, imposts, deposits, withholdings, restrictions, fines, interests, penalties, additions to tax or other tax, assessment or charge of any kind, including, without limitation, income, excise, personal property, real property, withholding, sales, use, gross receipts, value added, franchise, profits, capital, premium, occupational, production, severance, ad valorem, occupancy, stamp, transfer, employment, payroll, unemployment insurance, social security, disability, workers compensation, custom duties, license recording, documentation and registration fees imposed by any Governmental Body, and all interest and penalties thereon and additions thereto.

"Tax Return" means any federal, state, local or foreign return, report, claim for refund, declaration, statement or other form relating to Taxes, including, without limitation, any schedule thereto or amendment thereof.

"Third Party Claim" has the meaning stated in Section 11.02(a)(ii).

"Threshold Amount" means an amount equal to $500,000.

"Total Assets" means, with respect to the Shareholder for any date of determination, all assets of the Shareholder that would properly be classified in accordance with the Shareholder's accounting policies and procedures as assets as of such date.

"Total Liabilities" means, with respect to the Shareholder for any date of determination, (a) all liabilities of the Shareholder that would properly be classified in accordance with the Shareholder's accounting policies and procedures as liabilities, and (b) liabilities of other Persons that would properly be classified in accordance with the Shareholder's accounting policies and procedures as liabilities that are guaranteed by the Shareholder, in each case, as of such date.

"Transactions" means (a) the transactions described in this Agreement as occurring on the Closing Date, including, without limitation, the sale, transfer, assignment, conveyance and delivery of the Purchased Assets by the Sellers to the Purchaser and (b) in addition, except for purposes of Section 4.01(a), the first paragraph of Section 4.02, the first paragraph of Section 4.03, Section 4.04(a)(ii), Section 4.04(b)(ii) or the heading of Section 4.05, in which Sections or specified portion thereof each reference to the "Transactions" relates solely to the transactions described in the foregoing clause (a) that will be consummated as of the Closing, the transactions described in the Transition Services Agreement.

"Transfer" means a direct or indirect offer, transfer, sale, assignment, pledge, conveyance, hypothecation, license, sublicense or other disposition of all or any interest.

"Transition Services Agreement" has the meaning stated in Section 8.01.

"Unfunded Vested Liabilities" of a Person means, with respect to any Benefit Plan at any time, the excess, if any, of (a) the present value of all vested nonforfeitable benefits under the Benefit Plan, over (b) the fair market value of all Benefit Plan assets allocable to those benefits, all determined as of the then most recent valuation date for the Benefit Plan, but only to the extent that the excess represents a potential liability of the Person or any member of its Controlled Group to the PBGC or the Benefit Plan under Title IV of ERISA.

"WARN Act" means the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §2101, et seq.

# ARTICLE II

## The Purchase and Sale Transaction

Section 2.01.  Purchase and Sale of the Purchased Assets.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, for the consideration payable by the Purchaser to the Sellers in accordance with Article III, the Sellers will sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser will purchase, accept and acquire from the Sellers, all of the Sellers' right, title and interest in, to and under all of the Purchased Assets, free and clear of Liens other than Permitted Encumbrances.  The term "Purchased Assets" means with respect to each of the Sellers, all the business, goodwill, operations as a going concern, assets, properties, interests and rights owned, leased or licensed by such Seller of every kind and wherever situated as of the Effective Time, excluding only the Excluded Assets, but including, without limitation, (x) the following and (y) all other assets of the Business, if any, as may be specified on Schedule 2.01 agreed upon by the Purchaser and the Sellers:

(a) all Real Property and Leaseholds;

(b) all Equipment;

(c) all right, title and interest of the Sellers now or hereafter existing, in, to and under the Scheduled Contracts and the Other Assumed Contracts;

(d) all Inventory and Accounts Receivable;

(e) all security deposits, refunds, deposits and prepaid expenses of the Sellers and all vendor rebate accounts and prospective rebates, whether estimated or actual;

(f) all Intellectual Property;

(g) all other rights, assets and goodwill of the Sellers, including, without limitation, all (i) tangible and intangible personal property, (ii) Permits (to the extent transferable), (iii) the right to carry on the Business, (iv) invoices and customer and supplier lists, and (v) causes of action, claims and demands of whatever nature arising from or in connection with the Business after the Effective Time;

(h) the Condor line of business and all related assets of any of the Sellers, including the Condor trademark (subject to the limitations on usage of the name Condor set forth in the letters dated May 11, 2000 from Time Condor Corporation and March 22, 2000 from Time Manufacturing Co., copies of which have been supplied by the Company to the Purchaser) and the tooling and manufacturing assets located at Ladson, South Carolina and Jedburg, South Carolina;

(i) each Seller's domain names and website content;

(j) the entire collection of antique museum fire trucks and other vehicles, all or mostly all of which are currently located in Cleveland, North Carolina and Ladson, South Carolina, subject

to the Purchaser's commitment made hereby to honor the Company's offer to loan the collection of antique museum fire trucks and other vehicles to the City of North Charleston for housing in a museum the City is proposing to construct, such loan to be for not more than five years, with the Purchaser to have the right at all times to (i) remove the vehicles (with the intention that such removal shall be done only periodically) and (ii) to sell the vehicles (although this is not the Purchaser's present intent); and

(k)  all payments or proceeds received by any Seller under any casualty insurance policy in respect of a covered loss thereunder that occurs prior to the Effective Time relating to any and all of the foregoing.

Section 2.02.  Excluded Assets.  The Sellers will retain (and the Purchased Assets will not include) the following (collectively, "Excluded Assets"):

(a)  all of the Sellers' rights under the Sale Documents;

(b)  the Initial Cash Payment Amount and any cash Increase Amount payable to the Sellers pursuant to Article III;

(c)  the articles of incorporation, minute books, and stock books and other corporate records of the Sellers having to do with the corporate organization and capitalization of the Sellers;

(d)  the real property and buildings of the Company's  manufacturing facility and related administrative offices located in Ladson, South Carolina and refurbishment center located in Cleveland, North Carolina and the maintenance equipment for such facilities, which real property and maintenance equipment are described in more detail on Schedule 2.02(d);

(e)  any and all cash and cash equivalents of the Sellers, including customer deposits previously paid to the Sellers (but subject in the case of customer deposits to Section 9.05);

(f)  the outstanding stock or limited liability company interests of each of the Sellers;

(g)  financial and Tax records of the Sellers (with the understanding of the Sellers that the Purchaser shall have the right to request and receive copies of such financial and Tax records) and employee records of the Sellers;

(h)  the outstanding stock and the assets of Freightliner Specialty Vehicles, Inc. and any outstanding stock or assets of the following dormant, liquidating or dissolved subsidiaries of the Company:  Northeast Fire Apparatus, Inc., Southern Coach, Inc. and 3D Manufacturing, Inc. (dissolved October 4, 2005);

(i)  the rights of any Seller under any Contract of the Seller that is not a Scheduled Contract or Other Assumed Contract, including the Services Agreement between Chassis and the Company; and

(j)  those assets as may be specified by the Purchaser on Schedule 2.02(j) and accepted by the Sellers; provided, however, that the Purchaser shall not, without the consent of the Company,

which may be withheld in the Company's sole and absolute discretion, specify as an Excluded Asset (i) any Accounts Receivable or Inventory as of the Effective Time determined in a manner consistent with the Agreed Methodologies or (ii) any asset that relates to an Assumed Liability, including, without limitation, any Scheduled Contract.

Section 2.03.  <u>Assumption of the Assumed Liabilities</u>.  The Purchaser will not assume, satisfy or become liable for the payment, performance or discharge of any liabilities or obligations of the Sellers, except that, upon the terms and subject to the conditions of this Agreement, at the Closing, the Purchaser will execute and deliver to the Sellers the Assumption Agreement, pursuant to which the Purchaser will, effective as of the Effective Time, assume only the Assumed Liabilities.  The term "<u>Assumed Liabilities</u>" means the liabilities and obligations of the Sellers set forth below:

(a)  the normal, ordinary course liabilities and obligations relating to the Purchaser's operation of the Business first arising after the Effective Time, including, without limitation, any such liabilities and obligations of any Seller arising under any Scheduled Contract or Other Assumed Contract after the Effective Time, but excluding from such liabilities and obligations the Late Delivery Liabilities and the Seller-Responsibility Warranty Liabilities; <u>provided</u> <u>that</u>, in the case of the customer Contracts (including purchase orders) listed on <u>Schedule 5.13(a)</u>, including without limitation customer Contracts that are part of the Backlog as of the Closing Date, the Assumed Liabilities shall include all obligations thereunder necessary to fulfill each such customer Contract after the Effective Time; and <u>provided</u>, <u>further</u>, that the Purchaser shall have the right to renegotiate any such customer Contract listed on <u>Schedule 5.13(a)</u>;

(b)  the Purchaser-Assumed Employment Liabilities;

(c)  the Purchaser-Responsibility Warranty Liabilities;

(d)  the Backlog Liabilities;

(e)  the Sublease Guaranty Agreement relating to the bond financing of the premises occupied by RDM; and

(f)  the Permitted Encumbrances.

in each case, (i) only if and to the extent the same have not been paid or discharged prior to the Effective Time, and (ii) excluding liabilities and obligations that as of the Effective Time were not paid but would have been in the ordinary course of business consistent with past practice or that were otherwise overdue (other than the Backlog Liabilities).  In addition, for the avoidance of doubt with respect to the Condor line of business, it is understood and agreed that the Sellers and the Shareholder shall have no obligation after the Closing related to the compliance with 2007 emission standards for Condor and any modification of the cab and chassis of trucks and vehicles in the Condor line to a front-loader compatible design.

Section 2.04.  <u>Retained Liabilities</u>.

(a)  <u>Purchaser Not Assuming Retained Liabilities</u>.  Notwithstanding any provision of the Sale Documents to the contrary, the Purchaser will not accept, acquire, assume or become liable

to pay, perform or discharge, and the Assumed Liabilities will not include, the Retained Liabilities.  The term "Retained Liabilities" means all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether due or to become due, and whether existing or arising in the future, or otherwise of any kind of the Sellers), other than the Assumed Liabilities. "Retained Liabilities" include, without limitation, the following liabilities and obligations, subject to the carve out from each relevant subsection below of (x) any Assumed Liabilities otherwise described in such subsection (whether or not expressly excluded from such subsection by language included therein) and (y) any liabilities and obligations (including without limitation certain environmental liabilities) the responsibility for which is expressly allocated to the Purchaser in the indemnification provisions of Article XI:

(i)    any liability of the Sellers that was incurred or accrued prior to the Effective Time or arose from the operation of the Business prior to the Effective Time, including, without limitation, all accounts payable accrued through the Effective Time, other than the Purchaser-Assumed Employment Liabilities and the Backlog Liabilities;

(ii)    any liability or obligation of the Sellers incurred or accrued by the Sellers on or after the Effective Time (other than the Purchaser-Assumed Employment Liabilities);

(iii)    any liability or obligation that arises out of, relates to or is otherwise attributable to any of the Excluded Assets;

(iv)    any liability or obligation that arises out of, relates to or results from any income, sales, use or other Tax or any expense arising from or associated with (A) the conveyance and transfer to the Purchaser of the Purchased Assets or (B) the operation of the Business by any Seller or ownership by any Seller of their assets;

(v)    any liability or obligation for breach or nonperformance of any Contract on or prior to the Effective Time; provided that the foregoing shall not include any late delivery liability with respect to any of the Backlog other than the Late Delivery Liability retained by the Sellers;

(vi)    any liability or obligation with respect to any Debt of the Sellers;

(vii)    any liability or obligation of the Sellers arising out of, relating to or otherwise attributable to any claim, cause of action, Action, judgment, verdict, ruling, decree or settlement that is pending, threatened or completed on or prior to the Effective Time, or that arises out of or is based on any act, omission, event, condition or circumstance (actual or alleged) taking place or existing on or prior to the Effective Time, including, without limitation, accidents, injuries, damage to real or personal property, or discrimination, harassment, retaliation, and sexual harassment, and wrongful or retaliatory discharge claims,

(viii)    any liability or obligation in respect of any claim, regardless of when made or asserted, which arises from, out of or is based upon the negligence, strict liability of, or any express or implied representation or warranty (except as expressly provided in

Section 2.08(b)), agreement or guarantee made by, any Seller, or alleged to have been made, or which is imposed or asserted to be imposed by operation of law, in connection with any Covered Item or any service provided or sold by or on behalf of any Seller, including, without limitation, any claim relating to the repair or replacement of any Covered Item, any product liability claim and any claim seeking recovery for property damage, consequential damage, lost revenue or income or personal injury and any litigation set forth on Schedule 5.07;

(ix)    any liability or obligation (A) under or in connection with any Benefit Plan of any Seller or any other Person who is a part of a Controlled Group with any Seller, (B) arising out of or by reason of a complete or partial withdrawal from a multi-employer pension plan within the meaning of ERISA or termination or withdrawal from any other Benefit Plan, as of a date prior to or as of the Effective Time by any Seller, or any other Person who is part of a Controlled Group with any Seller, (C) that constitutes an Unfunded Vested Liabilities with respect to any Benefit Plan of any Seller or any other Person who is part of a Controlled Group with any Seller or (D) that constitutes the Seller-Retained Employment Liabilities (for purposes of this provision, a claim for medical benefits shall be deemed to have been incurred on the date on which the covered services were rendered and a claim for disability benefits based on a disability arising on or prior to Closing will be deemed to have occurred prior to Closing and not when the employee qualifies for the benefit);

(x)    the Sellers' liabilities as set forth in Section 2.05 through and including Section 2.08; and

(xi)    any other liability or obligation of the Sellers that is not expressly included in the Assumed Liabilities or not made the responsibility of the Purchasers pursuant to the indemnification provisions of Article XI.

(b)  Sellers to Perform Retained Liabilities.  The Purchaser will acquire the Purchased Assets free and clear of all liabilities and obligations except for the Assumed Liabilities and Permitted Encumbrances.  The Sellers will remain responsible for and will, and the Shareholder will cause the Sellers to, duly and timely pay, perform and discharge in full all Retained Liabilities.

(c)  Purchaser Taking Post-Closing Business Risk.  The Purchaser is taking the risk of the post-closing operation of the Business as provided in Sections 8.02, 8.03 and 8.04.

Section 2.05.  Employees.

(a)  Employment Offers.  The Purchaser will make employment offers to certain of the current employees of the Sellers listed on Schedule 2.05(a), unless such employee is on disability or leave of absence (other than temporary and ordinary course vacation) as of the Effective Time but, subject to the foregoing, the Purchaser shall not be required to offer employment to all current employees of the Sellers or other employees involved in the Business.  The terms of such employment offers will be as determined by the Purchaser in its sole discretion.  The Purchaser

may, in its sole discretion, modify or amend any employment offer or any of such employment terms or benefits at any time after the Closing Date.

(b) <u>Purchaser-Hired Employees</u>. With respect to all Purchaser-Hired Employees, the Purchaser will be responsible for, and shall pay, all liabilities and obligations (in accordance with the Purchaser's employment offers) to the Purchaser-Hired Employees, but only to the extent that such liabilities and obligations either (i) accrue from and after the Effective Time, or (ii) are for (A) accrued unpaid salary that has accrued from the last payroll payment date in the ordinary course and has not been paid in the ordinary course as of the Closing Date, as certified to the Purchaser by the Sellers on <u>Schedule 2.05(b)-I</u>, an update to which as of the Closing Date shall be delivered to the Purchaser by the Sellers within five Business Days after the Closing Date, and (B) accrued unused vacation time and accrued unused sick pay to the extent such vacation time and sick pay were accrued within the one-year period immediately preceding the Closing Date (in each case accrued up to the Effective Time) , as certified to the Purchaser by the Sellers on <u>Schedule 2.05(b)-I</u>, an update to which shall be delivered to the Purchaser by the Sellers within five Business Days after the Closing Date (the liabilities and obligations described in clause (ii) updated to the Closing Date being, collectively, "<u>Purchaser-Assumed Employment Liabilities</u>"). The Purchaser shall have the right, within 30 Business Days after receipt of the update to <u>Schedule 2.05(b)-I</u> delivered to Purchaser in accordance with this Section 2.05(b), to dispute such updated <u>Schedule 2.05(b)-I</u>. If any dispute arises, the Sellers and the Purchaser agree to work in good faith to resolve such dispute. If the Sellers and the Purchaser are unable to agree upon a mutually agreeable resolution, the Independent Accounting Firm shall make a final determination as to an appropriate <u>Schedule 2.05(b)-I</u>, which determination shall be final and binding. Prior to the final determination with respect to any matter in dispute, the Purchaser shall pay the accrued payroll and/or honor the accrued unused vacation time and accrued unused sick pay shown on <u>Schedule 2.05(b)-I</u> and shall be excused from doing so only if and solely to the extent the final determination with respect to any dispute resolves the dispute in the Purchaser's favor. Except for the Purchaser-Assumed Employment Liabilities, the Sellers will be responsible for, and shall duly and timely pay, perform and discharge, all liabilities and obligations to the Purchaser-Hired Employees accruing up to the Effective Time, including, without limitation, any ordinary-course bonuses for 2005 for all Purchaser-Hired Employees, whether or not set forth on <u>Schedule 2.05(b)-II</u> (provided that the foregoing shall not obligate any Seller to pay any such bonus) and any severance obligations owing thereto.

(c) <u>Other Employment Obligations</u>. Except for the Purchaser-Assumed Employment Liabilities, the Purchaser will not assume or become responsible for any liability or obligations to any current, former or inactive employees of the Sellers. Each of the Sellers will be responsible for, and shall duly and timely pay perform and discharge, all liabilities and obligations to any current, former or inactive employees of the Seller, including, without limitation, any and all retirement benefits, extended benefits and severance obligations (such liabilities and obligations of Sellers under Section 2.05(b) and Section 2.05(c), collectively, the "<u>Seller-Retained Employment Liabilities</u>").

(d) <u>No Rights of Officers or Employees</u>. The parties hereto expressly acknowledge and agree that the matters and agreements set forth in Section 2.05 and Section 2.06 are strictly agreements among the Sellers and the Purchaser and no present or former officer or employee of the Sellers has any rights (directly, as a third party beneficiary or otherwise) under Section 2.05

and Section 2.06 and shall not have any right to enforce any of the agreements set forth in such Sections.

(e) [Omitted]

(f) <u>Resignations</u>. On the Closing Date, the Sellers and the Shareholder shall cause to be delivered to the Purchaser duly signed resignations, effective as of the Effective Time, of all of the directors and officers of each of the Sellers who are hired by the Purchaser on the Closing Date, which directors and officers shall be set forth on <u>Schedule 2.05(f)</u>, and shall take such other actions as are necessary to accomplish the foregoing.

(g) <u>Transition Employees</u>. The Sellers and the Shareholder shall make available, or cause to be made available, those employees identified on <u>Schedule F</u> of the Transition Services Agreement on such terms and for such periods as set forth therein, including in connection with the Purchaser's marketing efforts relating to Condor as provided in Section 3.01(b).

For the avoidance of doubt, however, the parties expressly acknowledge and agree that the Sellers are not guaranteeing compliance by the employees with any provision of this Section 2.05.

Section 2.06. <u>Benefit Plans</u>. The Sellers shall be responsible for (and the Purchaser shall not assume) all obligations or liabilities incurred or accrued prior to the Closing Date with respect to any Seller's Benefit Plans for any employee employed by any Seller, whether or not such employee is hired by the Purchaser on the Closing Date. The Purchaser shall have no obligation to have any Benefit Plans or to include any particular terms or benefits in any such Benefit Plans. Each Purchaser-Hired Employee participating in the Seller's Benefit Plans as of the Effective Time will become a participant in the Purchaser's Benefit Plans as of the Effective Time. The Purchaser may, in its sole discretion, modify or amend any such Benefit Plan or the terms or benefits provided thereunder at any time after the Closing.

Section 2.07. <u>Backlog</u>.

(a) <u>Backlog Liabilities</u>. The Purchaser shall be responsible for all costs, including without limitation dealer commissions, associated with the production and delivery of vehicles under the purchase orders and other customer Contracts of the Sellers listed as Scheduled Contracts on <u>Schedule 5.13(a)</u>. Such purchase orders and other Customer contracts constitute the backlog of the Sellers ("<u>Backlog</u>"), and will be assigned to and assumed by the Purchaser ("<u>Backlog Liabilities</u>") ; provided, <u>however</u>, the Purchaser shall not assume (and the Sellers shall be liable for) any Late Delivery Liabilities; and provided, <u>further</u>, that the Purchaser shall have the right to renegotiate any customer Contracts listed on <u>Schedule 5.13(a)</u> but, as between the Purchaser and the Sellers, any renegotiation of any customer Contract shall not affect the Backlog Liabilities assumed by the Purchaser or increase the Late Delivery Liability of the Sellers. For the avoidance of doubt, any actual incremental late delivery liability for any vehicle in excess of the Late Delivery Liability for such vehicle as shown in the Backlog Report will be the responsibility of the Purchaser.

(b) <u>Late Delivery Liabilities</u>. With respect to each late Backlog item as of the Closing Date, the Sellers shall retain and be responsible for an amount of late delivery liability up to but

not exceeding the estimated late delivery liability based on the estimated delivery date of the finished product determined as of the Closing Date using the methodology mutually agreed to between the Sellers and the Purchaser pursuant to Section 2.07(c) (with respect to each vehicle in the Backlog, "Late Delivery Liability"). Such Late Delivery Liability shall be set forth in Schedule 2.07(c) as finally determined pursuant to this Section 2.07.

(c) Determination of Backlog Report. The Sellers have provided a list of Backlog items under the Scheduled Contracts, late Backlog items as of the Closing Date and the estimated Late Delivery Liability for each vehicle ("Backlog Report") and, in connection therewith, the Sellers and the Purchaser have, with the assistance of the Independent Accountants to the extent necessary, agreed upon a mutually acceptable methodology to identify late Backlog items under the Scheduled Contracts relating to Backlog items and to determine the corresponding amount of the Sellers' Late Delivery Liability, as set forth in Schedule 2.07(c). The Purchaser shall have the right, within 30 Business Days after the Closing Date, (i) to dispute the Backlog Report and (ii) to update the Backlog Report for information as of the Closing Date. If any dispute arises, the Sellers and the Purchaser agree to work in good faith to resolve such dispute. If the Sellers and the Purchaser are unable to agree upon a mutually agreeable resolution, the Independent Accounting Firm shall make a final determination as to an appropriate Backlog Report, which determination shall be final and binding. Following the Closing, the Sellers shall have the right to have Sanjiv Khurana or other designated representatives of the Sellers (i) review and audit all records and systems of the Purchaser relating to the Backlog and the development of any update to the Backlog Report and (ii) represent the Sellers in any and all discussions relating to the updating of the Backlog Report and any dispute relating thereto. As finally determined pursuant to this Section 2.07, the Late Delivery Liability will be set forth in Schedule 2.07(c).

Section 2.08.  Warranties.

(a) With respect to (i) any vehicles, parts or other goods delivered by the Sellers to a customer prior to the Closing Date and (ii) any vehicles, parts or other goods included in the Sellers' finished goods Inventory on the Closing Statement (clauses (i) and (ii), collectively, "Covered Items"), the Sellers will retain responsibility for, and indemnify Purchaser for, (x) warranty claims within coverage under applicable warranty manuals or Contracts (including, without limitation, extended coverage warranties), (y) Policy to the extent provided in Section 2.08(b) and (z) identified product actions, known recalls and service actions described in Schedule 2.08(a) (claims described in clauses (x), (y) and (z) with respect to Covered Items being, collectively, without limitation by those specifically identified on Schedule 2.08(a) or Schedule 2.08(b), "Seller-Responsibility Warranty Liabilities").

(b) Following the Closing, the Purchaser shall be responsible for (i) any and all customer relations and satisfaction costs, including, without limitation, all costs of non-contractual warranty work (known within the Company as "Policy"), except for and excluding any Policy relating to the Covered Items that any Seller has authorized or committed to prior to the Effective Time (which Sellers shall remain responsible for) and (ii) for all warranty coverages, identified product actions, recalls and service actions for vehicles, parts or other goods that are not Covered Items and are produced or distributed by the Business after the Closing (such Policy costs, warranty coverages, identified product actions, recalls and service actions as are the responsibility of the Purchaser under this Section 2.08 being the "Purchaser-Responsibility

Warranty Liabilities"). The Sellers represent and warrant that the Policy authorizations and commitments made by the Sellers prior to the Effective Time are listed on Schedule 2.08(b).

(c) The Purchaser shall administer warranty claims potentially resulting in Seller-Responsibility Warranty Liabilities in accordance with the warranty manuals of the Sellers and in a manner consistent with the past practice of the Sellers. The Sellers and the Shareholder shall have reasonable access to the warranty records of the Purchaser relating to Covered Items and the right to audit the same for compliance by the Purchaser with the written terms of Sellers' warranties in connection with the Purchaser's administration of warranty claims. The Sellers shall have the right to have Sanjiv Khurana or another designated representatives of the Sellers participate in any such review and audit and represent the Sellers in any and all discussions relating to warranty matters and warranty administration and any dispute relating thereto.

Section 2.09. Title and Survey Review. The Sellers have (a) caused LandAmerica Commercial Services or its affiliate to prepare and furnish to the Purchaser a preliminary title insurance commitment covering all of the Real Property and the Leaseholds identified in Schedule 4.03(s) and (b) caused a registered land surveyor to provide the Purchaser with a current ALTA survey certified to the Purchaser depicting each of the Real Property and Leaseholds identified in Schedule 4.03(s). With respect to each such property, the Purchaser had ten (10) days following the receipt of the latter of such title insurance commitment or survey to notify the Sellers in writing of the Purchaser's disapproval of any Liens or exceptions shown in the report or matters shown on the surveys (except that all objections raised in James E. Dillon's letter of November 29, 2005 to Andrew I. Davis are deemed timely for purposes hereof), and the Sellers have either eliminated any disapproved exception they elected (in their sole discretion) to eliminate or the Purchaser and the Sellers have otherwise resolved any such disapproval by the Purchaser. Accordingly, any Lien or exceptions in the preliminary title commitment or matters shown on surveys that have not been eliminated as of the Closing Date shall be deemed approved for purposes of this Agreement.

## ARTICLE III

### Consideration; Adjustments

Section 3.01. Consideration.

(a) Payment at Closing. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, as payment in full for the purchase of the Purchased Assets, subject to adjustment after the Closing Date as provided in this Article III, the Purchaser will:

(i)       pay, or cause to be paid, to the Sellers, by wire transfer of immediately available funds, the Initial Cash Payment Amount; and

(ii)       assume the Assumed Liabilities by execution and delivery of the Assumption Agreement.

(b) Condor.  In addition to the foregoing, the Purchaser will execute and deliver the Supply Agreement with the Shareholder relating to the Condor vehicles to be provided to Waste Management, Inc. by the Shareholder and other Condor customers in the Backlog in the form attached as Exhibit 3.01(b) ("Condor Supply Agreement") and will issue the Initial Series B Face Amount to the Shareholder in consideration of the services to be provided by the Shareholder under the Transition Services Agreement.  For Tax purposes, the Initial Series B Face Amount will be a profits interest in the Purchaser and will not entitle the Shareholder to any capital account balance in the Purchaser as of the date of the issuance of such interest to the Shareholder.  In connection with the transition arrangements with respect to Condor, the Shareholder will as promptly as possible notify the Freightliner and Sterling dealers listed on Schedule 3.01(b), which dealers handle the Condor product, that Freightliner and Sterling are withdrawing from the manufacture of this product and will introduce the Purchaser to such dealers as requested and permit the Purchaser to establish a dealership arrangement with such dealers with respect to the distribution of Condor products by the Purchaser.  The Shareholder will also provide the Purchaser with the services of the three employees of the Shareholder listed on Schedule F to the Transition Services Agreement for the period provided on said Schedule. During such period, such employees will assist the Purchaser with the marketing of Condor, subject to the agreement and acknowledgment of the Purchaser that (i) the Shareholder and such employees shall have no responsibility or accountability to the Purchaser or any other Person for formulating the marketing program or strategy with respect to Condor or otherwise with respect to the marketing or distribution of Condor except for acting at the direction of the Purchaser in attempting to effectuate and carry out the marketing program and the distribution and sales strategy initiated, developed or utilized by the Purchaser and (ii) the Shareholder shall have no responsibility for any of the foregoing except to the extent of any gross negligence or willful misconduct by any such employee for which the Shareholder may have liability under the Transition Services Agreement as provided therein.  On the terms and conditions set forth in the Transition Services Agreement and subject to any applicable limitations set forth therein, the Purchaser shall indemnify and hold harmless the Shareholder for any liability arising out of the foregoing arrangements for the benefit of the Purchaser or relating to the marketing and distribution of Condor after the Closing.

Section 3.02.  Determination of Any Post-Closing Adjustments.

(a) Preparation of Closing Statement.  As promptly as practicable, but in any event within 30 Business Days following to the Closing Date, the Purchaser will deliver to the Sellers a statement ("Closing Statement"), certified by the Purchaser as fairly presenting the amount of Accounts Receivable (appropriately discounted for aged and uncollectible Accounts Receivable) and Inventory (excluding obsolete or otherwise unmarketable Inventory) as of the Effective Time, as determined in conformity with methodologies consistent with those used in arriving at the June 30, 2005 Accounts Receivable and Inventory, including the methodologies used to estimate allowances for uncollectible Accounts Receivable and Inventory identified as obsolete or otherwise unmarketable and setting forth the calculation of such amounts ("Closing Receivables and Inventory"; and all such methodologies, the "Agreed Methodologies") as of the Effective Time.  Subject to Section 3.02(c), the proposed Closing Statement and the calculation of Closing Receivables and Inventory delivered by the Purchaser to the Sellers will be deemed to be and will be final, binding and conclusive on the parties hereto.

(b) <u>Calculation of Final Cash Payment Amount</u>. The proposed Closing Statement shall set forth a proposed "<u>Final Cash Payment Amount</u>," which shall mean an amount equal to the Initial Cash Payment Amount either <u>minus</u> any Closing Shortfall or <u>plus</u> the pro rata share of any Increase Amount to be added to the Initial Cash Payment Amount pursuant to Section 3.02(g)(ii), and, in the case of any Increase Amount, a proposed "<u>Final Series B Face Amount</u>," which shall mean a face amount equal to the sum of the Initial Series B Face Amount <u>plus</u> the pro rata share of the Increase Amount to be added to the Series B Interest under Section 3.02(g)(ii), in each case calculated pursuant to Section 3.02(g) based on the Closing Receivables and Inventory.

(c) <u>Right to Review and Dispute</u>. The Sellers shall have the right to have Sanjiv Khurana or other designated representatives of the Sellers (i) review and audit all records and systems of the Purchaser relating to the Closing Receivables and Inventory and the proposed Closing Statement and (ii) represent the Sellers in any and all discussions relating to any dispute relating thereto. In furtherance and not in limitation of the foregoing:

(i)     During the 30-calendar day period following the Sellers' receipt of the proposed Closing Statement, the Sellers (including Sanjiv Khurana, acting on behalf of the Sellers) and Sellers' Accountants will be permitted to review the working papers of the Purchaser and the Purchaser's Accountants relating to the preparation of the Closing Statement and the calculation of the Final Cash Payment Amount and, if applicable, any Final Series B Face Amount.

(ii)     The Sellers may dispute the application of the Agreed Methodologies (but not the Agreed Methodologies themselves) used in the preparation of the proposed Closing Statement, and/or the determination of the Final Cash Payment Amount or Final Series B Face Amount set forth thereon; <u>provided</u>, <u>however</u>, that the Sellers must notify the Purchaser in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within 30 calendar days of the Purchaser's delivery of the proposed Closing Statement to the Sellers. In the event written notice of such a dispute is received by the Purchaser in a timely manner, such a dispute will be resolved in accordance with the provisions of Section 3.02(d) below.

(iii)     The Closing Statement and the calculation of Closing Receivables and Inventory and the Final Cash Payment Amount and, if applicable, the Final Series B Face Amount will be deemed final for the purposes of this Article III upon the earliest to occur of (A) the failure of the Sellers to notify the Purchaser of a dispute in accordance with this Agreement within 30 calendar days of the Purchaser's delivery of the proposed Closing Statement to the Sellers, (B) the resolution of all disputes in writing by the Sellers and the Purchaser, (C) the resolution of all disputes pursuant to Section 3.02(d) by the Sellers' Accountants and the Purchaser's Accountants, and (D) the resolution of all disputes pursuant to Section 3.02(d) by the Independent Accounting Firm. The final Closing Statement will become <u>Schedule 3.02</u>.

(d) <u>Resolution of Disputes Under This Section 3.02</u>.

(i)     In the event that written notice of a dispute is received by the Purchaser under Section 3.02(c) in a timely manner, the Purchaser and the Sellers shall attempt in

good faith to resolve their dispute for a period of 30 calendar days. In the event that the Purchaser and the Sellers are able to resolve such dispute within such period, any resolution by them as to any disputed amounts will be final, binding and conclusive on the parties hereto. If the Purchaser and the Sellers are unable to reach a resolution with such effect within 30 calendar days after receipt of such written notice of dispute under Section 3.02(c), the Purchaser and the Sellers will submit the items (together with their respective positions thereon and the reasons therefor) remaining in dispute for resolution to the Independent Accounting Firm. The Independent Accounting Firm will be instructed to determine the appropriate amount of each disputed item in accordance with Agreed Methodologies consistent with those used with respect to Accounts Receivable and Inventory in Schedule 5.05(a) (including the methodologies used to estimate allowances for uncollectible Accounts Receivable and Inventory identified as obsolete or otherwise unmarketable) applied on a consistent basis and to render a report to the Purchaser and the Sellers within 30 calendar days after such submission; provided, however, that in no case may such determination of any such disputed item be outside of the range established by the respective positions of the Purchaser and the Sellers. The report of the Independent Accounting Firm as to the disputed items will be conclusive as to each disputed item and will be final and binding on the parties hereto. The fees and expenses of the Independent Accounting Firm will be split equally between the Sellers and the Purchaser.

(ii)    The procedures for resolution of disputes concerning the Closing Statement and the Final Cash Payment Amount and, if applicable, any Final Series B Face Amount set forth in this Section 3.02(d) shall be final and exclusive of any other contest or appeal in relation thereto, so that when any determination is deemed final hereunder, no party will be entitled to subject the final determination hereunder to any court or tribunal.

(e) Payment of Adjustment Amount. In the event that the Final Cash Payment Amount (as finally determined in accordance with this Article III) (i) is less than the Initial Cash Payment Amount, the Sellers and the Shareholder, jointly and severally, will pay to the Purchaser an amount in cash equal to the Closing Shortfall by wire transfer of immediately available funds, and (ii) is more than the Initial Cash Payment Amount, the Purchaser shall pay to the Sellers an amount in cash equal to the cash portion of the Increase Amount by wire transfer of immediately available funds, in each case, within five Business Days of the final determination hereunder.

(f) Issuance of Additional Series B Interest. If the Final Series B Face Amount (as finally determined in accordance with this Article III) is more than the Initial Series B Face Amount, the Purchaser shall issue an additional certificate representing the additional Series B Face Amount portion of the Increase Amount and send such additional certificate to the Shareholder by overnight delivery through a nationally recognized courier service within five Business Days of the final determination hereunder.

(g) Mechanics for Any Adjustment of Initial Cash Payment Amount and Initial Series B Face Amount. The Initial Cash Payment Amount and, if applicable, the Initial Series B Face Amount will be adjusted in the following manner:

(i)    Closing Shortfall.  The Purchaser shall receive a credit on the cash portion of the Initial Cash Payment Amount equal to any Closing Shortfall.  The "Closing Shortfall" shall mean the excess, if any, of (i) 90.0% multiplied by the June 30, 2005 Accounts Receivable and Inventory, over (ii) the Closing Receivables and Inventory (for the avoidance of doubt, no adjustment described in this subsection (a) will be made if the foregoing calculation is negative); and

(ii)    Increase Amount.  The Initial Cash Payment Amount and the Initial Series B Face Amount will be increased by any Increase Amount (allocated pro rata between them based on the proportion that each bears to the sum of the two such amounts).  The "Increase Amount" shall mean the product of 35.75% multiplied by the excess, if any, of (i) the Closing Receivables and Inventory over (ii) the June 30, 2005 Accounts Receivable and Inventory (for the avoidance of doubt, the 35.75% upward adjustment described in this subsection (b) will be made from the first dollar of any excess of the Closing Accounts Receivable and Inventory over the June 30, 2005 Accounts Receivable and Inventory).

Section 3.03.  Allocation of Purchase Price for Tax Purposes.  The Sellers have previously proposed, and the Sellers and the Purchaser have agreed upon, a preliminary allocation of the Purchase Price to the Purchased Assets for federal, state and local Tax purposes as set forth on Schedule 3.03, which will be finalized as set forth therein to reflect any adjustment to the Purchase Price.  For federal income Tax purposes, the Sellers and the Purchaser will allocate the Purchase Price and any adjustments thereto following the requirements of Internal Revenue Code Section 1060 and Temporary Regulations Section 1.1060, and file Form 8594, Asset Acquisition Statement Under Section 1060, with their income Tax Returns for the taxable year of acquisition.  The Sellers and the Purchaser will implement, report and accept the allocation set forth on Schedule 3.03 for federal, state and local Tax purposes.  The parties agree that such allocations will not in any way limit their respective rights and obligations under this Agreement in respect of representations, warranties, covenants and agreements and the breach thereof or damages therefor.

## ARTICLE IV

## The Closing; Conditions to Closing

Section 4.01.  The Closing.

(a)    Time and Place of Closing.  The consummation of the Transactions ("Closing"), will take place at the offices of Richards Spears Kibbe & Orbe LLP, One World Financial Center, New York, New York 10281, at 10:00 a.m. (New York City time), on the date of this Agreement, or at such other location or time as the parties may agree in writing; provided, however, that if any of the conditions to Closing contained in this Agreement (except for conditions that can only be satisfied at Closing) are not satisfied or effectively waived as of the date of this Agreement or such other agreed-upon date, the Closing shall take place on the second Business Day after the date on which all of the conditions to Closing contained in this

Agreement (except for conditions that can only be satisfied at Closing) are satisfied or effectively waived (the date of the Closing being hereinafter referred to as the "Closing Date").

(b) Effective Time and Risk of Loss. The sale, transfer, assignment, conveyance and delivery of the Purchased Assets and the assumption of the Assumed Liabilities described in this Agreement will be effective as of the Effective Time. Until the Effective Time, any loss of or damage to any of the Purchased Assets from fire, casualty or any other occurrence will be the sole responsibility of the Sellers.

Section 4.02. Conditions Precedent to the Obligations of the Sellers. The obligations of the Sellers to consummate the Transactions at the Closing are expressly subject to the fulfillment of each of the following conditions, unless waived by the Sellers in writing, at or before the Closing:

(a) Representations and Warranties; Performance of Agreements. (i) All of the representations and warranties of the Purchaser set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except for those representations and warranties of the Purchaser qualified by materiality, which, taking into account all materiality qualifiers, shall be true and correct in all respects). (ii) The Purchaser shall have performed and complied in all material respects with all of its covenants and other obligations set forth in the this Agreement required to be performed or complied with by the Purchaser at or before the Closing. The Sellers shall have received a certificate of the manager of the Purchaser substantially in the form of Exhibit 4.02(a) as to the fulfillment of the conditions set forth in clauses (i) and (ii) above.

(b) Required Consents—Purchaser Responsibility. The Sellers shall have received copies of all of the Required Consents—Purchaser Responsibility, and all such Required Consents—Purchaser Responsibility shall be in full force and effect as of the Closing Date.

(c) No Actions. Since the date of this Agreement, there shall be no (i) Action by any Governmental Body (A) challenging or seeking to restrain or prohibit the Transactions or (B) seeking to obtain from the Purchaser or any Seller, or from any Affiliate of the Purchaser or any Seller, any damages in connection with the Transactions that are material in relation to the Initial Cash Payment Amount or (ii) Law in effect that has had or could reasonably be expected to have any of the consequences referred to in clause (i) above.

(d) Consideration for Purchased Assets and Transition Services Agreement. The Sellers shall have received (i) the Initial Cash Payment Amount by wire transfer of immediately available funds. The Shareholder shall have received the Condor Supply Agreement, duly executed by the Purchaser, and the Initial Series B Face Amount.

(e) Assumption Agreement. The Sellers shall have received the Assumption Agreement, duly executed by the Purchaser, substantially in the form of Exhibit 4.02(e) ("Assumption Agreement").

(f) Certificate of Manager. The Sellers shall have received a certificate of the manager of the Purchaser, substantially in the form of Exhibit 4.02(f), with respect to (i) the certificate of formation of the Purchaser, (ii) the operating agreement of the Purchaser, (iii) the resolutions of

the manager of the Purchaser approving each Sale Document to which the Purchaser is a party and the other documents to be delivered by the Purchaser under the Sale Documents and the performance of the obligations of the Purchaser thereunder and (iv) the names and true signatures of the manager or any officers of the Purchaser authorized to sign each Sale Document to which it is a party and the other documents to be delivered by it under the Sale Documents.

(g) Good Standing Certificate. The Sellers shall have received a certificate of the Secretary of State of the jurisdiction in which the Purchaser is organized, dated as of a recent date, as to the good standing of the Purchaser.

(h) Transition Services Agreement. The Transition Services Agreement shall have been executed and delivered to the Shareholder by the Purchaser.

(i) Schedule of Additional Excluded Assets. Any Schedule 2.02(j) of additional Excluded Assets delivered by the Purchaser pursuant to Section 2.02(j) shall be consistent with the terms and conditions of this Agreement and be accepted or deemed accepted by the Sellers.

(j) Subscription Agreement. The Subscription Agreement shall have been executed and delivered to the Shareholder by the Purchaser.

(k) Put Agreement with Respect to Series B Interest. The Put Agreement shall have been executed and delivered to the Shareholder by Ark II CLO 2001-1, Limited.

(l) Security Agreement; Mortgage. Each of the Security Agreement and the Mortgage shall have been executed and delivered to the Shareholder by the Purchaser.

The foregoing conditions are for the sole benefit of the Sellers and may be waived by the Sellers, in whole or in part, at any time and from time to time in the sole discretion of the Sellers. In the event that the Closing shall occur, all of the foregoing conditions shall be of no further force or effect from and after the Closing.

Section 4.03. Conditions Precedent to the Obligations of the Purchaser. The obligations of the Purchaser to consummate the Transactions at the Closing are expressly subject to the fulfillment of each of the following conditions, unless waived by the Purchaser in writing, at or before the Closing:

(a) Representations and Warranties; Performance of Agreements. (i) All of the representations and warranties of the Sellers and the Shareholder set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date (except for those representations and warranties of the Sellers and the Shareholder qualified by materiality, which, taking into account all materiality qualifiers, shall be true and correct in all respects). (ii) Each Seller and the Shareholder shall have performed and complied in all material respects with all of its covenants and other obligations contained in this Agreement required to be performed or complied with by such Seller at or before the Closing. (iii) The Purchaser shall have received a certificate of the president or a vice president of each Seller and of the Shareholder substantially

in the form of Exhibit 4.03(a) as to the fulfillment of the conditions set forth in clauses (i) and (ii) above.

(b) Required Consents—Seller Responsibility. The Purchaser shall have received copies of all Required Consents—Seller Responsibility and all Required Consents—Seller Responsibility shall be in form and substance reasonably satisfactory to the Purchaser and shall be in full force and effect as of the Closing Date.

(c) No Actions. Since the date of this Agreement, there shall be no:

(i)    Action by any Governmental Body or by any other Person (A) challenging or seeking to restrain or prohibit the Transactions, (B) seeking to obtain from the Purchaser or any Seller, or from any Affiliate of the Purchaser or any Seller, any damages in connection with the Transactions that are material in relation to the Initial Cash Payment Amount, or (C) seeking to (x) impose any material limitation on the ability of the Purchaser to effectively exercise full rights of ownership of the Purchased Assets, (y) impose any material limitation on the Purchaser's ability to operate the Business, or (z) compel the Purchaser to dispose of or hold separate any of its businesses or assets; or

(ii)    Law in effect that has had or could reasonably be expected to have any of the consequences referred to in clause (i) above.

(d) Ancillary Agreements. The Purchaser shall have received the following, each dated the Closing Date and in full force and effect as of the Closing Date, in form and substance satisfactory to the Purchaser:

(i)    one or more Bills of Sale, duly executed by the Sellers, in the form of Exhibit 4.03(d)(i) (each, a "Bill of Sale");

(ii)    one or more Assignment Agreements, duly executed by the Sellers, in the form of Exhibit 4.03(d)(ii) (each, an "Assignment Agreement");

(iii)    one or more Intellectual Property Assignment Agreements, duly executed by the Sellers, in the form of Exhibit 4.03(d)(iii) (each, an "Intellectual Property Assignment Agreement");

(iv)    one or more special warranty deeds with respect to the Real Property, subject in each case only to Permitted Encumbrances (each, a "Deed"). Each Deed shall be in form and substance similar to the form of Exhibit 4.03(d)(iv), with such modifications as are necessary to comply with the laws of the state in which the Real Property described therein is located; and

(v)    all other instruments of transfer, duly executed by the Sellers as shall be necessary or appropriate to vest in the Purchaser good and indefeasible title to the Purchased Assets and to permit the Purchaser to conduct the Business without interruption.

(e) <u>Shareholder Approval; Board Approval</u>. The Board of Directors of each of the Sellers (other than Northwest, which is a single-member limited liability company managed by its sole member) and the Board of Directors of the Shareholder shall have approved the Transactions and have delegated authority to consummate the Transactions to officers of such Seller or the Shareholder, as applicable. The Shareholder as the sole shareholder of the Company and the Company as the sole shareholder or member of each of Sellers (including Northwest) shall have approved the Transactions. The board of management of DCX shall have approved the Transactions.

(f) <u>Secretary's and Manager's Certificates</u>. The Purchaser shall have received a certificate of the secretary or manager, as the case may be, of each Seller and the Shareholder, substantially in the form of <u>Exhibit 4.03(f)</u>, with respect to (i) the certificate or articles of incorporation, articles of organization or certificate of formation, as the case may be, of such Seller or Shareholder, (ii) the bylaws, operating agreement or limited liability company agreement, as the case may be, of such Seller or the Shareholder, (iii) the resolutions of the board of directors of and the sole shareholder or member, as the case may be, of such Seller or the Shareholder, satisfying Section 4.03(e) and the performance of the obligations of such Seller or the Shareholder with respect thereto, and (iv) the names and true signatures of the officers, managers or members, as the case may be, of such Seller or the Shareholder authorized to sign the Sale Documents to which such Seller or the Shareholder is a party.

(g) <u>Good Standing Certificate</u>. The Purchaser shall have received a certificate of the Secretary of State of each jurisdiction in which each Seller is organized, dated as of a recent date, as to the good standing of such Seller.

(h) <u>Opinion of Counsel</u>. The Purchaser shall have received an opinion of Stoel Rives LLP, counsel for the Sellers and the Shareholder, with respect to the enforceability of the guarantee by the Shareholder in Section 11.07.

(i) [Omitted]

(j) <u>Resignations</u>. The officers and the members of the board of directors of each of the Sellers who are hired by the Purchaser on the Closing Date shall have resigned from the Sellers and the board of directors of each of the Sellers or have been terminated and removed by the Sellers.

(k) <u>Transfer of Environmental Permits</u>. The Purchaser shall have received from the applicable Governmental Body new Environmental Permits or have been Transferred the existing Environmental Permits of the Sellers that are required under Environmental Laws for operation of the Business in compliance with applicable Environmental Laws (in each case to the extent that Environmental Laws or applicable Governmental Body require the obtaining or the Transfer of such Environmental Permits on or before Closing to lawfully conduct the Business).

(l) <u>FIRPTA</u>. The Purchaser shall have received from each Seller a certificate executed by such Seller that, as of the Closing Date, such Seller is not a "foreign person" within the meaning of Section 1445 of the Code and the Regulations thereunder, in form and substance acceptable to counsel for the Purchaser.

(m) <u>Material Adverse Effect</u>. Since June 30, 2005, no fact, circumstance, event or change shall have occurred, or be reasonably likely to occur, which has had, or could reasonably be expected to have, a Material Adverse Effect.

(n) <u>UCC Searches</u>. The Purchaser shall have received current Uniform Commercial Code and state, local and federal tax, sales and unemployment compensation tax, judgment, bankruptcy and similar lien searches (paid for by the Purchaser) showing no Liens against the Purchased Assets other than Permitted Encumbrances.

(o) <u>RDM Equity</u>. The Company shall have good and marketable title to all of the outstanding stock of RDM.

(p) <u>Transition Services Agreement</u>. The Transition Services Agreement shall have been executed and delivered to the Purchaser by the Shareholder.

(q) <u>Assignment of Employment Agreement</u>. If so requested by the Purchaser, Becker shall have assigned to the Purchaser at Closing (without representation or warranty by the Sellers) the Employment and Noncompetition Agreement entered into in 1999 with Carl Becker, as amended.

(r) <u>Leases</u>. The Sellers shall have assigned to the Purchaser at Closing all Leases with respect to each Leasehold.

(s) <u>Title Insurance and Surveys</u>. The Purchaser shall have received standard owner's/leaseholder title insurance policies with respect to all Real Property and with respect to the Leaseholds identified on <u>Schedule 4.03(s)</u>, in customary form, subject to the standard printed exceptions of the title company (except for the standard exception for matters that would appear on a current, accurate survey of the premises described therein, which exception shall be deleted) and the Permitted Encumbrances and in such amounts as are determined by mutual agreement of the Sellers and the Purchaser. In addition, the Purchaser may elect, at its cost and expense, to cause such standard printed exceptions to be deleted, and to have such policies endorsed with such title insurance endorsements as it may request; <u>provided</u> that the obtaining of any such deletions and endorsements or lack thereof shall not be a condition to the Purchaser's obligations under this Agreement and shall not delay the Closing (unless caused by any Seller's failure to fulfill its obligations in the final sentence of this Section 4.03(s)). To the extent that any issuing title insurer or agent requires any affidavit or indemnity pertaining to parties in possession, mechanic's or materialmen's Liens affecting such Real Property or Leaseholds or other matters typically contained in an owner's affidavit and indemnity as of the Closing Date in conjunction with the issuance of the foregoing policies of title insurance, the Sellers shall deliver such affidavits and/or indemnities as of the Closing Date to the issuing title insurer or agent as may reasonably be requested of the Sellers. The Purchaser shall have received ALTA surveys with respect to all Real Property and with respect to the Leaseholds identified on <u>Schedule 4.03(s)</u> certified to the Purchaser.

(t) <u>FRP License</u>. RDM shall have assigned to the Purchaser the License Agreement to use the FRP Process ("<u>FRP License</u>") at no cost to the Purchaser (other than the costs for which the licensee is responsible under the license). The Purchaser acknowledges that, under the terms

of the FRP License, upon the termination of Savage's employment by RDM, the exclusivity of the FRP License will terminate and the FRP License will become non-exclusive.

(u) Subscription Agreement. The Subscription Agreement shall have been executed and delivered to the Purchaser by the Shareholder.

(v) Assignment of Certain Donnelly Confidentiality Agreements. The Donnelly Confidentiality Agreements that are assignable shall have been assigned by the to the Purchaser and are identified in Schedule 4.03(v).

The foregoing conditions are for the sole benefit of the Purchaser and may be waived by the Purchaser, in whole or in part, at any time and from time to time in the sole discretion of the Purchaser. In the event that the Closing shall occur, all of the foregoing conditions shall be of no further force or effect from and after the Closing.

Section 4.04. Efforts to Close.

(a) Purchaser's Efforts. The Purchaser will negotiate in good faith and will use its commercially reasonable efforts to have caused (i) the conditions to Closing set forth in Section 4.02 that were within the Purchaser's control to be satisfied on or prior to the Closing Date, and (ii) the Transactions to be consummated on the Closing Date. In addition, the Purchaser shall have obtained all Required Consents—Purchaser Responsibility at the sole cost and expense of the Purchaser.

(b) Shareholder's and Sellers' Efforts. The Shareholder and the Sellers will negotiate in good faith and will use their respective commercially reasonable efforts to have caused (i) the conditions to Closing set forth in Section 4.03 that were within such parties' control to be satisfied on or prior to the Closing Date, and (ii) the Transactions to be consummated on the Closing Date. In addition, the Shareholder and the Sellers shall have obtained all Required Consents—Seller Responsibility at the sole cost and expense of the Sellers and the Shareholder.

Section 4.05. Transactions to be Effected at the Closing. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing:

(a) Purchaser Deliveries. The Purchaser will deliver to the Sellers the Initial Cash Payment Amount and the Assumption Agreement as provided in Section 3.01. The Purchaser will deliver to the Shareholder the Initial Series B Face Amount and the Put Agreement executed by Ark II CLO 2001-1, Limited. The Purchaser will deliver to the appropriate parties the other documents, certificates, agreements and instruments listed in Section 4.02 and will deliver to the Sellers such other documents as the Sellers or their counsel may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement; and

(b) Sellers' Deliveries. The Sellers will deliver to the Purchaser (i) appropriately executed Bills of Sale, Assignment Agreements, the Transition Services Agreement, and other instruments of transfer relating to the Purchased Assets in form and substance reasonably satisfactory to the Purchaser and its counsel, (ii) the other documents, certificates, agreements and instruments listed in Section 4.03 and (iii) such other documents as the Purchaser or its

counsel may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement.

## ARTICLE V

### Representations and Warranties of the Sellers About the Sellers

Each of the Sellers, jointly and severally, represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows:

Section 5.01.  Existence and Power.  Each of the Sellers (a) is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) is duly qualified under the laws of, or is licensed to do business as a foreign company in good standing in, each jurisdiction in which such qualification or license is required to own, lease or license the Purchased Assets or to operate or carry on the Business, and (c) has all necessary corporate or limited liability company, as the case may be, power and authority required to own, lease or license the Purchased Assets, to operate and carry on the Business and to execute and deliver the Sale Documents, to consummate the Transactions and to perform their obligations under the Sale Documents.  The Sellers have previously made available to the Purchaser correct and complete copies of the articles or certificates of incorporation, certificates of formation, articles of organization, bylaws, operating agreement and other organization documents, as the case may be, of each of the Sellers.

Section 5.02.  Authorization; Binding Effect.  The execution and delivery by each Seller of each of the Sale Documents to which the Seller is a party, the performance by such Seller of its obligations under such Sale Documents and the consummation of the Transactions by such Seller have been duly authorized by all necessary corporate or limited liability company action, as the case may be, on the part of such Seller.  No other proceedings on the part of any Seller or its Shareholder are necessary to approve and adopt the Sale Documents or to approve the consummation of the Transactions.  Each of the Sale Documents to which any Seller is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, the legal, valid and binding obligation of such Seller enforceable against such Seller in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 5.03.  Contravention.  Neither the execution, delivery and performance of the Sale Documents by the Sellers nor the consummation of the Transactions will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of any Seller's articles or certificate of incorporation, bylaws, articles of organization, certificate of formation, operating agreement, limited liability company agreement or other similar organizational documents, (b) conflict with, violate or breach any Law by which any Seller, the Business or any of the Purchased Assets is bound, (c) conflict with, breach or result in a default under, result in the acceleration of, or give rise to a change in the terms of or a right of termination, cancellation,

modification or acceleration or require any notice under, any Scheduled Contract, (d) result in or require the creation or imposition of any Lien on any of the Purchased Assets other than Permitted Encumbrance, or (e) otherwise result in a Material Adverse Effect.

Section 5.04. <u>Consents</u>. Except for the Required Consents—Seller Responsibility identified on Schedule 5.04, no Consents are required to be obtained by the Sellers in connection with (a) the due execution and delivery by any Seller of the Sale Documents and the performance of such Seller's obligations thereunder, (b) the consummation of the Transactions, (c) the exercise by the Purchaser of its rights and remedies under the Sale Documents, and (d) the (i) conduct of the Business and (ii) ownership or use of the Purchased Assets, by the Purchaser immediately following the Closing Date. Based on the Purchaser's representation in Section 7.04, the Sellers have agreed with the Purchaser's determination that filing is not required under the HSR Act. As of the Closing Date, all of the Required Consents—Seller Responsibility will have been obtained and will be in full force and effect.

Section 5.05. <u>Financial Information</u>.

(a) <u>Financial Statements</u>. Attached as Schedule 5.05(a) are the pro forma unaudited consolidated balance sheets of the Company as of December 31, 2004, April 30, 2005 and June 30, 2005, and the pro forma (reflecting only the Sellers) unaudited consolidated statements of operations of the Company for the fiscal year ended December 31, 2004 and the four-month and six-month periods ended April 30, 2005 and June 30, 2005, respectively (collectively, "<u>Financial Statements</u>"). Each of the Financial Statements has been prepared in accordance with the Shareholder's accounting policies and procedures and the Company's methodologies, practices, accounting applications and assumptions, all as set forth on Schedule 5.05(a), and fairly presents the consolidated financial position and results of operations of the Sellers as of the date or for the period indicated therein. As of June 30, 2005, the sum of the Sellers' Accounts Receivable (appropriately discounted for aged and uncollectible receivables) and of the Sellers' Inventory (excluding obsolete or otherwise unmarketable Inventory) was $117,846,234, as set forth in Schedule 5.05(a) ("<u>June 30, 2005 Accounts Receivable and Inventory</u>").

(b) <u>Accounts Receivable</u>. All Accounts Receivable classified as such on Schedule 5.05(a), and all additions to Accounts Receivable since June 30, 2005, (i) arose from bona fide transactions in the ordinary course of business of the Sellers consistent with past practice and (ii) arose from the sale of goods or services on customary trade terms in the ordinary course of business. Since June 30, 2005, Sellers have collected their Accounts Receivable in the ordinary course consistent with past practice.

(c) <u>Inventory</u>. All Inventory classified as such on Schedule 5.05(a), and all additions to Inventory since June 30, 2005, consist of items of a quantity and quality that are usable or saleable in the ordinary course of the business of the Sellers consistent with the Company's accounting policies and past practice and are carried on the books of the Sellers at the lower of cost or market value. The charges, accruals and reserves on Schedule 5.05(a) in respect of obsolete and slow moving Inventory were calculated consistent with the Company's accounting policies and past practice. None of the Sellers is under any obligation nor does any of them have any liability with respect to accepting returns of items of Inventory in the possession of their customers except as set forth on Schedule 5.05(c).

(d) <u>Liabilities</u>.  The accounts payable and accrued liabilities of the Sellers as reflected on Schedule 5.05(a) have arisen in the ordinary course of business consistent with past practice. Since June 30, 2005, the Sellers have paid in the ordinary course consistent with past practice all liabilities that as of the Closing Date otherwise would become Purchaser-Assumed Employment Liabilities and the Purchaser-Assumed Employment Liabilities shall be only those liabilities of the Sellers described in Section 2.05(b) that, in the ordinary course consistent with past practice, would not have been paid as of the Closing Date.  Since June 30, 2005, the Sellers have paid their accounts payable in the ordinary course consistent with past practice.

Section 5.06.  <u>Taxes</u>.

(a) <u>Filing of Tax Returns and Payment of Taxes</u>.  Each of the Sellers has timely filed all material Tax Returns that are required to be filed by the Seller and has timely paid all material Taxes due and owing by the Seller (whether or not such Taxes are required to be shown on a Tax Return).  All such Tax Returns were correct and complete in all material respects when filed.

(b) <u>Withholding Taxes</u>.  Each Seller has withheld all Taxes required to have been withheld from payments to employees or third parties and, to the extent required, has paid such Taxes over to the proper Governmental Body on a timely basis.

(c) <u>Audits</u>.  Schedule 5.06(c) sets forth a correct and complete list of all audits, if any, of each Seller by any Taxing authority in the past three years.  Except as set forth on Schedule 5.06(c), no such audit is in progress.  All deficiencies proposed as a result of such examinations or audits have been paid or finally settled.  None of the Sellers has received any notice of any pending or threatened audit by the Internal Revenue Service or any state, local or foreign Taxing authority related to such Seller's Tax Returns or Tax liability for any period and no claim for special assessment or collection of Taxes has been asserted in writing against any Seller.

(d) <u>Waivers</u>.  No Seller has entered into any agreements for any waiver or for the extension of any statute of limitations governing the time of assessment or collection of any federal, state or local Taxes or the filing of any Tax Return.

(e) <u>Claims by Certain Jurisdictions</u>.  No claim has been made in writing by any Taxing authority in a jurisdiction where none of the Sellers files any Tax Returns that any Seller is or may be subject to taxation in that jurisdiction.

(f) <u>Other Tax Matters</u>.

(i)  None of the Sellers has executed any closing agreement pursuant to Section 7121 of the Code or any predecessor provision thereof, or any similar provision of any Tax Law.

(ii)  None of the Sellers has filed a consent pursuant to Section 341(f) of the Code or agreed to have Section 341(f)(2) of the Code apply to any disposition of a subsection (f) asset (as such term is defined in Section 341(f)(4) of the Code) owned by any Seller.

(iii)    None of the Purchased Assets is property that is required to be treated as owned by any other Person pursuant to Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, as in effect immediately prior to the enactment of the Tax Reform Act of 1986 or is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

Section 5.07.  Litigation.  There is no Action pending, or to the Knowledge of the Sellers, threatened (a) except as set forth on Schedule 5.07, against any Seller, or (b) that questions the validity of any of the Sale Documents or that involves or relates to any of the Transactions, or (c) affecting any of the Purchased Assets or the Business, or (d) that could reasonably be expected to materially adversely affect the Purchaser's ability to conduct the Business after the Closing or the ownership or use by the Purchaser of the Purchased Assets after the Closing.  None of the matters disclosed on Schedule 5.07, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.08.  Permits; Compliance with Laws.

(a) Permits.  Schedule 5.08(a) sets forth a correct and complete list of each material permit, license, written permission or clearance, registration, filing or other written authorization issued or given by any Governmental Body or pursuant to any federal, state, local or foreign Law (other than Environmental Permits which are addressed in Section 5.18) necessary to entitle or permit each Seller to own, lease, operate and use the Purchased Assets of the Seller and to lawfully carry on and conduct the Business (collectively, other than Environmental Permits, the "Permits").  Schedule 5.08(a) also indicates which Permits, if any, are transferable by the Sellers to the Purchaser to the extent discernable from the face of the Permit.

(b) Compliance with Laws.  Except as set forth on Schedule 5.08(b), each Seller, its operations, the Business and the Purchased Assets are and at all times have been in material compliance with each Permit and each Law applicable to such Seller, its operations, the Business or the Purchased Assets.

(c) Certain Notices.  No Seller has received any notice (a) concerning the revocation, suspension, modification, limitation, cancellation or non-renewal of any Permit, or (b) of a violation of or default with respect to, any Permit or Law applicable to any Seller, its operations, the Business or the Purchased Assets.

Section 5.09.  Absence of Certain Changes or Events.  Since June 30, 2005, (a) there has not occurred any event, fact, circumstance or change that has had or that could reasonably be expected to have, a Material Adverse Effect, (b) each Seller has conducted its business only in the ordinary course consistent with past practice, and (c) except as specifically set forth on the applicable Schedule referred to below, no Seller:

(i)    has (A) Transferred any assets, rights or property except for Inventory or other transfers in the ordinary course of business consistent with past practice, (B) caused or permitted any of its assets, rights or property to become subject to any Liens other than Permitted Encumbrances, (C) purchased or acquired any ownership interest in or otherwise made or acquired any investment in any Person, except as disclosed in

Schedule 5.09(c)(i), or (D) incorporated or formed any subsidiary, or merged, or consolidated with or into, or entered into any business combination, with any Person;

(ii)    has entered into any Contract or transaction with any of its Affiliates other than in the ordinary course of the Business;

(iii)    has (A) paid or agreed to pay any bonus, extra compensation, pension or severance pay, (B) increased the benefits payable under any Seller's Benefit Plans, or (C) otherwise increased the wage, salary or compensation (of any nature) or benefits to any of its directors, officers or employees, except in the ordinary course of business or as set forth in Schedule 5.09(c)(iii);

(iv)    other than in connection with the marketing of the Business on behalf of the Sellers and the Shareholder by Donnelly Penman & Partners, in connection with which Donnelly Penman & Partners entered into confidentiality restrictions with the parties given access to Confidential Information (together with any related documents, the "Donnelly Confidentiality Agreements"), has disclosed any confidential Intellectual Property or other Confidential Information of any Seller to any Person (other than to the Purchaser);

(v)    Transferred, terminated or permitted to lapse any Intellectual Property necessary to the operations of the Business;

(vi)    has (A) written down or written up the value of any Inventory or Accounts Receivable except as set forth in Schedule 5.09(c)(vi), (B) revalued of any of its assets, or (C) increased or changed any assumptions underlying, or methods of calculating, any bad debt, contingency or other reserves;

(vii)    has (A) made any material change in its customary methods of operation, including, without limitation, practices and policies relating to manufacturing, purchasing, inventories, marketing, selling and pricing, or (B) entered into any other transaction other than in the ordinary course of business consistent with past practice;

(viii)    has suffered any material damage, destruction or casualty loss to any of its assets (whether or not covered by insurance) or any material operating or other loss (other than continued operation of the Business at a loss) or any taking of any of its assets, by condemnation or eminent domain;

(ix)    has allowed any material Permit to lapse or terminate; or

(x)    has entered into, or authorized, any Contract to do any of the foregoing.

Section 5.10.  Assets.

(a) Purchased Assets; Transfer of Title to Purchased Assets.  The Sellers have good and marketable title to or a leasehold in all of the Purchased Assets.  Each of the Sellers has good right, full power and lawful authority to sell, bargain, convey, transfer, deliver and assign to Purchaser all the Seller's right, title and interest in, to and under each of the Purchased Assets of

the Seller, subject to Permitted Encumbrances. Upon delivery to the Purchaser at the Closing by the Sellers of the agreements, documents and instruments set forth in Section 4.03(d) and upon the Sellers' receipt of the Initial Cash Payment Amount and the Assumption Agreement in accordance with Article III, good and marketable title to the Purchased Assets will pass to the Purchaser, free and clear of any Liens other than Permitted Encumbrances.

(b) Sufficiency and Condition of the Purchased Assets. The Purchased Assets comprise all of the properties and assets reflected in the Financial Statements other than assets and properties sold or otherwise disposed of since the date of such Financial Statements in the ordinary course of business consistent with past practice. The Purchased Assets include all of the assets, properties, rights and interests of the Sellers used in the conduct of the Business and include all assets, properties, rights or interests, required for the Sellers to conduct their operations as currently conducted. The Purchased Assets (i) are in good condition and repair, except for ordinary wear and tear, (ii) are suitable and adequate for the uses for which they are used and to carry on the Business and (iii) comply with the material terms and conditions of all Scheduled Contracts relating to the Purchased Assets.

Section 5.11. Real Property and Leaseholds.

(a) Schedules. Schedule 5.11(a)(i) and Schedule 5.11(a)(ii) set forth a correct and complete list, legal description and location of all Real Property and Leaseholds, respectively, in which the Sellers have an interest and that are used in the Business.

(b) Title to Real Property; Leasehold Interests. The Sellers have good and marketable title in fee simple to all of the Real Property. None of the Real Property is subject to any lease, sublease or other similar Contract or arrangement granting a right of occupancy or possession to any third party. The Sellers have good and marketable leasehold interest to all of the Leaseholds (provided that no representation is made with respect to the leasehold interest of Northwest in the premises located in Portland, Oregon). Except as specifically set forth on Schedule 5.11(a)(ii), each of the Leaseholds is the subject of a written lease agreement, and there are no oral terms inconsistent with the written terms thereof. Except as set forth on Schedule 5.11(b), no work has been performed on, or materials supplied to, any of the Real Property or Leaseholds within the applicable statutory period that would give rise to any mechanic's or materialmen's Liens. All obligations of any Seller with regard to all applicable covenants, easements and restrictions affecting any Real Property have been and are being performed in a proper and timely manner.

(c) No Restrictions. The Sellers enjoy peaceful and undisturbed possession of the Real Property and the Leaseholds. Except for Permitted Encumbrances, there are no recorded easements or encroachments by improvements on adjoining premises with respect to any of the Real Property or Leaseholds that could reasonably be expected to materially affect the ability of the Sellers to conduct the Business as conducted by the Sellers.

(d) Condemnation and Eminent Domain. Except as set forth on Schedule 5.11(d), there is no pending or, to the Knowledge of the Sellers, threatened condemnation or eminent domain proceeding with respect to any of the Real Property or Leaseholds or other claims, causes of action, lawsuits or legal proceedings pending or threatened regarding the ownership, use or possession of any of the Real Property or Leaseholds.

(e) <u>Leasehold Obligations</u>. All rental payments of any kind that are due and owing with respect to any of the Leaseholds have been paid in full through the date of this Agreement and, at Closing, will have been paid in full through the Closing Date. The Sellers who are named as lessees, sublessees, licensees or occupants in any Lease relating to any of the Leaseholds have the exclusive right to occupy the premises described in each of such Leases, and no third party has occupancy rights pursuant to any such Lease. The Sellers have not entered into any sublease, license or other occupancy agreement relating to any of the Leaseholds that will be in effect on the Closing Date. <u>Schedule 5.11(e)</u> sets forth: (i) all uncured notices of any default pursuant to any Lease of any Leaseholds, either received by or sent by any Seller, and (ii) any other unresolved material notices, either received by or sent by any Seller, relating to any Lease of any Leaseholds.

(f) <u>Property Tax and Assessments</u>. The Sellers have paid all Taxes due and owing with respect to the Real Property that, if not paid, could constitute a Lien on any of the Real Property or otherwise impose liability on the Purchaser or any future owner of the Real Property. No Seller has received any notice or become aware of any proposed special assessment that would affect any of the Real Properties.

(g) <u>Notices of Violations</u>. No Seller has received notice of any violation of any zoning, subdivision, platting, building, fire, insurance, safety, health, environmental or other applicable laws, ordinances or regulations related to any of the Real Property or the Leaseholds or the occupancy thereof that remain uncured or otherwise unresolved.

(h) <u>Agreements</u>. There are no Contracts affecting the operation of any of the Real Properties and Leaseholds or the improvements located thereon (including without limitation management, maintenance, service, supply, purchase, consulting, advertising, promotion, public relations and construction contracts, agreements, commitments, guarantees and warranties) that will survive the Closing and be binding upon the Purchaser, as the owner of any of the Real Properties or as the lessee or sublessee of any Leaseholds after the Closing, except for the Permitted Encumbrances and any such Contracts that are Scheduled Contracts or Other Assumed Contracts.

Section 5.12. <u>Equipment</u>.

(a) <u>Schedules and Possession</u>. <u>Schedule 5.12(a)(i)</u> sets forth a correct and complete list and description of all Equipment listed on the Sellers' depreciation schedules, all of which constitute Purchased Assets. Whether or not listed on <u>Schedule 5.12(a)(i)</u>, the Purchased Assets transferred by the Sellers to the Purchaser will include (x) the Equipment located at the Company's (1) manufacturing facility and related administrative offices located in Ladson, South Carolina and (2) refurbishment center located in Cleveland, North Carolina, (y) tools and other Equipment located at vendor locations listed on <u>Schedule 5.12(a)(i)</u> and (z) Equipment at any location of the Sellers that has previously been expensed. The Sellers have exclusive possession and control of all their Equipment.

(b) <u>Certifications</u>. The plant and operation at Ladson, South Carolina are currently, and will be as of the Closing Date, ISO9000 certified. No facts, issues or circumstances exist that

could reasonably be expected to cause such certification to be revoked or rescinded.  No other facilities of the Sellers are ISO or QS certified and the RDM location is on ISO probation.

Section 5.13.  Scheduled Contracts and Other Assumed Contracts.

(a)  Scheduled Contracts and Other Assumed Contracts.  Schedule 5.13(a) sets forth a correct and complete list by Seller of all Contracts to which any Seller is party (or that is binding on any Seller or to which any Seller or the Purchased Assets are subject) that are part of or relate to the Business, including without limitation all customer Contracts and purchase orders reflected in the Backlog and the Backlog Report (all listed Contracts being "Scheduled Contracts"); provided that the Sellers shall not be required to list on Schedule 5.13(a), but the Purchaser shall nevertheless assume, any Contract entered into by a Seller in the ordinary course of business that relates to the Business and the Purchased Assets and continues in effect on the Closing Date (x) the parties to which are the Seller and one or more non-Affiliates of the Sellers and (y) that obligates the Seller to pay, or entitles the Seller to receive (in cash or other property), $25,000 or less in any one twelve (12)-month period (all such Contracts, if not Scheduled Contracts, being, collectively, "Other Assumed Contracts").  The Scheduled Contracts and the Other Assumed Contracts do not include any of the following and, to the extent any of the Sellers is a party to any Contract described in the following list of types of Contracts, such Contract will be an Excluded Asset: (i) credit agreements, guarantees, indentures, loan documents, bonds, capitalized leases, bonds, debentures, notes, foreign exchange or other hedging arrangements, interest rate swaps, investments and other evidences of Debt providing for or relating to Debt in respect of which any Seller is in any manner directly or contingently obligated or liable or (ii) purchase agreements, shareholder agreements or employment agreements (other than the employment agreement described in Section 4.03(q)).

(b)  Copies of Scheduled Contracts.  Prior to the date of this Agreement, the Sellers have furnished or made available to the Purchaser correct and complete copies of all Scheduled Contracts. ·

(c)  Enforceability.  (i) Each of the Scheduled Contracts (A) has been duly authorized, executed and delivered by the applicable Seller, and, to the Knowledge of the Sellers, the other parties thereto, and is in full force and effect and (B) constitutes the legal, valid and binding obligation of such Seller, and the other parties thereto, enforceable against such Seller, and to the Knowledge of such Seller, the other parties thereto in accordance with the terms of each such Scheduled Contract, except that such enforcement (x) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (y) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

(i)  There exists no breach or default (or event that with or without the lapse of time or the giving of notice, or both would constitute a breach or default) under any of the Scheduled Contracts of the applicable Seller, or, to the Knowledge of the Sellers, the other parties thereto, and neither such Seller nor any other party to any Scheduled Contract has given any notice of breach or default thereunder.  No Seller has given or received any notice that any party to any Scheduled Contract intends to terminate, amend or modify any Scheduled Contract.

(ii)    Subject to the obtaining of any Required Consents—Seller Responsibility relating to the Scheduled Contracts, the consummation of the Transactions will not cause (A) any of the Scheduled Contracts to cease to be in full force and effect, (B) the termination or breach of any terms or conditions of any Scheduled Contract, (C) the forfeiture or impairment of any rights under any Scheduled Contract or (D) any material change in the terms thereof or any material penalty or other material adverse consequence under any Scheduled Contract.

Section 5.14.  Liens.  Schedule 5.14 sets forth a correct and complete list and description of all of the Liens affecting or attaching to the Purchased Assets other than Permitted Encumbrances.  All Liens other than Permitted Encumbrances will be discharged at or prior to Closing.

Section 5.15.  Intellectual Property.

(a)  Ownership or Right to Use.  Schedule 5.15(a) sets forth a correct and complete list and description of all material Intellectual Property (the "Material Intellectual Property") (and indicating whether such Material Intellectual Property is owned or licensed by the Sellers), including, without limitation, a correct and complete list of all jurisdictions in which all trademarks, copyrights and patents (whether owned or licensed) are registered, issued or applied for and all registration, grant and application numbers.  As to all Intellectual Property owned by the Sellers, the Sellers own such Intellectual Property free and clear and have the legal and valid right to use such Intellectual Property.  As to all Intellectual Property licensed by the Sellers, the Sellers have the legal and valid right to use such Intellectual Property as provided under the applicable license.  The Sellers own, or have the legal and valid right to use, any and all of the following of any of the Sellers used in the Business: data, plans and resources, permits, technology, processes and other proprietary rights, whether or not subject to statutory registration.  All Intellectual Property is valid, enforceable (to the Knowledge of the Sellers) and in good standing.  No Seller has entered into any Contract providing for any Lien, option, license, sublicense or other right to use, acquire or Transfer any Intellectual Property, other than those licenses or sublicenses that (i) have been granted to any Seller as licensee or sublicensee, and (ii) are included in Scheduled Contracts.  The Intellectual Property includes all Intellectual Property that has been developed by or arisen out of the conduct of the Business and all other Intellectual Property (whether or not currently used in the Business) in which any Seller has an interest, whether as owner, licensee, licensor, sublicensee, sublicensor or otherwise.

(b)  No Infringement.  The ownership and use of the Material Intellectual Property does not infringe, misappropriate or conflict with any Intellectual Property of any other Person.  As to all other Intellectual Property, to the Knowledge of the Sellers, neither the ownership or use of the Intellectual Property nor the operation of the Business has infringed, misappropriated or conflicted with and does not infringe, misappropriate or conflict with any Intellectual Property of any other Person, and any future conduct of the Business as presently contemplated would not infringe, misappropriate or conflict with any Intellectual Property of any other Person.  To the Knowledge of the Sellers, none of the Sellers or any Person under the control or supervision of any of the Sellers is using or engaging in any unauthorized use of any of the Intellectual Property.

(c) <u>Loss of Rights</u>. There have been no claims made at any time (whether currently pending or resolved) against any Seller asserting the invalidity, misuse or unenforceability of any Intellectual Property owned or used by such Seller and, to the Knowledge of the Sellers, there are no grounds for any of the foregoing. To the Knowledge of the Sellers, at no time during the conception or reduction of any of the Intellectual Property to practice was any developer, inventor or other contributor to such Intellectual Property (i) operating under any grants from any Governmental Body or private source, (ii) performing research sponsored by any Governmental Body or private source or (iii) subject to any employment agreement or invention assignment or non-disclosure agreement or other obligation with any third party that could reasonably be expected to adversely affect any Seller's rights in the Intellectual Property.

(d) <u>Confidentiality of Intellectual Property</u>. The Intellectual Property has been maintained in confidence in accordance with protection procedures customarily used in the industry of the Sellers to protect rights of like importance and, to the extent that any portion of the Intellectual Property would otherwise qualify as a "trade secret," that would be necessary to preserve its status as trade secrets under applicable Laws. The Sellers have taken all necessary actions to maintain and protect the Intellectual Property. To the Knowledge of the Sellers, the owners of any Intellectual Property licensed to the Sellers have taken all necessary actions to maintain and protect such Intellectual Property that is subject to such licenses. Except as set forth on <u>Schedule 5.15(d)</u>, to the Knowledge of the Sellers, no Seller has disclosed, released or authorized the disclosure or release of any proprietary or confidential Intellectual Property or other Intellectual Property owned or used by any Seller, the disclosure or release of which could reasonably be expected to have a Material Adverse Effect.

Section 5.16. <u>Books and Records</u>. The records and books of account of each Seller have been maintained in accordance with good business practices, including the maintenance of an adequate system of financial controls, and accurately reflect the transactions and other information purported to be contained therein. Copies of all of the Sellers' books and records have been made available to the Purchaser or its representatives.

Section 5.17. <u>Customers and Suppliers</u>.

(a) <u>Customers</u>. <u>Schedule 5.17(a)</u> sets forth a correct and complete list and description, including, without limitation, the names and addresses, of the twenty most significant customers (by revenue to the Sellers) of the Sellers for the 12-month period ended on the June 30, 2005 and the amount for which each such customer was invoiced during such period.

(b) <u>Suppliers</u>. <u>Schedule 5.17(b)</u> sets forth a correct and complete list and description, including, without limitation, the names and addresses, of the twenty most significant vendors and suppliers (by amounts billed to the Sellers) of the Sellers for the 12-month period ended on June 30, 2005. Since June 30, 2005, there has not been (i) any adverse change in the business relationship of any Seller with any supplier of goods, supplies, Inventory or merchandise or (ii) any change in any term (including credit terms) of any Scheduled Contract that is a supply contract or related arrangements with any such supplier. Since June 30, 2005, no Seller has received any notice from any vendor or supplier listed in <u>Schedule 5.17(b)</u> that such customer intends to take any of the actions set forth in clauses (i) or (ii) above.

Section 5.18. <u>Environmental Matters</u>.

(a) <u>No Environmental Liability</u>.

(i)    Except as set forth on <u>Schedule 5.18</u>, no Seller has, nor will any of the Sellers or Purchaser have, any, actual, alleged or contingent liability or obligation:

(A) relating to the violation, or alleged violation, of any Environmental Law;

(B) with respect to, or relating to (other than continuing environmental compliance obligations in the ordinary course of the Business until the Effective Time), the use, generation, presence, disposal, Release, threatened Release, handling, transportation, treatment, storage, Cleanup or contamination of or by any Hazardous Material at any Relevant Property;

(C) with respect to, or relating to, the Cleanup or contamination of Hazardous Materials at any Relevant Property or any off-site property;

(D) relating to the violation, or alleged violation, of any Environmental Law or any Environmental Permit resulting from the operations of the Business; or

(E) relating to the failure (I) to timely file all reports, (II) to obtain all Environmental Permits and (III) to generate, maintain, and comply with all Environmental Permits, data, documentation and records required under any Environmental Laws

(any such liability or obligation referred to in clauses (A), (B) and (C) being an "<u>Environmental Liability</u>"; and such liability or obligation referred to in clauses (D) and (E) being an "<u>Environmental Noncompliance Liability</u>").

(b) <u>Environmental Actions</u>.  Except as set forth on <u>Schedule 5.18</u>, there is no Action against any Seller, or relating to any of the Purchased Assets or any current or former Real Property or Leasehold, in each case, arising out of, based on or resulting from any Environmental Liability or Environmental Noncompliance Liability.

(c) <u>No Violation of Environmental Laws or Environmental Permits</u>.

(i)    Except as set forth on <u>Schedule 5.18</u>, none of the Sellers, any of the Purchased Assets, nor the operation of the Business , including, without limitation, (A) the condition or use of, or operations at, all Real Property and Leaseholds and (B) the use, generation, presence, disposal, Release, handling, transportation, treatment, storage, Cleanup or contamination of or by any Hazardous Material at any Real Property or Leasehold, has violated or is in violation of any Environmental Law or Environmental Permit.

(ii)   Except as set forth on <u>Schedule 5.18</u>, the Sellers, the Purchased Assets and the Business currently possess all Environmental Permits required under applicable

Environmental Laws, such Environmental Permits are valid and in full force and effect and the Sellers, the Purchased Assets and the operation of the Business have been and are in material compliance with the terms and conditions thereof. All Environmental Permits required for the operation of the Business under Environmental Laws are listed in Schedule 5.18.

(iii)    Except as set forth on Schedule 5.18, the sale of the Real Property and Leaseholds to Purchaser hereunder does not require any notice or disclosure to Purchaser or any Governmental Body under applicable Environmental Laws.

(d) Basis for Environmental Claims.

(i)    Except as set forth on Schedule 5.18, none of the Sellers has been identified or listed as a potentially responsible party or a responsible party under the federal Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Law, nor has any Seller received any written information or request in writing from a Governmental Body under any Environmental Law (except for such matters that are in the ordinary course of the Business and do not allege liability of any Seller). Except as set forth on Schedule 5.18, no Real Property or Leasehold is listed or is proposed for listing on the federal National Priorities List or any other similar Law.

(ii)    Except as set forth on Schedule 5.18, there are no underground storage tanks, storing or previously storing Hazardous Materials at any Real Property or Leaseholds, nor are any such underground storage tanks owned or operated by Sellers located at any previously owned, leased or occupied property of any Seller.

(e) Notices. Except as set forth on Schedule 5.18, none of the Sellers has received any written communication from a Governmental Body, Person or any citizens' group, employee or otherwise within the past five years, alleging (i) that any Seller or any Real Property or Leasehold has violated or is in violation of any Environmental Law or Environmental Permit; (ii) is liable for any Cleanup of Hazardous Materials or reimbursement of costs of Cleanup or (iii) that any Seller has any Environmental Liability.

(f) Environmental Reports. The Sellers have made available to the Purchaser or the Purchaser's representatives copies and results of all material Environmental Reports.

(g) Filing of Reports. The Sellers have timely filed all reports, obtained all Environmental Permits and generated and maintained, and currently generates and maintains, all Environmental Permits, data, documentation and records required under any Environmental Laws.

Section 5.19. Employees; ERISA.

(a) Employees. Schedule 2.05(a) lists the employees of the Sellers as of the date set forth therein.

(b) Employment Agreements. Except as set forth on Schedule 5.19(b), no Seller has entered into and no Seller is bound by any (i) employment, consulting or severance Contract with

any of its directors, officers or employees, or (ii) collective bargaining agreements with its employees. Except as set forth on <u>Schedule 5.19(b)</u>, none of the Sellers' employees are subject to any non-compete, non-disclosure, confidentiality, employment, consulting or similar agreements relating to, affecting or in conflict with the Sellers' conduct of the Business.

(c) <u>Plans</u>. <u>Schedule 5.19(c)</u> sets forth a correct and complete list of all Benefit Plans any Seller maintains or to which any Seller contributes or has any obligation to contribute.

(d) <u>Plan Qualification</u>. Each of each Seller's Employee Pension Benefit Plans that is intended to qualify under Section 4.01(a) of the Code has received a favorable determination letter from the Internal Revenue Service that such Benefit Plan is qualified and that its related trust has been determined to be exempt from taxation under Section 501(a) of the Code. To the Knowledge of the Sellers, no events or circumstances have occurred since the date of such letters that will materially adversely affect the qualification or exemption of such Benefit Plan.

(e) <u>Compliance with Applicable Laws</u>. Each Benefit Plan has been maintained, funded and administered in all material respects in accordance with the terms of such Benefit Plan and complies in form and operation in all material respects with all applicable provisions of ERISA, the Code, and other applicable Laws with respect to each Benefit Plan. With respect to any Benefit Plan of any Seller, or other member of a Controlled Group with any Seller, that is an Employee Pension Benefit Plan (i) no notice of intent to terminate has been filed nor has any such Benefit Plan been terminated, (ii) no circumstances exist which constitute grounds under Section 4042 of ERISA entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administrate, any such Benefit Plan, nor has the PBGC instituted any such proceedings, and (iii) each Seller and the other members of a Controlled Group with any Seller has met its minimum funding requirements under ERISA with respect to all of such Benefit Plans. None of the Sellers or other members of a Controlled Group with any Seller has incurred any liability to the PBGC under ERISA, other than liability for premiums which have been paid. None of the Sellers or other members of a Controlled Group with any Seller has incurred a material liability for a complete or partial withdrawal under Section 4201 or 4204 of ERISA from a multi-employer pension plan. No action, suit, proceeding, hearing, or investigation with respect to the administration or the investment of the assets of any Benefit Plan (other than routine claims for benefits) is pending or, to the Knowledge of any Seller or other members of a Controlled Group with any Seller, threatened.

(f) <u>Contributions and Premiums</u>. Each Seller has made all contributions that are due within the time periods prescribed by ERISA and the Code to each Benefit Plan that is an employee pension benefit plan as defined in Section 3(2) of ERISA and all contributions for any period ending on or before the Closing Date that are not yet due will be made to each such Employee Pension Benefit Plan or accrued within the time required by law. Each Seller has made all premiums or other payments that are due with respect to each Benefit Plan that is an employee welfare benefit plan as defined in ERISA Section 3(1) and all premiums or other payments for any period ending on or before the Closing Date that are not yet due will be made to each such Benefit Plan or accrued within the time required by law.

Section 5.20. <u>Employment-Related Matters</u>.

(a) <u>Labor Relations</u>. None of the Sellers' employees currently are covered by a unit that has been certified by the National Labor Relations Board as a unit for purposes of collective bargaining, nor are they represented by any labor union or organization. To the Knowledge of each Seller, no labor union or organization currently is engaged in any efforts to organize or represent any of the Sellers' employees. There is no unfair labor practice complaint against any Seller pending before any Governmental Body or other Person. There is no labor strike, dispute, slowdown or stoppage.

(b) <u>Compliance with Laws</u>. Except as set forth on <u>Schedule 5.20(b)</u>, at no time within the last five years has any Seller been cited by any Governmental Body or found to be liable for any violation of the Fair Labor Standards Act, including, without limitation, any child labor provisions, any state law dealing with minimum wage, overtime or child labor, or the Occupational Safety And Health Act, nor has any Seller nor any of such Seller's employees or agents been named in any unfair labor practice charge within the last two years.

(c) <u>WARN Act</u>. The Sellers have given all notices to employees required under the WARN Act or any applicable state or local law.

(d) <u>Workers' Compensation</u>. The Sellers are self-insured with respect to workers' compensation benefits for their employees.

Section 5.21. <u>Warranties</u>. Each Seller has delivered to the Purchaser or the Purchaser's representatives correct and complete copies of such Seller's warranty manuals and any written warranties of such Seller. Such materials set forth each warranty or warranty program of each Seller. No claim for breach of any express or implied warranty with respect to any Covered Item or services provided or sold by or on behalf of any Seller has been made or, or to the Knowledge of the any Seller, is threatened. None of the Sellers is contemplating the recall (which are different from the service campaigns described in <u>Schedule 2.08(a)</u>) of any products sold by them and there are no material defects in any such products.

Section 5.22. <u>Brokers, Finders</u>. Except for Donnelly Penman & Partners, whose fees are the responsibility of the Sellers, none of the Sellers has retained any broker or finder in connection with the Transactions, and no Seller is obligated, or has agreed, to pay any brokerage or finder's commission, fee or similar compensation.

Section 5.23. <u>Misstatements; Full Disclosure</u>.

(a) <u>Misstatements or Omissions</u>. No representation or warranty of the Sellers contained in this Agreement (including all Schedules) contained or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

(b) <u>Full Disclosure</u>. There are no facts pertaining to any Sellers, the Purchased Assets or the Business that could reasonably be expected to have a Material Adverse Effect and that have not been disclosed in this Agreement, (b) none of the representations or warranties of any Seller contained in this Agreement is untrue or incorrect in any material respect and (c) there is no

information that, in any material way, would contradict or is inconsistent with any representation or warranty of any Seller contained in this Agreement.

Section 5.24. <u>No Other Parties</u>. The Business is conducted by only the Sellers, and no other entities conduct the Business, except for the Shareholder but only to the extent it provides services to the Sellers.

**ARTICLE VI**

<u>Representations and Warranties of the Shareholder</u>

The Shareholder represents and warrants to the Purchaser as of the date hereof and as of the Closing Date as follows:

Section 6.01. <u>Existence and Power</u>. The Shareholder (a) is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (b) has all necessary limited liability company power and authority to execute and deliver each of the Sale Documents and to consummate the Transactions and to perform its obligations under the Sale Documents.

Section 6.02. <u>Authorization; Binding Effect</u>. The execution and delivery by the Shareholder of each of the Sale Documents to which the Shareholder is a party, the performance by the Shareholder of its obligations under such Sale Documents and the consummation of the Transactions by the Shareholder have been duly authorized by all necessary limited liability company action on the part of the Shareholder. No other proceedings on the part of the Shareholder are necessary to approve and adopt the Sale Documents or to approve the consummation of the Transactions. Each of the Sale Documents to which the Shareholder is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, the legal, valid and binding obligation of the Shareholder enforceable against the Shareholder in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 6.03. <u>Contravention</u>. Neither the execution, delivery and performance of the Sale Documents by the Shareholder nor the consummation of the Transactions by the Shareholder will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of the Shareholder's organizational or governing documents, (b) conflict with, violate or breach any Law by which the Shareholder or any of its assets or properties are bound or affected, or (c) conflict with, breach or result in a default under, result in the acceleration of, or give rise to a change in the terms of or a right of termination, cancellation, modification or acceleration or require any notice under, any material Contract to which the Shareholder is a party or by which the Shareholder or any of its assets or properties, are bound or affected.

Section 6.04. <u>Consents</u>. Except for any Required Consents—Seller Responsibility identified on <u>Schedule 6.04</u> as the responsibility of the Shareholder, the Shareholder is not required to obtain any Consents in connection with (a) the due execution and delivery by the Shareholder of the Sale Documents and the performance of the Shareholder's obligations thereunder, (b) the consummation of the Transactions by the Shareholder, (c) the exercise by the Purchaser of its rights and remedies under the Sale Documents, and (d) the (i) conduct of the Business and (ii) ownership or use of the Purchased Assets, by the Purchaser immediately following the Closing Date. Based on the Purchaser's representation in Section 7.04, the Shareholder has agreed with the Purchaser's determination that filing is not required under the HSR Act. As of the Closing Date, all of the Required Consents—Seller Responsibility will have been obtained and will be in full force and effect.

Section 6.05. <u>Litigation</u>. There is no Action against the Shareholder (or, to the Knowledge of the Shareholder, any other Person), that involves any of the Transactions or any asset or property owned, licensed, leased or used by the Shareholder, that, individually or in the aggregate, if determined adversely to the Shareholder, could reasonably be expected to have a Material Adverse Effect.

Section 6.06. <u>Title to Securities</u>. The Shareholder is, directly or indirectly, the sole owner of all of the outstanding common stock of each of the Sellers.

Section 6.07. <u>Misstatements; Full Disclosure</u>.

(a) <u>Misstatements or Omissions</u>. No representation or warranty of the Shareholder contained in this Agreement (including all Schedules), contained or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

(b) <u>Full Disclosure</u>. There are no facts pertaining to the Shareholder that could reasonably be expected to have a Material Adverse Effect and have not been disclosed in this Agreement, (b) none of the representations or warranties of the Shareholder contained in this Agreement is untrue or incorrect in any material respect and (c) there is no information that, in any material way, would contradict or is inconsistent with any representation or warranty of the Shareholder contained in this Agreement.

Section 6.08. <u>Solvency</u>. As of the date of this Agreement, and as of the Effective Time, before and after giving effect to the Transactions, the Shareholder is, and will be, Solvent.

## ARTICLE VII

### Representations and Warranties of the Purchaser

The Purchaser represents and warrants to the Seller as of the date hereof and as of the Closing Date as follows:

Section 7.01. <u>Existence and Power</u>.  The Purchaser (a) is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and (b) has all necessary limited liability company power and authority to execute and deliver each of the Sale Documents and to consummate the Transactions and to perform its obligations under the Sale Documents.

Section 7.02. <u>Authorization; Binding Effect</u>.  The execution and delivery by the Purchaser of each of the Sale Documents to which the Purchaser is a party, the performance by the Purchaser of its obligations under such Sale Documents and the consummation of the Transactions by the Purchaser have been duly authorized by all necessary limited liability company action on the part of the Purchaser.  No other proceedings on the part of the Purchaser are necessary to approve and adopt the Sale Documents or to approve the consummation of the Transactions.  Each of the Sale Documents to which the Purchaser is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, the legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms, except that such enforcement (a) may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and (b) is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

Section 7.03. <u>Contravention</u>.  Neither the execution, delivery and performance of the Sale Documents by the Purchaser nor the consummation of the Transactions by the Purchaser will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of the Purchaser's organizational or governing documents, (b) conflict with, violate or breach any Law by which the Purchaser or any of its assets or properties, are bound or (c) conflict with, breach or result in a default under, result in the acceleration of, or give rise to a right of termination, cancellation, modification or acceleration or require any notice under, any material Contract to which the Purchaser is a party or by which the Purchaser or any of its assets or properties, are bound.

Section 7.04. <u>Consents</u>.  Except for the Required Consents—Purchaser Responsibility identified on <u>Schedule 7.04</u>, no Consents are required to be obtained by the Purchaser in connection with (a) the due execution and delivery by the Purchaser of the Sale Documents and the performance of the Purchaser's obligations thereunder, and (b) the consummation of the Transactions by the Purchaser.  The Purchaser has made a good faith determination that the value of the assets the Purchaser will acquire in the Transactions does not exceed the jurisdictional threshold under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations ("<u>HSR Act</u>").  As of the Closing Date, all of the Required Consents—Purchaser Responsibility will have been obtained and will be in full force and effect.

Section 7.05. <u>Litigation</u>.  There is no Action against the Purchaser (or, to the Purchaser's knowledge, any other Person) that involves any of the Transactions or any asset or property owned, licensed, leased or used by the Purchaser that, individually or in the aggregate, if determined adversely to the Purchaser, could reasonably be expected to affect the ability of the Purchaser to perform its obligations under the Sale Documents or to consummate the Transactions.

Section 7.06. <u>Compliance with Laws</u>. The Purchaser is and at all times has been in compliance in all material respects with each Law applicable to the Purchaser and its assets and properties, except for any such noncompliance that could not reasonably be expected to adversely affect the ability of the Purchaser to perform its obligations under the Sale Documents or to consummate the Transactions.

Section 7.07. <u>Brokers, Finders</u>. Except for Glass & Co., whose fees are the responsibility of the Purchaser, the Purchaser has not retained any broker or finder in connection with the Transactions, and is not obligated and has not agreed to pay any brokerage or finder's commission, fee or similar compensation.

Section 7.08. <u>No Reliance</u>.

(a) Notwithstanding anything contained in Article V or Article VI or any other provision of this Agreement, the Purchaser understands, acknowledges and agrees that, beyond the representations and warranties expressly set forth in this Agreement, the Sellers and the Shareholder are not making any representation or warranty whatsoever, express or implied (including without limitation any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose as to any of the Purchased Assets or with respect to the offering materials provided to the Purchaser and its Affiliates).

(b) Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions that may be contained or referred to in the Schedules and Exhibits hereto or in the offering materials, as well as any information, documents or other materials (including any such materials contained in any "dataroom" or reviewed by the Purchaser pursuant to any confidentiality agreements) or management presentations that have been or shall hereafter be provided to the Purchaser or any of its Affiliates, agents or representatives are not, and will not be deemed to be, representations or warranties of the Sellers or the Shareholder, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing.

(c) The Purchaser further understands and agrees that the Purchased Assets and the Business (which the Purchaser acknowledges is currently losing money and has lost money during prior periods) will be Transferred to the Purchaser "as is", "where is," subject only to the representations and warranties, covenants and indemnities contained in this Agreement, with all faults and without any other representation or warranty of any nature whatsoever.

Section 7.09. <u>Misstatements; Full Disclosure</u>.

(a) <u>Misstatements or Omissions</u>. No representation or warranty of the Purchaser contained in this Agreement, contained or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

(b) <u>Full Disclosure</u>. There are no facts pertaining to the Purchaser that would be relevant to the decision of the Sellers to proceed with the Transactions that have not been disclosed in this Agreement, (b) none of the representations or warranties of the Purchaser contained in this Agreement is untrue or incorrect in any material respect and (c) there is no information that, in

any material way, would contradict or is inconsistent with any representation or warranty of the Purchaser contained in this Agreement.

## ARTICLE VIII

### Transition Services Agreement; Responsibility for the Business

Section 8.01. <u>Transition Services Agreement; Acknowledgments</u>. At the Closing, the Shareholder and the Purchaser will enter into a Transition Services Agreement ("<u>Transition Services Agreement</u>") in the form attached as <u>Exhibit 8.01</u>. The Purchaser acknowledges for the benefit of the Sellers and the Shareholder that, notwithstanding any other provision of this Agreement or the Transition Services Agreement apparently to the contrary and without offset against any other amount owing by any party to another party, as provided in the Transition Services Agreement, (b) there is an agreed $250,000 cap on the aggregate amount that will be expended by the Shareholder and/or any or all of the Sellers to reconfigure the Ladson plant to accommodate the Purchaser's continuation of body manufacturing in such facility during the Purchaser's period of occupancy up to July 1, 2007 and any and all other associated cost and expense shall be the sole responsibility of the Purchaser and (b) there will be a $10,000 a day penalty upon any failure by the Purchaser to have vacated, fully and completely, the Ladson, South Carolina facility by July 1, 2007, which penalty shall cumulate on a daily basis for each day or partial day commencing on July 1, 2007 as of which the Purchaser has not fully and completely vacated the premises. Any such penalty shall be payable by the Purchaser promptly upon demand therefor whether or not the Purchaser has fully and completely vacated the premises. Interest will accrue at the rate per annum provided for in Section 9.09(f) on any such penalty amount not promptly paid by the Purchaser upon demand by the Shareholder therefore.

Section 8.02. <u>Limitations on Responsibilities of the Shareholder and the Sellers</u>. In furtherance and not in limitation of Section 7.08 (<u>No Reliance</u>), the parties agree that, except as expressly provided in this Agreement and the Transition Services Agreement (under which the Shareholder shall be responsible solely for any gross negligence or willful misconduct on the part of Shareholder or its designees), neither the Sellers nor the Shareholder shall have any liability to the Purchaser or to any Affiliate of the Purchaser with respect to the operation of the Business on or after the Closing Date. The Purchaser acknowledges that the Shareholder and its Affiliates are not guarantors of the results of the Business and that, following the Closing, (a) the Shareholder and its Affiliates have on-going obligations with respect to the Purchased Assets and the Business only to the extent expressly provided in this Agreement or the Transition Services Agreement and (b) except for the on-going obligations of the Shareholder and its Affiliates described in clause (a), the results or the value of the Business following the Closing shall be the obligation and risk of the Purchaser. Furthermore, the indemnification provisions of Article XI shall not apply to any claim of the Purchaser under the Transition Services Agreement and any such claim shall instead be governed by and be subject to the terms and conditions of the Transition Services Agreement.

Section 8.03. <u>Good Faith Resolution of Potential Claims</u>. The parties agree that, following the Closing, before resorting to litigation with respect to the Transactions or any situation or circumstance arising under the Transition Services Agreement, the ultimate

decisionmakers on behalf of the Purchaser and Affiliates of the Purchaser and the ultimate decisionmakers on behalf of the Shareholder will work in good faith for up to 30 days to attempt to resolve the same. Accordingly, the Purchaser and Affiliates of the Purchaser will not, through litigation or threatened litigation or any other means, assert any claim against the Shareholder or any Affiliates of the Shareholder that without first attempting to resolve any claim in accordance with this Section 8.03.

Section 8.04. Survival; Indemnification. Notwithstanding any other provision of this Agreement apparently to the contrary, the representations, warranties, acknowledgements and covenants of the parties contained in this Article VIII shall survive the Closing for an unlimited period of time.

## ARTICLE IX

### Covenants of the Shareholder, the Sellers and the Purchaser

Section 9.01. Public Announcements; Confidentiality.

(a) Public Announcements. Except as required by applicable Laws, without the prior written consent of the other parties hereto, the Sellers and the Shareholder will not permit the directors, officers, employees or agents of each Seller or any investment banker, financial advisor, attorney, accountant, representative, or any other Person acting on behalf of the Sellers to, nor will the Purchaser or any manager, member, partner, shareholder, director, officer, employee or other agent or representative of the Purchaser, make (i) any press release or any similar public announcement concerning the Transactions, or (ii) any general communication to any of the Sellers' employees, customers, suppliers, lenders, creditors, distributors or others having business or financial relationships with any Seller (other than in connection with (A) informing employees and representatives of the Purchaser, the Sellers or the Shareholder of the Transactions, (B) notifying customers, suppliers, dealers or others of any pending assignment in connection with the Transactions or (C) seeking any Required Consent—Seller Responsibility or Required Consent—Purchaser Responsibility from any of the foregoing), or any other public statement, pertaining to the Sale Documents or the Transactions.

(b) Confidentiality. The Shareholder, the Sellers and the Purchaser agree that the Confidentiality Agreement shall terminate and be of no further force or effect as of the Effective Time.

Section 9.02. Tax Matters.

(a) Responsibility for Taxes. The Sellers shall be responsible for and shall duly and timely pay all Taxes payable by any Seller relating to Taxable periods ending on or prior to the Closing Date. The Purchaser shall be responsible for and shall duly and timely pay all Taxes relating to the operations of the Business during Taxable periods beginning on or after the Closing Date. The Sellers and the Shareholder shall be responsible for and shall duly and timely pay all Taxes payable by any Seller relating to Taxable periods beginning on or after the Closing Date.

(b) <u>Tax Returns</u>.  The Sellers and the Shareholder will prepare, or cause to be prepared, and timely file in a manner consistent with past practice all Tax Returns required by applicable Law to be filed by the Sellers with respect to any and all Taxable periods, including periods that include the Closing Date.  Such Tax Returns shall be correct and complete in all respects.

(c) <u>Certain Tax Disclosures</u>.  Notwithstanding anything to the contrary set forth in this Agreement, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each of the parties hereto may disclose to any and all Persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions.  The preceding sentence is intended to cause the Transactions not to be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Code, and shall be construed in a manner consistent with such purpose.  In addition, each of the parties hereto acknowledges that it has no proprietary or exclusive rights to the tax structure of the Transactions or any tax matter or tax idea related to the Transactions.

Section 9.03.  <u>Non-Competition</u>.

(a) <u>Acknowledgment</u>.  In order to induce the Purchaser to purchase the Purchased Assets and assume the Assumed Liabilities as provided in this Agreement and to consummate the Transactions and in consideration of the payments made or to be made by the Purchaser to the Sellers under this Agreement and the issuance of the Series B Interest to the Shareholder and to protect the goodwill of the Business, each Seller and the Shareholder (i) agrees to be bound by the terms and provisions of this Section, (ii) agrees, represents and warrants that such Seller and the Shareholder has read and given careful consideration to all of the terms and provisions of this Section, and agrees that the terms and provisions of this Section are reasonable with respect to the subject matter thereof and necessary for the reasonable and proper protection of the Confidential Information, legitimate business interests and goodwill of the Purchaser, the Business and the Purchased Assets, and (iii) acknowledges that the Purchaser has agreed to enter into this Agreement in reliance on the representations, agreements and covenants of such Seller and the Shareholder to abide by and be bound by the terms and provisions of this Section.

(b) <u>Confidential Information</u>.

(i) <u>Confidentiality</u>.  Each Seller and the Shareholder will not, and will to cause its respective Affiliates, directors, officers, employees or agents or any investment banker, financial advisor, attorney, accountant, representative, and any other Person acting on behalf of such Seller or the Shareholder not to, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known any of the Confidential Information to any Person for any reason or purpose whatsoever, or use any of the Confidential Information for any reason or purpose whatsoever at any time from and after the Effective Time except as otherwise required in connection with the Transition Services Agreement or in connection with any claim under Article XI.  In addition, each Seller and the Shareholder agrees to treat the Confidential Information as confidential at all times. Each Seller and the Shareholder agrees to be fully responsible for any breach of this Section by any of its Affiliates, directors, officers, employees or agents or any investment

banker, financial advisor, attorney, accountant, representative, or any other Person acting on behalf of such Seller or the Shareholder.

(ii)    Compelled Disclosure.  Notwithstanding the provisions of clause (i) above, if any Seller, the Shareholder or any of their Affiliates, directors, officers, employees or agents or any investment banker, financial advisor, attorney, accountant, representative, or any other Person acting on behalf of such Seller or the Shareholder is required to disclose any Confidential Information pursuant to any applicable Law, subpoena, court order, similar judicial process, regulatory agency or stock exchange rule, such Seller or the Shareholder will promptly notify the Purchaser of any such requirement so that the Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section.  Such Seller or the Shareholder will reasonably cooperate with the Purchaser to obtain such a protective order.  If such order is not obtained, or the Purchaser waives compliance with the provisions of this Section, such Seller or the Shareholder will disclose only that portion of the Confidential Information that it is advised by counsel that it is legally required to so disclose and will obtain written assurance that confidential treatment will be accorded the information so disclosed.

(c)  Restrictive Covenant.  Each of the Sellers and the Shareholder agrees that during the Non-Compete Period, neither the Seller nor the Shareholder will engage, or hold any direct or indirect financial interest in any Person that engages, or assist any Person in engaging, either directly or indirectly, individually, or as a shareholder, manager, member, partner, owner, trustee, agent, consultant, independent contractor, investor, lender or principal, or in any other capacity, in any of the following in any of the United States, Canada or Mexico: (a) the manufacture of custom chassis with or without cabs for fire, rescue or refuse vehicles, (b) the manufacture of bodies for fire or rescue vehicles and (c) the manufacture of fire and rescue apparatus.  For the avoidance of doubt, the Shareholder's performance of its obligations under its contract with Waste Management, Inc. and under the Condor Supply Agreement with the Purchaser will not violate this Section 9.03(c).

(d)  Non-Solicitation.  Each of the Sellers, the Shareholder, and DCX agrees that, during the two-year period after the Closing Date, none of the Sellers, the Shareholder or either of DaimlerChrysler Vans LLC and the Commercial Vehicles NAFTA division of DCX will, in any manner, directly or indirectly:

(i)    other than through or as a result of general media advertisement, solicit, hire, induce or attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any employee, contractor, consultant or agent of the Purchaser to either (A) leave his or her employment, consulting or other position or business relationship with the Purchaser, or (B) breach his or her employment, consulting or other agreement with the Purchaser (it being understood that solicitation or employment that results from general advertising, employees who quit or are no longer employed, or nondirected searches do not constitute a breach); or

(ii)    solicit, induce or attempt to induce or assist others to solicit, induce or attempt to induce, any customer, supplier, vendor, contractor or client associated with the

Purchaser's business to terminate or reduce its, his or her relationship or association with the Purchaser, or in any manner, directly or indirectly, interfere with any business relationship between the Purchaser, on the one hand and any such Person, on the other hand.

(e) Enforcement. Notwithstanding any other provision of this Agreement, if, at the time of enforcement of any provision of this Section, a court should hold that the duration or scope restrictions stated herein are unreasonable or unenforceable under circumstances then existing, the parties agree that the maximum duration or scope permitted by applicable Law under such circumstances will be substituted for the stated duration or scope. Whenever possible, each provision of this Section will be interpreted in such manner as to be effective and valid under applicable law. If the provisions of this Section are held unenforceable to any extent in any jurisdiction, such holding shall not impair the enforceability of this Section in any other jurisdiction.

Section 9.04. Name Change. Immediately following the Closing, and at all times thereafter, the Sellers and the Shareholder will cease using (a) any corporate names or trade names that include "American LaFrance", "ALF" and "ALAF" (or any substantially similar names and acronyms) and (b) any logos or symbols previously used.

Section 9.05. Customer Deposits and Late Delivery Liabilities. From and after the Closing Date, upon delivery of vehicles to customers for which any Seller has previously received a "customer deposit" on or prior to the Closing Date or with respect to which any Seller has any Late Delivery Liability, the Purchaser shall invoice such Seller for the amount of such customer deposit and/or the Late Delivery Liability (or, if applicable, such lesser amount of late delivery liability with respect to the vehicle as may have actually been incurred by the Purchaser) and such Seller shall promptly pay such amount to the Purchaser.

Section 9.06. Net Worth. The Shareholder hereby certifies that its Net Worth as of the Closing Date is in excess of $100,000,000. Every six months after the Closing Date up to and including the third anniversary of the Closing Date, the Shareholder shall provide a certification to the Purchaser signed by the Shareholder's chief financial officer on behalf of the Shareholder that the Shareholder's Net Worth as of the date of the certification is not less than $100,000,000.

Section 9.07. COBRA. Seller has provided, or will provide prior to the Closing, to individuals entitled thereto all required notices and coverage pursuant to Section 4980B of the Code and the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), with respect to any "qualifying event" (as defined in Section 4980B(f)(3) of the Code) occurring prior to and including the Closing Date to the extent required under Section 4980B of the Code. Seller shall retain and shall assume and discharge all liabilities and costs under COBRA (including liabilities for violations thereof) for any "qualifying event" occurring with respect to employees of the Business and their dependents prior to and on the Closing Date, including any qualifying event that occurs as a result of the consummation of the Transactions.

Section 9.08. Donnelly Penman Confidentiality Agreements Not Assigned to Purchaser. With respect to any Donnelly Penman Confidentiality Agreements that the Shareholder determines are not assignable to the Purchaser, the Shareholder shall promptly notify the

Purchaser of any violation of any such Donnelly Penman Confidentiality Agreement of which the Shareholder or any Seller becomes aware and the Purchaser may notify the Shareholder of any violation of any such Donnelly Penman Confidentiality Agreement of which the Purchaser becomes aware. Upon any notice from the Purchaser to the Shareholder specifying any bona fide commercially reasonable claims that the Purchaser is requesting be made by the Shareholder on behalf of the Purchaser, the Shareholder will assert such claims on behalf of the Purchaser; provided that the Purchaser shall indemnify the Shareholder and all other Seller Indemnified Parties from and against all Losses (beginning with the first dollar of Losses) arising out of any such claims made by the Shareholder on behalf of the Purchaser, and, as a condition precedent to the pursuit or continued pursuit of any claim on behalf of the Purchaser, the Shareholder may require that the Purchaser deposit with the Shareholder all funds that the Shareholder reasonable determines are needed by the Shareholder to cover the out-of-pocket costs and expenses and any Losses the Shareholder or any other Seller Indemnified Party may incur by reason of the pursuit or continued pursuit of any such claims by the Shareholder. The Purchaser shall be entitled to any monetary recovery obtained by the Shareholder after set-off against such amount of any and all unreimbursed out-of-pocket costs and expenses of the Shareholder and any Losses of the Shareholder or any other Seller Indemnified Party relating to or arising out of any and all such claims that the Shareholder is pursuing on behalf of the Purchaser.

Section 9.09.  Performance Bonding.

(a) Procurement After Closing.  After the Closing Date, the Purchaser shall be responsible for procuring all new performance bonding required under new Contracts executed in connection with the Business after the Effective Time and the Shareholder shall have no obligation or liability to the Purchaser for such new performance bonding.

(b) Performance Bonds Existing at Closing.  The Shareholder shall continue to maintain and be responsible for the performance bonds issued in connection with the Business or any Purchased Asset and that are outstanding on the Closing Date (each, an "Existing Bond"). The Existing Bonds are listed on Schedule 9.09(b).  The Shareholder covenants that it will continue to pay, in accordance with the terms of the Bonding Agreement, any and all amounts due to a Bonding Company to reimburse the Bonding Company for payments made in respect of an Existing Bond (such payments by a Bonding Company, each, a "Bonding Company Payment"; and such payments by Shareholder, each, a "Shareholder Bond Payment").

(c) Reimbursement.  If the Shareholder shall incur any Reimbursement Expense (as defined below) pursuant to the Bonding Agreement, (a) the Shareholder shall provide written notice ("Reimbursement Notice") to the Purchaser describing such Reimbursement Expense in reasonable detail, including the amount thereof, and (b) the Purchaser shall reimburse the Shareholder in respect of such Reimbursement Expense by paying to the Shareholder, by wire transfer of immediately available funds to the account designated by the Shareholder in the Reimbursement Notice, an amount equal thereto within five Business Days after the date the Reimbursement Notice is received by the Purchaser. For all purposes under this Agreement, "Reimbursement Expense" shall mean all Shareholder Bond Payments made to a Bonding Company under the Bonding Agreement in reimbursement for any Bonding Company Payments made under any of the Existing Bonds. To secure the Purchaser's obligation to reimburse the Shareholder for Reimbursement Expenses (and to secure the payment of interest pursuant to

Section 9.09(f)), the Purchaser shall execute and deliver the Security Agreement and the Mortgage in the forms attached as Exhibit 9.09(c) in favor of the Shareholder.

(d) Information and Documents. The Shareholder shall promptly convey to the Purchaser copies of all documents received by the Shareholder from time to time from a Bonding Company or any other person in connection with or relating to the Bonding Obligations. Without limiting the foregoing, the Shareholder agrees to promptly notify the Purchaser upon receipt by the Shareholder of any demand by a Bonding Company for payment with respect to the Bonding Obligations.

(e) Subrogation. To the extent the Shareholder is entitled to any remedy under any Bonding Agreement against a Bonding Company or any other person relating to the Bonding Obligations, then upon payment of amounts due in respect of the Bonding Obligations to the Shareholder by the Purchaser, the Purchaser shall be subrogated to the Shareholder's rights against the Bonding Company or such other person with respect thereto and the Shareholder shall assign such rights to the Purchaser. If, for any reason, such rights may not be assigned to the Purchaser, then the Shareholder agrees to act at the Purchaser's direction and on Purchaser's behalf (and at Purchaser's expense) in pursuing its remedies with respect thereto. As a condition precedent to the pursuit or continued pursuit of any claim on behalf of the Purchaser, the Shareholder may require that the Purchaser deposit with the Shareholder all funds that the Shareholder reasonably determines are needed by the Shareholder to cover the out-of-pocket costs and expenses and any Losses the Shareholder or any other Seller Indemnified Party may incur by reason of the pursuit or continued pursuit of any such claims by the Shareholder. The Purchaser shall be entitled to any monetary recovery obtained by the Shareholder after set off against such amount of any and all unreimbursed out-of-pocket costs and expenses of the Shareholder and any Losses of the Shareholder or any other Seller Indemnified Party relating to or arising out of any and all such claims that the Shareholder is pursuing on behalf of the Purchaser.

(f) Interest. If any payment due from the Purchaser under this Section 9.09 is not paid by the Purchaser within five Business Days of the date due under this Section 9.09, then interest shall accrue, and be payable immediately, on all such amounts not paid at a per annum rate equal to eighteen percent (18%) per annum; provided that such interest rate shall not exceed the maximum rate permitted by applicable law.

Section 9.10. Surrender of Dealer Licenses. Promptly, but in no event more than 30 calendar days, after the Closing Date, the Sellers and the Shareholder shall surrender, or cause the surrender, of all dealer licenses identified on Schedule 5.08(a). The Sellers and the Shareholder agree from time to time to execute and deliver all further instruments and documents, and take all further actions, that may be reasonably necessary or desirable, or that the Purchaser may reasonably request, in order to terminate such dealer licenses and to effect the issuance of new dealer licenses to the Purchaser, provided that the Sellers and the Shareholder shall undertake any of the actions described in this sentence at the sole expense of the Purchaser.

# ARTICLE X

## Fees and Expenses

Section 10.01. <u>Fees and Expenses</u>.

(a) <u>Payment of Fees and Expenses</u>. Subject to clauses (b) and (c) below, each of the parties hereto will be responsible for and pay its own fees and expenses, including, without limitation, reasonable attorneys' and accountants' fees and expenses and the fees and expenses of financial consultants, investment bankers, lenders and consultants, incurred in connection with the Transactions, including, without limitation, the due diligence review, and the negotiation, preparation and execution of the Sale Documents.

(b) <u>Transaction Fees and Taxes</u>. Each of the Sellers and the Purchaser will be responsible for and will duly and timely pay one half of any filing fees related to any governmental or regulatory filings. The Sellers shall be responsible for and will duly and timely pay (i) recording charges for each Deed conveying the Real Property and assignment or memorandum thereof for each Lease relating to a Leasehold, (ii) Taxes (other than income Taxes of the Purchaser), including, without limitation, sales and use Taxes and real property gains and transfer Taxes, in each case, attributable to the Transactions and (iii) fees for standard coverage title insurance as described in Section 4.03(t) and ALTA surveys for the Real Property and the Leaseholds identified on <u>Schedule 4.03(s)</u> certified to the Purchaser and otherwise sufficient to remove the title policy exception for matters that would be disclosed by a survey. Except as otherwise required by applicable Law, the Sellers will be responsible for filing any Tax Returns and complying with any procedures required in connection with all Taxes described in clause (ii) resulting from such the Transactions.

(c) <u>Real Property Taxes</u>. Each of the Sellers and the Purchaser will share in the payment of Taxes related to Real Property and Leaseholds at the Effective Time in accordance with customary pro-rations. For the avoidance of doubt, the Sellers will be responsible for all Taxes related to Real Property and Leaseholds that accrue for all periods prior to the Effective Time, and the Purchaser shall have responsible for all Taxes related to Real Property and Leaseholds that accrue for all periods following the Effective Time.

# ARTICLE XI

## Indemnification

Section 11.01. <u>Indemnification</u>.

(a) <u>Indemnification by the Shareholder and the Sellers</u>. Subject to the limitations hereinafter expressly set forth in this Article XI, the Shareholder and each of the Sellers, jointly and severally, will indemnify and defend the Indemnified Purchaser Parties against, and hold each Indemnified Purchaser Party harmless from, any and all Losses that the Indemnified

Purchaser Parties may incur, suffer, sustain or become subject to arising out of, relating to, based upon, in connection with, or due to:

(i)    any inaccuracy or breach of any of the representations and warranties of the Shareholder or any Seller contained in this Agreement;

(ii)    the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation of the Shareholder or any Seller contained in this Agreement;

(iii)    all Known Environmental Matters;

(iv)    all liability of any Seller under Environmental Laws to the extent any such liability relates to previously owned, leased or occupied property of any Seller or to the off-site disposal of Hazardous Materials by any Seller before the Closing Date;

(v)    all Environmental Noncompliance Liability of any Seller to the extent such liability is associated with or relates to the operations of the Sellers or the Business prior to the Effective Time;

(vi)    any nonfulfillment of any covenant, undertaking, agreement or other obligation of the Shareholder or any Seller contained in Section 9.02, including with respect to any Taxes related to (A) the operation of the Business by any Seller prior to the Closing, (B) the ownership by the Sellers of the Purchased Assets prior to the Closing, (C) any distributions, dividends or other payments from any Seller to the Shareholder, or (D) the transfer of the Purchased Assets to the Purchaser;

(vii)    any broker's or finder's fees payable to any Person retained, consulted or hired by the Sellers or the Shareholder in connection with the Transactions;

(viii)    any obligation or liability relating to the employees of any Seller or the employment or termination of any employee, including, without limitation, any obligation or liability relating to compensation, salary, bonus, vacation, benefits, severance, pensions, unemployment insurance and related Taxes accruing, arising, or based on or relating to facts, issues or circumstances occurring prior to the Closing, but excluding the Purchaser-Assumed Employment Liabilities;

(ix)    the Retained Liabilities; or

(x)    any liability relating to any Seller not being Solvent as of the date of the Closing Date, including, without limitation, any liability arising under laws of fraudulent transfer or fraudulent conveyance.

(b) Indemnification by the Purchaser. The Purchaser will indemnify and defend the Indemnified Seller Parties against, and hold each Indemnified Seller Party harmless from, any and all Losses that the Indemnified Seller Parties may incur due to:

(i)    any inaccuracy or breach of any of the representations and warranties of the Purchaser contained in this Agreement;

(ii)     the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation of the Purchaser contained in this Agreement;

(iii)     any Assumed Liability;

(iv)     any broker's or finder's fees payable to any Person retained, consulted or hired by the Purchaser in connection with the Transactions;

(v)     the Purchaser-Responsibility Warranty Liabilities;

(vi)     (A) in all respects with respect to the Donnelly Penman Confidentiality Agreements that the Shareholder assigned to the Purchaser pursuant to Section 4.03(v) or any actions or omissions with respect thereto by the Purchaser or any successor in interest following such assignment and (B) to the extent provided in Section 9.08 with respect to the Donnelly Penman Confidentiality Agreements that are not assigned pursuant to Section 4.03(v); or

(vii)     (A) the Purchaser-Assumed Employment Liabilities, (B) arising out of or with respect to any post-Closing employment practices of the Purchaser or (C) arising out of or relating to any Benefit Plans of the Purchaser in which Purchaser-Hired Employees participate.

(c) <u>Right to Assign</u>.  The parties hereto agree that the Purchaser shall have the right to assign its rights to indemnification under this Section 11.01 to any Person that acquires the Business and substantially all of the Purchased Assets from the Purchaser, or substantially all of the outstanding limited liability company interests of the Purchaser, whether by sale, merger, consolidation or otherwise.

Section 11.02.  <u>Notice and Opportunity to Defend</u>.

(a) <u>Delivery of Indemnification Notice</u>.

(i)     If there occurs an event that a party hereto asserts is an indemnifiable event pursuant to Section 11.01 hereof, the party seeking indemnification ("<u>Indemnitee</u>") will promptly notify the party obligated to provide indemnification hereunder ("<u>Indemnitor</u>") in writing (such written notice being an "<u>Indemnification Notice</u>").  Such Indemnification Notice shall specify (A) the nature of the claim or Loss, (B) the facts, circumstances, issues and events with respect to such claim or Loss in reasonable detail, and (C) the amount of such claim or Loss, if determined.  Delay or failure to deliver an Indemnification Notice to the Indemnitor will relieve the Indemnitor of its indemnification obligations hereunder only to the extent, if at all, that the Indemnitor is actually prejudiced by reason of such delay or failure.

(ii)     The Indemnitor will have a period of 10 calendar days following the Indemnitor's receipt of the Indemnification Notice (such period to be 20 calendar days if the event specified in the Indemnification Notice involves a claim or a Loss by a Person other than a Indemnified Purchaser Party or a Indemnified Seller Party (a "<u>Third Party Claim</u>")), in which to either (A) accept responsibility for such claim, Loss or Third Party

Claim or (B) deny or dispute responsibility for such claim, Loss or Third Party Claim (which dispute may be as to the validity of such claim or Loss, the amount thereof or both).

(b) <u>Third Party Claims</u>.

(i)    Subject to the provisions of clause (iii)(B) below, if within the 20-calendar day period under Section 11.02(a)(ii) the Indemnitor accepts responsibility in writing for a Third Party Claim, the Indemnitor will be obligated to defend, compromise or settle such Third Party Claim and, subject to the terms, conditions and limitations set forth in this Article XI, the Indemnitor will be liable for the Losses in connection with such Third Party Claim, including, without limitation, the fees and expenses of counsel incurred by the Indemnitor in defending, compromising or settling such Third Party Claim; <u>provided, however</u>, that in such an event, the Indemnitee will have the right to participate in the defense of such Third Party Claim and employ counsel, at the Indemnitee's expense, separate from the counsel employed by the Indemnitor, it being understood that the Indemnitor will control such defense.

(ii)    If (A) the Indemnitor fails to accept responsibility for such Third Party Claim within such 20-calendar day period or the Indemnitor does not respond within such 20-calendar day period, or (B) either (x) the Indemnitee is advised by counsel that in connection with such Third Party Claim there may be one or more legal defenses available to the Indemnitee that are not available to the Indemnitor or conflict with or are different from those available to the Indemnitor, (y) the Indemnitee reasonably believes that the Indemnitor's financial condition may result in the Indemnitor being unable or unwilling to timely discharge its obligations under this Article XI in full, or (z) the Third Party Claim seeks an order, injunction or other relief other than money damages against the Indemnitee, then in any such case, the Indemnitor will not be entitled to assume the defense of such Third Party Claim and the Indemnitee shall have the right to undertake the defense, compromise or settlement of such Third Party Claim and, subject to the terms, conditions and limitations set forth in this Article XI, the Indemnitor will be liable for the Losses in connection with such Third Party Claim, including, without limitation, the fees and expenses of counsel incurred by the Indemnitee in defending, compromising or settling such Third Party Claim; <u>provided</u>, <u>however</u>, that in such an event, the Indemnitor will have the right to participate in the defense of such matter and employ counsel, at the Indemnitor's expense (<u>provided that</u> such expenses shall not count towards any limitations on the Indemnitor's obligations hereunder), separate from the counsel employed by the Indemnitee, it being understood that the Indemnitee will control such defense.

(iii)    The Indemnitor will not be liable for any settlement of any Action effected without the Indemnitor's written consent (which consent shall not be unreasonably withheld or delayed), but if settled with the Indemnitor's written consent or if there be a final judgment for the plaintiff in any such Action, the Indemnitor agrees, subject to the terms, conditions and limitations set forth in this Article XI, to indemnify and hold harmless the Indemnitee from and against any Loss by reason of such settlement or judgment.

(c) <u>Non-Third Party Claims</u>.

(i)    If the Indemnitor accepts responsibility for a claim or Loss that does not involve a Third Party Claim in writing within such 10-calendar day period, or the Indemnitor does not respond within such 10-calendar day period, such claim or Loss specified by the Indemnitee in the Indemnification Notice will conclusively be deemed a liability of the Indemnitor under Section 11.01 and the Indemnitor will pay the amount of such liability to the Indemnitee on demand.

(ii)    If the Indemnitor has timely disputed its liability with respect to such claim or Loss within such 10-calendar day period, the Indemnitor and the Indemnitee will proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute will be resolved by litigation in an appropriate court of competent jurisdiction.

(d) <u>Contribution</u>. If the indemnification provided for in this Article XI to an Indemnitee is prohibited under applicable Laws (other than by reason of the exceptions, limitations and conditions set forth in this Article XI) then the Indemnitor, in lieu of indemnifying the Indemnitee, will contribute to the amount paid or payable by the Indemnitee as a result of the Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitor, on the one hand, and of the Indemnitee, on the other, in connection with the events or circumstances that resulted in the Losses as well as any other relevant equitable considerations. The relative fault of the Indemnitor, on the one hand, and of the Indemnitee, on the other, will be determined by reference to, among other things, such Persons' relative intent, knowledge, access to information and opportunity to correct or prevent the events or circumstances resulting in the Losses.

Section 11.03. <u>Survival of Indemnification</u>. The representations and warranties of the parties contained in this Agreement and the rights to indemnification under this Agreement with respect thereto will survive the Closing Date and any investigation at any time made by or on behalf of the Purchaser or any other party; <u>provided</u>, <u>however</u>, that, except as expressly provided below, the representations and warranties shall expire on the second anniversary of the Closing Date (<u>provided</u> <u>that</u> the same will be effective with respect to any inaccuracy therein or breach thereof, notice of which has been given on or prior to the second anniversary); <u>provided</u>, <u>however</u>, that:

(a) <u>Fundamental Indemnification</u>. The Fundamental Representations of Sellers and Shareholder and the representations and warranties in Section 5.18 and the rights to indemnification with respect to the foregoing will survive the Closing for a period of three years and will be effective thereafter with respect to any inaccuracy therein or breach thereof, notice of which has been given within such three-year period;

(b) <u>Tax Indemnification</u>. The representations and warranties set forth in Section 5.06 and the rights to indemnification with respect to the foregoing will survive the Closing for a period ending six months after the termination of the statute of limitations (or any extension thereof) on any Law applicable to the matters covered therein, and will be effective thereafter

with respect to any inaccuracy therein or breach thereof, notice of which has been given within such period;

(c) <u>Known Environmental Indemnification</u>. The indemnification obligations of the Sellers and the Shareholder forth in Section 11.01(a)(iii) with respect to Known Environmental Matters will survive the Closing for an unlimited period of time (subject, however, to the terms and conditions and the dollar limitation provided for in Section 11.04(b)(ii)); and

(d) <u>Other Indemnifications</u>. The indemnifications by the Sellers and the Shareholder set forth in Sections 11.01(a)(ii), 11.01(a)(iv), 11.01(a)(v), 11.01(a)(vi), 11.01(a)(vii), 11.01(a)(viii) and 11.01(a)(ix) shall survive the Closing for an unlimited period of time. The indemnifications by the Purchaser set forth in Sections 9.08, 11.01(b)(ii), 11.01(b)(iii), 11.01(b)(iv), 11.01(b)(v), 11.01(b)(vi) and 11.01(b)(vii) shall survive the Closing for an unlimited period of time.

Section 11.04. <u>Threshold and Limitation on Liability</u>.

(a) <u>Threshold</u>. No Indemnified Purchaser Party or Indemnified Seller Party will be entitled to indemnification for any Losses under Section 11.01(a)(i), or 11.01(b)(i), unless and until the aggregate amount of Losses suffered, sustained, or incurred by all of the Indemnified Purchaser Parties or the Indemnified Seller Parties, as the case may be, exceeds the Threshold Amount, calculated on a cumulative basis and not per item basis, and then such party will be entitled to recover such Losses from the first dollar of such Losses and not merely the excess of such Losses above the Threshold Amount; provided, however, that:

(i)     with respect to indemnification pursuant to the Fundamental Representation Indemnification by Sellers and Shareholder or under any of Sections 11.01(a)(ii), 11.01(a)(iii), 11.01(a)(iv), 11.01(a)(v), 11.01(a)(vi), 11.01(a)(vii), 11.01(a)(viii) or 11.01(a)(ix), the Indemnified Purchaser Parties shall be entitled to recover any such Losses from the first dollar of such Losses without any threshold, basket or deductible of any kind; and

(ii)     with respect to indemnification under the Fundamental Representation Indemnification by Purchaser or under any of Sections 9.08, 11.01(b)(ii), 11.01(b)(iii), 11.01(b)(iv), 11.01(b)(v) or 11.01(b)(vi), the Indemnified Seller Parties shall be entitled to recover any such Losses from the first dollar of such Losses without any threshold, basket or deductible of any kind;

(b) <u>Limitations on Liability of the Shareholder and the Sellers</u>. The aggregate liability of the Shareholder and the Sellers for indemnification under Section 11.01(a) shall be limited as follows:

(i)     <u>Basic Limitation</u>. Indemnification under Section 11.01(a)(i) for inaccuracies or breaches of representations or warranties, including without limitation, the Fundamental Representations of Sellers and Shareholder and the representations set forth in Section 5.18, shall not exceed $5,000,000 in the aggregate;

(ii)     <u>Known Environmental Indemnification</u>. With respect to the Known Environmental Indemnification set forth in Section 11.01(a)(iii), such liability shall not

exceed an aggregate amount equal to $10,000,000 (and any indemnification payments made by the Shareholder or the Sellers under such Section shall not count towards any of the limitations on the Shareholder's and the Sellers' liability set forth elsewhere in this Agreement). Sellers and the Shareholder shall discharge their obligation to indemnify the Purchaser with respect to the Known Environmental Indemnification by reimbursing the Purchaser for the Purchaser's actual reasonable out-of-pocket costs for (1) correction of Environmental Noncompliance Liabilities identified in <u>Schedule 5.18</u> and (2) the Cleanup of any Environmental Liabilities that are Known Environmental Matters to the extent necessary to comply with (A) the requirements of any applicable Lease, (B) remediation standards applicable to commercial or industrial property and (C) applicable Environmental Laws, in each case as of the Closing Date. Any such Cleanup of the Known Environmental Matters by the Purchaser shall be consistent with the industrial or commercial use of the Real Properties and Leaseholds as of the Closing Date. The Purchaser shall use reasonable efforts to keep the cost of resolving the Known Environmental Matters identified on <u>Schedule 5.18</u> (and the cost of Cleanup of any Known Environmental Matters not identified on <u>Schedule 5.18</u>) commercially reasonable and shall provide the Sellers and the Shareholder with copies of all draft proposals, work plans, reports and similar documents for their review and comments (which shall be done on a timely basis) and shall incorporate any reasonable comments prior to implementing such proposals or work plans or submitting such documents or reports to any Governmental Body. To the extent requested by the Sellers or the Shareholder, the Purchaser shall allow the Seller and the Shareholder to participate in any discussions or negotiations with any Governmental Body concerning any aspect of the Known Environmental Matters. The Purchaser shall keep the Seller and the Shareholder apprised on a regular basis and shall provide the Sellers and the Shareholder copies of documents relating to: (i) any discussions and agreements with a Governmental Body concerning any remediation, (ii) any testing and Cleanup programs that the Purchaser plans to participate in or implement pursuant to discussions and agreements with a Governmental Body, (iii) the results of testing and Cleanup programs and (iv) any other information reasonably requested by the Sellers or the Shareholder with respect to the Known Environmental Matters. Once the Purchaser has resolved a particular Known Environmental Matter identified on <u>Schedule 5.18</u>, or has remediated a Known Environmental Matter to meet the requirements of any applicable Lease or such commercial or industrial remediation standards and applicable Environmental Laws and any required engineering control has been installed or land use restriction implemented (which may include the receipt of a final "No Further Remediation" letter from the relevant Governmental Body), the Sellers and the Shareholder shall have no further responsibility to the Purchaser for such Known Environmental Matter. Furthermore, any and all expenses and costs reimbursed by the Sellers or the Shareholder to the Purchaser shall be applied in reduction of the obligations of Sellers and the Shareholder with respect to the Known Environmental Indemnification. If and when the aggregate amount actually expended for Cleanup of Known Environmental Matters and reimbursed to the Purchaser by the Sellers and the Shareholder equals $10,000,000, the Sellers and the Shareholder shall have no further Cleanup liability or responsibility to the Purchaser with respect to the Known Environmental Indemnification and the Purchaser shall release the Sellers and the Shareholder from any future Cleanup obligations under the Known

Environmental Indemnification. For the avoidance of doubt, the parties acknowledge that the Purchaser shall not be obligated to indemnify the Sellers or the Shareholder under any circumstances for any costs or expenses incurred by the Sellers or the Shareholder relating to the defense of any claims for Cleanup of environmental matters asserted against any Seller or the Shareholder by any third party, including, without limitation, claims asserted by any Governmental Body under any Environmental Laws; provided, however, the Purchaser agrees that it shall be responsible, at its sole cost, for performing any Cleanup required as a result of such environmental claims once the Sellers and the Shareholder have satisfied their obligation to Purchaser hereunder for reimbursement of costs relating to Known Environmental Matters, or, respectively, upon such time that the Sellers and the Shareholder no longer have any indemnity obligation for a breach of its representations in Section 5.18 as a result of the expiration of the three-year survival period or due to reaching the dollar limitation under Section 11.04(b)(i), and, thereupon, the Sellers and the Shareholder shall have no further indemnity obligations with respect to the Known Environmental Matters under this Agreement or otherwise to the Purchaser.

(iii)    Other Indemnifications. With respect to indemnification by the Sellers and the Shareholder under any of Sections 11.01(a)(ii), 11.01(a)(iv), 11.01(a)(v), 11.01(a)(vi), 11.01(a)(vii), 11.01(a)(viii) and 11.01(a)(ix), such liability shall have no limit.

(c)    Limitation on Liability of the Purchaser. The aggregate liability of the Purchaser for indemnification under Section 11.01(b)(i) of this Agreement shall not exceed the aggregate amount equal to $5,000,000.

Section 11.05.    Fraud Exception. Notwithstanding any provision contained in Article XI to the contrary, in the event any Loss or failure to discover a fact or condition:

(a) by an Indemnified Purchaser Party is due to, arises from, or is in connection with, fraud, intentional misrepresentation, grossly negligent misrepresentation or willful misconduct by the Shareholder, any Seller or any Person acting or purporting to act on their behalf, such Indemnified Purchaser Party will be entitled to recover any such Losses from the Shareholder and each Seller, jointly and severally, without regard to any of the time limitations, dollar thresholds or dollar limitations set forth above, and will be entitled to recover the full amount of such Losses from the first dollar of any such Loss, together with any punitive, exemplary and other damages that may be assessed by any court of competent jurisdiction; and

(b) by an Indemnified Seller Party is due to, arises from, or is in connection with, fraud, intentional misrepresentation, grossly negligent misrepresentation or willful misconduct by the Purchaser or any Person acting or purporting to act on its behalf, such Indemnified Seller Party will be entitled to recover any such Losses from the Purchaser without regard to any of the time limitations, dollar thresholds or dollar limitations set forth above, and will be entitled to recover the full amount of such Losses from the first dollar of any such Loss, together with any punitive, exemplary and other damages that may be assessed by a court of competent jurisdiction.

Section 11.06. <u>Set-Off</u>. Each of the parties hereto expressly acknowledges and agrees that in the event that a Indemnified Purchaser Party is entitled to indemnification under Section 11.01(a), the Purchaser will be entitled to set-off the amount of such Losses incurred by such Indemnified Purchaser Party against and retain such amount from any cash payments due to the Shareholder or any Seller under this Agreement or under the Initial Series B Face Amount.

Section 11.07. <u>Guarantee</u>.

(a) <u>Guarantee</u>. Subject to all of the limitations on liability set forth in this Article XI, the Guarantor hereby unconditionally and irrevocably guarantees the due and prompt payment, performance and discharge of the covenants, obligations and liabilities, including, without limitation, the indemnification obligations of the Sellers under this Article XI ("<u>Guaranteed Obligations</u>"). If the Guarantor fails to pay any amount owing under this Section, the Purchaser shall have all of the rights and remedies provided by law. This guaranty is a guaranty of payment and not of collection. Therefore, the Purchaser can insist that the Guarantor pay the Guaranteed Obligations immediately when due, and the Purchaser is not required to attempt to collect first from the Sellers. The obligation of the Guarantor shall be irrevocable and absolute.

(b) <u>Obligations Not Affected</u>. The Purchaser may release the Sellers from their liability for the Guaranteed Obligations, either in whole or in part, without affecting the obligations of the Guarantor under this Section. The Guarantor's obligations under this Section shall not be released or affected by (i) the voluntary or involuntary liquidation, sale or other disposition of all or substantially all of the assets of any of the Sellers, or any receivership, insolvency, bankruptcy, reorganization or other similar proceedings affecting any of the Sellers or any of their respective assets or (ii) any change in the composition or structure of any Seller or the Guarantor, including a merger or consolidation with any other Person.

(c) <u>Obligations Not Affected by Bankruptcy</u>. The Guarantor further agrees that if any payments to the Purchaser on the Guaranteed Obligations are invalidated in whole or in part, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act or code, state or federal law, common law or equitable doctrine, the obligations of the Guarantor under this Section shall remain in full force and effect (or are reinstated as the case may be) until payment in full of those amounts.

(d) <u>Waivers</u>. The Guarantor waives any right it may have to receive notice of the following matters before the Purchaser enforces any of its rights (i) the Purchaser's acceptance of this guarantee, (ii) any default by any of the Sellers this Agreement, (iii) any demand, or (iv) any action that the Purchaser takes regarding any of the Sellers regarding the Guaranteed Obligations or any other obligation that it might be entitled to by law or under any other agreement.

(e) <u>Representations of the Guarantor</u>. The Guarantor hereby represents that (i) the execution and delivery of this Agreement and the performance by the Guarantor of its obligations hereunder do not violate any law applicable to the Guarantor, conflict with any material agreement by which it is bound or require the consent or approval of any Governmental Body or any third party, (ii) that this Agreement constitutes the valid and binding agreement of the Guarantor enforceable against the Guarantor in accordance with its terms, (iii) that the Guarantor is duly organized, validly existing and in good standing under the laws of the

jurisdiction of its organization, (iv) that the execution and delivery of this Agreement and the performance of its obligations hereunder are within its powers and have been duly authorized by all necessary action and do not contravene the terms of its organizational or charter documents.

**ARTICLE XII**

Miscellaneous

Section 12.01.  Notices.  All notices, requests, demands and other communications to any party or given under this Agreement will be in writing and delivered personally, by overnight delivery or courier, by registered mail or by telecopier (with confirmation received) to the parties at the address or telecopy number specified for such parties on the signature pages hereto (or at such other address or telecopy number as may be specified by a party in writing given at least five Business Days prior thereto).  All notices, requests, demands and other communications will be deemed delivered when actually received.

Section 12.02.  Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, and by different parties hereto in separate counterparts, each of which when executed will be deemed an original, but all of which taken together will constitute one and the same instrument.

Section 12.03.  Amendment of Agreement.  This Agreement may not be amended, modified or waived except by an instrument in writing signed on behalf of each of the parties hereto.

Section 12.04.  Successors and Assigns; Assignability.  This Agreement will be binding upon and inures to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  This Agreement may not be assigned by any party hereto without the prior written consent of all other parties hereto, except for the assignment of all, but not less than all, of the rights and obligations of the Purchaser under this Agreement in a transaction described in Section 11.01(c), which may occur after the Closing Date provided that the Business continues in existence at the time of such assignment.  Any assignment or attempted assignment in contravention of this Section will be void ab initio and will not relieve the assigning party of any obligation under this Agreement.

Section 12.05.  Governing Law.  This Agreement will be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts executed in and to be performed entirely within that state, without reference to conflicts of laws provisions.

Section 12.06.  Integration.  This Agreement contains and constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto, including without limitation that certain term sheet dated September 27, 2005.

Section 12.07.  Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect.  Upon any

determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the Transactions are fulfilled to the extent possible.

Section 12.08.  <u>Further Assurances</u>.  In order to (a) carry out more effectively the purposes of each Sale Document, (b) enable the Purchaser to exercise and enforce its rights and remedies and collect any payments and proceeds under each Sale Document and (c) transfer, preserve, protect and confirm to the Purchaser the rights granted or now or hereafter intended to be granted to the Purchaser under each Sale Document or under each other instrument executed in connection with any Sale Document to which any Seller or the Shareholder is or may become parties, promptly upon the request by the Purchaser, the parties hereto shall (i) correct any defect or error that may be discovered in any Sale Document or in the execution, delivery, acknowledgment or recordation of any Sale Document and (ii) execute, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, estoppel certificates, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments, in each case, as such requesting party may require from time to time.

Section 12.09.  <u>No Third-Party Rights</u>.  This Agreement is not intended, and will not be construed, to create any rights in any parties other than the Shareholder, the Sellers and the Purchaser, and no Person may assert any rights as third-party beneficiary hereunder, including, without limitation, the directors, officers and employees of the Sellers (as of the Closing Date), except in the case of the Indemnified Purchaser Parties and the Indemnified Seller Parties as provided in Article XI.

Section 12.10.  <u>Enforcement; Attorneys' Fees</u>.  Each of the parties hereby acknowledges and agrees that (a) the provisions of this Agreement are of a special and unique nature, the failure of fulfillment of which cannot be accurately compensated for in damages by an action at law, (b) the breach or threatened breach of any provision of this Agreement would cause the party entitled to the benefit of such provision ("benefited party") irreparable harm and (c) money damages would not be an adequate remedy for any breach or threatened breach of the provisions of this Agreement.  Therefore, the parties hereto agree that the benefited party shall be entitled to equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond or other security or any similar requirement or proving actual damages) to prevent breaches or threatened breaches of this Agreement (including, without limitation, the provisions of Section 9.03, by any Seller or the Shareholder) and to specifically enforce the terms and provisions of this Agreement (including, without limitation, Section 9.03), this being in addition to any other remedy to which the benefited party may be entitled under this Agreement.  In a legal proceeding under this Agreement brought at law or in equity or both (including, without limitation, any proceeding in bankruptcy), the non-prevailing party shall pay all costs and expenses incurred by the prevailing party, including, without limitation, all reasonable attorneys' fees and costs and expenses, whether at trial, on appeal or in connection with any petition for review.  For purposes of this Agreement, the term "prevailing party" shall be deemed to include, without limitation, a party that successfully opposes a petition for review filed with an appellate court.

Section 12.11. <u>Submission to Jurisdiction</u>. Each of the Shareholder, the Sellers and the Purchaser hereby (a) agrees that any Action with respect to any Sale Document may be brought only in the courts of the State of New York or of the United States of America for the Southern District of New York, (b) accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of such courts, (c) irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of <u>forum non conveniens</u>, which it may now or hereafter have to the bringing of any Action in those jurisdictions, and (d) irrevocably consents to the service of process of any of the courts referred to above in any Action by the mailing of copies of the process to the parties hereto as provided in Section 12.01. Service effected as provided in this manner will become effective ten calendar days after the mailing of the process.

Section 12.12. <u>Waiver of Jury Trial</u>. EACH OF THE SHAREHOLDER, THE SELLERS AND THE PURCHASER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION TO ENFORCE OR DEFEND ANY RIGHT UNDER ANY SALE DOCUMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR TO BE DELIVERED IN CONNECTION WITH ANY SALE DOCUMENT AND AGREES THAT ANY ACTION WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Section 12.13. <u>No Waiver; Remedies</u>. The parties hereto acknowledge and agree that, except as otherwise provided in Section 11.05 or as otherwise expressly permitted under Section 12.10, each party's sole and exclusive rights and remedies with respect to this Agreement, the events giving rise to this Agreement, and the Transactions contemplated by this Agreement, including any rights or remedies under any statute, regulation or ordinance or under any other theory of law or equity, shall be pursuant to the indemnification provisions set forth in Article XI. No failure or delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of the right, power or privilege. A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the rights, power or privilege or the exercise of any other right, power or privilege.

Section 12.14. <u>Interpretation</u>. As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate. Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, schedule and exhibit references are references with respect to this Agreement unless otherwise specified. Unless the context otherwise requires, the term "including" will mean "including, without limitation." The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement. References in this Agreement to any law or regulation will refer to such laws and regulations as from time to time amended and to any laws or regulations successor thereto.

Section 12.15. <u>Ambiguities</u>. This Agreement was negotiated between legal counsel for the parties and any ambiguity in this Agreement shall not be construed against the party who drafted this Agreement.

Section 12.16.  <u>Incorporation of Schedules</u>.  The Schedules hereto are incorporated into this Agreement and will be deemed a part hereof as if set forth herein in full.  References to "this Agreement" and the words "herein", "hereof" and words of similar import refer to this Agreement (including the Schedules) as an entirety.

Section 12.17.  <u>Conflicts; Terms and References</u>.  In the event of any conflict between the provisions of this Agreement and any Schedule or Exhibit, the provisions of this Agreement will control.  Capitalized terms used in the Schedules have the meanings assigned to them in this Agreement.  The Section references referred to in the Schedules are to Sections of this Agreement, unless otherwise expressly indicated.

[Remainder of page intentionally left blank; signature pages follow]

In witness whereof, the parties have executed and delivered this Agreement as of the date first written above.

SELLERS:                            AMERICAN LAFRANCE CORPORATION

                                    By_____
                                       Name:  John Stevenson
                                       Title:   President


                                    AMERICAN LAFRANCE CHASSIS CO. LLC

                                    By_____
                                       Name:  John Stevenson
                                       Title:   President


                                    LADDER TOWERS, INC.

                                    By_____
                                       Name:  John Stevenson
                                       Title:   President


                                    R.D. MURRAY INC.

                                    By _Roger M. Nielsen_____
                                       Name:   Roger Nielsen
                                       Title:    Vice President

                     [Signatures continue on next page]

In witness whereof, the parties have executed and delivered this Agreement as of the date first written above.

SELLERS:                              AMERICAN LAFRANCE CORPORATION

                                      By _____
                                          Name:  John Stevenson
                                          Title:  President


                                      AMERICAN LAFRANCE CHASSIS CO. LLC

                                      By _____
                                          Name:  John Stevenson
                                          Title:  President


                                      LADDER TOWERS, INC.

                                      By _____
                                          Name:  John Stevenson
                                          Title:  President


                                      R.D. MURRAY INC.

                                      By _____
                                          Name:   Roger Nielsen
                                          Title:    Vice President

                          [Signatures continue on next page]

BECKER FIRE EQUIPMENT CO.

By _____

    Name:   John Stevenson
    Title:    President

AERO PRODUCTS CORPORATION

By _____

    Name:   John Stevenson
    Title:    President

AMERICAN LAFRANCE NORTHWEST LLC

By _____

    Name:   John Stevenson
    Title:    President

[Signatures continue on next page]

SHAREHOLDER:

FREIGHTLINER LLC

By _____

Name:  Chris Patterson
Title:     President and Chief Executive Officer

Address for Notices to any of Sellers and Shareholder:

Freightliner LLC [and any applicable Seller]
Attention:  Stefan Kuerschner
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR  97208-3849
Facsimile No.:  (503) 745-8188

with a copy to:

Freightliner LLC
Attention:  General Counsel
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR  97208-3849
Facsimile No.:  (503) 745-7959

[Signatures continue on next page]

# McNair Law Firm, P.A.

### ATTORNEYS AND COUNSELORS AT LAW

JOHN E. ROSEN
jrosen@mcnair.net

*www.mcnair.net*

100 CALHOUN STREET, SUITE 400
CHARLESTON, SOUTH CAROLINA  29401

POST OFFICE BOX 1431
CHARLESTON, SOUTH CAROLINA  29402
TELEPHONE (843)723-7831
FACSIMILE  (843) 722-3227

August 8, 2006

**VIA FEDERAL EXPRESS**

Freightliner LLC
Attn: Stefan Kuerschner
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR 97208-3849

Freightliner LLC
Attn: General Counsel
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR 97208-3849

Dr. Albert Kirchmann
DaimlerChrysler AG
Mercedesstrasse 137
70327 Stuttgart, GE

Dr. Peter Waskoenig
VP Legal Affairs
cc: Eugene Danaher
DaimlerChrysler AG
Epplestrasse 225
70567 Stuttgart, GE

RE: Change of Address for Notices in Asset Purchase and Sale Agreement, dated December 14, 2005 (the "Agreement")

Dear Mr. Kuerschner:

Pursuant to the notice provision provided for in Section 12.01 of the Agreement, please send all future correspondence addressed to Purchaser in connection with the Agreement to the following address:

American LaFrance, LLC
Attn: David M. Mulder, Chief Financial Officer
8500 Palmetto Commerce Parkway
Ladson, SC 29456-6700

With a copy to:

McNair Law Firm, P.A.
Attn: Elizabeth (Lisa) J. Philp
100 Calhoun Street
Suite 400
Charleston, SC 29401

Thank you for your attention to this matter.

Sincerely,

McNair Law Firm, P.A.

John E. Rosen

JER/mc

ANDERSON   •   BLUFFTON   •   CHARLESTON   •   CHARLOTTE   •   COLUMBIA   •   GEORGETOWN   •   GREENVILLE   •   HILTON HEAD ISLAND   •   MYRTLE BEACH   •   RALEIGH

PURCHASER:                              AMERICAN LAFRANCE, LLC

                                        By:
                                        Name:   Lynn Tilton
                                        Title:    Manager

Address for Notices to Purchaser:

8500 Palmetto Commerce Pkwy.
Ladson, SC 29456-6700
Attention: John Stevenson
Telephone No.: 843-486-7401
Facsimile No.:843-486-7500

With a copy to:

        Morris Manning & Martin, LLP
        1600 Atlanta Financial Center
        3343 Peachtree Road, NE
        Atlanta, Georgia 30326
        Attention: Brooks Binder
        Telephone No.: 404-504-7626
        Facsimile No.: 404-365-9532


                [Signatures continue on next page]

AGREED, *SOLELY AS*
*TO SECTION 9.03(d)* <u>*AND*</u>,
*FOR PURPOSES THEREOF,*
*SOLELY WITH RESPECT TO*
*DAIMLERCHRYSLER VANS LLC*
*AND THE  COMMERCIAL*
*VEHICLES NAFTA DIVISION OF*
*DAIMLERCHRYSLER AG:*

DAIMLERCHRYSLER AG

By: _____
      Dr. Albert Kirchmann
      Vice President Business Development,
      Controlling and Finance
      Commercial Vehicle Division

By: _____
      Dr. Rolf Bartke
      Executive Vice President
      Commercial Vehicle Division
      Head of Business Unit Mercedes-Benz Vans

<u>Address for Notices to DaimlerChrysler AG:</u>

Dr. Albert Kirchmann
DaimlerChrysler AG
Mercedesstrasse 137
70327 Stuttgart

postal address:

DaimlerChrysler AG
HPC F 305
70546 Stuttgart

With a copy to:

Dr. Peter Waskoenig
VP Legal Affairs
cc:  Eugene Danaher
DaimlerChrysler AG
Epplestrasse 225
70567 Stuttgart

postal address:

DaimlerChrysler AG
RA
HPC 0431
70546 Stuttgart

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this "Agreement") is entered into as of December 14, 2005 by and between Freightliner LLC ("Freightliner") and American LaFrance, LLC ("New ALF").

## WITNESSETH:

WHEREAS, New ALF has acquired certain assets of American LaFrance Corporation, American LaFrance Chassis Co. LLC, Ladder Towers, Inc., R.D. Murray Inc., Becker Fire Equipment Co., Aero Products Corp. and American LaFrance Northwest LLC (collectively, the "Sellers"), pursuant to that certain Asset Purchase and Sale Agreement (the "Asset Purchase Agreement"), dated as of December 14, 2005, among the Sellers, Freightliner and New ALF;

WHEREAS, it is a condition precedent to the Asset Purchase Agreement that Freightliner shall have entered into this Agreement under which Freightliner shall provide New ALF with certain services on a transitional basis; and

WHEREAS, New ALF desires to obtain such services from Freightliner on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1  Definitions.  All terms used but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.  The following terms, as used herein, have the following meanings, applicable to both the singular and the plural forms of the terms described:

"Agreement" means this Transition Services Agreement, including all Schedules, as supplemented, amended, restated or replaced from time to time by written agreement of Freightliner and New ALF.

"Asset Purchase Agreement" has the meaning set forth in the first Whereas clause in this Agreement.

"Committee" has the meaning set forth in Section 12.1 hereof.

"Confidential Information" means, with respect to either Party, non-public information about such Party's or any of its Affiliates' businesses or activities that is proprietary and confidential, which shall include, but not be limited to, all business,

financial, technical and other information of such Party or its Affiliates that is marked or designated "confidential" or "proprietary" or that by its nature or the circumstances surrounding its disclosure should reasonably be regarded as confidential or proprietary. Confidential Information includes not only written or other tangible information, but also information transferred orally, visually, electronically or by any other means. Confidential Information shall not include information that (a) is in or enters the public domain without breach of this Agreement, (b) the receiving party lawfully receives from a third party without restriction on disclosure and, to the receiving party's knowledge, without breach of a nondisclosure obligation, or (c) is independently developed by the receiving party without reference to the Confidential Information.

"Freightliner" has the meaning set forth in the preamble to this Agreement.

"Improvement" has the meaning set forth in Section 13.2(a) hereof.

"Indemnified New ALF Party" has the meaning set forth in Section 9.1 hereof.

"Indemnified Freightliner Party" has the meaning set forth in Section 9.2 hereof except as otherwise provided in Section 11.4(a)(i)(B).

"IP Licensee" has the meaning set forth in Section 13.1 hereof.

"IP Owner" has the meaning set forth in Section 13.1 hereof.

"Liaison" has the meaning set forth in Section 3.1 hereof.

"Loss" has the meaning set forth in Section 9.1 hereof.

"New ALF" has the meaning set forth in the preamble to this Agreement.

"Obligated Party" has the meaning set forth in Section 7.1 hereof.

"Owned IP" has the meaning set forth in Section 13.1 hereof.

"Parties" means, collectively, New ALF and Freightliner, and "Party" means either of them individually.

"Schedules" means, collectively, the Schedules hereto.

"Sellers" has the meaning set forth in the first Whereas clause in this Agreement.

"Services" means one or more of the specific services described in any of the Schedules, in each case solely as and to the extent expressly described and provided for in the Schedule.

"Service Costs" has the meaning set forth in Section 4.1 hereof.

Section 1.2  <u>Schedules; Internal References</u>.  The Schedules are a part of this Agreement as if fully set forth herein.  All references herein to Articles, Sections, subsections, paragraphs, subparagraphs, clauses and Schedules shall be deemed references to such parts of this Agreement, unless the context shall otherwise require.

Section 1.3  <u>Interpretation</u>.  For purposes of this Agreement, the words "hereof," "herein," "hereby" and other words of similar import refer to this Agreement as a whole unless otherwise indicated.  Whenever the singular is used herein, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate, and words in one gender include all genders.  All terms defined herein in the singular shall have the same meaning when used in the plural; all terms defined herein in the plural shall have the same meaning when used in the singular.

## ARTICLE II
## PROVISION OF SERVICES

Section 2.1  <u>Provision of Services</u>.  On the terms and subject to the conditions of this Agreement, Freightliner shall provide to New ALF, or procure the provision to New ALF of, and New ALF hereby contracts to receive from Freightliner, the Services.  The scope of Services shall be as expressly set forth in the Schedules.

Section 2.2  <u>Additional Services</u>.  In addition to the Services to be provided or procured by Freightliner in accordance with Section 2.1, if requested by New ALF, and to the extent that each of Freightliner and New ALF, in the sole and absolute discretion of each, may mutually agree, Freightliner shall provide additional services to New ALF.  The scope of any such additional services, as well as the term, costs, and other terms and conditions applicable to such additional services, shall be as mutually agreed by Freightliner and New ALF and shall be reflected in amendments or additions to the Schedules as mutually agreed by Freightliner and New ALF.  Until so mutually agreed, there shall be no obligation or agreement regarding additional services.  Additional services that are mutually agreed to shall be set forth in an amendment or addendum to the Schedules and shall thereafter be referred to as and included in the "Services."

## ARTICLE III
## LIAISONS

Section 3.1  <u>Liaisons</u>.  Kevin Stevick, on behalf of New ALF, and Stefan Kuerschner, on behalf of Freightliner or, in each case, such other Person as either New ALF or Freightliner may by notice to the other appoint as its successor representative (each a "<u>Liaison</u>"), shall be the contact persons for the purposes of this Agreement and shall have responsibility for managing and supervising the rendering of the Services on behalf of New ALF or Freightliner, as applicable.  The Liaisons shall work closely and directly to facilitate efficient and effective communication between New ALF and Freightliner in connection with the Services.  The Liaisons shall be available to New ALF and/or Freightliner, as the case may be, during regular

business hours and upon reasonable advance notice by telephone or in person. The business telephone number of Stefan Kuerschner is (503) 745-6204 and the business telephone number of Kevin Stevick is 508-208-7785.

## ARTICLE IV
## SERVICE COSTS

Section 4.1    <u>Service Costs Generally</u>.  The Services provided hereunder shall be provided without charge or cost or at the rates set forth on the Schedules, as applicable, in each case as set forth on the Schedules (such charges, the "<u>Service Costs</u>").

Section 4.2    <u>Invoicing; Payment and Settlement of Costs</u>.

(a)    Freightliner shall invoice New ALF on a monthly basis for the Service Costs incurred in the prior month or on such other more frequent basis for specific Services as is consistent with the timing of payments owing by Freightliner with respect thereto to third party providers.  Freightliner will provide to New ALF billing data in reasonably sufficient detail to allow New ALF to ascertain the Services provided and the billing for the same.

(b)    Unless otherwise specified herein or as specifically provided in the Schedules, New ALF shall pay to Freightliner all Service Costs within thirty (30) days of the date of the invoice therefor (or upon such other terms as the Parties may agree from time to time).  Such payments shall be made by New ALF, at its option, through one of the following methods:  (i) by check or (ii) by wire transfer of immediately available funds, in each case payable to the order of such Party indicated on the corresponding invoice.   New ALF shall have the right to dispute any Services Costs charged to it that New ALF reasonably believes to be incorrect or inconsistent with the provisions of this Agreement but shall not have the right to withhold payment of any amount that is either not related to a disputed charge or that constitutes any undisputed portion of a specific charge.

(c)    Any Service Costs (other than any specific amount disputed in good faith by prior notice by New ALF to Freightliner) that are not paid within thirty (30) days of the date of the invoice therefor shall incur interest at a rate equal to eighteen percent (18%) per annum; <u>provided</u> that such interest rate shall not exceed the maximum rate permitted by applicable law. To the extent any dispute with respect to any Service Cost is decided in favor of Freightliner, interest at the foregoing rate shall accrue and be owing on the amount payable to Freightliner from the date as of which it was due (i.e., the date that is thirty (30) days after the date of the invoice therefor) until paid in full to Freightliner.

(d)    Upon termination of this Agreement, Freightliner shall be entitled to the payment of and New ALF shall, within thirty (30) days after the date of termination, pay to Freightliner or its designees, all unpaid Service Costs as of the date of termination and any and all accrued interest thereon.

(e)    Freightliner shall maintain books and records regarding the Services provided by Freightliner hereunder.  Such books and records shall be accurate and complete in all material

4

respects and be maintained in accordance with commercially reasonable standards. During the term of this Agreement, New ALF and its representatives shall have the right, at the expense of New ALF, to inspect such books and records at the offices of Freightliner upon reasonable prior notice during normal business hours for the purpose of verifying the Services provided and any charges pursuant to this Agreement. In the event that the results of any inspection of such charges indicate a discrepancy between the charges invoiced and the charges that should have been charged (in accordance with the Schedules) based on the actual Services performed by or on behalf of Freightliner, New ALF shall notify Freightliner of such discrepancy and indicate the difference between the charges invoiced and the appropriate charges. Within fifteen (15) days of receipt of a notice of discrepancy, Freightliner shall (i) reimburse New ALF for the amount of the discrepancy arising out of such inspection or (ii) notify New ALF that Freightliner disputes the discrepancy set forth in the notice.

(f)    Any dispute regarding Service Costs arising under this Article IV shall be referred to the Committee for resolution pursuant to Article XII before either Party pursues any other remedy; provided that, notwithstanding the foregoing, neither Party shall be required to refer any such dispute to the Committee more frequently than twice in any period of twelve (12) consecutive calendar months before resorting to other dispute resolution mechanisms, including litigation.


ARTICLE V
COVENANTS

Section 5.1    Covenants of the Parties.

(a)    The information that each Party provides to the other Party under this Agreement shall be, to the best of the providing Party's knowledge, complete and accurate as of the date that it is delivered.

(b)    Each Party shall comply with all applicable laws in all material respects.

(c)    Freightliner shall provide the Services hereunder on a timely basis and in accordance with the standards set forth in this Agreement, including, but not limited to, responding to all correspondence and communications of New ALF within a reasonable period of time.

(d)    Each Party hereby agrees that it and its employees and other personnel shall at all times comply with all reasonable security regulations, practices and policies of the other Party to the extent the Party has received a copy of such regulations, practices and policies. In furtherance and not in limitation of the foregoing, New ALF shall enter into as of the date of this Agreement and shall thereafter comply with the terms and conditions of a Freightliner Systems Access Agreement in the form attached as Schedule I.

ARTICLE VI
STANDARD OF PERFORMANCE; LIMITATION ON LIABILITY OF SHAREHOLDER

Section 6.1   <u>Provision of Services</u>.

(a)      The Parties shall provide or receive all Services hereunder, as applicable, in accordance with the standards set forth herein and in a professional, ethical and businesslike manner consistent with general industry standards.

(b)      Each Party shall use commercially reasonable efforts in connection with the performance or utilization of the Services, as applicable, and will avoid commingling any of the Party's business records, material and other data with its own such business records, material and other data.

(c)      Each Party shall inform the other Party of all material developments, issues or problems related to the Services in a timely manner as soon as reasonably practicable following the occurrence thereof.

(d)      Freightliner shall be entitled to provide any Services under this Agreement through (i) its Affiliates or (ii) any agents or subcontractors not affiliated with Freightliner, <u>provided</u> that such agents or subcontractors (x) comply with all confidentiality, data protection and other security obligations set forth in this Agreement, (y) are not direct competitors of New ALF and (z) Freightliner remains liable, subject to the limitations on liability set forth in Section 6.3, for the performance of this Agreement and any delegated Services by such agents and subcontractors.

Section 6.2   <u>Compliance with Standards of Performance</u>.  If the service standards set forth herein are not satisfied in all material respects by Freightliner, New ALF shall inform Freightliner in writing of its noncompliance with the applicable service standards.  Freightliner shall cure any noncompliance with the service standards within fifteen (15) days of its receipt of notice of its failure to comply with such standards or, if cure is not reasonably possible within such period, shall commence and complete a cure as soon as reasonably practicable.

Section 6.3   <u>Limitation of Liability on Part of Freightliner</u>.  Notwithstanding the foregoing or any other provision of this Agreement apparently to the contrary, Freightliner shall not be responsible for its failure to satisfy the service standards or for any breach of any provision of this Agreement in any regard whatsoever, unless, and solely to the extent that, any such failure or breach is the result of willful misconduct or gross negligence (a) on the part of Freightliner with respect to the performance by Freightliner of its obligations under this Agreement or (b) on the part of any Affiliates, subcontractors or agents of Freightliner with respect to the performance of the obligations of Freightliner under this Agreement. Freightliner's performance of its obligations under this Agreement shall also be excused to the extent that such performance is impeded by the failure of New ALF, any Affiliate of New ALF or any unaffiliated third party not acting at the direction or under the supervision of Freightliner to provide any necessary access to Freightliner or any Affiliate, subcontractor or agent of Freightliner.

6

ARTICLE VII
CONFIDENTIALITY

Section 7.1   Confidential Information.  Each Party (the "Obligated Party") agrees for the benefit of the other Party that:

(a)    The Obligated Party will not, and the Obligated Party will cause each of its Affiliates, agents and subcontractors not to, disclose to any third party or use any Confidential Information of the other Party disclosed hereunder, except as expressly permitted in this Agreement; and

(b)    The Obligated Party will take reasonable measures to maintain the confidentiality of all Confidential Information of the other Party in the possession or control of the Obligated Party or of any of its Affiliates, agents or subcontractors, which measures will in no event be less than the measures the Obligated Party uses to maintain the confidentiality of its own information of similar type and importance.

Notwithstanding the foregoing, each of the Parties may disclose Confidential Information of the other Party (i) to the extent required by a court of competent jurisdiction or other Governmental Entity or otherwise as required by applicable law, (ii) to employees, agents and representatives of any agent or sub-contractor on a "need-to-know" basis to the extent necessary to provide or access and use, as applicable, the Services or (iii) to its or any of its Affiliates, employees, agents, representatives, legal counsel, auditors, accountants and advisors; provided, however, that such persons shall be specifically informed of the confidential character of such Confidential Information and that they are receiving such information subject to the terms of this Agreement relating to the treatment of such Confidential Information.

Section 7.2   Use of Other Materials; Return of Information.  Each Party hereby agrees that it will not use any other materials of any nature, kind or type provided by the other Party hereunder other than for the sole purposes of performing or receiving the Services and complying with the terms of this Agreement.  Upon termination of this Agreement or at any such earlier time as any Confidential Information ceases to be used or needed for the provision of the Services hereunder, the non-disclosing Party with respect to such Confidential Information shall promptly transfer and deliver to the disclosing Party all such Confidential Information and other materials with respect thereto of whatever nature has been provided by the disclosing Party under this Agreement, without retaining any copies of such information.  Alternatively, the Party in possession of Confidential Information or other materials of the other Party may promptly destroy all such information and certify in a letter to the other Party that such destruction has occurred.

Section 7.3   Remedies for Breach of Confidentiality Provisions.  Each Party further agrees that a breach of the foregoing obligations of confidentiality and nondisclosure may give rise to an irreparable injury to the disclosing Party that is inadequately compensable in Losses. Accordingly, the disclosing Party affected by the other Party's breach may seek (without the

7

posting of any bond or other security) injunctive relief against any such breach, in addition to any other legal and equitable remedies that may be available.

Section 7.4  Legal Obligation to Disclose.  If a Party (or any person to whom the Party discloses Confidential Information pursuant to this Agreement) becomes legally compelled to disclose any of the Confidential Information, such Party shall immediately notify the disclosing Party with respect to such Confidential Information so that the disclosing Party may seek a protective order or other appropriate remedy that may be sought for the purpose of preventing disclosure of any of the Confidential Information.  If such protective order or other remedy is not obtained, the Party compelled to disclose such information will furnish only that portion of the Confidential Information which it is legally required to disclose and it will use its reasonable best efforts to obtain confidential treatment of the Confidential Information.

Section 7.5  Further Assurances.  Each Party further agrees that it will not sell, assign, sublicense, part with possession of or otherwise transfer or dispose of the other Party's Confidential Information, or contract, incur or suffer to exist any claim, lien, charge or other encumbrance with respect to such Confidential Information without prior written approval of the disclosing Party with respect to such Confidential Information.  For clarity and avoidance of doubt, it is expressly understood that New ALF shall not in any manner, including through transfer of a minority interest in New ALF or through any other means, whether direct or indirect and whether intentional or unintentional, allow or provide a means of access to any competitor of Freightliner to any systems of Freightliner or any Affiliate of Freightliner or to any Confidential Information of Freightliner or any Affiliate of Freightliner.  Any breach by New ALF of the foregoing sentence of this Section 7.5 shall entitle Freightliner to terminate this Agreement and the provision of all Services hereunder effective immediately by notice of such termination to New ALF.

ARTICLE VIII
RELATIONSHIP OF THE PARTIES

Section 8.1  Independent Contractors.  It is expressly understood and agreed that the Parties are independent contractors of each other for all and any purposes whatsoever.

Section 8.2  No Agency.

(a)  Nothing contained in this Agreement nor the consummation of the transactions contemplated herein shall be construed to create a partnership, association, joint venture, agency relationship or the relationship of employer and employee between the Parties, nor shall the officers, managers, directors, employees or agents of one Party be considered officers, managers, directors, employees or agents of the other Party for any purpose.  Nothing in this Agreement shall permit a Party to create or assume any obligation on behalf of, or otherwise bind, the other Party for any purpose.  Neither Party shall have any power to act for or represent the other Party, except as expressly set forth herein, and shall not hold itself out as the agent of the other Party.

(b)  Nothing in this Agreement shall establish or be deemed to establish any fiduciary relationship between the Parties hereto.  The Parties' respective rights and obligations hereunder

8

shall be limited to contractual rights and obligations expressly set forth herein on the terms and conditions set forth herein.

(c)    Except as otherwise specifically provided for herein, each Party shall be responsible for compliance with all applicable laws, rules, regulations and orders of governmental authorities, for obtaining required licenses and permits and for the payments of all applicable taxes.

Section 8.3    Employment Liabilities.  Neither Party, nor its employees, contractors or subcontractors, shall be deemed to be employees, contractors or subcontractors of the other Party, it being fully understood and agreed that no employees of a Party are entitled to benefits or compensation from the other Party.  Each Party is wholly responsible for withholding and payment of all applicable federal, state and local and other payroll taxes with respect to its own employees, including any contributions from them as required by law.

ARTICLE IX
INDEMNIFICATION

Section 9.1    Indemnification of the Indemnified New ALF Parties.  Freightliner shall indemnify and hold harmless New ALF and its Affiliates, managers, officers, directors, agents, employees or other representatives (each, a "Indemnified New ALF Party") from and against any claim, charge, suit, demand, loss, damage, injury, expense (including reasonable attorneys' fees) or other liability ("Loss") to which any Indemnified New ALF Party shall be subject, provided that the Indemnified New ALF Party is able to demonstrate that such Loss is caused by or arises from any willful misconduct or gross negligence on the part of Freightliner in the performance of this Agreement (including on the part of any Affiliates, agents or subcontractors performing services on behalf of Freightliner) and is not otherwise excused under Section 6.3 or any other provision of this Agreement ; provided, further, that the foregoing limitation on liability on the part of Freightliner shall not apply in the case of any failure by Freightliner to pay any Loss for which Freightliner is liable under this Section 9.1.

Section 9.2    Indemnification of the Indemnified Freightliner Parties.  New ALF shall indemnify and hold harmless Freightliner and its Affiliates, managers, officers, directors, agents, employees or other representatives (each, an "Indemnified Freightliner Party") from and against any Loss to which any Indemnified Freightliner Party shall be subject, provided that the Indemnified Freightliner Party is able to demonstrate that such Loss is caused by or arises from any willful misconduct or gross negligence on the part of New ALF in the performance of this Agreement (including on the part of any Affiliates, agents or subcontractors acting on behalf of New ALF); provided, further, that the foregoing limitation on liability on the part of New ALF shall not apply in the case of any failure by New ALF to pay (i) any Service Costs or accrued interest thereon in accordance with Section 4.2 or (ii) any Loss for which New ALF is liable under this Section 9.2.

ARTICLE X
CONTINGENCY PLANNING

Section 10.1  Contingencies.  For the purposes of this Agreement, "contingency" means an event beyond Freightliner's reasonable control that prevents Freightliner from providing or procuring the provision of the Services and discharging its duties under this Agreement, including, but not limited to, any event referred to in Section 14.13, an order of a court of competent jurisdiction, third party nonperformance and failures in telecommunication equipment and services not caused by Freightliner.  Upon the occurrence of a contingency, the Parties shall use commercially reasonable efforts to cooperate to restore to an acceptable standard as soon as reasonably practicable all Services affected by the contingency; provided that, in any such event, the standard of performance to which Freightliner shall be held is, as contemplated by Section 6.3, performance that does not constitute willful misconduct or gross negligence on Freightliner's part or on the part of any Affiliates, subcontractors or other agents providing Services on behalf of Freightliner.

Section 10.2  Backup Systems.  During the term of this Agreement, each Party shall maintain safeguards against the destruction, loss or alteration of the data and data files of the other Party in the possession of the first Party consistent with the practice of such Party with respect to its own data and data files.

ARTICLE XI
TERM AND TERMINATION

Section 11.1  Term & Termination of the Agreement.  This Agreement shall commence as of the Effective Time and shall continue in full force and effect until the earliest to occur of (a) the date on which all Services have been provided, (b) the giving of a notice of termination of this Agreement by either Party in any circumstance permitted under this Agreement or (c) the mutual agreement of the Parties to terminate this Agreement.  The termination of this Agreement shall not terminate, affect or impair any rights, obligations, or liabilities of a Party that have accrued prior to such termination.

Section 11.2  Term & Termination of Services.  The term of each Service shall commence at the Effective Time and shall continue in force until the earliest to occur of (a) the date on which the required provision of such Service shall cease as set forth on the applicable Schedule, (b) the termination of this Agreement or (c) the termination of such Service by a notice given by New ALF if Freightliner fail to remedy any noncompliance with respect to such Service pursuant to Section 6.2.

Section 11.3  Termination by Freightliner for Change in Control, etc.  Upon the occurrence of the earliest to occur of any of (a) a change in control of New ALF, (b) the potential access of a competitor through New ALF to Confidential Information of Freightliner or (c) any proposed or attempted assignment of this Agreement by New ALF without the consent of Freightliner (which consent may be withheld in the sole and absolute discretion of Freightliner), Freightliner may give a notice of termination of this Agreement.  For the purposes of this

10

Agreement, a "change in control" means a direct or indirect transfer of sufficient ownership interests to elect a majority of the board of directors (or the equivalent) of New ALF and a "potential access of a competitor through New ALF to Confidential Information" means either any transfer of ownership interests in New ALF to a competitor of Freightliner regardless of whether such ownership interests constitute a controlling interest, or any other combination or contractual relationship between New ALF and a competitor of Freightliner that could give the competitor access to Confidential Information of Freightliner.

Section 11.4  <u>Termination Events.</u>

(a)    New ALF, on the one hand, or Freightliner, on the other hand, may, by notice to the other Party, terminate this Agreement, without prejudice to any other rights or indemnities that the Party may have under all applicable terms of this Agreement, upon the occurrence of any of the following events:

(i)    the material breach by the non-terminating Party where such breach is not remedied to the reasonable satisfaction of the Party wishing to terminate this Agreement within thirty (30) days after written notice of the breach has been given by such Party; <u>provided</u> that Freightliner shall not be obligated to give New ALF an opportunity to cure, and Freightliner may instead give an immediate notice of termination, upon (A) any two or more failures by New ALF, within any period of twelve (12) consecutive calendar months, to pay to Freightliner or any Indemnified Freightliner Party any amount owed thereto by New ALF under this Agreement, including without limitation, any failure of New ALF to pay to Freightliner by the applicable due date any Service Costs or accrued interest thereon owing by New ALF to Freightliner under this Agreement, (B) any breach or default by New ALF with respect to its obligations under the Asset Purchase Agreement, including without limitation, any failure by New ALF to pay Freightliner any amount owing to Freightliner under Section 9.09 of the Asset Purchase Agreement or to pay Freightliner or any Indemnified Freightliner Party (as such term is used in the Asset Purchase Agreement) any amount owed thereto under Article XI of the Asset Purchase Agreement, or (C) any breach or default by New ALF, or any provider of credit support for the purchase obligation of New ALF, in response to any put by Freightliner of the Series B Interest.

(ii)    the filing by the non-terminating Party of a voluntary petition in bankruptcy or insolvency or petitions for reorganization under any bankruptcy law;

(iii)    where the non-terminating Party consents to an involuntary petition in bankruptcy or if a receiving order is given against it under the United States Bankruptcy Code or the comparable law of any other jurisdiction; or

(iv)    where an order, judgment or decree by a court of competent jurisdiction, upon the application of a creditor, is entered approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of the non-terminating Party's assets and such order, judgment or decree continues in effect for a period of thirty (30) consecutive days.

Section 11.5   Orderly Transition.  Prior to the expiration of any Service as contemplated under this Agreement, Freightliner shall in good faith comply with New ALF's reasonable request to effect the orderly transition and migration to New ALF or to a third party designated by New ALF of any data and/or other information that, in either such case, is non-Confidential Information, as set forth on, and on the terms and conditions provided in, Schedule C.  However, notwithstanding any provision of this Agreement apparently to the contrary, upon any termination of this Agreement, Freightliner shall be entitled to cease providing all Services as of the date of termination.

Section 11.6   Return of Electronic Data.  Without limiting the generality of Section 11.5, the Parties hereby further agree that upon expiration or termination of the provision of each Service provided hereunder, each Party is to deliver forthwith all electronic data and records belonging to the other Party to such Party in a useful electronic format that is agreed to by the Parties.


ARTICLE XII
COMMITTEE; CONFLICT RESOLUTION MECHANISM

Section 12.1   Committee.  In addition to the Liaisons serving from time to time pursuant to Section 3.1, two representatives of New ALF and two representatives of Freightliners shall serve as the members of a committee, which will attempt to resolve any and all conflicts between the Parties arising under this Agreement (the "Committee").  Each of New ALF and Freightliner shall promptly appoint in writing its respective representatives to serve on the Committee along with each of the Liaisons of New ALF and Freightliner.  Each Liaison shall serve on the Committee by reason of and only during tenure as a Liaison.  Each of New ALF and Freightliner may change one or both of its other representative(s) on the Committee at any time upon written notice to the other.

Section 12.2   Referral of Conflict to Committee; Other Remedies.  If either of New ALF or Freightliner disagrees with the other about any matter arising under this Agreement, that Party shall give the other Party and the Committee written notice of such conflict, which shall summarize the nature of the conflict and the actions taken to date to resolve such conflict.  The Committee shall then have thirty (30) days to attempt to resolve the conflict.  Each Party shall each have the right to pursue any other remedies, including through litigation, if the conflict is not resolved by the end of such thirty (30)-day period.


ARTICLE XIII
INTELLECTUAL PROPERTY

Section 13.1   Transition Licenses.  To the extent that New ALF, on the one hand, or Freightliner, on the other hand, owns any Intellectual Property ("Owned IP") necessary for use in providing or receiving the Services (each an "IP Owner"), Freightliner (in each case in which Freightliner is the IP Owner) grants to New ALF (an "IP Licensee"), and New ALF (in each case in which New ALF is the IP Owner) grants to Freightliner (also an "IP Licensee") a limited, non-

12

exclusive, non-transferable, non-sublicensable, royalty-free, fully paid up license to use the IP Owner's Owned IP (a) for the sole purpose of providing or receiving the applicable Services and (b) solely to the extent such IP Licensee reasonably requires the use of such IP Owner's Owned IP during the term of this Agreement or such other shorter period as is applicable under this Agreement. No IP Licensee shall use, copy, distribute, reproduce, modify, create derivative works of, store, collect, alter, disclose or provide or make available to any third party the IP Owner's Owned IP for any purpose other than as expressly provided in this Section 13.1.

Section 13.2   Ownership.

(a)      As between the Parties, each IP Owner (i) retains all rights, title, and interest in and to its Owned IP and (ii) shall be the sole and exclusive owner of any amendment, modification, improvement, derivative work or further development of or to such IP Owner's Owned IP ("Improvement"), regardless of whether the IP Licensee created, developed, conceived or reduced to practice (or contributed to the creation, development, conception or reduction to practice of) any such Improvement.  To the extent the IP Licensee has any rights, title or interest in or to any Improvement to the IP Owner's Owned IP, such IP Licensee hereby assigns and transfers to the IP Owner, at no cost to the IP Owner, all of such IP Licensee's rights, title and interest in and to such Improvements to the IP Owner's Owned IP without any conditions or restrictions, and the IP Licensee shall execute or cause any relevant employee or contractor to execute any additional documents to effectuate such transfer and assignment to the IP Owner.

(b)      The rights to the IP Owner's Owned IP granted to the IP Licensee are limited to those stated in this Agreement and do not constitute a transfer of ownership or a sale of any intellectual property rights.  During the term of this Agreement, each IP Licensee shall (i) reasonably protect the IP Owner's Owned IP and (ii) reproduce the copyright notice and other proprietary rights notices of the IP Owner on any copy of the IP Owner's Owned IP.

Section 13.3   Return of Intellectual Property.  Each Party agrees and acknowledges that the Intellectual Property that is the property of the other Party will be returned to the other Party at its request upon the termination of this Agreement pursuant to its terms or, in the case of any earlier expiration of the period for the provision of any Service hereunder, upon such expiration to the extent any such Intellectual Property is not relevant to any continuing Services being provided hereunder.  Upon termination of this Agreement or any earlier expiration of all Services for which any Intellectual Property was provided, each Party shall completely remove the other Party's Owned IP software from all computers and, upon the request and at the direction of the other Party, destroy any Owned IP software of the other Party.  Each Party shall, upon the other Party's request, confirm in writing the return of the other Party's Owned IP and the complete removal and destruction of the other Party's Owned IP software.

13

ARTICLE XIV
GENERAL PROVISIONS

Section 14.1    Headings.  The headings in this Agreement are for reference only, and shall not affect the interpretation of this Agreement.

Section 14.2    Entire Agreement.  This Agreement (including the Schedules) contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements, understanding and negotiations between the Parties and their respective Affiliates, both written or oral, with respect thereto.

Section 14.3    Amendment.  This Agreement may be amended, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by each of the Parties hereto or, in the case of a waiver, by the Party waiving compliance.

Section 14.4    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the conflicts of laws principles thereof.

Section 14.5    Waiver of Jury Trial.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.6    Confidentiality of Agreement.  The Parties agree that, other than as agreed or as required to implement the transactions contemplated hereby, the Parties will keep confidential the terms and conditions of this Agreement, except as otherwise required by applicable law (including, but not limited to, pursuant to any federal or state securities laws or insurance laws or the rules of any stock exchange or self regulatory organization or pursuant to any legal, regulatory or legislative proceedings).

Section 14.7    Notices.  Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally (by courier or otherwise), sent by facsimile transmission or sent by certified or registered mail, postage prepaid and return receipt requested, or by express mail.  Any such notice shall be deemed given when so delivered personally, sent by facsimile transmission or other electronic transmission or, if mailed, three (3) days after the date of deposit in the United States mails, as follows:

(a)    if to Freightliner:

Freightliner LLC
Attention:  Stefan Kuerschner
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR  97208 3849
Facsimile No.:  (503) 745 8188

14

# MCNAIR LAW FIRM, P.A.
### ATTORNEYS AND COUNSELORS AT LAW

JOHN E. ROSEN
jrosen@mcnair.net

*www.mcnair.net*

100 CALHOUN STREET, SUITE 400
CHARLESTON, SOUTH CAROLINA 29401

POST OFFICE BOX 1431
CHARLESTON, SOUTH CAROLINA 29402
TELEPHONE (843)723-7831
FACSIMILE (843) 722-3227

August 8, 2006

**VIA FEDERAL EXPRESS**

Freightliner LLC
Attn: Stefan Kuerschner
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR 97208-3849

Freightliner LLC
Attn: General Counsel
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR 97208-3849

RE: <u>Change of Address for Notices in Transition Services Agreement, dated December 14, 2005</u> (the "Agreement")

Dear Mr. Kuerschner:

Pursuant to the notice provision provided for in Section 14.7 of the Agreement, please send all future correspondence addressed to New ALF in connection with the Agreement to the following address:

American LaFrance, LLC
Attn: David M. Mulder, Chief Financial Officer
8500 Palmetto Commerce Parkway
Ladson, SC 29456-6700

With a copy to:

McNair Law Firm, P.A.
Attn: Elizabeth (Lisa) J. Philp
100 Calhoun Street
Suite 400
Charleston, SC 29401

Thank you for your attention to this matter.

Sincerely,

McNair Law Firm, P.A.

John E. Rosen

JER/mc

ANDERSON • BLUFFTON • CHARLESTON • CHARLOTTE • COLUMBIA • GEORGETOWN • GREENVILLE • HILTON HEAD ISLAND • MYRTLE BEACH • RALEIGH

CHARLESTON 277267v1

with a copy to:

Freightliner LLC
Attention:  General Counsel
4747 North Channel Avenue
Portland, OR 97217
PO Box 3849
Portland, OR  97208 3849
Facsimile No.:  (503) 745 7959

(b)    if to New ALF:

American LaFrance, LLC
8500 Palmetto Commerce Pkwy.
Ladson, South Carolina 29456 -6700
Attention: John Stevenson
Telephone: (843) 486-7401
Facsimile: (843) 486-7500

with a copy to:

Richards Spears Kibbe & Orbe LLP
One World Financial Center
New York, New York  10281-1003
Attention:    Jonathan Kibbe, Esq.
Facsimile:    (212) 530-1801

Any Party may, by notice given in accordance with this Section 14.7 to the other Party, designate another address or person for receipt of notices hereunder provided that notice of such a change shall be effective upon receipt.

Section 14.8   Waivers; Non Contractual Remedies; Preservation of Remedies.  No delay on the part of a Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, or shall any waiver on the part of a Party of any right, power or privilege, or any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that a Party may otherwise have at law or in equity.

Section 14.9   Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, permitted assigns and legal representatives.  Neither this Agreement, nor any right hereunder, may be assigned by a Party (in whole or in part) without the prior written consent of the other Party hereto.

Section 14.10   No Third Party Beneficiaries.  Nothing in this Agreement is intended or shall be construed to give any Person, other than the Parties hereto, their successors and

15

permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein, except in the case of the Indemnified New ALF Parties and the Indemnified Freightliner Parties as provided in Article IX.

Section 14.11    Counterparts; Facsimile Signatures.  This Agreement may be executed by the Parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement.

Section 14.12    Severability.  Any provision of this Agreement which is deemed invalid or unenforceable shall not affect any other provision and shall be deemed to be severable.  In the event any provision is deemed invalid or unenforceable, the Parties shall negotiate in good faith and use commercially reasonable efforts to replace the invalid or unenforceable provision by a valid and enforceable substitute provision the effect of which is as close as possible to the intended effect of the invalid or unenforceable provisions.

Section 14.13    Force Majeure.  Neither Party shall be liable for any delay or failure to furnish any Services hereunder if such delay or failure is due to causes or conditions reasonably beyond the control of such Party without its fault or negligence.  Such causes shall include, but not be limited to, an act of God, a civil disturbance, terrorism or acts of terrorism, labor unrest, riots, acts of war, epidemics, governmental regulations imposed after the fact, fire, earthquakes, floods or other disasters; provided, however, it is understood that this Section 14.13 is intended only to suspend and not discharge a Party's obligations under this Agreement, and that when the causes of the failure or delay are removed or alleviated the affected Party shall resume performance of its obligations hereunder.  A Party that is unable to fulfill its obligations due to any "force majeure" event shall (a) promptly after the occurrence thereof give notice to the other Party with details of such event and (b) use its commercially reasonable best efforts to remedy such event as promptly as practicable.  Such Party shall not be liable for any Loss resulting directly or indirectly from the delay or failure in performance due to any such event.

Section 14.14    Enforcement; Attorneys' Fees.  Each of the Parties hereby acknowledges and agrees that (a) the provisions of this Agreement are of a special and unique nature, the failure of fulfillment of which cannot be accurately compensated for in damages by an action at law, (b) the breach or threatened breach of any provision of this Agreement would cause the Party entitled to the benefit of such provision ("benefited Party") irreparable harm and (c) money damages would not be an adequate remedy for any breach or threatened breach of the provisions of this Agreement.  Therefore, the Parties hereto agree that the benefited Party shall be entitled to equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond or other security or any similar requirement or proving actual damages) to prevent breaches or threatened breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, this being in addition to any other remedy to which the benefited Party may be entitled under this Agreement.  In a legal proceeding under this Agreement brought at law or in equity or both (including, without limitation, any proceeding in bankruptcy), the non-prevailing Party shall pay all costs and expenses incurred by the prevailing Party, including, without limitation, all reasonable attorneys' fees and costs and expenses, whether at trial, on appeal or in connection with any petition for review.  For purposes of this

16

Agreement, the term "prevailing Party" shall be deemed to include, without limitation, a Party that successfully opposes a petition for review filed with an appellate court.

[Remainder of page intentionally left blank; signatures follow on next page]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement on the date set forth above.

FREIGHTLINER LLC

By: _____

Name: Chris Patterson

Title:   President and Chief Executive Officer

[Signatures continue on next page]

**AMERICAN LAFRANCE, LLC**

By: _____
Name: Lynn Tilton
Title: Manager

## LIST OF SCHEDULES TO TRANSITION SERVICES AGREEMENT

| | |
|---|---|
| **Schedule A** | **Engineering Transition Services Schedule** |
| **Schedule B** | **Finance Transition Schedule** |
| **Schedule C** | **Service Level Schedule – Application and Infrastructure Support; Freightliner IT Portfolio for New ALF** |
| **Schedule D** | **Parts and Service Transition Schedule** |
| **Schedule E** | **Supply Chain Services Transition Schedule** |
| **Schedule F** | **Transition Employees Schedule** |
| **Schedule G** | **Transition Service Schedule for Vehicle Compliance Issues** |
| **Schedule H** | **Schedule for Warranty Services** |
| **Schedule I** | **Systems Access Agreement** |
| **Schedule J** | **Customs Compliance Services Transition Schedule** |

## Schedule A          Engineering Transition Services Schedule

**Schedule B          Finance Transition Schedule**

**Schedule C**        **Service Level Schedule – Application and Infrastructure Support; Freightliner IT Portfolio for New ALF**

**Schedule D        Parts and Service Transition Schedule**

## Schedule E          Supply Chain Services Transition Schedule

**Schedule F          Transition Employees Schedule**

**<u>Schedule G</u>          <u>Transition Service Schedule for Vehicle Compliance Issues</u>**

**Schedule H _____ Schedule for Warranty Services**

**Schedule I          Systems Access Agreement**

<u>Schedule J</u>        <u>Customs Compliance Services Transition Schedule</u>

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------X

FREIGHTLINER LLC,                                  Index No. 07-604037

                   Plaintiff,

             – against –                        **COMPLAINT**

AMERICAN LAFRANCE, LLC,

                  Defendant.

------------------------------------------------------------------X

        Plaintiff Freightliner LLC ("Freightliner"), by its undersigned attorneys,

for its Complaint against defendant American LaFrance, LLC ("New ALF"), alleges as

follows:

## INTRODUCTION

        1.      This is a straightforward breach of contract action by Freightliner

to recover amounts owed by New ALF for services Freightliner performed to assist New

ALF in running its business operations after it acquired the assets of Freightliner's fire

apparatus and emergency vehicles business, American LaFrance, from Freightliner's

subsidiary, American LaFrance Corporation ("Old ALF"), in December 2005.

        2.      By this action, Freightliner seeks compensatory damages, of no

less than $10,000,000 plus applicable interest, caused by New ALF's breach of its clear,

contractual obligations.

NEW YORK
COUNTY CLERK'S OFFICE

DEC 10 200?

NOT COMPARED
WITH COPY FILE

506150.5

## THE PARTIES

3.      Plaintiff Freightliner is a Delaware limited liability company, with its principal place of business at 4747 North Channel Avenue, P.O. Box 3849, Portland, Oregon 97217.

4.      Defendant New ALF is a Delaware limited liability company, with its principal place of business in North Charleston, South Carolina. New ALF is controlled by Patriarch Partners, LLC, a Delaware limited liability company with its principal places of business in North Carolina and New York.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over New ALF pursuant to Section 12.11 of the Asset Purchase Agreement (as defined below), which by its terms is governed by New York law, wherein New ALF consented and submitted to the jurisdiction of the courts of the State of New York and waived any defenses based on lack of personal jurisdiction. This Court also has jurisdiction over New ALF pursuant to CPLR § 302(a)(1) because New ALF transacts business within the State of New York.

6.      Venue for this action is proper in this county pursuant to CPLR § 501 because New ALF consented to venue in any court in the State of New York and waived any defenses based on venue or inconvenience of this forum in Section 12.11 of the Asset Purchase Agreement.

## FACTUAL ALLEGATIONS

A.      **New ALF Acquires the Assets of Old ALF**

7.      American LaFrance has been one of the leading manufacturers of fire and emergency services vehicles in North America, with a history dating to the

1870s. American LaFrance produces and distributes a full line of fire and emergency

apparatus including chassis, aerials, ambulances, pumper fire engines, rescue vehicles

and tankers.

8.     Freightliner owned Old ALF from 1995 through 2005, when it

divested itself of the fire and emergency vehicles manufacturing subsidiary.

9.     Pursuant to an Asset Purchase and Sale Agreement dated

December 14, 2005 ("Asset Purchase Agreement"), New ALF, an entity formed by New

York investment firm Patriarch Partners LLC, acquired substantially all of the assets of

Old ALF.

**B.     Freightliner Agrees to Perform Transitional Services to Allow New ALF to
Ease Into its New Role**

10.     Because neither Patriarch nor New ALF had experience in fire and

emergency vehicles manufacturing operations, or any experience in the commercial

vehicle manufacturing industry, Freightliner agreed to perform certain "transition

services," to help bridge the change in ownership while keeping the business operational.

11.     Freightliner and New ALF entered into a Transition Services

Agreement, dated December 14, 2005 ("Transition Services Agreement"), which set forth

a vast array of services Freightliner would perform for New ALF following the sale. The

details and scope of the services the parties agreed Freightliner would perform were set

forth in the schedules to the Transition Services Agreement.

12.     For varying periods following the sale as set forth in the Transition

Services Agreement, the parties agreed that Freightliner would support the transition of

the business in various areas in order to enable New ALF to work toward running its

operations independently.

13.    The parties agreed that Freightliner would assist New ALF in

maintaining its financial system, provide accounts payable services, as well as provide

information technology (IT) support for New ALF's operations.

14.    Freightliner further contracted to provide aftermarket parts and

services to New ALF for twelve months following the sale.  Freightliner committed to

continue to procure, stock and sell aftermarket parts for certain truck lines, including the

Condor and custom cab/chassis Eagle and Metro models.  Freightliner agreed to provide

New ALF the net profits related to the sales to the extent they related solely to New ALF,

less a handling fee.

15.    Freightliner also committed to provide certain supply chain

services for a period of two years.  In particular, the parties agreed that Freightliner

would procure key components of the Eagle, Metro and Condor custom cab/chassis truck

lines as well as provide Acterra and M2 commercial cab/chassis for New ALF's fire and

rescue truck manufacturing operation.

16.    In addition to supplying key parts, Freightliner was to perform key

services related to New ALF's supply chain.  Freightliner agreed to handle all vendor

charge backs and debit memos, provide support to New ALF in dealing with metal

suppliers, and provide inbound logistics services such as freight bill audit and payment

and supplier routing instructions.

17.    The parties also agreed that Freightliner would assist New ALF in

ensuring that its products and manufacturing operations complied with applicable

governmental regulations, including the Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq.* and customs requirements.

18.     Following the sale, New ALF was to provide warranty services for Old ALF legacy vehicles as well as for vehicles manufactured or sold by New ALF. Under the terms of the Transition Services Agreement, Freightliner was to administer associated warranty claims in its system until New ALF was able to establish its own warranty system.  In addition, Freightliner was to bear the warranty costs of Old ALF legacy vehicles.

19.     By the terms of the Transition Services Agreement, Freightliner invoiced New ALF monthly for Service Costs related to the transition services it provided.  Freightliner provided New ALF billing data "in reasonably sufficient detail to allow New ALF to ascertain the Services provided and the billing for the same," as required by Section 4.2(a) of the Transition Services Agreement.

20.     New ALF retained the right to dispute any Services Costs invoiced that it "reasonably believes to be incorrect or inconsistent" with the parties' agreement, but does not have the right to withhold payment of any amount that is "either not related to a disputed charge or that constitutes any undisputed portion of a specific charge."

21.     New ALF agreed to pay Freightliner for all Service Costs within 30 days of the invoice date, unless the parties agreed to extend the terms of payment. The Transition Service Agreement provided that Service Costs not paid within thirty days would accrue interest at the rate of eighteen percent.

22.     Freightliner and New ALF agreed that any disputes regarding Service Costs billed under the Transition Services Agreement would be referred to a

Committee composed of representatives of both companies, before either party could

pursue legal action against the other. If the Committee was unable to resolve the parties'

dispute within thirty days, the aggrieved party was free to pursue other remedies to

enforce its rights.

23.     The Transition Services Agreement provided an exception to the

requirement that all such disputes be referred to the Committee in the event that the

parties had recurring issues. Freightliner and New ALF agreed that "neither Party shall

be required to refer any such dispute to the Committee" if it had referred two such other

disputes within the preceding year.

24.     Since December 2005, Freightliner has faithfully performed its

contractual obligations to New ALF. Freightliner has billed New ALF for the transition

services provided according to the terms set forth in the parties' agreement.

25.     Notwithstanding its clear contractual obligation to pay Freightliner

for all of the services performed pursuant to the Transition Services Agreement, New

ALF has refused to do so.

26.     Despite the fact that New ALF had defaulted numerous times in

the previous twelve months, thus allowing Freightliner to immediately terminate the

Transition Services Agreement and seek its remedies, Freightliner allowed the Service

Costs disputes to be referred to the Committee established by Section12.1 of the

Transition Services Agreement as of August 9, 2007. The Committee was unable to

resolve the parties' disputes within the 30 day period provided by the Transition Services

Agreement.

27.     In an effort to render this litigation unnecessary, Freightliner shared with New ALF a draft of this Complaint before filing it.  Thereafter, Freightliner was told by Lynn Tilton, New ALF's Manager, that the relationship between New ALF and Freightliner had been mishandled by New ALF's management, that she was installing a new management team at New ALF, and that Freightliners bills would be paid.  Notwithstanding Ms. Tilton's assurances, Freightliner's bills remain unpaid.

### CAUSE OF ACTION
**Breach of Contract**

28.     Freightliner repeats and realleges the allegations in paragraphs 1 through 27 as if fully set forth herein.

29.     The Transition Services Agreement  between Freightliner and New ALF is a binding and enforceable contract.

30.     Freightliner performed transition services for New ALF pursuant to the terms of the Transition Services Agreement, and the schedules thereto.

31.     Freightliner billed New ALF for the Service Costs as required by the terms of their agreement, and New ALF has failed to pay the full amount of those Service Costs, as it is contractually obligated to do.

32.     In light of the above, New ALF's failure to pay for Service Costs rendered has resulted in damages to Freightliner, for which it hereby seeks recovery.

506150.5

**WHEREFORE**, plaintiff Freightliner demands judgment against defendant New ALF as follows:

(a)     for compensatory damages in an amount to be determined at trial, but believed to be not less than $10,000,000, plus interest in accordance with Section 4.2(c) of the Transition Services Agreement and applicable law;

(b)     for costs and attorneys' fees as provided in Section 14.14 of the Transition Services Agreement; and

(c)     for such other and further relief as this Court deems just and proper.

Dated: New York, New York
       December 10, 2007

FRIEDMAN KAPLAN
SEILER & ADELMAN LLP

By: _____
    Eric Seiler
    Lance J. Gotko
    Mala Ahuja Harker
    1633 Broadway
    New York, NY 10019
    (212) 833-1100

*Attorneys for Plaintiff Freightliner LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------X
                                       :

FREIGHTLINER LLC,                      :   Index No. 07-604037

                            :

               Plaintiff,   :   Date Filed:
                            :   December 10, 2007

      – against –            :

                            :   **SUMMONS**

AMERICAN LAFRANCE, LLC,      :

                            :   The basis of
              Defendant.   :   venue is defendant's
                            :   contractual consent.
---------------------------------------------------------------------X

TO DEFENDANT:

                    AMERICAN LAFRANCE, LLC
                    1090 Newton Way
                    Summerville, SC 29483-7430

          YOU ARE HEREBY SUMMONED to answer the complaint in this action
and to serve a copy of your answer or, if the complaint is not served with this summons,
to serve a notice of appearance, on plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

NEW YORK
COUNTY CLERK'S OFFICE

DEC 1 0 2007

NOT COMPARED
WITH COPY FILE

554894.1

Dated: New York, New York
      December 10, 2007

                    FRIEDMAN KAPLAN
                      SEILER & ADELMAN LLP

By: _____
                    Eric Seiler
                    Lance J. Gotko
                    Mala Ahuja Harker
                    1633 Broadway
                    New York, NY 10019
                    (212) 833-1100

                    *Attorneys for Plaintiff Freightliner LLC*

554894.1

2

B 1 (Official Form 1) (12/07)

| United States Bankruptcy Court<br>**District of Delaware** | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>American LaFrance, LLC | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>N/A |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>See Attached | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>N/A |
| Last four digits of Social-Security/Complete EIN or other Tax-I.D. No. (if more than one, state all): *Subject to Fed. R. Bankr. P. 9037. See note below.*<br>20-3680664 | Last four digits of Social-Security/Complete EIN or other Tax-I.D. No. (if more than one, state all): *Subject to Fed. R. Bankr. P. 9037. See note below.*<br>N/A |
| Street Address of Debtor (No. and Street, City, and State):<br>1090 Newton Way<br>Summerville, SC<br>ZIP CODE 29483 | Street Address of Joint Debtor (No. and Street, City, and State):<br>N/A<br>ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>Berkeley | County of Residence or of the Principal Place of Business:<br>N/A |
| Mailing Address of Debtor (if different from street address):<br>N/A<br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br>N/A<br>ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>See attached<br>ZIP CODE | |

| **Type of Debtor**<br>(Form of Organization)<br>(Check one box.) | **Nature of Business**<br>(Check one box.) | **Chapter of Bankruptcy Code Under Which<br>the Petition is Filed** (Check one box.) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☑ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☑ Other | ☐ Chapter 7      ☐ Chapter 15 Petition for<br>☐ Chapter 9           Recognition of a Foreign<br>☑ Chapter 11         Main Proceeding<br>☐ Chapter 12     ☐ Chapter 15 Petition for<br>☐ Chapter 13         Recognition of a Foreign<br>                          Nonmain Proceeding |
| | **Tax-Exempt Entity**<br>(Check box, if applicable.) | **Nature of Debts**<br>(Check one box.) |
| | ☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code). | ☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or house-hold purpose."     ☑ Debts are primarily business debts. |

| **Filing Fee** (Check one box.) | **Chapter 11 Debtors** |
|---|---|
| ☑ Full Filing Fee attached.<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br><br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,190,000.<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b). |

| **Statistical/Administrative Information** | | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|
| ☑ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | | |

Estimated Number of Creditors

| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | Over 100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

*Fed. R. Bankr. P. 9037 requires redaction of an individual debtor's taxpayer-identification number (ITIN) — include last 4 digits only*

B 1 (Official Form 1) (12/07)                                                                                                                            **Page 2**

| Voluntary Petition<br>*(This page must be completed and filed in every case.)* | Name of Debtor(s):<br>American LaFrance, LLC |
|---|---|

| All Prior Bankruptcy Cases Filed Within Last 8 Years (If more than two, attach additional sheet.) |||
|---|---|---|
| Location<br>Where Filed: | Case Number: | Date Filed: |
| Location<br>Where Filed: | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet.) |||
|---|---|---|
| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

| Exhibit A | Exhibit B |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐  Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.  I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br>      Signature of Attorney for Debtor(s)         (Date) |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐  Yes, and Exhibit C is attached and made a part of this petition.

☑  No.

---

**Exhibit D**

(To be completed by every individual debtor.  If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐  Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

☐  Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

---

**Information Regarding the Debtor - Venue**
(Check any applicable box.)

☑  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

---

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐  Landlord has a judgment against the debtor for possession of debtor's residence.  (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐  Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐  Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

Page 3

B 1 (Official Form) 1 (12/07)

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case.)* | **American LaFrance, LLC** |

<table>
<tr><td colspan="2" align="center">Signatures</td></tr>
<tr><td align="center"><b>Signature(s) of Debtor(s) (Individual/Joint)</b></td><td align="center"><b>Signature of a Foreign Representative</b></td></tr>
<tr>
<td valign="top">

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
   Signature of Debtor

X _____
   Signature of Joint Debtor

_____
Telephone Number (if not represented by attorney)

_____
Date

</td>
<td valign="top">

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.

☐ Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
   (Signature of Foreign Representative)

_____
(Printed Name of Foreign Representative)

_____
Date

</td>
</tr>
<tr><td align="center"><b>Signature of Attorney*</b></td><td align="center"><b>Signature of Non-Attorney Bankruptcy Petition Preparer</b></td></tr>
<tr>
<td valign="top">

X _____
   Signature of Attorney for Debtor(s)

_____
Printed Name of Attorney for Debtor(s)

_____
Firm Name

_____
Address

_____

_____
Telephone Number

_____
Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

</td>
<td valign="top">

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

_____
Address

X _____

_____
Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*

</td>
</tr>
<tr>
<td valign="top">

<b>Signature of Debtor (Corporation/Partnership)</b>

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _/s/ William Hinz_____
   Signature of Authorized Individual

   William Hinz
Printed Name of Authorized Individual

Title of Authorized Individual   CEO

Date   1-28-08

</td>
<td></td>
</tr>
</table>

| B 1 (Official Form) 1 (12/07) | Page 3 |
|---|---|

| **Voluntary Petition**<br>*(This page must be completed and filed in every case.)* | **Name of Debtor(s):**<br>American LaFrance, LLC |
|---|---|

| **Signatures** ||

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7]  I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition]  I have obtained and read the notice required by 11 U.S.C. § 342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>    Signature of Debtor<br><br>X _____<br>    Signature of Joint Debtor<br><br>    _____<br>    Telephone Number (if not represented by attorney)<br><br>    _____<br>    Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only one box.)<br><br>☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.<br><br>☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition.  A certified copy of the order granting recognition of the foreign main proceeding is attached.<br><br>X _____<br>    (Signature of Foreign Representative)<br><br>    _____<br>    (Printed Name of Foreign Representative)<br><br>    _____<br>    Date |

| **Signature of Attorney\*** | **Signature of Non-Attorney Bankruptcy Petition Preparer** |
|---|---|
| X _____<br>    Signature of Attorney for Debtor(s)<br>    Christopher A. Ward<br>    Printed Name of Attorney for Debtor(s)<br>    Klehr, Harrison, Harvey Branzburg & Ellers, LLP<br>    Firm Name<br>    919 Market Street, Suite 1000<br>    Address<br>    Wilmington, DE 19801<br>    _____<br>    (302) 426-1189<br>    Telephone Number<br>    _____<br>    Date<br><br>\*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | I declare under penalty of perjury that:  (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section.  Official Form 19 is attached.<br><br>    _____<br>    Printed Name and title, if any, of Bankruptcy Petition Preparer<br><br>    _____<br>    Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.) |

| **Signature of Debtor (Corporation/Partnership)** | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>    Signature of Authorized Individual<br><br>    _____<br>    Printed Name of Authorized Individual<br><br>    _____<br>    Title of Authorized Individual<br><br>    _____<br>    Date |     _____<br>    Address<br><br>X _____<br><br>    _____<br>    Date<br><br>Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.<br><br>Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156.* |

B 1 (Official Form) 1 (12/07)                                                                    Page 3

| Voluntary Petition | Name of Debtor(s): |
| *(This page must be completed and filed in every case.)* | American LaFrance, LLC |

## Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct.<br>[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br>[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.<br><br>(Check only one box.)<br><br>☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.<br><br>☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. |
| X _____<br>    Signature of Debtor<br><br>X _____<br>    Signature of Joint Debtor<br><br>_____<br>    Telephone Number (if not represented by attorney)<br><br>_____<br>    Date | X _____<br>    (Signature of Foreign Representative)<br><br>_____<br>    (Printed Name of Foreign Representative)<br><br>_____<br>    Date |

| Signature of Attorney* | Signature of Non-Attorney Bankruptcy Petition Preparer |
|---|---|
| X  *Ian T. Peck*<br>    Signature of Attorney for Debtor(s)<br>    Ian T. Peck<br>    Printed Name of Attorney for Debtor(s)<br>    Haynes and Boone, LLP<br>    Firm Name<br>    901 Main Street, Suite 3100<br>    Address<br>    Dallas, Texas 75202<br><br>    (817) 347-6613<br>    Telephone Number<br><br>    _____<br>    Date<br><br>*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | I declare under penalty of perjury that:  (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.<br><br>_____<br>    Printed Name and title, if any, of Bankruptcy Petition Preparer<br><br>_____<br>    Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)<br><br>    Address _____<br><br>X _____<br><br>_____<br>    Date |
| **Signature of Debtor (Corporation/Partnership)** | Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above. |
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>    Signature of Authorized Individual<br><br>_____<br>    Printed Name of Authorized Individual<br><br>_____<br>    Title of Authorized Individual<br><br>_____<br>    Date | Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.<br><br>If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.<br><br>*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.* |

**All other names used in past 8 years (including trade names)**

American LaFrance
American LaFrance Aerials
Ladder Towers, Inc (LTI)
American LaFrance Medic Master
Aero Products, Inc.
American LaFrance Northwest
ALF Northwest
RD Murray
American LaFrance Hamburg
Becker Fire Equipment
American LaFrance Casper
American LaFrance Los Angeles

## Principal Addresses

American LaFrance, LLC
1090 Newton Way
Summerville, SC 29483
Berkeley County

American LaFrance, LLC
S-4760 Camp Road
Hamburg, NY 14075
Erie County

American LaFrance, LLC
64 Cocalico Creek Road
Ephrata, PA 17522
Lancaster County

American LaFrance, LLC
235 N. 16th Street
Lebanon, PA 17042
Lebanon, PA

American LaFrance, LLC
3705 St. John's Parkway
Sanford, FL 32771
Seminole County

American LaFrance, LLC
1770 E. Lake Mary Blvd
Sanford, FL 32773
Seminole County

American LaFrance, LLC
5317 NE Portland Hwy
Portland, OR 97218
Multnomah County

American LaFrance, LLC
13800 Valley Blvd.
Fontana, CA 92335
San Bernadino County

## WRITTEN CONSENT OF BOARD OF MANAGERS
## OF AMERICAN LAFRANCE, LLC

The undersigned, constituting all of the members of the Board of Managers of American LaFrance, LLC (the "Company"), do hereby waive any and all requirements for calling, giving notice of, and holding a special meeting and, in lieu of such meeting, do hereby consent to, approve of and adopt the following resolutions:

### Filing and Prosecution of Bankruptcy Case

**RESOLVED**, that it is in the best interest of the Company, its creditors, members, and other interested parties to authorize officers of the Company to cause to be filed a petition seeking relief under the provisions of chapter 11 of title 11, United States Code on or after January 28, 2008; and it be

**FURTHER RESOLVED**, all actions taken by the officers and directors of the Company, with respect to the chapter 11 filing and all matters and actions taken during the chapter 11 proceedings are hereby in all respects authorized, approved, ratified, confirmed and adopted as the acts of the Company.

This action is the written consent of the sole member of the Board of Managers is effective the __ day of January, 2008.

By: _____

Lynn Tilton
Sole Member

1/28/08  8:58AM

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
## District of Delaware

In re   **American LaFrance LLC** _____
                                          Debtor(s)

Case No. _____
Chapter   **11** _____

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [*or chapter 9*] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br><br>Name of creditor and complete mailing address including zip code | (2)<br><br>Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br><br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br><br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br><br>Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| ACE-USA<br>ACE Bond Services | ACE-USA<br>ACE Bond Services | Letters of credit associated with performance and/or bid bonds | Contingent<br>Disputed | 18,200,000.00<br><br>(26,374,756.00 secured) |
| ALLISON TRANSMISSION, INC<br>P O BOX 894<br>INDIANAPOLIS, IN 46206 | ALLISON TRANSMISSION, INC<br>P O BOX 894<br>INDIANAPOLIS, IN 46206 | Trade Payable | Disputed | 2,214,529.19 |
| AME INC<br>PO BOX 909<br>FORT MILL, SC 29716-0909 | AME INC<br>PO BOX 909<br>FORT MILL, SC 29716-0909 | Trade Payable | Disputed | 725,131.84 |
| CANANWILL, INC<br>1000 MILWAUKEE AVE<br>GLENVIEW, IL 60025 | CANANWILL, INC<br>1000 MILWAUKEE AVE<br>GLENVIEW, IL 60025 | Trade Payable | Disputed | 2,205,261.07 |
| CLASS 1 INC<br>5794 COLLECTION DR<br>CHICAGO, IL 60693 | CLASS 1 INC<br>5794 COLLECTION DR<br>CHICAGO, IL 60693 | Trade Payable | Disputed | 1,129,577.00 |
| CLAY COUNTY<br>Kenneth Stach<br>4383 State Rt. 31<br>Clay, NY 13041 | CLAY COUNTY<br>Kenneth Stach<br>4383 State Rt. 31<br>Clay, NY 13041 | Customer Deposit | Contingent | 629,360.00 |
| ENAP Grupo De Empresas<br>Herman P. Zumarana<br>Av. Borgono 25777, Concon<br>CHILE | ENAP Grupo De Empresas<br>Herman P. Zumarana<br>Av. Borgono 25777, Concon<br>CHILE | Customer Deposit | Contingent | 598,376.00 |
| Freightliner, LLC | Freightliner, LLC | | Disputed | 10,578,000.00 |
| HALE PRODUCTS INC<br>PO BOX 98548<br>CHICAGO, IL 60693 | HALE PRODUCTS INC<br>PO BOX 98548<br>CHICAGO, IL 60693 | Trade Payable | Disputed | 714,339.45 |
| IBM CORPORATION<br>PO BOX 643600<br>PITTSBURGH, PA 15264-3600 | IBM CORPORATION<br>PO BOX 643600<br>PITTSBURGH, PA 15264-3600 | Trade Payable | Disputed | 840,092.14 |
| IBM CORPORATION<br>PO BOX 534151<br>ATLANTA, GA 30353-4151 | IBM CORPORATION<br>PO BOX 534151<br>ATLANTA, GA 30353-4151 | Trade Payable | Disputed | 707,799.81 |

1/28/08 8:58AM

In re   **American LaFrance LLC** _____    Case No. _____
                          Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| JEDBURG INDUSTRIAL PROPERTY 1<br>PO BOX 3524<br>SPARTANBURG, SC 29304 | JEDBURG INDUSTRIAL PROPERTY 1<br>PO BOX 3524<br>SPARTANBURG, SC 29304 | Trade Payable | Disputed | 571,518.05 |
| OFAB INC<br>2817 NW 8TH PLACE<br>OCALA, FL 34475 | OFAB INC<br>2817 NW 8TH PLACE<br>OCALA, FL 34475 | Trade Payable | Disputed | 627,380.24 |
| Patriach Partners Asset Services<br>227 West Trade Street<br>Suite 1400<br>Charlotte, NC 28202 | Patriach Partners Asset Services<br>227 West Trade Street<br>Suite 1400<br>Charlotte, NC 28202 | Trade Payable | Disputed | 3,382,838.00 |
| PATRIARCH PARTNERS AGENCY SERVICES<br>227 WEST TRADE STREET<br>CHARLOTTE, NC 28202 | PATRIARCH PARTNERS AGENCY SERVICES<br>227 WEST TRADE STREET<br>CHARLOTTE, NC 28202 | Trade Payable | Disputed | 3,966,532.60 |
| PNEU-MECH SYSTEMS MFG. INC<br>201 PNEU-MECH DRIVE<br>STATESVILLE, NC 28625 | PNEU-MECH SYSTEMS MFG. INC<br>201 PNEU-MECH DRIVE<br>STATESVILLE, NC 28625 | Trade Payable | Disputed | 2,631,962.42 |
| REHOBOTH BEACH VFC<br>Leonard Tylecki, Comm. Chair<br>PO Box 327, 219 Rehoboth Ave<br>Reboboth Beach, DE 19971 | REHOBOTH BEACH VFC<br>Leonard Tylecki, Comm. Chair<br>PO Box 327, 219 Rehoboth Ave<br>Reboboth Beach, DE 19971 | Customer Deposit | Contingent | 528,761.00 |
| Traveler's Casualty & Surety | Traveler's Casualty & Surety | Letters of credit associated with performance and/or bid bonds | Contingent<br>Disputed | 2,850,000.00<br><br>(4,947,000.00 secured) |
| VARIOUS EMPLOYEES | VARIOUS EMPLOYEES | Accrued Vacation | | 1,455,333.63 |
| Warranty Claims | Warranty Claims | Warranty reserve for vehicles delivered within the last year | Contingent | 7,105,000.00 |

1/28/08 8:58AM

In re __American LaFrance LLC_____     Case No. _____

                                    Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
(Continuation Sheet)

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

    I, the President & Chief Executive Officer of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date __January 28, 2008_____     Signature __/s/ Bill Hinz_____

                                                  **Bill Hinz**
                                                  **President & Chief Executive Officer**

*Penalty for making a false statement or concealing property*:  Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| AMERICAN LAFRANCE, LLC | § | |
| | § | Case No. 08-10178 (BLS) |
| Debtor. | § | |
| | § | |

---

**FOURTH AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF PLAN OF REORGANIZATION OF AMERICAN LAFRANCE, LLC**

---

**THIS FOURTH AMENDED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, BUT IS BEING TRANSMITTED TO YOU IN CONNECTION WITH THE DEBTOR-IN-POSSESSION'S REQUEST THAT IT BE APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THE TRANSMISSION OF THIS DISCLOSURE STATEMENT TO YOU IS NOT A SOLICITATION OF YOUR VOTE ON THE PLAN.**

Dated: March 27, 2008

/s/ Christopher A. Ward
KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS, LLP
Joanne B. Wills (No. 2357)
Christopher A. Ward (No. 3877)
919 Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193
jwills@klehr.com
cward@klehr.com

Counsel for the Debtor
and Debtor in Possession

/s/ Ian T. Peck
HAYNES AND BOONE, LLP
Ian T. Peck (TX 24013306)
Abigail Ottmers (TX 24037225)
901 Main Street, Suite 3100
Dallas, Texas 75202
Telephone: 214.651.5000
Facsimile: 214.651.5940
ian.peck@haynesboone.com
abigail.ottmers@haynesboone.com

# I. INTRODUCTION

American LaFrance, LLC ("ALF" or the "Debtor"), submits this Fourth Amended *Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Plan of Reorganization of American LaFrance, LLC* (as may be amended, the "Disclosure Statement"). This Disclosure Statement is to be used in connection with the solicitation of votes on the *Third Amended Plan of Reorganization of American LaFrance, LLC* (the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**. Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article II. of the Plan entitled "Definitions").

In addition to the Plan, the Debtor has filed its Motion for an Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of Its Assets; (B) Approving an Asset Purchase Agreement, Subject to Higher and/or Better Offers; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (the "Sale Motion"). If the Plan is confirmed, the Debtor will withdraw the Sale Motion. **If the Plan is not confirmed, the Debtor will proceed with the Sale Motion and cause the liquidation of its remaining assets. It is anticipated that, if the Debtor were liquidated, Holders of General Unsecured Claims would not be entitled to any distribution.**

## A.    Notice to Holders of Claims and Interests

The purpose of this Disclosure Statement is to enable Creditors and Interest Holders of the Debtor whose Claims and Interests are impaired to make an informed decision in exercising their right to vote to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR ON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT CAREFULLY.**

On March 25, 2008, the Bankruptcy Court entered an order pursuant to Bankruptcy Code section 1125 (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against and Interests in the Debtor, to make an informed judgment with respect to the acceptance or rejection of the Plan. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement.

**APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR MERITS OF THE PLAN.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to

accept or reject the Plan may be made except pursuant to this Disclosure Statement and Bankruptcy Code section 1125. No entity entitled to vote on the Plan should rely on any information relating to the Debtor, its business, or the Plan other than that contained in the Disclosure Statement and the exhibits hereto. Unless otherwise indicated, the source of all information set forth herein is the Debtor and his professionals.

After carefully reviewing this Disclosure Statement, including the attached exhibits and schedules, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and returning the same to the address set forth on the ballot, in the enclosed return envelope so that it will be received by the Balloting Agent, no later than 4:30 p.m., Prevailing Pacific Time, on April 18, 2008.

If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim, you may be bound by the Plan if the requisite holders of Claims accept it.

**TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 4:30 P.M., PREVAILING PACIFIC TIME, ON APRIL 18, 2008.**

Pursuant to Bankruptcy Code section 1128, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has scheduled a pre-trial hearing to consider confirmation of the Plan (the "Pre-Trial Confirmation Hearing"), on April 21, 2008, at 2:00 p.m., (Eastern Time) and a hearing to consider all confirmation issues not resolved at the Pre-Trial Confirmation Hearing on April 29, 2008 at 2:00 p.m. (Eastern Time) (the "Confirmation Hearing"). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before April 18, 2008, 4:00 p.m. (Eastern Time) in the manner described under the caption, "Confirmation of the Plan" set forth below.

## II. EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs or liquidate its property and assets for the benefit of the debtor, its creditors, and other interested parties.

The commencement of a chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the bankruptcy petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee, Bankruptcy Code sections 1107 and 1108 provide that a chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession."

The filing of a chapter 11 petition also triggers the automatic stay under Bankruptcy Code section 362. The automatic stay halts essentially all attempts to collect pre-petition claims from

the debtor or to otherwise interfere with the debtor's business or its bankruptcy estate, subject to certain specifically limited exceptions as set forth in the Bankruptcy Code.

Formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan of reorganization sets forth the means for satisfying the claims of creditors against and interests of equity holders in the debtor. Unless a trustee is appointed, only the debtor-in-possession may file a plan during the first 120 days of a chapter 11 case (the "Exclusive Period"). After the Exclusive Period has expired, a creditor or any other interested party may file a plan, unless the debtor files a plan within the Exclusive Period. If a debtor files a plan within the Exclusive Period, the debtor is given an additional 60 days (the "Solicitation Period") to solicit acceptances of its plan. Bankruptcy Code section 1121(d) permits the Bankruptcy Court to extend or reduce the Exclusive Period and the Solicitation Period on a showing of adequate "cause." By filing this Plan within the Exclusive Period, the Debtor has the sole right to solicit acceptances of the Plan.

**B.    Plan of Reorganization**

The debtor initially has the exclusive right to file a plan in the case. In this case, the Debtor has done so by filing a Plan in the first week of the case. After a plan is filed, the holders of certain claims against or interests in a debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan for the plan to be confirmed. At a minimum, however, if there is an impaired class, a plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan. The Bankruptcy Code also defines acceptance of a plan by a class of interests as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan, and are therefore not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or interests of that class. Modification for purposes of impairment does not include curing defaults and reinstating maturity. Classes of claims or interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan and are therefore not entitled to vote.

Even if all classes of claims and interests accept a plan of reorganization/liquidation, the Bankruptcy Court may nonetheless deny confirmation. Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. A plan must also be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization or liquidation.

The Bankruptcy Court may confirm a plan of reorganization/liquidation even though not all of the classes of impaired claims and interests accept it. The Court may do so under the "cramdown" provisions of Bankruptcy Code section 1129(b). For a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan.

If the proponent of the plan proposes to seek confirmation of the plan under the cramdown provisions of the Bankruptcy Code, the Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code section 1129(b) with respect to the subject objecting class. The proponent must also meet all applicable requirements of Bankruptcy Code section 1129(a) (except section 1129(a)(8)). Those requirements include the requirements that: (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law, (ii) the plan be proposed in good faith, and (iii) at least one impaired class of creditors or interest holders has voted to accept the plan.

## III. HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS IN THE BANKRUPTCY CASES

### A.     Information Provided Herein

Certain of the information set forth below has been provided by the Debtor, employees of the Debtor, and external sources. The Debtor used a combination of the information provided by these sources together with its own analysis regarding the impact of the Plan on the rights and liabilities of the Debtor and all Creditors of the estate. While the Debtor has attempted to provide information from sources believed to be reliable, the Debtor has not independently verified the accuracy of all of the information. The information contained herein has not been subject to an audit. Neither the Debtor nor its counsel represents or warrants the accuracy of discussions of past or future events.

### B.     Overview

#### 1.     ALF's History

Present-day ALF, through its predecessor entities, is one of the oldest fire-apparatus manufacturers in America, dating back to the founding of the business in 1832. In 1872, during the American Industrial Revolution, Truckson LaFrance and his partners started the LaFrance Manufacturing Company to produce hand pumps and rotary steam engines based on LaFrance's new patents. At the turn of the century, the LaFrance Fire Engine Company joined with the American Fire Engine Company to become the American LaFrance Fire Engine Company. In the 1950's, Sterling Precision purchased ALF. Ownership of ALF was transferred to ATO-Figgie in 1966 and then to Freightliner, LLC ("Freightliner") in 1995. In December 2005, Freightliner transferred its ownership of ALF to the current owner, American LaFrance LLC.

Today, ALF is a leading brand of custom-made, fire-fighting and fire-rescue vehicles, ambulances, and heavy-duty vocational vehicles. ALF offers customers a full-line, single-source solution of custom and commercial fire apparatuses and emergency vehicles, including aerials, pumpers, tankers, heavy-duty rescue vehicles, advance-care ambulances and rescue vehicles (the "Emergency Vehicles"). Amongst the Emergency Vehicles are fire apparatuses that ALF assembles on commercially available chassis. Since 2000, in addition to the Emergency Vehicles, ALF has offered customers the Condor – a heavy-duty, low-cab-forward chassis for multi-application vehicles (the "Condor Vehicles"). The versatility of the Condor chassis allows ALF customers to utilize the chassis for a variety of applications, including customization as refuse vehicles, concrete pumps, dump trucks, aircraft deicers, aircraft refuelers, truck-mounted cranes, sewer cleaning and maintenance trucks, and highway striping vehicles. ALF also operates an extensive service, parts, and refurbishment business for its Emergency Vehicles and Condor Vehicles (the "Support Business").

In general, ALF's Emergency Vehicle customers are cities and municipalities that seek bids from ALF to build, customize, and supply their Emergency Vehicles. ALF's largest customers include the City of San Francisco, the City of San Antonio, the City of Phoenix, the City of New York City, the City of Houston, the City of Charlotte, and the City of Los Angeles. ALF remains one of the top six suppliers of Emergency Vehicles in North America.

Since its introduction in 2000, the Condor Vehicle line has emerged as an industry leader for vocational vehicles. ALF's Condor customers include a wide variety of public and private organizations that have a need for the Condor Vehicles' versatility.

## 2.    ALF's Operations

ALF operated eight manufacturing/servicing facilities and two company-owned vehicle dealerships as of the Petition Date. As outlined on the summary chart of ALF's facilities attached hereto as **Exhibit B**, the manufacturing facilities are located in Summerville, South Carolina (which includes ALF's corporate headquarters); Jedburg, South Carolina; Ephrata, Pennsylvania; Hamburg, New York; and Sanford, Florida. Service facilities are located in Hanahan, South Carolina; Lebanon, Pennsylvania; and Lake Mary, Florida. The company-owned dealerships are located in Los Angeles, California and Portland, Oregon. All of the facilities described in this paragraph are leased from third-party landlords with the exception of the Lebanon, Pennsylvania and Sanford, Florida, which are owned by ALF.

Prior to the Petition Date, ALF began the process of winding-down operations at its Sanford, Florida; Lake Mary, Florida; Hanahan, South Carolina; Lebanon, Pennsylvania; Jedburg, South Carolina; and Portland, Oregon locations. Functions previously provided at these locations are being transferred to ALF's remaining facilities.

ALF also has a distribution network of over 150 third-party dealers in the United States, Canada, Mexico, and Australia. ALF maintains informational websites at www.americanlafrance.com, www.condortrucks.com and www.condornest.com.

As of the Petition Date, ALF had approximately 955 United States employees (682 hourly and 273 salaried). ALF's employees are not parties to any union contract.

### 3.    ALF's Products

ALF's product line includes the Emergency Vehicles and the Condor Vehicles, and ALF also operates the Support Business.

ALF's lines of vehicles include the following:

a. Fire Vehicles:

    i. Pumpers: ALF's line of pumpers, which are designed to bring water or chemicals to the scene of a fire, include conventional pumpers, specially-designed rescue configurations, mini-pumpers, and off-road models.

    ii. Aerials: ALF provides a line of aerial ladders and platforms, designed to allow emergency access to various elevations.

    iii. Rescues: ALF's rescue vehicles are designed to adapt to a variety of duties from traditional rescue situations to dive and high-angle operations.

    iv. Tankers: ALF tankers deliver large supplies of water to the fire scene.

b. Ambulances: ALF manufactures the MedicMaster Medium Duty customized ambulance vehicle.

c. Condor Chassis: Condor is built for high duty-cycle work applications like commercial and residential refuse service, home fuel oil delivery, construction and aircraft refueling.

ALF manufactures the chassis for both Emergency Vehicles and Condor Vehicles. Thereafter, the manufacturing process for Emergency Vehicles and the Condor Vehicles are dramatically different. Emergency Vehicles require component parts that, for the most part, are specified by the customer, resulting in customized construction on a truck-by-truck basis. On the other hand, Condor Vehicles are substantially standardized with few options available to the customer.

ALF also maintains the Support Business. The programs offered as part of the Support Business include a variety of refurbishments, ranging from an overhaul of fire-fighting systems through replacement of vehicle superstructures. ALF's hundreds of Emergency Vehicles and Condor Vehicles currently in service create service, parts, and refurbishment opportunities.

### 4.    Intellectual Property

ALF owns a number of the trademarks, service marks, copyright registrations and design patents used in its business, including United States and foreign trademark and patent registrations. On or about February 2, 2008, ALF filed its Schedules and Statement of Financial Affairs (the "Schedules and Statement").[1] A list of intellectual property owned by ALF is included in the Debtor's Schedules and Statement, which are available at http://www.kccllc.net/ALF.[2]

### 5.    Legal Proceedings

ALF is involved from time to time in litigation arising in the ordinary course of its business. In addition, ALF is a defendant in several actions related to the collection of debts allegedly owed by ALF. Finally, ALF is a defendant in litigation brought by Freightliner in the New York Supreme Court based on claims in the alleged amount of approximately $10 million arising from the transition of ALF's operations from Freightliner to ALF. A list of pending litigation as of the Petition Date is included in the Debtor's Schedules and Statement.

### 6.    Management

ALF's current management team is led by Mr. William J. Hinz, Chief Executive Officer. Mr. Hinz has more than 40 years of experience leading manufacturing companies in the aerospace, biotechnology, and telecommunications industries. Mr. Hinz spent almost 30 years at Allied Signal, Inc. where he served, among other roles, as the President of Worldwide Aftermarket Repair and Overhaul and Distribution, as well as President and CEO of European Operations. Mr. Hinz was appointed CEO on or about October 18, 2007. Mr. Hinz is an employee of Patriarch Partners Management Group LLC ("PPMG"), an affiliate of Patriarch Partners Agency Services, LLC ("PPAS"), agent for the Debtor's Pre-Petition Lenders.[3] PPMG provides Mr. Hinz's services, and the services of certain other executives, to ALF pursuant to a Letter Agreement dated October 1, 2007, by and between PPMG and ALF.

ALF has engaged Mr. William Snyder as Chief Restructuring Officer. The Bankruptcy Court approved the engagement of Mr. Snyder as CRO and his firm CRG Partners Group, LLC ("CRG") as ALF's financial advisors pursuant to an order dated February 22, 2008. Mr. Snyder is a managing partner with CRG. Mr. Snyder has extensive experience in interim management, particularly with companies in bankruptcy. Mr. Snyder has served as a CRO/Examiner/Independent Professional in several other bankruptcy cases including, among others, *In re McCommas LFG Processing Partners, LP*, Case No. 07-32219 (Bankr. N.D. Tex. 2007); *In re Mirant Corporation*, Case No. 03-46590 (Bankr. N.D. Tex. 2003); *In re Cafeteria Operators, L.P. d/b/a Furr's Cafeteria*, Case No. 03-30179 (Bankr. N.D. Tex. 2003); *In re Data*

---

[1] Portions of the Schedules and Statement have been amended, and further amendments may be filed.

[2] The Debtor's Schedules and Statement of Financial Affairs are qualified by the "Global Notes and Statement of Limitations, Methodology and Disclaimer Regarding Debtor's Statement of Financial Affairs With Schedules" filed contemporaneously with the Debtor's Schedules and Statement of Financial Affairs.

[3] Additional information regarding the relationship between PPAS and PPMG is provided in section B.7. herein.

*VoN, Inc.*, Case No. 02-38600 (Bankr. N.D. Tex. 2002); and *In re Denton County Electric Cooperative, Inc. d/b/a CoServe Electric*, Case No. 02-40665 (Bankr. N.D. Tex. 2002). Prior to his engagement in this matter, Mr. Snyder was not affiliated with ALF, the Pre-Petition Lenders, or any of their affiliates other than as disclosed in the Declaration Of William Snyder In Support Of The Motion Of The Debtor Pursuant To 11 U.S.C. § 363 For Entry Of An Order Approving The Retention Of CRG Partners Group LLC As Financial Advisors To The Debtor And Designating William Snyder As Chief Restructuring Officer Of The Debtor.

The remainder of ALF's current management team includes:  Scott Barnes (Vice President, Sales), Donald Ball (Vice President, Purchasing), and Jimmy Rogers (Vice President, Sales and Marketing).  These individuals are all employed by ALF and not by PPMG.

ALF has been conducting a search for candidates to fill the vacant roles of Chief Financial Officer and Chief Operating Officer and to replace certain PPMG-provided personnel with permanent management.  In the weeks before the hearing on this Disclosure Statement, ALF retained A. Matthew Karmel to serve as Chief Executive Officer.  Mr. Karmel is currently the President of Asia – Pacific operations of MAG – Industrial Automation Systems, USA, the third largest machine tool supplier in the world.  Mr. Karmel has over twelve years of general management experience with engineering, manufacturing, and logistics companies in automotive, industrial, and technology industries.   Mr. Karmel's experience includes management roles with Detroit Diesel Corporation and Ford Motor Company as well as a French-based $13 billion automotive supplier.  Mr. Karmel began his employment with ALF on March 17, 2008.   ALF anticipates that Mr. Hinz will become Chairman of the Board of Managers of ALF.

### 7.    Business Organization, Ownership and Related Parties

ALF is a limited liability company organized under the laws of the State of Delaware pursuant to the Delaware Limited Liability Company Act, as amended.  ALF was formed on October 25, 2005.  The management of ALF's affairs is vested in ALF's Board of Managers. Currently, the sole member of the Board of Managers is Ms. Lynn Tilton.  Upon Mr. Karmel's arrival, it is anticipated that Mr. Hinz will become chairman of the Board of Managers.  One hundred percent of the membership interests of ALF are owed by funds managed by affiliates of PPAS, including: ARK II CLO 2000-1 ("ARK II"), Limited, ZOHAR CDO 2003-1, Limited ("ZOHAR"), ZOHAR II 2005-1, Limited ("ZOHAR II"), and ZOHAR III, Limited ("ZOHAR III, and together with ARK II, ZOHAR I, and ZOHAR II, collectively, the "Funds").

As noted above, PPAS serves as agent to ZOHAR, ZOHAR II, and ZOHAR III, which are the Pre-Petition Lenders and the lenders that provided the DIP Financing.  PPAS is an affiliate of PPMG, which provides certain executive management services to ALF as discussed in Section III.B.6 above.

C.    **Events Leading to Chapter 11 Filings**

1.    **Conversion from Freightliner Systems**

Prior to December 2005, the assets and business now owned by ALF were operated as subsidiaries of Freightliner. After an extensive marketing campaign by Freightliner's investment banker, Donnelly Penman & Partners, ALF was formed and acquired the business operations discussed above in December 2005. At the time of the sale, ALF and Freightliner executed a transition agreement (the "Transition Services Agreement") whereby Freightliner agreed to provide accounting, inventory, payroll, and manufacturing-process services to ALF through June 2007. As a result of the Transition Services Agreement, ALF in essence "outsourced" management and operational functions to Freightliner as set forth in the Transition Services Agreement. In June 2007, pursuant to the Transition Services Agreement, ALF's systems were disengaged from the Freightliner systems. Leading up to the disengagement, ALF, through contractors, created a stand-alone enterprise resource planning system (the "ERP System") to handle the functions previously provided by Freightliner.

Almost immediately upon the changeover to the ERP System, ALF recognized serious deficiencies with the system that had a crippling impact on ALF's operations. Some of the problems that ALF encountered in implementing the ERP System include, among others: (a) inability to reconcile data between the Freightliner system and the ERP System; (b) incorrect or incomplete inventory, purchasing, and customer data due to problems with the Freightliner system and the conversion of the data to the ERP System; (c) inaccurate or incomplete vehicle configurations loaded in the ERP System; (d) insufficient training on the ERP System; and (e) missing financial information including accounts-payable detail, incomplete or inaccurate accounts-receivable data, and inaccurate beginning general-ledger balances.

For the next several months following the changeover, ALF attempted to solve the plethora of problems with the ERP system. Despite such efforts, as a direct result of the problems with the ERP System, ALF became unable to complete the manufacture of many pre-ordered vehicles.

The manufacture of highly-customized Emergency Vehicles requires the availability of a large number of inventory SKUs at key points in the production process. The conversion from the Freightliner system to the ERP System resulted in the inability to account for inventory on a reliable basis. This, in turn, severely limited ALF's ability to deliver completed products to its customers. Consequently, ALF's inability to deliver vehicles had an immediate impact on ALF's cash flow and created a liquidity crisis.

2.    **Business Disruption Caused by Relocation and Consolidation at Summerville**

In July 2007, ALF relocated its headquarters from Ladson, South Carolina to Summerville, South Carolina. In addition, ALF began to consolidate operations historically provided at locations outside of Summerville. At the time of the move, the Summerville facility was in the latter stages of construction but was not yet complete. The move and consolidation

required a temporary shutdown of production and caused a temporary lag in ALF's production cycle. Moreover, the commencement of manufacturing operations in the new and uncompleted Summerville facility created numerous operational difficulties that slowed production and ultimately hindered cash flow.

### 3. Pending Litigation and Investigations[4]

In December 2007, Freightliner commenced litigation against ALF in a case styled *Freightliner, LLC v. American LaFrance, LLC* and numbered 07-604037 in the New York Supreme Court (the "Freightliner Litigation") arising under the Transition Services Agreement in the alleged amount of $10 million. ALF disputes the allegations made and relief requested in the Freightliner Litigation. Moreover, ALF is currently investigating its own potential causes of action against Freightliner in connection with the purchase of ALF's business and the Transition Services Agreement. Finally, ALF is analyzing pre-petition transfers to Freightliner in excess of $40 million made within one year of the Petition Date to determine if such transfers may be recovered as part of an Insider Avoidance Action.

ALF is currently analyzing potential causes of action against IBM Corporation ("IBM") based upon IBM's involvement in connection with the problem-riddled transition to the ERP System. Based upon ALF's initial review, it appears that the causes of action against IBM would include, among others, breach of contract.

ALF is currently analyzing potential Preference Claims. Based upon ALF's initial review, ALF believes that over $43 million was paid to creditors in the ninety days prior to the Petition Date. After application of new value defenses and elimination of transfers not made on account of antecedent debt, ALF estimates that, subject to the Preference Election, net preference recoveries may exceed $12 million. More information regarding the Preference Claims and the Preference Election are contained in section V.C (4) herein.

ALF has investigated and analyzed the liens asserted by the Pre-Petition Lenders. Based on this investigation, ALF believes that the Pre-Petition Lenders have valid and enforceable liens on virtually all of the Debtor's property, with the exception of approximately $2.2 million of unrestricted cash held in ALF's operating account at Bank of America on the Petition Date. Although the Pre-Petition Lenders perfected their security interests in real property located in Sanford, Florida and Lebanon, Pennsylvania within approximately 95 days prior to the Petition Date, the Pre-Petition Lenders' liens in these properties do not appear avoidable because they were granted concurrently with $15 million of new financing from the Pre-Petition Lenders for ALF's operations.

Finally, ALF is currently analyzing potential causes of action against former officers and directors, including John Stevenson, former Chief Executive Officer, and David Mulder, former Chief Operating Officer. While this investigation is in its preliminary stages, ALF's outside pre-petition accountants identified significant deficiencies in internal controls during Mr.

---

[4] As noted above, in addition to the litigation matters identified with specificity in this paragraph, ALF is party to various collection lawsuits pending in state courts in South Carolina and in other states, all as set forth in the Schedules and Statement.

Stevenson's and Mr. Mulder's tenures. The lack of controls led to inaccurate financial reporting and ultimately contributed to ALF's financial losses. Mr. Stevenson and Mr. Mulder may have failed to safeguard the assets of the Debtor and properly manage the Debtor's pre-petition business operations. ALF may initiate litigation against Mr. Stevenson and Mr. Mulder for, among other causes of action, breach of fiduciary duty.

### 4.    Additional Factors Contributing to ALF's Financial Difficulties

In addition to the problems described above, the Emergency Vehicle industry is currently depressed. Many competitive manufacturers are experiencing financial difficulties and several have ceased operations.

New emission standards effective in 2007 required ALF to modify its engineering plans to achieve compliance.

Before the bankruptcy, the Pre-Petition Lenders provided over $150 million of funding pursuant to a credit agreement dated December 14, 2005 (the "Credit Agreement"). The funds borrowed from the Pre-Petition Lenders have been used in ALF's pre-petition operations. At current levels of revenue, ALF has insufficient cash to support ongoing operations. The Pre-Petition Lenders refused to provide additional operational financing outside of a chapter 11 bankruptcy, and ALF is aware of no other lenders willing to advance funds on an unsecured or junior-secured basis. Outside of chapter 11, ALF did not have sufficient liquidity to satisfy its debts.

### 5.    Turnaround Initiatives

In the August-October 2007 timeframe, certain of ALF's executives resigned, including its chief executive officer and chief financial officer. As explained above, effective October 1, 2007, ALF entered into a contract with PPMG whereby PPMG agreed to provide temporary executive staffing for ALF in exchange for certain fees. The team supplied by PPMG includes the current CEO, William J. Hinz, among others. The PPMG team and ALF's existing officers (collectively, the "Management Team") began to implement several new strategies designed to streamline the production process, implement new accounting and tracking processes, and determine the feasibility of certain ongoing divisions. While ALF believes that these strategies will ultimately return ALF to profitability, ALF's current liquidity crisis necessitated the bankruptcy filing.

To address some of the inventory-control issues that plagued ALF since its transition to the ERP System, the Management Team determined in December 2007 to furlough most manufacturing employees until January 14, 2008. During the furlough, ALF began a physical inventory at all ALF facilities. ALF subsequently extended the furlough to complete the physical inventory and to complete a business plan based on the inventory count.

In addition, in January 2008, ALF engaged CRG to advise ALF regarding restructuring alternatives.

### 6.    Business Plan Improvements

Over the few months leading up to the Petition Date, the Management Team focused on rationalizing ALF's business and developing a comprehensive turnaround plan (the "Business Plan"). The Business Plan is discussed in the financial materials attached hereto as **Exhibit C** (the "Financial Exhibit"). A summary of certain elements of the Business Plan follows:

#### a.    Addressing Production Backlog

Several months ago, the Management Team began a truck-by-truck analysis of its production backlog as a first significant step toward development of the Business Plan. Due to the problematic transition to the ERP System, the Management Team experienced difficulty determining the actual production costs of the trucks. It was necessary for the Management Team to develop an offline bill of materials for the trucks in the backlog to better estimate actual costs and margins.

As part of its analysis, the Management Team determined that ALF was selling several trucks below the material costs of the truck. The Management Team reviewed and prioritized the backlog of trucks by profitability, taking into account alleged penalties for late delivery and bonding requirements. Of the 316 fire trucks in the backlog as of the Petition Date, the Debtor has determined that it may reject over 30 truck contracts. The backlog also includes 16 ambulance vehicles at the Sanford facility, at least 13 of which will be completed prior to the closure of this facility. There are 537 contracted trucks in the Condor line, none of which has yet been selected for immediate rejection. This triage of the backlog will ensure trucks are not being produced at a loss. Going forward, the Management Team will have a much better handle on its costs; thus, bidding will be done with accurate cost data to avoid money-losing sales.

#### b.    Streamlining Manufacturing and Service Centers

ALF manufactures fire trucks at Summerville, South Carolina, Ephrata, Pennsylvania; and Hamburg, New York. Ambulances are manufactured in Sanford, Florida. ALF currently manufactures chassis at the its facility in Jedburg, South Carolina. ALF assembles the majority of its fire-truck chassis in Summerville and sends them to the other locations for completion. ALF maintains service centers in Hanahan, South Carolina; Lebanon, Pennsylvania; and Lake Mary, Florida.

The 500,000 square foot Summerville facility was completed last year and is capable of handling the parts distribution center in Hanahan and the Jedburg chassis operations. To improve efficiencies and minimize transportation costs, ALF intends to close the Jedburg facility and the Hanahan parts distribution center and transfer those operations to the Summerville facility. In addition, production previously completed at the Lebanon facility will be moved to the Ephrata facility.

The Debtor does not enjoy a competitive edge in the ambulance market and therefore sees no long-term strategy to maintain that business. Pursuant to the Debtor's plans to exit the

ambulance business, the Sanford and Lake Mary facilities in Florida will be closed. After 2008, ALF will no longer produce ambulances.

ALF's 2008 business plan calls for production of 1,781 trucks, including approximately 291 fire trucks and ambulances. ALF will continue to manufacture all trucks that are subject to performance bonds but will otherwise not produce any trucks that are expected to result in a loss.

### c.     Reducing Overhead

In recent years, ALF's selling, general, and administrative expenses and fixed overhead charges have been as high as $56 million annually. Pursuant to ALF's business plan, overhead will be reduced to $36 million initially and reduced further to $34 million in 2009. These savings will be accomplished by reclassifying over $3 million of engineering expenses (previously treated as overhead) as manufacturing expenses and eliminating approximately 40 personnel and the associated overhead.

### D.     Significant Events Since Commencement of the Chapter 11 Case

### 1.     Stay of Litigation

An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtor. This injunction will remain in effect until the Effective Date unless otherwise modified by the order of the Bankruptcy Court.

### 2.     Post-Petition Financing and Use of Cash Collateral

On January 28, 2008, the Debtor filed a Emergency Motion for Interim and Final Orders (A) Authorizing American LaFrance to Incur Postpetition Financing, (B) Authorizing American LaFrance to Use Cash Collateral, and (C) Scheduling Final Hearing ("DIP Motion"). In the DIP Motion, the Debtor requested authority to borrow up to $10 million on an interim basis and up to $50 million (the "Loan Proceeds") on a final basis to fund the Debtor's post-petition operations. The Court granted the DIP Motion on an interim basis on January 30, 2008. After a final hearing, the Court granted the DIP Motion on a final basis, in the aggregate amount of $42 million.

### 3.     Proposed Sale Of Substantially All of the Debtor's Assets

On or about February 2, 2008, the Debtor filed its Motion for an Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially All of Its Assets; (B) Approving an Asset Purchase Agreement, Subject to Higher and/or Better Offers; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (the "Sale Motion") and the Motion for Order (A) Approving Bid Procedures Relating to Sale of Substantially All of the Debtor's Assets; (B) Scheduling a Hearing to Consider the Sale and Approving the Form And Manner of Notices; (C) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of

Proposed Cure Amounts; and (D) Granting Related Relief (the "Bid Procedures Motion"). Pursuant to the Sale Motion, the Debtor proposes to sell substantially of its assets to PPAS or its assignee(s) for a purchase price pursuant to a credit bid of $150 million plus the amount of the DIP Financing Claim and assumption of certain liabilities. The Court granted the Bid Procedures Motion by order dated February 25, 2008 (the "Bid Procedures Order").

Pursuant to the Bid Procedures Order, the proposed sale to PPAS or its assignee(s) shall be subject to higher and better bids upon the completion of a marketing process conducted by ALF and its professional advisors. ALF and its professionals will conduct an extensive marketing effort to attract potential competing offers for the sale of the ALF's estate, including the establishment of a data room for potential purchasers and direct contact with several parties that might have an interest in ALF's assets. The Bankruptcy Court provisionally approved PPAS's credit bid.

As indicated in the Sale Motion, the relief sought therein is an alternative to the Plan, and if the Plan is confirmed, the Sale Motion will be withdrawn. The Sale Motion is scheduled to be heard on May 1, 2008.

### 4.    Retention of Professionals

In addition to the retention of Mr. Snyder and CRG described above, the Bankruptcy Court approved ALF's retention of Haynes and Boone, LLP as counsel for ALF; Klehr Harrison, Harvey, Branzburg & Ellers, LLP as co-counsel for ALF; and NachmanHaysBrownstein, Inc. as asset sale advisor to ALF. In addition, the Bankruptcy Court appointed Kurtzman Carson Consultants, LLC as claims, noticing and balloting agent.

### 5.    Miscellaneous First-Day Orders

The Bankruptcy Court granted several routine motions in the first few weeks of the case. All of the pertinent motions and orders are posted at http://www.kccllc.net/ALF.

### 6.    Appointment of Official Committee of Unsecured Creditors

On February 4, 2008, the United States Trustee appointed the Creditors' Committee. The Creditors' Committee consists of Daimler Trucks North America, LLC (also known as Freightliner, LLC) – Chairman; Bennett Motor Express, LLC; Hale Products, Inc./Class One, Inc.; Ryder Integrated Logistics; and Rehoboth Beach Volunteer Fire Company, Inc. On February 27, 2008, the Creditors' Committee filed applications to employ Pepper Hamilton, LLP as its counsel and FTI Consulting Inc. as its financial advisors.

## IV. ALF'S BANKRUPTCY ESTATE

On or about February 2, 2008, ALF filed its Schedules and Statement. The Schedules and Statement provide detailed information regarding ALF's finances that may assist holders of Claim and Interests in evaluating the Plan. Copies of the Schedules and Statement be posted at http://www.kccllc.net/ALF. The discussion contained herein generally summarizes the more

detailed asset and liability information contained in the Schedules and Statement. The following generally summarizes the aggregate asset and liability information contained in the Schedules and Statement.

### A.    Assets

#### 1.    Cash and Accounts Receivable.

As of the Petition Date, ALF had unrestricted cash on hand or in its various bank accounts totaling $6.47 million. In addition, ALF maintains $24.7 million in restricted cash to secure obligations under certain performance and bid bonds required in connection with ALF's public projects.

In addition, ALF reflected accounts receivable on the Petition Date in the amount of $19.8 million. Approximately 55% of the accounts receivable were within 45 days of invoice date at the Petition Date.

#### 2.    Inventory

On the Petition Date, ALF reflected finished, raw materials, and work-in-progress inventory as having a book value totaling approximately $100 million. Post-petition, ALF completed a physical inventory, which resulted in an updated inventory count of $87.5 million.

#### 3.    Machinery and Equipment.

The fixed assets of ALF consist principally of property, plant, software, and equipment utilized at its manufacturing and distribution facilities. The net book value of those fixed assets as of the Petition Date was approximately $30.9 million.

#### 4.    Real Property

**Exhibit B** includes a list of ALF's facilities. All of the facilities identified on **Exhibit B** are leased, with the exception of the Sanford, Florida and Lebanon, Pennsylvania facilities, which are owned by ALF. The Lebanon Real Property is comprised of approximately 14 acres of land and buildings containing approximately 190,000 square feet and are currently being offered for sale for $4.56 million.

### B.    Liabilities

#### 1.    Administrative and Priority Claims

ALF expects to incur various post-petition Claims in the ordinary course of its post-petition operations and its bankruptcy proceedings. However, certain of these administrative and priority claims will be outstanding on the Effective Date. As set forth on the Financial Exhibit, ALF estimates that the total of these claims will be approximately $5.9 million. Such claims are categorized by and will be treated in the Plan as follows:

### a.    Ordinary Course of Business Claims

Administrative claims for ongoing business operations will generally be paid in the ordinary course from funds received through operations or financed by the DIP Financing. To the extent incurred but unpaid on the Effective Date of the Plan, such claims will be paid as they come due according to their terms.

### b.    Professional Fees

ALF's costs of reorganization consists principally of professional fees incurred during the pendency of this case. Professional fees will likely be paid on an ongoing basis pursuant to procedural Orders of the Court, resulting in an accrued liability for only part of the professional-fee obligations to be paid at or after the Effective Date of the Plan or assumed by the Debtor. The professionals covered by this provision are ALF's attorneys, accountants, and financial/management consultants and advisors, the Creditors' Committee's attorneys and financial consultants, and the Pre-Petition Lenders' attorneys. ALF estimates that professional fees could reach $2.3 million if this case continues for 13 weeks. The Plan provides that professional fees will be paid in full by the Reorganized Debtor.

### c.    Payments to Cure Assumed Executory Contracts

The Plan provides that the Debtor may move to assume Executory Contracts prior to the Effective Date. At this time, the Debtor has not identified the Executory Contracts that it will assume in connection with the Plan  Therefore, the cure payments necessary to assume such Executory Contracts are unknown. The Debtor anticipates that any associated monetary default will be cured by ordinary-course payments and/or settlements with the contract counterparties.

### d.    Payments to Assume Additional Liabilities

The Debtor may owe certain pre-petition and post-petition amounts to Claimants with Assumed Liability Claims (Class 6). A list of Assumed Liability Claims is set forth on Schedule 6.6.1 to the Plan, subject to modification by the Plan Supplement. The Plan provides that Assumed Liability Claims will be paid in full by the Reorganized Debtor.

### e.    Wage, Benefit, and Casualty Claims

On January 30, 2008, the Court granted its Order Authorizing the Debtor to Pay Prepetition Wages, Compensation and Employee Benefits (the "Wage Order"). ALF expects to satisfy all wage claims in the ordinary course of operations or through the Wage Order. To the extent that any employee has an unpaid pre-petition wage claim in excess of the $10,950 cap set forth in 11 U.S.C. § 507(a)(4), such claim will be treated as a general unsecured claim.

ALF maintains insurance policies for general liability, auto liability, workers compensation, and property casualty with deductibles that are standard for a company in ALF's industry. Deductibles for these insurance policies for open years range from zero to $100,000. ALF is paid up on these policies and has authority to continue paying them during this case.

f.      **Sales and Use Taxes, Ad Valorem Taxes and Corporate Tax**

Accrued corporate, sales and use taxes, and ad valorem taxes aggregated approximately $488,000 at the Petition Date. The Debtor will likely receive additional tax bills and notices of audits from several governmental authorities, which may result in additional Claims for payment of taxes.

2.      **Secured Claims**

a.      **The Pre-Petition Lenders' Claim.**

The Claims of the Pre-Petition Lenders are secured by a first-priority Lien on substantially all of ALF's assets including its real estate, plants and equipment, accounts receivable, inventory, contract rights and general intangibles.

For purposes of the Plan, the Pre-Petition Lenders' secured debt is calculated at $154.4 million and the outstanding amount under the DIP Financing is calculated at $42 million plus costs.

b.      **Other Secured Claims**

(i)     ACE-USA and Traveler's Casualty and Surety have posted a total of $24.8 million of performance and bid bonds in connection with ALF's obligations to certain customers. The bonds are secured by letters of credit that are secured by $21.7 million of restricted cash held by Bank of America, N.A. These claims are contingent in the respect that if ALF performs its obligations to the applicable customers, the bonds will not be called.

(ii)    ALF's obligations to the landlord of the Summerville facility, Jedburg Commerce Park, LLC, are secured by $3.0 million letter of credit, which is in turn secured by $3.0 in restricted cash. This claim is contingent in the respect that, if ALF performs its obligations to landlord or renegotiates its lease, the cash may remain intact.

(iii)   ALF is party to capital equipment leases with Varilease and National City with approximate unpaid balances of $0.66 million and $0.51 million, respectively.

(iv)    Certain vendors and contractors that provided materials, goods or services related to the build-out of the Summerville, SC facility have asserted liens on the facility. The Debtor is currently analyzing the validity of the asserted liens. If the liens are valid, these vendors and contractors would be secured creditors of the landlord rather than the Debtor. However, the landlord may be able to require the Debtor to satisfy such claims as a condition to assumption of the lease.

3.    **Unsecured Claims**

a.    **Claims of Vendors and Customers**

The principal unsecured Claimants in this case are ALF's trade vendors and utility companies, whose Claims are scheduled in the aggregate amount of approximately $52.8 million. These Claims are based on goods and services provided to ALF prior to the Petition Date.

In the ordinary course of business, certain of ALF's customers make deposits to be applied to the final purchase price of ALF's products. As of the Petition Date, the total amount of customer deposits is approximately $13.4 million.

b.    **Warranty Claims**

ALF provides its customers with various warranty programs. Due to the terms of its warranties, ALF anticipates that warranty claims will be asserted in the future, including after the Effective Date. Based on its historical experience, while results vary, the average warranty cost for ALF has been approximately 2.5% of gross sales. The Debtor expects that approximately $7.1 million of unknown and unasserted warranty claims will be asserted in the one-year period following Confirmation of the Plan, including Claims asserted prior to the Confirmation Date.

c.    **Claims of Landlords**

ALF expects that the Debtor will assume certain of its leases for manufacturing and distribution facilities. It is likely that the Debtor will renegotiate with the landlords prior to assumption, which could result in unsecured claims against the estate. ALF believes that the landlords of the properties where leases will not be assumed may relet those locations, thereby further mitigating and reducing their Allowed Unsecured Claims against ALF.

ALF's landlord at its Summerville, South Carolina location may assert additional claims against ALF based on work performed by various contractors on the Summerville facility (the "Contractor Claims"). ALF estimates that the aggregate unpaid amount of Contractor Claims is approximately $5.4 million. Several of the holders of Contractor Claims have asserted state-law workman's liens on the Summerville facility, and the landlord may attempt to prevent assumption and assignment of the Summerville lease absent payment of the Contractor Claims in full.

d.    **Rejected Executory Contract Claims**

As of the Petition Date, ALF was party to several Executory Contracts with vendors, landlords, equipment lessors, dealers, customers, and other like parties. As reflected in Article XII of the Plan, ALF will reject all Executory Contracts not assumed by separate motion. The Debtor has not completed an analysis of which Executory Contracts it intends to reject and the aggregate liability generated by that rejection.

### e. Litigation Claims

As of the Petition Date, ALF was a party to several lawsuits. (*See* Schedules and Statement). All Claims arising from such litigation will be treated as Class 4 General Unsecured Claims. To the extent the plaintiffs or other claimants in a lawsuit fail to file a timely Proof of Claim, the Debtor reserves the right to file a Proof of Claim and estimate for all Plan purposes the amount of the Claim. To the extent that the holder of a Claim obtains a litigation recovery from insurance proceeds, then the holder of the Claim shall not share in the Class 4 distribution. Holders of Claims may only seek recovery from insurance policies of the Debtor for which there is no deductible or self-insured retention, or only to the extent that such recoveries exceed any applicable deductible or self-insured retention.

### f. Insurance Claims

Prior to the Petition Date, ALF entered into an agreement to finance the annual premiums due under ALF's various insurance policies. Although ALF is current on its premium-financing payments, the total amount of ALF's obligation to its insurance financier is approximately $115,582.

### g. Convenience Claims

ALF estimates that approximately 797 of the Unsecured Claims against ALF are in an amount equal to or less than $2,500 and will be treated as Class 5 Convenience Claims. The aggregate amount of these Claims is approximately $634,000.

Under the Plan, Holders of Unsecured Claims greater than $2,500 that would otherwise be treated as Class 4 General Unsecured Claims may elect to be treated as Class 5 Convenience Claims. An additional 176 of the Unsecured Claims against ALF are in an amount between $2,500 and $5,000. If all Holders of Unsecured Claims between $2,500 and $5,000 elect to be treated as Convenience Claims, the aggregate amount to be distributed to Allowed Class 5 Convenience Claims will total approximately $1.074 million. The aggregate amount of Unsecured Claims between $2,500 and $5,000 is approximately $609,000.

### 4. Contingent Claims

A discussion of the bonding liability and lawsuits has been covered previously.

### V. SUMMARY OF THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.**

**THE SUMMARIES OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS**

OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

IN THE EVENT THAT THE DEBTOR DOES NOT HAVE SUFFICIENT CASH FLOW OR IS UNABLE TO OBTAIN FINANCING NECESSARY TO KEEP THE BUSINESS OPERATING THROUGH THE CONFIRMATION DATE, THE DEBTOR MAY HAVE TO SHUT DOWN OPERATIONS OF THE BUSINESS. THE DEBTOR RESERVES THE RIGHT TO WITHDRAW ANY PLAN PRIOR TO CONFIRMATION AND IMMEDIATELY IMPLEMENT, WITH APPROPRIATE BANKRUPTCY COURT REVIEW AND APPROVAL, AN ORDERLY LIQUIDATION OF ALL ASSETS OF THE DEBTOR WITH DISTRIBUTIONS TO CREDITORS PURSUANT TO THE PROVISIONS OF THE BANKRUPTCY CODE.

## A. Classification Overview

Bankruptcy Code section 1123 provides that a plan of reorganization must classify the claims of a debtor's creditors and the claims of its interest holders. In accordance with section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims). The Debtor is required, under Bankruptcy Code section 1122, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtor believes that the Plan has classified Claims and Interests in compliance with the provisions of section 1122; however, it is possible that a holder of a Claim or Interest may challenge the Debtor's classifications of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court to make modifications to the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of a Claim or Interest after approval of the Plan could necessitate a re-solicitation of the Plan.

## B. Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), Unclassified Claims against the Debtor consist of Administrative Claims, Allowed Priority Tax Claims and DIP Financing Claims. Based on the Debtor's books and records and the Debtor's projections for future expenses, the Debtor presently estimates that the amount of such Claims should not exceed $3 million.

The holder of any Administrative Claim must file with the Bankruptcy Court a request for such Administrative Claim no later than forty-five (45) days after the Effective Date. Failure to file timely and properly serve the notice shall result in the Administrative Claim being forever barred and discharged.

Each professional who holds or asserts an Administrative Claim based on compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date (including, without limitation, any compensation requested by an professional or any other entity for making a substantial contribution in the chapter 11 case) shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice, an application within forty-five (45) days of the Effective Date. Objections must be filed and served no later than seventy (70) days after the Effective Date.

Each holder of an Allowed Priority Tax Claim shall receive (i) Cash equal to the amount of such Allowed Priority Tax Claim plus interest from the Effective Date to the Distribution Date at a rate of 8% per annum, or (ii) such other less favorable treatment to the holders of an Allowed Priority Tax Claim as to which the Debtor or, after the Effective Date, the Reorganized Debtor and the holder of such Allowed Priority Tax Claims shall have agreed on in writing; provided, however, that any Claim or demand for payment of a penalty (other than a penalty of the type specified in Bankruptcy Code section 507(a)(8)(G)) shall be disallowed pursuant to the Plan, and the holder of an Allowed Priority Tax Claim shall not be allowed to assess or attempt to collect such penalty from the Debtor, its Estate, or the Reorganized Debtor.

## C.    Classification and Treatment of Claims and Interests

All Claims and Interests (other than Administrative Claims, Allowed Priority Tax Claims, which collectively should not exceed $3.5 million, and DIP Financing Claims which are estimated at $42 million) are classified for all purposes, including voting, confirmation and distribution pursuant to the Plan as follows:

|  |  |  |  |  |
| --- | --- | --- | --- | --- |
| Class 1: Allowed Secured Claims of Pre-Petition Lenders | Impaired | Yes | Undetermined | $176.4 million[5] |
| Class 2: Other Allowed Secured Claims Against | Unimpaired | No | 100% | $1.17 million |

---

[5] Includes a $154.4 pre-petition secured claim and approximately $22 million drawn against the DIP Financing Claims.

| Debtor | | | | |
|---|---|---|---|---|
| Class 3: Allowed Priority Non-Tax Claims | Unimpaired | No | 100% | $1.413 million |
| Class 4: General Unsecured Claims | Impaired | Yes | 22.5%[6] | $58 million[7] |
| Class 5: Convenience Class Claims | Impaired | Yes | 100%[8] | $0.634 million |
| Class 6: Assumed Liabilities[9] | Unimpaired | No | 100% | $27 million |
| Class 7: Interests | Unimpaired | No | 0% | n/a (Interest Holders releasing claims of $4.225 million and investing $500,000 new cash) |

1.      **Class 1 – Secured Claims of Pre-Petition Lenders Against the Debtor.**

        (a)     Classification:  Class 1 consists of the Allowed Secured Claim of the Pre-Petition Lenders.

        (b)     Treatment:   Class 1 is impaired, and the holder of the Allowed Secured Claim in Class 1 is entitled to vote on the Plan.  On the Effective Date, in full satisfaction, release, and discharge of and in exchange for the Allowed Secured Claim in Class 1, the Pre-Petition Lenders shall receive a Restructured Note issued and Restructured Security Documents granted by the Reorganized Debtor to the Pre-Petition Lenders substantially in the form included in the Plan Supplement.

2.      **Class 2 – Other Secured Claims Against the Debtor.**

        (a)     Classification:  Class 2 consists of all Allowed Secured Claims other than the Secured Claims of the Pre-Petition Lenders.

---

[6] This figure does not include possible recoveries from Avoidance Actions or Insider Avoidance Actions.

[7] This figure does not include Convenience Class Claims of $2,500 or less and Assumed Liabilities because they are separately classified.  If all Creditors holding Unsecured Claims between $2,500 and 5,000 elect Convenience Class treatment, as discussed in Section IV.B.3.g., this figure will be reduced by approximately $609,000 and the total of Class 5 Convenience Class Claims will increase by approximately $440,000.

[8] Exclusive of interest accrued after the Petition Date.

[9] The total amount of General Unsecured Claims, Convenience Class Claims and Assumed Liabilities is $86.9 million.

(b)    Treatment: Class 2 is unimpaired, and the holders of the Allowed Secured Claims in Class 2 are not entitled to vote on the Plan. On the Effective Date, or as soon as reasonably practicable thereafter, at the Debtor's option, (a) the Plan may leave unaltered the legal, equitable, and contractual rights of the holder of an Allowed Secured Claim, or (b) the Reorganized Debtor may pay the Allowed Secured Claim in full, in cash, on the later of the Allowance Date or the Distribution Date, or (c) the Reorganized Debtor may deliver to the holder of an Allowed Secured Claim the property securing such Claim, or (d) the Reorganized Debtor may pay an Allowed Secured Claim in such manner as may be mutually agreed to by the holder of such Claim and the Reorganized Debtor.

### 3.    Class 3 – Allowed Priority Non-Tax Claims.

(a)    Classification: Class 3 Consists of Allowed Priority Non-Tax Claims.

(b)    Treatment: Class 3 is unimpaired, and the holders of Allowed Claims in Class 3 are not entitled to vote on the Plan. On, or as soon as reasonably practicable after, the later of (a) the Distribution Date, (b) the Allowance Date, and (c) the date on which such Allowed Claim would have been due had the Chapter 11 Case not been commenced (without regard to acceleration of the Claim), each Allowed Priority Non-Tax Claim shall be assumed and paid by the Reorganized Debtor in full from Available Cash or on such other terms as may be agreed upon in writing by and between the holder of such Claim and the Reorganized Debtor. If there is insufficient Available Cash to pay all Allowed Claims in Class 3 in full, holders of Allowed Claims entitled to priority under section 507(a)(3) of the Bankruptcy Code shall be paid in full in Cash before Distributions are made to holders of Allowed Claims entitled to priority under section 507(a)(4). If there is insufficient Available Cash to pay all Class 3 Claims entitled to priority under a section of the Code in full, the Claimholders of that priority will receive Pro Rata Distributions.

### 4.    Class 4 – General Unsecured Claims/Preference Waiver Election.

(a)    Classification: Class 4 consists of Allowed General Unsecured Claims other than Allowed Convenience Claims.

(b)    Treatment: Class 4 is impaired, and the holders of Allowed General Unsecured Claims are entitled to vote on the Plan. On the Distribution Date and from time to time thereafter as Trust Property is converted to Cash, the holders of Allowed General Unsecured Claims shall each receive (i) 22.5% of the amount of their Allowed General Unsecured Claim; (ii) their pro-rata portion of the Avoidance Action Share; and (iii) their pro-rata portion of the Insider Avoidance Action Share.

(c)    Settlement Provisions for Class 4 Claims: The Debtor has conducted a preliminary analysis of potential Preference Claims. The results of this analysis are attached hereto as **Exhibit D**.[10] For each Claimant subject to a potential Preference Claim, **Exhibit D**

---

[10] **Exhibit D** is a preliminary analysis only. It is subject to change and is not in any way binding upon the Debtor.

identifies the Debtor's estimate of the preference amount recoverable by the Debtor pursuant to section 547 of the Bankruptcy Code, after taking into account applicable new value defenses.

If the Debtor holds a potential Preference Claim against a holder of an Allowed General Unsecured Claim, the Claimant may settle its liability (the "Preference Amount") for such Preference Claim and be released therefrom by electing and agreeing (the "Preference Election") to provide the Reorganized Debtor, for a period of twelve (12) months after the Effective Date, with pricing for goods and services equal to or more favorable than the best pricing offered to ALF during 2007.[11] The Preference Amount for each Holder of a Class 4 Claim shall be the amount set forth on **Exhibit D** under the column titled "Preference" and shall be binding on any Claimant exercising the Preference Election.

**The sole method of exercising the Preference Election is to vote in favor of the Plan by checking the box titled "Accept the Plan and Exercise the Preference Election" on the Ballot for General Unsecured Creditors – Class 4 included in the solicitation package containing this Plan.** A Claimant making such Preference Election shall, subject to the occurrence of the Effective Date, be deemed released from any Preference Claim. **If enough affirmative votes for the Plan are not obtained and the Plan is not approved by the Court, or the Plan is not approved by the Court for any other reason, the Preference Election is null and void and the Debtor may prosecute all Preference Claims.**

(d)    Treatment of Class 4 Claims of Freightliner:  Freightliner shall receive the (i) 22.5% of the amount of their Allowed General Unsecured Claim and (ii) their pro-rata portion of the Avoidance Action Share, but shall not receive any portion of the Insider Avoidance Action Share.  Additionally, to the extent that Freightliner has an Allowed Claim pursuant to Bankruptcy Code section 502(h) in connection with an Insider Avoidance Action, the amount of the Distribution on such Allowed Claim shall be determined by multiplying Freightliner's total liability in connection with the Insider Avoidance Action by the percentage that results from dividing (y) the amount of its Allowed Class 4 Claims (including any Allowed Class 4 Claim by Freightliner under Bankruptcy Code section 502(h)) by (z) the aggregate amount of all Allowed Class 4 General Unsecured Claims (including any Allowed Class 4 Claim by Freightliner under Bankruptcy Code section 502(h)).  Any Allowed Class 4 Claim by Freightliner under Bankruptcy Code section 502(h) will be paid or satisfied through a setoff of the amount of its section 502(h) claim against Freightliner's liability under any Insider Avoidance Action.

The Preference Election is _not_ available to recipients of transfers that are subject to Insider Avoidance Actions.

### 5.    Class 5 – Convenience Claims.

(a)    Classification:  Class 5 consists of Allowed General Unsecured Claims that would otherwise be included in Class 4 that are either (i) $2,500 or less or (ii) greater than $2,500 but as to which the holder thereof elects ("Convenience Class Election").  The sole

---

[11] ALF and the Claimant may establish other pricing terms by mutual agreement.  To the extent ALF previously agreed to pricing adjustments on a periodic basis, ALF intends to honor such pricing arrangements.

method of exercising the Convenience Class Election is to timely submit a "Ballot for Claim in Class 5 (Convenience Class) Against American LaFrance, LLC" included in the solicitation package containing this Plan. Any such election shall be effective only upon the receipt thereof by the Balloting Agent prior to the Ballot Deadline. Once the election is made and received by Balloting Agent, such election shall be irrevocable and binding on any successor-in-interest or assignee with respect to such Claim, but shall not preclude the Debtor or others from objecting to such Claim as reduced.

(b)    Treatment: Class 5 is impaired, and the holders of Allowed Convenience Claims are entitled to vote on the Plan. The Reorganized Debtor will deliver to holders of Allowed Convenience Claims on the Distribution Date, Cash in an amount equal to 100% of the Allowed Amount of the Claim not to exceed $2,500.

### 6.    Class 6 – Assumed Liabilities.

(a)    Classification: Class 6 consists of Assumed Liability Claims. A list of Assumed Liability Claims is set forth on Schedule 6.6.1, which may be amended or supplemented in the Plan Supplement.

(b)    Treatment: Class 6 is unimpaired, and the holders of Allowed Assumed Liability Claims are not entitled to vote on the Plan. All Assumed Liabilities Claims shall be assumed by the Reorganized Debtor and paid pursuant to their ordinary terms.

### 7.    Class 7 –Interests.

(a)    Classification: Class 7 consists of all Interests.

(b)    Treatment: The holders of Interests are unimpaired, and the holders of Interests are not entitled to vote on the Plan. Each holder of an Interest shall retain its Interest. In exchange for retention of Interests, the holders of Interests that are also holders of Class 1 Claims will release $4,225,767.09 of their Class 1 Claims. This amount represents the total of accrued, unpaid interest owed to the Pre-Petition Lenders. In addition, the holders of Interests will contribute $500,000 in cash to the Reorganized Debtor.

### D.    Objections to Claims

From and after the Effective Date, the Reorganized Debtor will have the authority to file, settle, compromise, withdraw, arbitrate, or litigate to judgment additional objections to claims pursuant to applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Plan.

Any objection to the allowance of a Claim shall be in writing and may be filed with the Bankruptcy Court not later than 45 days after the Effective Date. The failure of the Debtor or any other party in interest to object to any claim for voting purposes will not be deemed a waiver of the Debtor's right to object to or re-examine any such Claim in whole or in part.

### E.    Exculpation and Releases of Certain Persons

Article 17.12 of the Plan provides for exculpation and limitation of liability of various Persons in connection with the Plan and Disclosure Statement. Article 17.13 of the Plan provides for a release in favor of various Persons from any and all claims based on any act or omission, transaction, event or other occurrence taking place on or at any time prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the chapter 11 Case or the Plan, except that no Releasees shall be released from acts or omissions that are the result of willful misconduct or fraud. Except as set forth in section III.C.3 above, the Debtor has not investigated causes of action against the parties that will obtain releases pursuant to Articles 17.12 and 17.13 of the Plan. Creditors should review Articles 17.12 and 17.13 carefully before voting on the Plan.

## VI. ACCEPTANCE OR REJECTION OF THE PLAN

### A.    Class Acceptance Requirement

Under the Bankruptcy Code, only Classes of Claims and Interests that are "Impaired" (as that term is defined in Bankruptcy Code section 1124) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the Plan modifies the legal, equitable, or contractual rights of holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt.) Under section Bankruptcy Code 1126(f), Classes of Claims and Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. Under Bankruptcy Code section 1126(g), Classes of Clams and Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims or Interests will have accepted a plan if the holders (other than any holder designated under Bankruptcy Code section 1126(e)) of at least two thirds in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan and the holders (other than any holder designated under Bankruptcy Code section 1126(e)) of more than half in number of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan.

All classes other than Classes 2, 3, 6, and 7 are Impaired under the Plan. Accordingly, the holders of Claims or Interests in Classes 1, 4, and 5 are entitled to vote on the Plan.

### B.    Cramdown

The Debtor may request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b), and it reserves the right to modify the Plan to the extent, if any, that confirmation in accordance with Bankruptcy Code section 1129(b) requires modification. Under Bankruptcy Code section 1129(b), the Court may confirm a plan over the objection of a rejecting class, if among other things, (i) at least one impaired Class of Claims has accepted the plan (not counting votes of any "insiders" as defined by the Bankruptcy Code) and (ii) the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class. To the extent all Impaired Class do not vote to accept the Plan, the Debtor will seek confirmation pursuant to Bankruptcy Code section 1129(b).

## VII. MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Creation of the Trust to Administer Trust Property

The Trust Property includes the (a) $6,100,000.00 of Cash described in Article 8.1(c) herein, (b) the Avoidance Action Share, (c) the Insider Avoidance Action Share, and (d) the lien and security rights provided granted in the Trust Security Documents. After Holders of Allowed General Unsecured Claims in Class 4 have received the 22.5% Distribution as provided in Article 6.4 of the Plan, the lien and security rights granted in the Trust Security Documents shall be released and the assets secured thereby, or the proceeds thereof remaining after payment of such 22.5% Distribution (and the costs of foreclosure, if any), will revert to the Reorganized Debtor.

A major component of the Plan is to collect and administer the proceeds of the assets left behind for general unsecured creditors. The Trust will engage a Trustee to administer this process.

The Trustee shall have the power and authority to perform the acts set forth in Article 10.3 of the Plan.

## VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except as otherwise provided in the Confirmation Order, the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Confirmation Order shall constitute an order under Bankruptcy Code section 365 rejecting all Executory Contracts to which the Debtor is a party on and subject to the occurrence of the Effective Date unless such contract or lease (a) previously was assumed or rejected by the Debtor, (b) previously expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is listed in the Plan Supplement as an executory contract to be assumed.

## IX. CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN

### A. Conditions to Effectiveness of the Plan

The Plan shall not become operative unless and until the Effective Date occurs. The Effective Date shall occur after the following conditions have been satisfied; provided, however, the Debtor may waive any and all of the following conditions, whereupon the Effective Date shall occur without further action by any Person:

(1)    All documents useful and necessary to implement this Plan shall be in the form and substance satisfactory to the Debtor and fully executed;

(2)    All governmental and regulatory approvals necessary to consummate this Plan have been obtained or waived in writing;

(3)    The Restructured Note, Restructured Security Documents, and the Trust Security Documents have been fully executed;

(4)    The Confirmation Order has become a Final Order;

(5)    The Debtor has received all authorizations, consents, regulatory approvals, rulings, tax rulings, tax determinations, letters, no-action letters, opinions or documents that are determined by the Debtor to be necessary to implement the Plan;

(6)    The Executive Committee and Trustee have been appointed; and

(7)    The Trust Agreement shall be executed.

## B.    Modifications; Withdrawal

The Plan may be amended or modified by the Debtor before the Effective Date. After the Effective Date, the Plan may be amended or modified by the Reorganized Debtor.

The Debtor reserves the right to withdraw this Plan at any time prior to the Confirmation Date. If the Debtor withdraws this Plan prior to the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute an admission, waiver or release of any Claims by or against the Debtor or any other person, or to prejudice in any manner the rights of the Debtor, the Estate or any person in any further proceedings involving the Debtor.

## X. CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including those items discussed in the Financial Exhibit, before deciding whether to accept or reject the Plan.

As indicated in the Financial Exhibit, the Debtor has lost over $100 million in the past two years, and the Debtor projects that it will only break even on an operating cash basis by the middle of 2008. The business plan that forms the basis of the Debtor's projections has only recently been completed, and the results of such plan are unknown.

Economic forces beyond the Debtor's control, including the demand for Emergency Vehicles and Condor Vehicles and the general health of the economy, among others, could have a material impact on the Debtor's operations.

Despite efforts to resolve problems with the ERP System, the ERP System is still not functioning properly and will continue to present challenges after the Effective Date.

The impact of vendor and customer reaction to the bankruptcy filing is unknown. Over one half of the Debtor's vendors are single-source providers, and the failure to retain relationships with such vendors could have a material effect on the Debtor's business. Certain customers have purported to cancel orders or expressed an intent to cancel orders.

Certain members of the Management Team are provided on a temporary basis. The impact of locating and placing permanent management is unknown, and ALF has not yet completed its executive search.

The Debtor's going-forward business plan depends on the consolidation of operations previously conducted in several different facilities. The operational risks and difficulties that the Debtor will encounter in the consolidation process is unknown.

If the Plan is not confirmed and consummated, there can be no assurance that the chapter 11 Case will continue rather than be converted to a chapter 7 liquidation. The Debtor has no reason to believe that such a process would yield a return to Creditors and Interest Holders higher than the Plan, as reflected in the liquidation analysis included in the Financial Exhibit. It is possible that, absent confirmation of the Plan, the result may be a lower purchase price for the Debtor's assets in a chapter 7 liquidation proceeding, or alternatively, a piecemeal liquidation of estate assets. If that were to occur, holders of Claims or Interests might see substantially lower recovery or no recovery at all.

## XI. CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code, including, among other things, that (a) the Plan properly classifies Claims and Interests (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtor has complied with applicable provisions of the Bankruptcy Code, (d) the Debtor has proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by Bankruptcy Code section 1125 has been made, (f) the Plan has been accepted by the requisite votes of creditors or interest holders (except to the extent "cramdown" is available under Bankruptcy Code section 1129(b)), (g) the Plan is in the "best interests" of all holders of Claims and Interests in each impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court and the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the payment of all retiree benefits, as defined in Bankruptcy Code section 1114, at the level established at any time before confirmation in accordance with Bankruptcy Code section 1114(e)(1)(B) or 1114(g), for the duration of the period that the Debtor has obligated itself to provide such benefits.

### A.    Voting Requirements

Under the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" are entitled to vote to accept or reject the Plan. A Class is impaired if the Plan modifies the legal, equitable or contractual rights of holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt). Under Bankruptcy Code section 1126(f), Classes of Claims or Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. Under Bankruptcy Code section 1126(g), Classes of Claim and Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An impaired Class of Claims or Interests will have accepted the Plan if (a) the holders (other than any holder designated under Bankruptcy Code section 1126(e)) of at least two thirds in amount of the Allowed Claims or Interests actually voting in the Class have voted to accept the Plan and (b) holders (other than any holder designated under Bankruptcy Code section 1126(e)) of more than one half in number of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan.

All classes other than Classes 2, 3, 6, and 7 are Impaired under the Plan. Accordingly, the holders of Claims or Interests in Classes 1, 4, and 5 are entitled to vote on the Plan.

## B.    Feasibility of the Plan

In connection with confirmation of the Plan, Bankruptcy Code section 1129(a)(11) requires that the Bankruptcy Court find that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so called "feasibility" test.

The Debtor has prepared certain financial information to demonstrate the feasibility of the Plan. The financial information includes (i) projected financial information to demonstrate the Debtor's ability to perform under the Plan, and (ii) historical financial information to demonstrate that the pro forma financial projections are derived from historical operations. Included in the information is an analysis of ALF's results of operations for the calendar years ending December 31, 2005 (audited); December 31, 2006 (unaudited); and December 31, 2007 (unaudited). *See* Financial Exhibit. The Financial Exhibit also includes a liquidation analysis demonstrating that, in the event of a liquidation, General Unsecured Creditors will not be entitled to any distribution.

As such, confirmation of the Plan is very unlikely to be followed by further liquidation. Accordingly, the Debtor believes that the Plan complies with the standard of Bankruptcy Code section 1129(a)(11).

## C.    Best Interests Test

Even if the Plan is accepted by each Class of holders of Claims and Interests, the Bankruptcy Code requires the Bankruptcy Court find the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan and that have not accepted the Plan. As set forth in Bankruptcy Code section 1129(a)(7), the "best interests" test requires a bankruptcy court to find that either (i) all members of an impaired class have voted to accept a plan, or (ii) the plan will provide a member who has not accepted the plan with a recovery of

property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each class of holders of claims or interests if a debtor were liquidated under chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 debtor.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses of both the chapter 7 case and the chapter 11 case. Costs of a liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as counsel and other professionals retained by that trustee, asset-disposition expenses, all unpaid expenses incurred by the trustee and debtor in the chapter 11 Case (such as compensation of attorneys and advisors) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the Debtor during the pendency of the Cases. The liquidation would also likely prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity interest holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity interest holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the liquidation analysis included in the Financial Exhibit, the Debtor believes that each member of each Class of Claims and Interests will receive at least as much under the Plan as they would receive if the Debtor were liquidated in a chapter 7 case. More specifically, a liquidation of the Debtor would significantly impair recoveries to all Creditors and Interest Holders and clearly is not in the best interests of the Estate's constituencies. Accordingly it is clear that Creditors and Interest Holders will fare much better under the Plan than in a liquidation. The Plan therefore satisfies the best-interests-of-creditors test.

## D.    Confirmation Without Acceptance of All Impaired Classes – "Cramdown"

The Debtor may request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b), and it reserves the right to modify the Plan to the extent, if any that confirmation in accordance with Bankruptcy Code section 1129(b) requires modification. Under Bankruptcy Code section 1129(b), the Court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired Class of Claims has accepted the plan (not counting votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan, if amount other things, the plan provides (a)(i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interests in such property; (b) for the sale, subject to Bankruptcy Code section 363(k), of any property that is subject to liens securing the claims included in the rejecting class, free and clear of liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph, or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects a plan in the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to such class will receive or retain under the plan any property on account of such junior interest.

## XII. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The purpose of this provision is to provide a discussion of the potential material Federal income tax consequences of the plan to the Debtor and the hypothetical holders of Claims or Interests in the case that would enable such a hypothetical investor to make an informed judgment about the Plan, as contemplated in 11 U.S.C. § 1125(a)(1). The Federal income tax consequences discussed herein are those arising under the Internal Revenue Code of 1986, as amended (the "Tax Code") and the income tax regulations promulgated thereunder, (the "Regulations") and case law, revenue rulings, revenue procedure and other authority interpreting the relevant sections of the Tax Code and the Regulations.

This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the Federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, non-profit entities or foundations, small business investment companies, persons that hold Claims or Interests as part of a straddle or conversion transaction and tax-exempt organizations.)

No administrative rulings will be sought from the Internal Revenue Service ("IRS") with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

**THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY. ALL CLAIMANTS AND INTEREST HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, AS WELL AS STATE AND LOCAL TAX CONSEQUENCES AND FEDERAL ESTATE AND GIFT TAXES.**

## XIII. RECOMMENDATIONS AND CONCLUSION

THE DEBTOR BELIEVES THAT THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE AND CREDITORS THEREOF. FOR THESE REASONS THE DEBTOR URGES ALL HOLDERS OF CLAIMS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY THE DEBTOR'S BALLOTING AGENT ON OR BEFORE APRIL 18, 2008 AT 4:30 P.M. PREVAILING PACIFIC TIME.

Dated: March 27, 2008

Wilmington, Delaware

AMERICAN LAFRANCE, LLC

/s/ William J. Hinz
William J. Hinz, President & CEO

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS, LLP

By:    /s/ Christopher A. Ward
        Joanne B. Wills (No. 2357)
        Christopher A. Ward (No. 3877)
        919 Market Street, Suite 1000
        Wilmington, DE 19801
        Telephone: (302) 426-1189
        Facsimile:  (302) 426-9193
        jwills@klehr.com
        cward@klehr.com

            -and-

        HAYNES AND BOONE, LLP
        Ian T. Peck (TX 24013306)
        Abigail Ottmers (TX 24037225)
        901 Main Street, Suite 3100
        Dallas, Texas 75202
        Telephone: 214.651.5000
        Facsimile: 214.651.5940
        ian.peck@haynesboone.com
        abigail.ottmers@haynesboone.com

        Counsel for the Debtor and Debtor in Possession

## **EXHIBIT A**

**[INTENTIONALLY OMITTED—FILED SEPARATELY]**



**American LaFrance, LLC**
Organizational Structure

South Carolina
471 employees

Parts Distribution
Hanahan

Manufacturing
Summerville

Condor Cab/Chassis
Fire Cab/Chassis
Liberty and M2 Fire Trucks
Aftermarket Parts Distribution

ALF Chassis Co
Jedburg

Pennsylvania
263 employees

Manufacturing
Ephrata

Service & Refurb
Lebanon

Aerial Fire Trucks
Fire Service and Refurbishments
Aftermarket Parts Distribution

Florida
154 employees

Manufacturing
Sanford

Service
Lake Mary

Ambulances
Pumper Fire Trucks
Aftermarket Parts Distribution

New York
80 employees

Manufacturing & Service
Hamburg

Pumper Fire Trucks
Tanker Fire Trucks
Fire Service
Aftermarket Parts Distribution

California
10 employees

Los Angeles

Fire Sales
Fire Service

Oregon
10 employees

Portland

Fire Sales
Fire Service

Financial Exhibits

Historical Financials

**American LaFrance, LLC**
**Historical Financial Statements**
*(in thousands)*

| | Audited 12/31/2005 | Unaudited 12/31/2006 | Unaudited [1] 12/31/2007 |
|---|---|---|---|
| **Statement of Operations** | | | |
| | | | |
| Net Sales | | $ 233,648 | $ 194,497 |
| Cost of goods sold | | 232,159 | 191,969 |
|     Gross Profit | | 1,489 | 2,528 |
| | | | |
| Selling, general and administrative | | 42,021 | 56,211 |
|     Loss from Operations | | (40,532) | (53,683) |
| | | | |
| Other income (expense): | | | |
|     Interest expense | | (8,233) | (15,084) |
|     Interest and other income, net | | 536 | 9,746 |
|     Other income (expense), net | | (7,697) | (5,338) |
| | | | |
| Net loss | | $ (48,229) | $ (59,020) |
| | | | |
| **Balance Sheets** | | | |
| | | | |
| Assets | | | |
| Cash and cash equivalents | 8,808 | 2,432 | 4,000 |
| Restricted cash | 422 | 24,331 | 24,717 |
| Accounts receivable, net of allowance | 15,277 | 35,077 | 19,803 |
| Receivable from Freightliner, LLC | 11,936 | 4,769 | |
| Inventories | 78,780 | 92,432 | 87,500 |
| Transitional services agreement, net | 2,961 | - | |
| Prepaid insurance and other current assets | 913 | 3,686 | 3,000 |
|     Total current assets | 119,097 | 162,727 | 139,020 |
| | | | |
| Property, plant and equipment, net | - | 1,925 | 17,255 |
| Software, net | - | 8,550 | 13,620 |
|     Total Assets | 119,097 | 173,202 | 169,895 |
| | | | |
| Liabilities | | | |
| Accounts payable and accrued liabilities | 3,930 | 8,081 | 52,813 |
| Warranties | 658 | 4,752 | 7,172 |
| Employee compensation | 3,431 | 3,901 | 2,487 |
| Accrual for loss on uncompleted contracts | 2,086 | 2,305 | 1,050 |
| Payable to Freightliner, LLC | 4,578 | 49,689 | 10,578 |
| Distribution payable to members | 1,826 | 6,224 | |
| Customer deposits | 7,420 | 9,903 | 13,378 |
| Current portion of other term debt | - | 2,308 | |
|     Total current liabilities | 23,929 | 87,163 | 87,478 |
| | | | |
| Deferred revenue - Extended warranties | | 985 | |
| Long-term portion of related-party debt | 37,000 | 60,900 | 154,141 |
| Revolving term loan with related party | | 15,000 | |
| Long-term portion of other term debt | | 3,000 | 1,170 |
| Preferred member's interest subject to mandatory redemption | | | |
|     Series A | 3,571 | 2,473 | 4,225 |
|     Series B | 6,646 | 3,959 | - |
|     Total Long-term liabilities | 47,217 | 86,317 | 159,536 |
| | | | |
| Member's Capital | | - | |
| Accumulated earnings | 47,951 | (278) | (59,298) |
| Valuation Adjustment [2] | | | (17,821) [2] |
|     Total member's capital | 47,951 | (278) | (77,119) |
| | | | |
| Total liabilities and member's capital | 119,097 | 173,202 | 169,895 |

[1] Financial statements as of 12/31/07 are based on management estimates
[2] Unidentified adjustment necessary to reconcile ending equity

Financial Projections

**American LaFrance, LLC**
**Business Plan Projections**
*(in thousands)*

|  | Post-petition | | Fresh Start | Post-emergence | | | | |
|  | 12 mo end | 4 mo end | | 4 mo end | 8 mo end | 12 mo end | 12 mo end | 12 mo end |
| STATEMENT OF OPERATIONS | 12/31/07 | 4/25/2008 | Adjustments | 4/25/2008 | 12/31/2008 | 12/31/08 | 12/31/2009 | 12/31/2010 |
|---|---|---|---|---|---|---|---|---|
| Net sales | $ 194,497 | $ 43,690 | $ - | $ 43,690 | $ 213,072 | $ 256,762 | $ 390,935 | $ 355,074 |
| Cost of goods sold | 191,969 | 42,625 | - | 42,625 | 180,924 | 223,549 | 334,480 | 303,612 |
| Gross margin | 2,528 | 1,064 | - | 1,064 | 32,148 | 33,212 | 56,455 | 51,462 |
| SG&A | 56,211 | 13,052 | - | 13,052 | 22,983 | 36,035 | 34,316 | 34,316 |
| Operating profit | (53,683) | (11,988) | - | (11,988) | 9,165 | (2,823) | 22,138 | 17,146 |
| Interest (incl Series A PIK Interest) | 15,084 | 785 | - | 785 | 15,179 | 15,964 | 21,508 | 19,997 |
| Other income (expense) | 9,746 | - | - | - | - | - | - | - |
| Reorganization Costs | - | 3,000 | - | 3,000 | - | 3,000 | - | - |
| Debt forgiveness (income) | - | - | (51,554) | (51,554) | - | (51,554) | - | - |
| Net income (loss) | $ (59,020) | $ (15,772) | $ 51,554 | $ 35,781 | $ (6,014) | $ 29,767 | $ 631 | $ (2,851) |
| Operating Profit | (53,683) | (11,988) | - | (11,988) | 9,165 | (2,823) | 22,138 | 17,146 |
| D&A | 2,671 | 1,828 | - | 1,828 | 3,782 | 5,610 | 5,744 | 5,744 |
| EBITDA | $ (51,011) | $ (10,159) | $ - | $ (10,159) | $ 12,947 | $ 2,788 | $ 27,882 | $ 22,890 |
| **BALANCE SHEET** | | | | | | | | |
| Assets | | | | | | | | |
| Cash and cash equivalents | $ 4,000 | $ 2,000 | $ 500 | $ 2,500 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 |
| Restricted cash | 24,717 | 24,717 | - | 24,717 | 24,717 | 24,717 | 24,717 | 24,717 |
| Accounts receivable, net of allowance | 19,803 | 33,593 | - | 33,593 | 44,690 | 44,690 | 64,295 | 58,397 |
| Inventories | 87,500 | 85,154 | - | 85,154 | 94,030 | 94,030 | 66,896 | 50,602 |
| Prepaid insurance and other current assets | 3,000 | 3,000 | - | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Total current assets | 139,020 | 148,464 | 500 | 148,964 | 168,437 | 168,437 | 160,908 | 138,716 |
| Net Fixed Assets | 30,875 | 31,395 | - | 31,395 | 29,180 | 29,180 | 29,180 | 29,180 |
| Total Assets | $ 169,895 | $ 179,859 | $ 500 | $ 180,359 | $ 197,617 | $ 197,617 | $ 190,088 | $ 167,896 |
| Liabilities | | | | | | | | |
| Accounts payable and accrued liabilities | $ 52,813 | $ 52,813 | $ (46,937) | $ 5,876 | $ 14,825 | $ 14,825 | $ 22,492 | $ 20,429 |
| Warranties | 7,172 | 7,330 | - | 7,330 | 9,468 | 9,468 | 14,416 | 13,093 |
| Employee compensation | 2,487 | 2,661 | - | 2,661 | 2,724 | 2,724 | 4,998 | 4,540 |
| Accrual for loss on uncompleted contracts | 1,050 | 100 | (100) | - | - | - | - | - |
| Payable to Freightliner, LLC | 10,578 | 10,578 | (10,578) | - | - | - | - | - |
| Distribution payable to members | - | - | - | - | - | - | - | - |
| Customer deposits | 13,378 | 13,378 | - | 13,378 | 13,378 | 13,378 | 13,445 | 12,212 |
| Total current liabilities | 87,478 | 86,860 | (57,615) | 29,246 | 40,396 | 40,396 | 55,351 | 50,274 |
| Exit financing | - | - | 186,471 | 186,471 | 198,422 | 198,422 | 175,037 | 160,489 |
| Debtor-in-possession facility | - | 42,000 | (42,000) | - | - | - | - | - |
| Prepetition secured debt | 154,141 | 138,410 | (138,410) | - | - | - | - | - |
| Revolving term loan with related party | - | - | - | - | - | - | - | - |
| Long-term portion of other term debt | 1,170 | 1,170 | - | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 |
| Series A | 4,225 | 4,310 | - | 4,310 | 4,482 | 4,482 | 4,751 | 5,036 |
| Total Long-term liabilities | 159,536 | 185,890 | 6,061 | 191,951 | 204,074 | 204,074 | 180,958 | 166,695 |
| Member's Capital | | | | | | | | |
| Accumulated earnings | (59,298) | (75,070) | 47,328 | (27,742) | (33,757) | (33,757) | (33,126) | (35,977) |
| Prepetition Secured Debt Converted to Equity | | | 4,226 | 4,226 | 4,226 | 4,226 | 4,226 | 4,226 |
| Equity Contribution from Old Equity | | | 500 | 500 | 500 | 500 | 500 | 500 |
| Valuation Adjustment | (17,821) | (17,821) | - | (17,821) | (17,821) | (17,821) | (17,821) | (17,821) |
| Total member's capital | (77,119) | (92,892) | 52,054 | (40,838) | (46,852) | (46,852) | (46,222) | (49,073) |
| Total liabilities and member's capital | $ 169,895 | $ 179,859 | $ 500 | $ 180,359 | $ 197,617 | $ 197,617 | $ 190,088 | $ 167,896 |

**American LaFrance, LLC**
**Business Plan Assumptions**

Fresh Start Adjustments & Equity Contributions

- Debt forgiveness income – reflects the net book value of all liabilities settled pursuant to the Plan, less cash consideration paid in connection with the Plan. These include:

| | |
|---|---|
| Accounts payable and accrued liabilities | $46.9 million |
| Payable to Freightliner | $10.6 million |
| Prepetition Secured Debt to Equity | $4.3 million |
| Accrual for loss on uncompleted contracts | $0.1 million |
| Estimated 11 U.S.C. §503(b)(9) Claims | ($1.1) million |
| Estimated Executory Contract Cure Costs | ($1.4) million |
| Priority Taxes | ($0.5) million |
| Convenience Claims | ($1.2) million |
| Cash consideration paid to creditors | ($6.1) million |
| Net debt forgiveness income | $51.6 million |

- Exit financing of $186.5 million reflects the refinance of approximately $138.4 million of prepetition secured debt at 4/25/08 and $42 million of debtor-in-possession financing, and the conversion of approximately $4.3 million of prepetition secured debt to equity. Additionally, the exit financing facility includes a $10.3 million draw to make payments to unsecured creditors, pay 11 U.S.C. §503(b)(9) claims, cure executor contracts, pay convenience claims, and pay priority taxes.

- The balance sheet reflects the conversion of $4.226 million of pre-petition secured debt to equity.

- The balance sheet also reflects a $0.5 million equity contribution by members of Old Equity.

Post Emergence Balance Sheet Modeling Assumptions

- Accounts receivable – at 12/31/09 and 12/31/10, reflects a projected DSO of 60 days, an improvement of 3.5 days over 12/31/08, which reflects an increasing product mix of Condors (Fire typically has DSO of around 60 to 95 days versus Condor of 20 to 30 days).

- Inventory –Inventory turns are projected to increase from 2.4x at 12/31/08 to 5.0x in 2009 and 6.0x in 2010 as production and supply chain efficiencies are achieved and as the product mix shifts toward higher volume Condor products.

- Accounts Payable – at 12/31/08, days payable are assumed to be 15 days.  At 12/31/09 and 12/31/10, days payable are projected to increase to 30 days.

- Warranties and employee compensation – both of these accounts are projected to remain in the same proportion of sales as observed at 12/31/07.

- Customer Deposits – in 2009 and 2010, Customer Deposits are expected to represent 3.4% of sales.  This is approximately one-half the rate observed for 2007.

Business Plan Assumptions

- Work furlough began in December 2007 and is projected to continue until March 2008, at which time production will resume to a full schedule.  Prior to March, the company will be completing WIP.

- Sales Volumes – Sales volumes are based on the actual backlog PO prices.  The current Fire backlog runs through the full year 2008.  Condor backlog runs through August of 2008.  Sales in 2010 are expected to be lower than 2009 as a result of the new emissions standards which will take effect in 2010 (essentially 2010 sales are projected to be pulled forward into 2009).  Projected unit shipment volumes are reflected in the following table:

| | 2008 Plan | 2009 Plan | 2010 Plan |
|---|---|---|---|
| Fire | 279* | 276 | 276 |
| Condor HD | 817 | 1,495 | 1,280 |
| Condor MD | 434 | 680 | 500 |
| Private Label | 251 | 500 | 500 |
| Total | 1,781 | 2,951 | 2,556 |

*Excludes twelve ambulances that will be produced at Sanford in 2008.  No ambulances are budgeted for 2009 and 2010 after the Sanford facility is closed in 2008.

- Average Unit Pricing – average unit prices are reflected in the following table:

| | 2008 Plan | 2009 Plan | 2010 Plan |
|---|---|---|---|
| Fire | $361,142 | $388,835 | $388,835 |
| Condor HD | $109,021 | $112,292 | $112,292 |
| Condor MD | $69,380 | $65,100 | $65,100 |
| Private Label | $90,000 | $92,700 | $92,700 |

- Parts and Service sales are projected at $13.8 million in 2008 and $25.1 million for each of 2009 and 2010.

- Material costs are based upon actual bill of materials for trucks of similar type.

- The plan assumes bid and performance bond capabilities commensurate with projected sales volumes.

- SG&A reduction – SG&A is projected to decrease more than $10 million from 2007 to 2008 as a result of:

  - $3.0 million – a reclassification of engineering costs to COGS, and
  - $8.3 million – a reduction in sales workforce from 86 to 47 headcounts

- The Sanford facility (owned) will be closed and the existing WIP will be finished out by the end of March. The Lake Mary (leased) facility will be vacated by the end of March. All employees will receive 60 days notice pursuant to the WARN act. The plan anticipates no further ambulance production after the closure of these facilities.

- The inventory at the PDC facility (leased) will be transferred to the Summerville plant. The PDC facility will be completely vacated on or before the end of March.

- The ACC cab chassis plant (leased) is to be relocated to the Summerville plant by July 2008.

- The Northwest dealership in Oregon is being closed under the facility rationalization plan. This is a leased facility.

- The plan assumes that all OEM vendor pricing remains in place.

- The plan currently assumes no P&L impact for the recent physical inventory, the results of which are still being quantified.

- The plan assumes the number of labor hours per truck produced will reduce, as a result of efficiencies expected post-furlough.

Liquidation Analysis

**American LaFrance, LLC**
**Liquidation Analysis**
*(in thousands)*

| | | Forced Liquidation | |
|---|---|---|---|
| | Balance Sheet Unaudited 12/31/2007 | Realization Rate | Extended Value |
| **Gross Assets** | | | |
| Cash and cash equivalents | $ 4,000 | 100.0% | $ 4,000 |
| Restricted cash | 24,717 | 100.0% | 24,717 |
| Accounts receivable, net of allowance | 19,803 | 75.0% | 14,852 |
| Raw Materials | 40,400 | 25.0% | 10,100 |
| Work in process | 45,900 | 18.5% | 8,492 |
| Finished Goods | 1,310 | 80.0% | 1,048 |
| Used | 3,000 | 5.0% | 150 |
| Other - unidentified | - | 0.0% | - |
| Reserve for excess and obsolescence | (3,110) | 0.0% | - |
| Net Inventory | $ 87,500 | 22.6% | $ 19,790 |
| Prepaid insurance and other current assets | 3,000 | 0.0% | - |
| Current Assets | $ 139,020 | 45.6% | $ 63,359 |
| 235 N. 16th Street Lebanon, PA 17042 | - | NA | 4,500 |
| 3705 St. Johns Parkway Sanford FL 32771 | - | NA | 5,000 |
| Factory Equipment | 3,531 | 25.0% | 883 |
| Leasehold Improvements | 1,208 | 0.0% | - |
| Furniture & Fixtures | 1,194 | 10.0% | 119 |
| Computer & Communications Equipment | 1,479 | 16.9% | 250 |
| Software | 13,620 | 0.0% | - |
| Construction in Progress | 9,800 | 10.0% | 980 |
| Vehicles | 43 | 10.0% | 4 |
| Net Property, plant and equipment | 30,875 | 38.0% | 11,736 |
| Gross Value of Assets | $ 169,895 | 76.2% | $ 75,095 |
| Liquidation Expenses | | | (2,207) |
| Restricted Cash | | | (24,717) |
| Preference Actions | | | 12,500 |
| Legal Expense | | | (500) |
| Net Liquidation Value | | | $ 48,171  $ 12,000 |

| | Claims | | $ Cascade | $ Chp 5 | Rec % |
|---|---|---|---|---|---|
| DIP Facility | $ 42,000 | | $ 42,000 | | 100.0% |
| Secured Debt | 138,410 | | 6,120 | | 4.4% |
| Other Secured | 1,170 | | 52 | | 4.4% |
| Admin Claims | 2,000 | | - | 2,000 | 100.0% |
| 11 U.S.C. §503(b)(9) | 1,100 | | - | 1,100 | 100.0% |
| Priority Unsecured | 488 | | - | 488 | 100.0% |
| *General Unsecured:* | | | | | |
| Secured Deficiency Claim | 133,409 | | - | 4,491 | 3.4% |
| Rejection Damages | 7,911 | | - | 266 | 3.4% |
| Unsecured Performance Bonds | 6,283 | | - | 212 | 3.4% |
| Other Unsecured | 89,772 | | - | 3,022 | 3.4% |
| Preference Claims | 12,500 | | - | 421 | 3.4% |
| **Subtotal - General Unsecured** | $ 249,876 | | - | 8,412 | 3.4% |
| Total | | | - | | |
| | | | $ 48,171 | $ 12,000 | |

**American LaFrance, LLC**
**Liquidation Analysis**
**Assumptions**

The liquidation analysis was prepared under a forced liquidation scenario.  For purposes of this analysis, the definition of forced liquidation is:

> *The most probable price at which the subject assets could typically realize at a properly advertised and professionally managed auction, held under forced sale conditions and present day economic trends.  The assets are assumed to be sold on a piecemeal basis, "as is condition, where is location", with the purchaser responsible for removal at their own risk and expense.  The sale is assumed to be a sale of duress, where manufacturing operations, if applicable, have been discontinued.*

Specific line item assumptions for assets include:

- Cash and Restricted cash – valued at 100% of book value.

- Accounts receivable, net of allowance – assumed to liquidate at 75% of book value.

- Raw Materials – assumed to realize 25% under a forced liquidation.  This realization rate is based a September 30, 2006 valuation study conducted by AccuVal Associates, Incorporated, which indicated a 49% realization under an orderly liquidation assumption.  A forced liquidation value was assumed to be 25%, or 50% of the orderly liquidation assumption.

- Work-in-Process - assumed to realize 18.5% under a forced liquidation.  This realization rate is based a September 30, 2006 valuation study conducted by AccuVal Associates, Incorporated, which indicated a 37% realization under an orderly liquidation assumption.  A forced liquidation value was assumed to be 18.5%, or 50% of the orderly liquidation assumption.

- Finished Goods - assumed to realize 80% under a forced liquidation.  This realization rate is based a September 30, 2006 valuation study conducted by AccuVal Associates, Incorporated, which indicated an 81% realization under an orderly liquidation assumption.  A forced liquidation value was assumed to be 80%, or roughly the same as the orderly liquidation assumption.

- Prepaid insurance and other current assets – assumed to recover 0% under a forced liquidation.

- 235 N. 16th Street Lebanon, PA  – this property is currently listed with a real estate broker for $4.56 million.

- 3705 St. Johns Parkway Sanford, FL – value of $4.0 million is based on management's estimate of the probable sale / leaseback value of this location.

- Factory equipment – based on management's estimate of the probable liquidation value of this asset.

- Leasehold improvements – based on management's estimate of the probable liquidation value of this asset.

- Furniture and fixtures – based on management's estimate of the probable liquidation value of this asset.

- Computer and communications equipment – based on management's estimate of the probable liquidation value of this asset.

- Software – assumed to be non-transferrable and to have no value under a forced liquidation.

- Construction in progress – valuation based on anticipated sale of significant equipment, such as paint booths, etc.

- Vehicles – assumed to liquidate for 10% of net book value.  The book value of vehicles is inconsistent with other data that has been provided by the Company.

Chapter 5 – Avoidance Actions:

- $12.0 million of preference recovery is assumed (net of $0.5 million of legal fees), which is distributed in the following priority:

    1. Admin Claims and 11 U.S.C. §503(b)(9) claims, then to
    2. Priority Unsecured, then to
    3. General Unsecured claims, including unsecured pre-petition preference claims.

American LaFrance LLC
90 preference analysis

| Vendor Name | Preference |
|---|---|
| A&R METAL INDUSTRIES LTD | 1,783 |
| A. DUIE PYLE INC | |
| A.C.P.A. | 6,477 |
| A.H. STOCK MANUFACTURING CORPORATION | |
| A.J.G LOCKSMITH | |
| ABF FREIGHT SYSTEM INC | 6,650 |
| ABLE MANUFACTURING & ASSEMBLY LLC | 12,292 |
| ABRASIVE-TOOL CORPORATION | |
| ACC BUSINESS | 11,153 |
| ACC CLIMATE CONTROL | |
| ACCOUNTEMPS | 4,876 |
| ACCURATE DIESEL | |
| ACCURIDE CORPORATION | 49,551 |
| ACTION COUPLING & EQUIPMENT INC | |
| ACUMNET GLOBAL TECH | 2,058 |
| ADP | |
| ADVANCE DRIVELINE | |
| ADVANCED FLUID SYSTEMS | - |
| AEROTEK COMMERICAL STAFFING | 123,260 |
| AFLAC | 7,539 |
| AI CONTROL SYSTEMS INC | 6,450 |
| AIR CENTERS OF FLORIDA | |
| AIR LIQUIDE HEALTHCARE AMERICAN CORPORATION | |
| AIR POWER INC | 46,027 |
| AIRGAS | 14,753 |
| AIRGAS EAST | 29,838 |
| AIRITE INC | 6,000 |
| AIR-KWIK INC | 14,830 |
| AKRON BRASS CO | 103,803 |
| ALBRIGHT OPTICIANS | |
| ALCOA SUB-ASSEMBLY LOGISTICS | 10,622 |
| ALLEGHENY YORK COMPANY | |
| ALLEGIS CORPORATION | |
| ALLIANCE METALS GROUP | 6,878 |
| ALLISON TRANSMISSION, INC | 457,472 |
| ALLYSON MOSER | |
| ALTA RESOURCES INC | |
| ALTEK SYSTEMS INC | 88,870 |
| ALUMINUM LADDER COMPANY | 496 |
| AMAZON HOSE & RUBBER | |
| AMDOR SPECIALITY ROLL-UP DOORS | 38,690 |
| AME INC | 71,891 |
| AMENO CONNECTOR SUPPLY | |
| AMERICAN CITADEL GUARD INC | |
| AMERICAN METAL PRODUCTS | |
| AMERICAN METAL PRODUCTS COMPANY | |
| AMERICAN SAFETY & FIRE | |
| AMERICAN SENSOR TECHNOLOGIES | 7,490 |
| AMERICAN STAINLESS CORPORATION | |
| AMERICAN STEEL & ALUMINUM | 16,731 |
| AMERICAN WASTE DIGEST | |
| AMETEK DIXSON | - |
| AMITY MACHINE SHOP | - |
| ANIXTER INC | 5,926 |
| AON RISK SERVICES INC | |
| APPLE ROCK DISPLAYS | 20,331 |
| APPLIED INDUSTRIAL TECHNOLOGIES | |
| ARIZONA CORPORATION COMMISSION | |
| ARKANSAS MOTOR VEHICLE COMMISSION | |
| ARROWSAFETY DEVICE CO. INC | |
| ART SYSTEMS OF FLORIDA | |
| ARVIN RIDE CONTROL PRODUCTS | |
| ARVINMERITOR AUTOMOTIV ON-HWY AXLE DIV | 179,764 |
| ASCOM HASLER | |
| ASTRO MANUFACTURIGN & DESIGN | |
| AT&T | - |
| ATKINSON INTERNATIONAL INC | |
| ATLANTIC FORD TURCK SALES, INC. | |
| ATLANTIC STUD WELDING | |
| ATLAS FOOD SYSTEMS AND SERVICES INC | 22,772 |
| AUBURN ENGINEERING | 39,740 |
| AURORA METALS DIVISION | 10,842 |
| AUSTIN HARDWARE & SUPPLY | 12,491 |
| AUTOMATION TECHNOLOGY INC | |
| AUTOMOTIVE RENTALS INC | |
| AVIONIC STRUCTURES INC | - |
| AVON BEARINGS CORPORATION | 6,412 |
| AW DIRECT INC | |
| AXLE ALLIANCE COMPANY LLC | 1,640 |
| A-Z COATINGS | |
| BANK OF AMERICA | |
| BARBEY ELECTRONICS CORPORATION | 4,855 |
| BARKER PRODUCTS | |
| BARNHARDT MANUFACTURING COMPANY | |
| BARRY CONTROLS | 12,871 |
| BATTERY POST INC. | |
| BAYTREE ASSOCIATES | - |
| BEHR HEAT TRANSFER SYSTEMS INC | 7,107 |
| BEI TECHNOLOGIES INC | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| BEILER HYDRAULICS | 24,118 |
| BELMOR/AUTOTRON | |
| BENCO TECHNOLOGY LLC | |
| BENDIX COMMERCIAL VEHICLE SYSTEMS LLC | - |
| BENNETT MOTOR EXPRESS | |
| BEN'S PAINT SUPPLY | 9,742 |
| BERGSTROM CLIMATE SYSTEMS L.L.C | 11,105 |
| BERKELEY ELECTRIC COOPERATIVE | - |
| BETTS SPRING COMPANY INC | |
| BETTS TRUCK PARTS | |
| BEYOND COMPONENTS NY INC. | |
| BILL HEARD CHEVROLET | 253,505 |
| BILLY LEE LLC | - |
| BLACHFORD INC | 15,725 |
| BORGWARNER EMISSIONS/THERMAL SYSTEMS | 10,081 |
| BOSTROM SEATING INC | |
| BOWEN MACHINE CO INC | |
| BOWEN'S SALES & SHARPENING | |
| BOYD CORPORATION | - |
| BOYD CORPORATION - GAFFNEY | 18,347 |
| BP AMOCO OIL | 13,113 |
| BREATHING AIR SYSTEMS | |
| BRENTWOOD INDUSTRIES INC | |
| BRIGHTHEADLIGHTS.COM | 13,566 |
| BRITECH INDUSTRIES | 1,250 |
| BROOKLINE MACHINE CO IN | |
| BUCKHORN RUBBER PRODUCTS INC | 4,367 |
| BUFFALO WELDING SUPPLY CO INC | |
| BULLDOG HIWAY EXPRESS | |
| BUMPER TO BUMPER TIRE AND TRUCK REPAIR | |
| BUSTIN INDUSTRIAL PRODUCTS | - |
| BUYERS PRODUCTS COMPANY | |
| BYERS PRECISION FABRICATORS INC | |
| C.H. REED INC | |
| C.R. LAURENCE CO NC | |
| CABLE ASSEMBLY  LLC | 68,448 |
| CABLE COMPONENTS INC | |
| CADCAM-E.COM | 55,002 |
| CALIFORNIA STATE BOARD OF EQUALIZATION | 5,072 |
| CAMPBELL SUPPLY CO. INC | 163,230 |
| CANANWILL, INC | |
| CARLING TECHNOLOGIES INC | 6,876 |
| CAROLINA OFFICE SYSTEMS | |
| CAROLINA RIM AND WHEEL | 5,537 |
| CARROLL  MARK SIGNS & GRAPHICS | |
| CASCADIA INTERNATIONAL LLC | 130,061 |
| CAST PRODUCTS INC | 1,696 |
| CATERPILLAR INC | 11,624 |
| CAVIN'S BUSINESS SOLUTIONS, LLC | |
| CCI ENTERPRISES INC | |
| CDW DIRECT  LLC | 10,507 |
| CE SUPPLY  INC. | |
| CEL OIL CO. | 22,839 |
| CELESCO TRANSDUCER PRODUCTS INC | |
| CENTRAL TRANSPORT INTERNATIONAL INC | |
| CERTIFIED FLEET SERVICES INC | |
| CERTIFIED SLINGS INC | |
| CERTIFIED TESTING LABORATORIES | |
| CHADWICK DESIGN CONSULTING LLC | 8,480 |
| CHALMERS SUSPENSIONS INTERNATIONAL INC | 2,944 |
| CHAMBERLAIN MARKETING GROUP INC | 9,940 |
| CHAMBERLIN RUBBER CO INC | |
| CHAMPION TOOLING & MACHINING COMPANY INC | 6,765 |
| CHARGING SYSTEMS INTERNATIONAL INC | 5,379 |
| CHARLESTON COUNTY TREASURER | |
| CHARLESTON WIRELESS GROUP | |
| CHART INC | 9,586 |
| CHELSEA PRODUCT DIVISION | |
| CHIEF MIKE KENNEDY | |
| CHRISTENSON OIL | 6,146 |
| CHURCHVILLE FIRE EQUIPMENT CORPORATION | |
| CIGNA | |
| CINTAS | 7,942 |
| CIT TECHNOLOGY FIN SERV, INC | |
| CITATION CORPORATION | 11,952 |
| CITY OF SANFORD UTILITIES | |
| CLASS 1 HARNESS INC | 12,369 |
| CLASS 1 INC - HALE PRODUCTS | |
| CLEAN SEAL INC | |
| CLEVELAND IGN CO INC | 6,028 |
| CMA SERVICES INC | 67,558 |
| COAST TO COAST CELLULAR INC | - |
| CODE 3 INC | - |
| COLE HERSEE COMPANY | |
| COMCAST | |
| COMMERCIAL PIPE & SUPPLY CORPORATION | |
| COMMONWEALTH OF PENNSYLVANIA | |
| CONDUSTRIAL INC | 59,789 |
| CONESTOGA FUELS | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| CONMET DE MEXICO S.A. DE C.V | 22,417 |
| CONNOR MANUFACTURING SERVICES | 20,313 |
| CONSOLIDATED ELECTRICAL DISTRIBUTORS-SC | - |
| CONSOLIDATED METAL PRODUCTS INC | - |
| CONSOLIDATED METCO | |
| CONTROL ELECTRIC SUPPLY INC | |
| CON-WAY FREIGHT | |
| COOPER BUSSMAN | 3,988 |
| COOPER STANDARD | |
| COOPER TOOLS | 22,855 |
| COPYTRONICS INC | |
| CORE COMPOSITES CORPORATION | 14,993 |
| CORNING REAL ESTATE LEASE RECEIVABLES | 22,901 |
| CORPORATION SERVICE COMPANY | |
| COS COMMUNICATIONS INC | |
| COUNTRY INN & SUITES | - |
| COUNTY OF LANCASTER | |
| CRG PARTNERS GROUP LLC | |
| CROSSROADS UNLIMITED | |
| CRYSTAL ROCK LLC | |
| CUMBERLAND TRUCK EQUIPMENT COMPANY | |
| CUMMINS ATLANTIC INC | 31,148 |
| CUMMINS EMISSION SOLUTIONS | 65,264 |
| CUMMINS ENGINE CO INC | 2,036,498 |
| CUMMINS FILTRATION INC | 14,805 |
| CUMMINS POWER SYSTEMS INC | 14,906 |
| CUMMINS POWERCARE BUSINESS | |
| CUMMINS SOUTHEAST POWER INC | |
| CUPER TEK | 66,500 |
| CUSTOM FIBERGLASS PRODUCTS | |
| CUSTOM SYSTEMS | |
| CVG-NATIONAL SEATING COMPANY | 17,383 |
| CYBERMETRICS CORPORATION | 5,249 |
| CYGNUS BUSINESS MEDIA | 16,006 |
| D&E COMMUNICATIONS | 7,895 |
| DAIMLER VANS MANUFACTURING, LLC | 25,000 |
| DAIMLERCHRYSLER TRUCK FINANCIAL | 7,916 |
| DANA CORPORATION | |
| DANIEL J. WARSOWICK | 7,957 |
| DAUPHIN ASSOCIATES INC | 4,332 |
| DAVID CLARK COMPANY INC | |
| DAYCO PRODUCTS | |
| DEALER SOLUTION | |
| DEAN HENSLEY ENTERPRISES LLC | 10,106 |
| DECHERT DYNAMICS CORPORATION | 4,131 |
| DEFIANCE METAL PRODUCTS COMPANY | 76,211 |
| DELL MARKETING L.P. | |
| DELLINGER ENTERPRISES LTD | 5,384 |
| DELMARVA PUMP CENTER, INC. | 83,071 |
| DELPHI AUTOMOTIVE PACKARD ELECTRIC | 1,351 |
| DEPARTMENT OF FINANCIAL INSTITUTIONS | |
| DETROIT DIESEL | |
| DHS | |
| DIALIGHT CORPORATION | |
| DIAMOND MANUFACTURING COMPANY | |
| DIAMOND SPRINGS | |
| DIXIE PLYWOOD | |
| DOLORES BANKERT | |
| DONALDSON CO INC | |
| DONALDSON COMPANY INC | 5,151 |
| DONOVAN MARINE INC | |
| DORCHESTER COUNTY TREASURER | - |
| DOUGHERTY EQUIPMENT CO. INC | 3,516 |
| DOUG'S WHEEL ALIGNMENT | |
| DPC EMERGENCY EQUIPMENT | |
| DUO-SAFETY LADDER CORP | 5,813 |
| DURRETT SHEPPARD STEELCOMPANY | |
| E & E METAL FABRICATIONS INC | 58,366 |
| E.J.METALS INC | - |
| E.V.S. LTD | 3,712 |
| EAGLE SYSTEMS INC | |
| EAST PENN MANUFACTURING INC | 19,810 |
| EATON CLUTCH DIVISION | 5,870 |
| EATON HYDRAULIC INC | 26,501 |
| EBERL IRON WORKS INC | 4,841 |
| EDEN RESORT INN | 8,170 |
| EDWARD HOSTMANN, INC | - |
| EDWARD W. DANIEL | |
| EGROUP INC | 60,000 |
| ELECTRICAL SPECIALIST | 56,619 |
| ELECTRO-FAST DIST INC | 8,343 |
| ELKHART BRASS MFG CO INC | |
| ELMHIRST INDUSTRIES INC | - |
| EMERGENCY VEHICLES PLUS | |
| ENDURA PLASTICS INC | |
| ENGINEERED HANDLING INC | |
| ENGINEERED PRODUCTSCOMPANY | |
| ENTERPRISE TECHNOLOGIES INC | 66,497 |
| ENVIRONMENTAL COMPL. MGMT | 9,916 |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| ERIC ANDERSON | |
| ERIE COUNTY WATER AUTHORITY | |
| E-T-M ENTERPRISES INC | - |
| EWH SPECTRUM INC | 490 |
| EXCELLO ENGINEERED SYSTEMS LLC | |
| EXXON MOBILE | |
| FALCON FIRE SYSTEMS | |
| FARGO ASSEMBLY COMPANY OF PA. INC | - |
| FARRELL'S MAINTENANCE SERVICE | 437 |
| FARRIS FAB & MACHINE CO INC | 37,765 |
| FASTENAL COMPANY | |
| FAULKNER/HAYES LLC | 15,360 |
| FDN COMMUNICATIONS | 6,994 |
| FEDERAL SIGNAL CORPORATION | 24,143 |
| FEDERAL-MOGUL CORPORATION | 1,735 |
| FEDEX | - |
| FEDEX NATIONAL LTL INC | |
| FENNELL CONTAINER CO. INC | 53,510 |
| FENN-VAC INC | |
| FERGUSON ENTERPRISES INC | 85,771 |
| FERGUSON INTERGRATED SERVICES | 166,866 |
| FERNO WASHINGTON INC | |
| FIAMM TECHNOLOGIES INC | |
| FIRE APPARATUS MANUFACTURERS' ASSOC. | |
| FIRE HOOKS UNLIMITED | 7,375 |
| FIRE RESEARCH CORPORATION | |
| FIRE SERVICE INC | 32,846 |
| FIRE TECH SERVICES INC | 11,006 |
| FIRECOM | 9,762 |
| FIREQUIP | 1,201 |
| FIRWIN CORPORATION | |
| FISHER RECYCLING INC | |
| FLAGLER EMERGENCY SERVICES, LLC | |
| FLAMBEAU SOUTHEAST CORPORATION | 171 |
| FLAMING RIVER INDUSTRIES INC | 4,276 |
| FLEET MAINTENANCE INC | |
| FLEET SOURCE INC | - |
| FLEETPRIDE | 20,935 |
| FLEXFAB | |
| FLEXFAB DE MEXICOMPANY | |
| FLEXFAB INC | 7,248 |
| FLORIDA DETROIT DIESEL | |
| FLORIDA POWER & LIGHT | - |
| FLORIDA PUBLIC UTILITIES | |
| FLORIDA SOUTHERN PLYWOOD CORPORATION | |
| FLORIDA STATE MOTOR VEHICLE DIV | |
| FLORIG EQUIPMENT CO INC | |
| FLUID POWER INC | 14,400 |
| FLUID TECH INC | |
| FOCUS BUSINESS SOLUTIONS INC | - |
| FOL-DA-TANK | |
| FORESTER COMMUNICATIONS INC | 8,118 |
| FORKLIFTS INC | 8,697 |
| FORMS IN A WINK | |
| FRAISER TIRE SERVICE, INC | 8,610 |
| FREEMAN DECORATING CO | |
| FREIGHTLINER LLC | |
| FREIGHTLINER, STERLING, WESTERN STAR OF ARIZON | 19,500 |
| FUEL SYSTEMS LLC | - |
| G.G.SCHMITT & SONS INC | |
| GABLE & SONS CONSTRUCTION INC | 25,300 |
| GARBER SCALE & CALIBRATION | 5,000 |
| GARNER ENGINEERING ASSOCIATES | 7,704 |
| GARRISON AMERICAN LAFRANCE | |
| GARRISON FIRE AND RESCUE CORPORATION | - |
| GATES RUBBER COMPANY | - |
| GE FANUC | 14,576 |
| GE FANUC AUTOMATION NORTH AMERICA INC | |
| GEAR PRODUCTS INC | |
| GENERAL TRANSERVICE INC | 8,278 |
| GEXPRO SERVICES | 90,436 |
| GGF LLP | 42,371 |
| GGS INFORMATION SERVICES | 22,721 |
| GIANT RESOURCE RECOVERY-SUMTER INC | 4,548 |
| GIMAEX OF AMERICA LLC | 25,814 |
| GLASSMASTER CONTROLS COMPANY INC | |
| GLAUBER EQUIPMENT CORPORATION | |
| GLOBAL ENVIRONMENT ASSURANCE INC | |
| GLOBAL TRAFFIC TECHNOLOGIES LLC | |
| GOOD'S DISPOSAL | 9,923 |
| GORDON ALUMINUM INDUSTRIES | 13,721 |
| GPM HYDRAULIC CONSULTING INC | 6,137 |
| GRAINGER | 4,364 |
| GRAKON INTERNATIONAL INC | 2,881 |
| GRANT THORNTON LLP | 96,012 |
| GRAYBAR ELECTRIC COMPANY INC | 12,124 |
| GREAT AMERICA LEASING CORPORATION | - |
| GREGORY INC | 6,474 |
| GREGORY POOLE EQUIPMENT COMPANY | 15,858 |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| GRIFFITH RUBBER MILLS | 16,266 |
| GRIFFITH TECH. ILLUSTRATI | |
| GROTE MANUFACTURING COMPANY | 2,430 |
| GROVER PRODUCTS COMPANY | - |
| GSM INDUSTRIAL INC | - |
| GT DEVELOPMENT CORPORATION | - |
| GUARDIAN | 19,499 |
| GUARDIAN INDUSTRIES CORPORATION | |
| GUARDIAN LIFE INSURANCE | - |
| GUNITE CORPORATION | 21,742 |
| H.O. BOSTROM CO. INC | 15,789 |
| HAGEMEYER | 12,890 |
| HAGEMEYER NORTH AM. INC | 3,217 |
| HALDEX BRAKE SYSTEMS | 24,895 |
| HALDEX CORPORATION | - |
| HAMPTON HYDRAULICS LLC | 9,032 |
| HANES SUPPLY INC | |
| HANNAY REELS | 32,432 |
| HANSEN INTERNATIONAL INC | 59,478 |
| HANSEN MARINE END. | 16,514 |
| HARALSON METALS | |
| HARNDEN TRANSPORT INC | |
| HARRISON HYDRA-GEN INC | 38,442 |
| HAVIS-SHIELDS EQUIPMENT CORPORATION | 8,563 |
| HEAVY DUTY PARTS INC | |
| HEHR INTERNATIONAL | |
| HENDRICKSON | 238,121 |
| HIGH FOOD SERVICES LTD | |
| HI-LINE INC | |
| HILL MANUFACTURING | |
| HOBBS CORPORATION | 7,045 |
| HOLIDAY INN EXPRESS CHAR/SUMMERVILLE | |
| HOLIDAY INN EXPRESS HOTEL & SUITES | |
| HOME DEPOT 32-2004730739 | |
| HORTON INC | 2,878 |
| HORTON INDUSTRIES INC | - |
| HOSELINE INC | 13,814 |
| HYDRAULIC PACKING & SEAL | |
| HYDRAULIC TUBES& FITTINGS LLC | |
| HYDRO AIR LLC | 2,501 |
| HYDROMOTION INC | 192,366 |
| HYPRO LLC | 21,615 |
| IBM CORPORATION | - |
| IGRAPHICS, LLC | |
| IGUS BEARINGS INC | 3,739 |
| IMAGE NETWORK OF CHARLESTON, INC. | |
| IMMI | - |
| INCAT INC | 247,570 |
| INDIANA MILLS MFG. | |
| INDIANAPOLIS MARRIOTT DOWNTOWN | 5,000 |
| INDUSTRIAL DISTRIBUTION | |
| INDUSTRIAL FABRICATORS INC | 33,156 |
| INDUSTRIAL PIPING SYSTEMS | 8,803 |
| INDUSTRIAL POWER SALES INC | |
| INMAGUSA | - |
| INNOVATIVE CONTROLS INC | |
| INNOVATIVE INDUSTRIES INC | 16,183 |
| INTEGRATED OFFICE NETWORKS | |
| INTERNATIONAL SERVICES & TECHNICAL SOLUTIONS, I | 5,436 |
| INTERTEK INDUSTRIAL CORP | |
| IOTA ENGINEERING | |
| IOWA METAL SPINNERS | |
| ISSPRO INC | |
| J&J MATERIAL HAND SYSTEMS | |
| J. C. EHRLICH CO. INC | |
| J. HERBERT CORP. | |
| JAMES KLINE TRANSPORTATION SERVICES LLC | 38,610 |
| JB MATHEWS | |
| JERRY CHAMBERS CHEVROLET INC | 47,235 |
| JF SCHULTZE CONSTRUCTION  LLC | 28,160 |
| JOHN HANCOCK LFE INSCOMPANY | 5,717 |
| JOHN K. HASTINGS | |
| JOHNSON SERVICE GROUP INC | 36,804 |
| JOINT & CLUTCH SERVICE | - |
| JON THURMOND | |
| JOSAM FRAME AND AUGNMENT | |
| JPC SPECIALTY FASTENERS | 12,929 |
| JULIAN ELECTRIC INC | |
| KAISCO INC | 5,722 |
| KALAS MANUFACTURING INCORPORATED | 3,924 |
| KARSTEDT'S AUTOMOTIVE CENTERS INC | |
| K-D SUPPLY CORPORATION | |
| KENNETH J CARLSON JR | - |
| KEY PLASTICS | |
| KIMBERLY WRIGHT | |
| KOCHEK COMPANY INC | 26,460 |
| KRAFT FLUID SYSTEMS | 20,941 |
| KREIDER'S CANVAS SERVICE INC | 3,440 |
| KUSSMAUL ELECTRONICS COMPANY INC | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| L A HAZARD & SONS INC | |
| LAB SAFETY SUPPLY | |
| LADD INDUSTRIES INC | 146 |
| LAIRD PLASTICS INC | |
| LANCASTER COUNTY TAX COLLECTION BUREAU | - |
| LANG MEKRA NORTH AMERICA | - |
| LASERFAB INC | 13,468 |
| LATONYA WATERMAN | |
| LAVANTURE PRODUCTS | |
| LAW OFFICES OF ASHLEY DWORSKY | 5,100 |
| LAWRENCE S. DOWHOWER | |
| LAWSON PRODUCTS INC | |
| LEBANON FARMS DISPOSAL, INC | |
| LEFFLER ENERGY | 16,422 |
| LEHIGH VALLEY PLASTICS IN | 3,571 |
| LEO'S GOLD LION PRODUCTS INC | |
| LESLIE MARTINEZ | |
| LETHBRIDGE IRON WORKS CO. LTD | |
| LIBERTY FIRE PROTECTION INC | |
| LIBERTY STEEL PRODUCTS INC | |
| LIEBERT CORPORATION | |
| LIFT ALL CO INC | 10,791 |
| LINDE MATERIAL HANDLING NA CORPORATION | - |
| LINEMASTER SWITCH CORPORATION | |
| LINE-X OF ORLANDO | 9,730 |
| LINK MFG LTD | 6,532 |
| LIVINGSTON INTERNATIONAL INC | 96,436 |
| LONEHILL SYSTEMS INC | 10,600 |
| LONSEAL INC | |
| LORD CORPORATION | 12,984 |
| LOUISIANA MOTOR VEHICLE COMMISSION | |
| LOWE'S HOME CENTERS INC | |
| LUXURY LIGHTING INC | |
| M & M TRUCK CENTER | |
| M & N SALES CO INC | |
| MACK EMPLOYMENT SERVICES, INC | |
| MACSTEEL SERVICE CENTERS USA | 22,735 |
| MAGNYS INNOVATIVE SOLUTIONS, LLC | 62,675 |
| MANHATTAN ACQUISITIONS LLC | 44,650 |
| MARK METALS | |
| MARMON KEYSTONE TUBE | |
| MASON FORGE & DIE INC | |
| MATHEWS SPECIALTY VEHICLES | 70,000 |
| MAXIMA TECHNOLOGIES | 4,164 |
| MCIVOR MANUFACTURING INC | 12,079 |
| MCMASTER-CARR SUPPLY COMPANY | 5,011 |
| MCPC COMPUTER PRODUCTS & CONSULTING | |
| MCROBERTS AUTO CENTER | |
| MECANISMOS AUTOMOTRICES SA DE CV | 24,182 |
| MECHANICAL PRODUCTS MFG. CO. LLC | |
| MERCURY PRODUCTS CORPORATION | 19,527 |
| MERIT FASTENERS CORPORATION | 36,414 |
| METAL SUPERMARLETS (BUFFALO) | |
| MET-ED | 21,687 |
| METROPOLITAN LIFE INSURANCE COMPANY | - |
| MGM BRAKES INC | |
| MICHAEL BELL | 9,900 |
| MICHELIN TIRE CORPORATION. | |
| MID-ATLANTIC RUBBER COMPANY INC | |
| MIDWEST GEAR | |
| MISSISSIPPI MOTOR VEHICLE COMMISSION | |
| MOBILE STORAGE GROUP INC | 12,822 |
| MODERN CORPORATION | |
| MODERN MACHINE & METAL FABRICATORS INC | - |
| MODINE MANUFACTURING CO | 110,084 |
| MOELLER PRODUCTS CO INC | |
| MONARCH HYDRAULICS INC | 11,877 |
| MORE DIRECT INC | |
| MR. MUFFLER SHOP INC | |
| MSC INDUSTRIAL SUPPLY COMPANY | 149,520 |
| MULTIPLASTICS, DIV OF CURD ENTERPRISES,INC. | 2,731 |
| MUNCIE POWER PRODUCTS INC | |
| MUNCY CORPORATION | 53,595 |
| MUNICIPAL EMERGENCY SERVICES INC | 26,244 |
| MYERS TOOL & MACHINE CO. INC | 9,583 |
| NATALE MACHINE & TOOL CO. INC | 2,195 |
| NATIONAL FUEL RESOURCES INC | 8,112 |
| NATIONAL GRID | 21,451 |
| NATIONAL SEATING | 13,166 |
| NATIONAL TESTING | |
| NATIONAL TRANSFER LLC | |
| NATIONAL WELDERS SUPPLY CO. INC | 17,217 |
| NATURES CALLING INC | 13,719 |
| NEBRASKA MOTOR VEHICLE IND LIC BOARD | |
| NESCON INC-FL | 37,190 |
| NEW YORK DEPARTMENT OF STATE | |
| NEWARK ELECTRONICS | 6,008 |
| NEWARK ELECTRONICS-IL | |
| NEWARK ELECTRONICS-NC | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| NEXT GENERATION POWER | 6,075 |
| NMHG FINANCIAL SERVICES | 5,692 |
| NOLT BROTHERS INC | |
| NORRISEAL | |
| NORTH AMERICAN EQUIPMENT UPFITTERS INC | 22,142 |
| NORTH AMERICAN INTERCONNECT | |
| NORTHSIDE INDUSTRIES | - |
| NORTHSIDE TRUCKS & EQUIPMENT | |
| NUPLA CORPORATION | |
| NYS DEPARTMENT of ENVIRONMENTAL CONSERVATION | |
| OCCUPATIONAL HEALTH CENTERS OF SWPA PC | |
| OEM CONTROLS INC | |
| OFAB INC | 205,040 |
| OLATHE FORD SALES INC | 139,277 |
| OMNEX CONTROL SYSTEMS INC | |
| OMNI FINISHING SYSTEMS | - |
| ONEIDA MOLDED PLASTICS | |
| ON-SPOT | 3,154 |
| ONSPOT OF NORTH AMERICA | |
| OPTRONICS INC | |
| ORACLE CORPORATION | |
| ORIGIN AND CAUSE INC | 8,803 |
| ORLANDO FREIGHTLINER INC | 7,156 |
| ORR & ORR INC | |
| ORSCHELN PRODUCT LLC | 10,036 |
| PA DEPT OF LABOR & INDUS | |
| PACBRAKE COMPANY | |
| PACBRAKE MANUFACTURING | |
| PACIFIC INSIGHT ELECTRONICS | |
| PAGE-HARMS OIL COMPANY INC | |
| PAIGE ELECTRIC CORPORATION | |
| PAMEK ENGRAVING & NAMEPLATE | |
| PARAMONT MFG LLC | 10,427 |
| PARKER HANNIFIN | |
| PARKER INSTRUMENT CO. INC | |
| PATRIARCH PARTNERS AGENCY SERVICES | |
| PAULB LLC | 3,458 |
| PAWLING CORPORATION | 4,149 |
| PECK ROAD FORD TRUCK SALES, INC | 26,839 |
| PENN DETROIT DIESEL ALLISON | |
| PENNSYLVANIA DEPARTMENT OF STATE | |
| PENNWELL | 67,192 |
| PERFORMANCE ADVANTAGE COMPANY | 8,323 |
| PHILLIPS & TEMRO INDUSTRIES | |
| PHILLIPS GROUP | 2,538 |
| PHILLIPS INDUSTRIES  COMMERCIAL VEHICLE | |
| PHOTO GRAPHIC METALS COMPANY | |
| PIEDMONT PLASTICS INC | |
| PIERO'S | |
| PILKINGTON NORTH AMERICA - AGR | 34,529 |
| PITNEY BOWES INC | |
| PLASTISOL COMPOSITES NORTH AMERICA | 57,563 |
| PLYMOUTH SPRING COMPANY INC | |
| PNEU-MECH SYSTEMS MFG. INC | 252,028 |
| POLYGON COMPANY | |
| POOLEY INC | |
| PORTER'S FABRICATION INC | 7,666 |
| PORTLAND HWY  LLC | 13,516 |
| PORTLAND POLICE ALARM ADMINISTRATION | |
| POSITRON CORP | |
| POWER PERSONNEL | |
| POWER TOOLS & ABRASIVES INC | |
| POWER-PACKER | 35,068 |
| POWERTECH HYDRAULICS | 16,249 |
| PPC LUBRICANTS | 14,274 |
| PPG INDUSTRIES | 69,351 |
| PPL ELECTRIC UTILITIES | |
| P-Q CONTROLS INC | 9,949 |
| PRAXAIR DISTRIBTION, INC | |
| PRECISION MEDICAL | |
| PRECO ELECTRONICS INC | |
| PREISCHEL BROTHERS SERVICE INC | |
| PREMIER LOGISTICS SOLUTIONS WAREHOUSING | |
| PREMIER S.F. | 5,015 |
| PRESGLAS | 17,222 |
| PRESTOLITE ELECTRIC INC | - |
| PRINCIPAL FINANCIAL GROP | |
| PRINT-O-STAT INC | |
| PRO AUTO INTERIOR REPAIRS | |
| PRO POLY OF AMERICA INC | |
| PRODUCT SALES COMPANY | 7,537 |
| PRODUCTIVE PLASTICS INC | |
| PROGRESSIVE METAL MFG. INC | 15,133 |
| PROGRESSIVE PRESSURE SYST | |
| PROLIFT | |
| PROTOTYPE TOOLING & MFG. INC | |
| PSL OF AMERICA INC | 13,620 |
| PST INC | 6,823 |
| PUROSIL  AN AFFILIATE OF MISSION RUBBER | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| PYRAMID MOULDINGS INC | |
| QUERMBACK ELECTRIC INC | 6,603 |
| R & M EQUIPMENT CO | |
| R J MARX INC | |
| R.L. TAYLOR & SON, INC. | |
| R/W CONNECTION | |
| RACKSPACE LTD | |
| RAFAB SPECIALTY FABRICATION | 5,490 |
| RAY VALDES | - |
| READING ELECTRIC | |
| REALWHEELS COVER CO. INC. | 2,284 |
| REC'S INDUSTRIAL & PREVENTATIVE | 5,999 |
| RED DOT CORPORATION | 25,375 |
| RED HEAD BRASS LLC | |
| RED-D-ARC INC | 12,607 |
| REFRIGERATION SALES & SERVICE INC | |
| REHAU INC | |
| RELATIONAL TECHNOLOGY SOLUTIONS | 87,191 |
| RELIABLE CASTINGS CORPORATION | 3,811 |
| REMY INC | 29,529 |
| RESSLER & MATEER INC | |
| RG GROUP | |
| RHINO ASSEMBLY CORPORATION | |
| RHODE ISLAND MOTOR VEHICLE DLR LIC COMM | |
| RICHARD'S UPHOLSTERY | 1,305 |
| RICOH AMERICAS CORPORATION | |
| RIDEWELL | |
| RIEKER INSTRUMENT | |
| RILEYS EMERGENCY MEDICAL REPAIR | |
| RIVER'S TRUCK CENTER INC | 7,000 |
| RIVERSIDE TANK & MFG. INC | |
| ROADMASTER | |
| ROADWAY EXPRESS INC | 25,053 |
| ROBERT E. GETZ INC | |
| ROBERT-JAMES SALES INC | |
| ROBWEN INC | |
| ROCHLING ENGINEERING PLASTICS Ltd. | |
| ROCKFORD TOOLCRAFT INC | |
| ROM CORPORATION | - |
| ROSS PRINTING | |
| ROYALL MFG INC | |
| RT JEDBURG COMMERCE PARK, LLC | |
| RUHL'S FRAME & ALIGNMENT | |
| RYDER CARRIER MANAGEMENT SERVICES | 36,568 |
| RYERSON  JOSEPH T & SON INC | 808,242 |
| SAFETY VISION INC | |
| SAF-HOLLAND USA | 28,287 |
| SAIA COMMUNICATIONS INC | |
| SAM'S CLUB/GECF | |
| SANDEN INTERNATIONAL INC (USA) | 9,168 |
| SANFORD AUTO & TRUCK PARTS INC | |
| SCANA ENERGY MARKETING INC | 9,739 |
| SCE&G (SOUTH CAROLINA ELECTRIC & GAS) | - |
| SCHAEDLER YESCO DISTRIBUTION | 5,462 |
| SCHENKER INTERNATIONAL INC | 15,976 |
| SCHOFIELD ENTERPRISES INC | - |
| SEATS INCORPORATED | |
| SEEBURGER INC | 15,000 |
| SELIG INDUSTRIES | |
| SEMINOLE TOWEL & RAG | |
| SEN-DURE PRODUCTS INC | - |
| SERVICE BENCH INC | |
| SERVICE PLUS DISTRIBUTORS INC | 11,198 |
| SETCOM CORPORATION | |
| SGM COMPANY INC | 25,932 |
| SHAPIRO PHOTOGRAPHY | |
| SHEPPARD  R H CO INC | 6,723 |
| SHERRILL INDUSTRIES | |
| SHERWIN-WILLIAMS AUTOMOTIVE | 5,199 |
| SIEMENS VDO S.A. DE C.V. | |
| SIGNATURE PARTNERS INC | |
| SILVER STATE SAFETY IMAGE | |
| SIZEMORE WELDING INC | |
| SKF SEALING SOLUTIONS | |
| SMALL PARTS MFG CO INC | |
| SMC | |
| SMC CORPORATION OF AMERICA | - |
| SONG CHUAN USA | |
| SOURCE GROUP PROFESSIONALS | - |
| SOUTH PARK CORPORATION | - |
| SOUTH STATE CONTRACTORS, INC. | 11,226 |
| SOUTHCO INC | |
| SOUTHEAST INDUSTRIAL EQUIPMENT INC | |
| SOUTHEAST POWER SYSTEMS OF ORLANDO INC | |
| SOUTHEASTERN FREIGHT LINES | (4,700) |
| SOUTHERN TUBE FORM LLC | |
| SOUTHSIDE TRAILER SERVICE INC | |
| SOUTHWEST STERLING, INC | 14,784 |
| SPARTAN CHASSIS INC | |

American LaFrance LLC
90 preference analysis

| Vendor Name | Preference |
|---|---:|
| SPECIALTY FILTER INC | |
| SPHERION CORPORATION | |
| SPITZ AUTO | |
| SPRAGUE DEVICES INC | 72,919 |
| SPRINT | 9,651 |
| SRI TECHNOLOGIES INC | 11,853 |
| STAINLESS FLOW TECHNOLOGIES INC | - |
| STAINLESS UNLIMITED | - |
| STAM INC | - |
| STANDARD REGISTER | |
| STARLINE USA LLC | 5,450 |
| STEEL TECH INC | - |
| STEPHENSON EQUIPMENT INC | |
| STOCKER HINGE MFG COMPANY | |
| STREAMLIGHT INC | 3,128 |
| STRIPPIT INC. | |
| STROBEL TIRE | 2,755 |
| STRUCTURAL FIBERGLASS | 4,446 |
| STRYKER MEDICAL | |
| SUB-CITY ELECTRICAL, INC | |
| SUBURBAN PROPANE LP | 3,443 |
| SUN DIGITAL VIDEO INC | |
| SUNBELT RENTALS INC | 51,723 |
| SUNDRAM FASTENERS LTD | |
| SUNNEX INC | |
| SUPER VACUUM INC | 21,956 |
| SUPERIOR CAM INC | 81,172 |
| SUPERIOR LUBRICANTS | |
| SUPERIOR MANUFACTURING COMPANY INC | - |
| SURE POWER INDUSTRIES INC | |
| SURGE CUTTING SYSTEMS | - |
| SWAN ENGINEERING AND SUPP | |
| T & S CANVAS SHOP INC | - |
| TACO METALS | 8,309 |
| TASK FORCE TIPS INC | 9,633 |
| TAYLOR ENTERPRISES | 23,604 |
| TECHNIFORM METAL CURVING OF TEXAS | - |
| TELCOVE OPERATIONS | |
| TELMA RETARDER INC | - |
| TEMCO METAL PRODUCTS COMPANY | |
| TENNCO INC | |
| TENNECO AUTOMOTIVE | 28,554 |
| TEXAS HYDRAULICS INC | 242,652 |
| THE AROUND THE CLOCK FREIGHTLINER GROUP, INC. | 34,760 |
| THE BRIX GROUP INC | 3,516 |
| THE BUFFALO NEWS | |
| THE TIMKEN COMPANY | 19,461 |
| THERMO KING OF PALM BEACH LLC | - |
| THERM-O-TANE | |
| THOMAS ENTERPRISES OF GREENSBORO, INC. | 22,541 |
| THOMAS SMART HOMES INC | |
| THYSSEN KRUPP MATERIALS | 12,174 |
| TIRE CONSULTANTS INC | |
| TITAN TECHNOLOGY PARTNERS | 6,940 |
| TNCI | |
| TOMAR ELECTRONICS | |
| TORCA PRODUCTS INC | |
| TRAINING SPECIALTIES, INC | 8,000 |
| TRANSPORT SERVICES & BRAKE SALES | |
| TRANSPORTATION SAFETY TECHNOLOGIES INC | 43,625 |
| TRAYER PRODUCTS INC | |
| TRIDENT EMERGENCY PRODUCTS  LLC | 6,703 |
| TRIDENT ENVIRONMENTAL SERVICES INC | |
| TRIGON ENGINEERING CONSULTANTS, INC | |
| TRIM SYSTEMS | |
| TRIMARK CORPORATION | 8,726 |
| TRIM-LOK INC | 9,757 |
| TRIM-MASTER | - |
| TRISTARR STAFFING | |
| TROMBETTA LLC | 13,661 |
| TRUCK EQUIPMENT MANUFACTURING CO. OF | 2,515 |
| TRUCK-LITE CO INC | |
| TRU-FIT PRODUCTS CORP | |
| TRW INC ROSS GEAR | 93,488 |
| TUBE SPECIALTIES CO INC | - |
| TUPPERWAY TIRES AND SERVICE | |
| TURNKEY CREATIVE | 15,464 |
| TURTLE & HUGHES INC | |
| TURTLE PLASTICS CLEVELAND RECLAIM IND | 46 |
| TUSCO DISPLAY | 208,657 |
| TUTHILL TRANSPORT TECHNOLOGIES | 3,548 |
| TUV RHENLAND OF NORTH AMERICA INC | 6,390 |
| TYCO ELECTRONICS CORPORATION | |
| TYEE CHEVROLET | 74,046 |
| UGI UTILITIES INC | 21,095 |
| ULINE SHIPPING SUPPLY SPECIALISTS | |
| UNDERWRITERS LABORATORIES INC | |
| UNIFIRST CORPORATION | |
| UNI-GRIP INC | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| UNIMERICA INSURANCE COMPANY | 66,155 |
| UNITED HEALTH CARE INSURANCE | |
| UNITED PLASTIC FABRICATING INC | - |
| UNITED WAY OF LANCASTER | |
| UNITY MANUFACTURING COMPANY | |
| UNIVERA HEALTHCARE GROUP | - |
| UNIVERSAL LIFE SAFETY PRODUCTS INC | 5,021 |
| UPS | 105,611 |
| URBAN PAINT INC | |
| US BANK OFFICE EQUIPMENT FINANCE SERVICES | |
| US DIGITAL CORPORATION | |
| USCIS | |
| UTICA METAL PRODUCTS INC | |
| VALEO CLIMATE CONTROL DE MEXICO SA DE CA | |
| VANDERSTEEN & SONS INC | |
| VARILEASE FINANCE INC | 80,000 |
| VEE ENGINEERING INC | 5,792 |
| VEHICLE IMPROVEMENT PRODUCTS INC | 1,962 |
| VELVAC INC | |
| VIRGINA TRUCK CENTER OF RICHMOND | 28,240 |
| VISIONMARK INC | |
| VISTA MFG. | |
| VISUAL SOUND COMPANY | |
| VOGEL LUBRICATION INC | 1,138 |
| VOGELPOHL FIRE EQUIPMENT INC | 37,410 |
| VOLLAND ELECTRIC EQUIPMENT CORPORATION | |
| VOLT MANAGEMENT CORP DBA | 1,311 |
| VP SUPPLY CORPORATION | |
| W. S. DARLEY & COMPANY | 73,167 |
| WAGNER E R MFG CO ENGINEERED PROD DIV | |
| WALES ENVIRONMENTAL | |
| WARN INDUSTRIES INC | 5,894 |
| WARWICK MACHINE & TOOL CO INC | - |
| WASHINGTON STATE DEPT OF REVENUE | |
| WASHINTON FIRE & HOSE CO. #2 | 12,005 |
| WASTE INDUSTRIES | |
| WASTE PRO | |
| WATEROUS COMPANY | 5,760 |
| WATKINS & ASSOCIATES INC | |
| WAYNE AUTOMATIC FIRE SPRINKLERS INC | |
| WAYTEK INC | 9,187 |
| WEAVER FLUID POWER | 8,622 |
| WEB SALES TOOL | |
| WEBB WHEEL PRODUCTS INC | 10,977 |
| WEBEX COMMUNICATIONS INC | 7,478 |
| WELDON TECHNOLOGIES INC | 54,578 |
| WES-GARDE COMPONENTS GROUP INC | 3,088 |
| WEST EARL SEWER AUTHORITY | |
| WEST LEBANON TOWNSHIP | |
| WESTFALIA INC | |
| WHEELS NOW INC | 9,570 |
| WHELEN ENGINEERING COMPANY INC | - |
| WILL-BURT COMPANY | 40,425 |
| WILLIAM HINZ | |
| WILLIAM KOLBA | - |
| WILLIAM L. ROBERTS | |
| WILLIAM PAIGE DAVID HEISER | - |
| WILLIAMS CONTROLS INC | - |
| WORLD CLASS WIRE & CABLE | 33,192 |
| WORLD OF CONCRETE/WORLD OF MASONRY | 38,625 |
| WW WILLIAMS | 4,064 |
| WYSONG | |
| XODE INC | |
| YEAGER SUPPLY | |
| YELLOW TRANSPORTATION INC | |
| YORK CORRUGATING COMPANY | 21,045 |
| YORK LADDER | |
| ZF COMMERCIAL SUSPENSION SYSTEMS | |
| ZIAMATIC CORPORATION | - |
| ZIMCO PARTNERS | 100,490 |
| Total | 13,062,815 |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| ADP | |
| CUMMINS ENGINE CO INC | 2,036,496 |
| UNITED HEALTH CARE INSURANCE | |
| CANANWILL, INC | |
| RYERSON JOSEPH T & SON INC | 808,242 |
| BANK OF AMERICA | |
| PATRIARCH PARTNERS AGENCY SERVICES | |
| PRINCIPAL FINANCIAL GROP | |
| ALLISON TRANSMISSION, INC | 457,472 |
| OFAB INC | 205,040 |
| CLASS 1 INC - HALE PRODUCTS | |
| FREIGHTLINER LLC | |
| PREMIER LOGISTICS SOLUTIONS WAREHOUSING | |
| RYDER CARRIER MANAGEMENT SERVICES | 36,568 |
| LIVINGSTON INTERNATIONAL INC | 96,436 |
| ARVINMERITOR AUTOMOTIV ON-HWY AXLE DIV | 179,764 |
| HENDRICKSON | 238,121 |
| BENNETT MOTOR EXPRESS | |
| RT JEDBURG COMMERCE PARK, LLC | |
| INCAT INC | 247,570 |
| TEXAS HYDRAULICS INC | 242,652 |
| DANA CORPORATION | |
| PNEU-MECH SYSTEMS MFG. INC | 252,028 |
| ORACLE CORPORATION | |
| AMERICAN STEEL & ALUMINUM | 16,731 |
| UNDERWRITERS LABORATORIES INC | |
| BILL HEARD CHEVROLET | 253,505 |
| GARRISON AMERICAN LAFRANCE | |
| TITAN TECHNOLOGY PARTNERS | 6,940 |
| TUSCO DISPLAY | 208,657 |
| HYDROMOTION INC | 192,366 |
| GARRISON FIRE AND RESCUE CORPORATION | - |
| MODINE MANUFACTURING CO | 110,084 |
| FIRE SERVICE INC | 32,846 |
| BERKELEY ELECTRIC COOPERATIVE | |
| RELATIONAL TECHNOLOGY SOLUTIONS | 87,191 |
| GRANT THORNTON LLP | 96,012 |
| FERGUSON INTERGRATED SERVICES | 166,866 |
| AEROTEK COMMERICAL STAFFING | 123,260 |
| ALTEK SYSTEMS INC | 88,870 |
| AON RISK SERVICES INC | |
| MSC INDUSTRIAL SUPPLY COMPANY | 149,520 |
| UPS | 105,611 |
| SPHERION CORPORATION | |
| CHARLESTON COUNTY TREASURER | |
| CABLE ASSEMBLY  LLC | 68,448 |
| INDUSTRIAL FABRICATORS INC | 33,156 |
| PARKER HANNIFIN | |
| CADCAM-E.COM | 55,002 |
| AKRON BRASS CO | 103,803 |
| MICHELIN TIRE CORPORATION. | |
| OLATHE FORD SALES INC | 139,277 |
| CASCADIA INTERNATIONAL LLC | 130,061 |
| PRODUCTIVE PLASTICS INC | |
| TRW INC ROSS GEAR | 93,488 |
| SGM COMPANY INC | 25,932 |
| PPG INDUSTRIES | 69,351 |
| GGS INFORMATION SERVICES | 22,721 |
| UNIVERA HEALTHCARE GROUP | |
| CAMPBELL SUPPLY CO. INC | 163,230 |
| ZIMCO PARTNERS | 100,490 |
| CRG PARTNERS GROUP LLC | |
| VOLT MANAGEMENT CORP DBA | 1,311 |
| SUPERIOR CAM INC | 81,172 |
| GEXPRO SERVICES | 90,436 |
| DEFIANCE METAL PRODUCTS COMPANY | 76,211 |
| VARILEASE FINANCE INC | 80,000 |
| PENNWELL | 67,192 |
| GORDON ALUMINUM INDUSTRIES | 13,721 |
| FERGUSON ENTERPRISES INC | 85,771 |
| EGROUP INC | 60,000 |
| SPRAGUE DEVICES INC | 72,919 |
| BILLY LEE LLC | - |
| WELDON TECHNOLOGIES INC | 54,578 |
| AMERICAN CITADEL GUARD INC | |
| RED DOT CORPORATION | 25,375 |
| ATKINSON INTERNATIONAL INC | |
| SUBURBAN PROPANE LP | 3,443 |
| RAY VALDES | |
| HANSEN INTERNATIONAL INC | 59,478 |
| CORE COMPOSITES CORPORATION | 14,993 |
| W. S. DARLEY & COMPANY | 73,167 |
| PRO POLY OF AMERICA INC | |
| HARRISON HYDRA-GEN INC | 38,442 |
| E & E METAL FABRICATIONS INC | 58,366 |
| TYEE CHEVROLET | 74,046 |
| DELMARVA PUMP CENTER, INC. | 83,071 |
| AME INC | 71,891 |
| FLEET SOURCE INC | - |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| MATHEWS SPECIALTY VEHICLES | 70,000 |
| CMA SERVICES INC | 67,558 |
| CUPER TEK | 66,500 |
| ENTERPRISE TECHNOLOGIES INC | 66,497 |
| UNIMERICA INSURANCE COMPANY | 66,155 |
| ACCURIDE CORPORATION | 49,551 |
| CUMMINS EMISSION SOLUTIONS | 65,264 |
| GUARDIAN LIFE INSURANCE | - |
| MAGNYS INNOVATIVE SOLUTIONS, LLC | 62,675 |
| POWER-PACKER | 35,068 |
| FARRIS FAB & MACHINE CO INC | 37,765 |
| MUNCY CORPORATION | 53,595 |
| CONDUSTRIAL INC | 59,789 |
| SCE&G (SOUTH CAROLINA ELECTRIC & GAS) | - |
| UNITED PLASTIC FABRICATING INC | - |
| DORCHESTER COUNTY TREASURER | - |
| PLASTISOL COMPOSITES NORTH AMERICA | 57,563 |
| ROYALL MFG INC | - |
| ELECTRICAL SPECIALIST | 56,619 |
| SAF-HOLLAND USA | 28,287 |
| SEATS INCORPORATED | - |
| BLACHFORD INC | 15,725 |
| FENNELL CONTAINER CO. INC | 53,510 |
| CINTAS | 7,942 |
| FLORIDA POWER & LIGHT | - |
| SUNBELT RENTALS INC | 51,723 |
| GIMAEX OF AMERICA LLC | 25,814 |
| COOPER BUSSMAN | 3,988 |
| BUSTIN INDUSTRIAL PRODUCTS | - |
| WILL-BURT COMPANY | 40,425 |
| INMAGUSA | - |
| EDWARD HOSTMANN, INC | - |
| COAST TO COAST CELLULAR INC | - |
| STAINLESS FLOW TECHNOLOGIES INC | - |
| HANNAY REELS | 32,432 |
| BENDIX COMMERCIAL VEHICLE SYSTEMS LLC | - |
| PPL ELECTRIC UTILITIES | - |
| JERRY CHAMBERS CHEVROLET INC | 47,235 |
| H.O. BOSTROM CO. INC | 15,789 |
| AIR POWER INC | 46,027 |
| CORNING REAL ESTATE LEASE RECEIVABLES | 22,901 |
| MANHATTAN ACQUISITIONS LLC | 44,650 |
| TRANSPORTATION SAFETY TECHNOLOGIES INC | 43,625 |
| NORTH AMERICAN EQUIPMENT UPFITTERS INC | 22,142 |
| PILKINGTON NORTH AMERICA - AGR | 34,529 |
| GGF  LLP | 42,371 |
| ACUMNET GLOBAL TECH | 2,058 |
| WARWICK MACHINE & TOOL CO INC | - |
| BAYTREE ASSOCIATES | - |
| TASK FORCE TIPS INC | 9,633 |
| BEILER HYDRAULICS | 24,118 |
| WATEROUS COMPANY | 5,760 |
| AUBURN ENGINEERING | 39,740 |
| AMDOR SPECIALITY ROLL-UP DOORS | 38,890 |
| ACCOUNTEMPS | 4,876 |
| JOHNSON SERVICE GROUP INC | 36,804 |
| WORLD OF CONCRETE/WORLD OF MASONRY | 38,625 |
| JAMES KLINE TRANSPORTATION SERVICES LLC | 38,610 |
| CITATION CORPORATION | 11,952 |
| AT&T | - |
| WORLD CLASS WIRE & CABLE | 33,192 |
| GUARDIAN | 19,499 |
| REMY INC | 29,529 |
| VOGELPOHL FIRE EQUIPMENT INC | 37,410 |
| BOYD CORPORATION - GAFFNEY | 18,347 |
| NESCON  INC-FL | 37,190 |
| ROM CORPORATION | - |
| MERIT FASTENERS CORPORATION | 36,414 |
| SOURCE GROUP PROFESSIONALS | - |
| STAINLESS UNLIMITED | - |
| HYPRO LLC | 21,615 |
| THE AROUND THE CLOCK FREIGHTLINER GROUP, INC. | 34,760 |
| FEDERAL SIGNAL CORPORATION | 24,143 |
| KOCHEK COMPANY INC | 26,460 |
| LASERFAB INC | 13,468 |
| LEFFLER ENERGY | 16,422 |
| ELMHIRST INDUSTRIES INC | - |
| KENNETH J CARLSON JR | - |
| AIRGAS EAST | 29,838 |
| AUSTIN HARDWARE & SUPPLY | 12,491 |
| PSL OF AMERICA INC | 13,620 |
| TENNECO AUTOMOTIVE | 28,554 |
| CUMMINS ATLANTIC INC | 31,146 |
| CVG-NATIONAL SEATING COMPANY | 17,383 |
| WHELEN ENGINEERING COMPANY INC | - |
| STROBEL TIRE | 2,755 |
| ABLE MANUFACTURING & ASSEMBLY LLC | 12,292 |
| DELLINGER ENTERPRISES LTD | 5,384 |
| LINDE MATERIAL HANDLING NA CORPORATION | - |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
| --- | --- |
| SANDEN INTERNATIONAL INC (USA) | 9,168 |
| MECANISMOS AUTOMOTRICES SA DE CV | 24,182 |
| KRAFT FLUID SYSTEMS | 20,941 |
| TAYLOR ENTERPRISES | 23,604 |
| PRESGLAS | 17,222 |
| HALDEX BRAKE SYSTEMS | 24,895 |
| VIRIGINA TRUCK CENTER OF RICHMOND | 28,240 |
| FIRE RESEARCH CORPORATION | - |
| JF SCHULTZE CONSTRUCTION  LLC | 28,160 |
| AMITY MACHINE SHOP | - |
| FOCUS BUSINESS SOLUTIONS INC | - |
| CYGNUS BUSINESS MEDIA | 16,006 |
| COOPER TOOLS | 22,855 |
| SUPER VACUUM INC | 21,956 |
| PECK ROAD FORD TRUCK SALES, INC | 26,839 |
| EATON HYDRAULIC INC | 26,501 |
| MUNICIPAL EMERGENCY SERVICES INC | 26,244 |
| PRESTOLITE ELECTRIC INC | - |
| GUNITE CORPORATION | 21,742 |
| GSM INDUSTRIAL INC | - |
| FLEETPRIDE | 20,935 |
| GABLE & SONS CONSTRUCTION INC | 25,300 |
| ROADWAY EXPRESS INC | 25,053 |
| DAIMLER VANS MANUFACTURING, LLC | 25,000 |
| THE TIMKEN COMPANY | 19,461 |
| DELPHI AUTOMOTIVE PACKARD ELECTRIC | 1,351 |
| INNOVATIVE INDUSTRIES INC | 16,183 |
| IMMI | - |
| CONNOR MANUFACTURING SERVICES | 20,313 |
| HANSEN MARINE END. | 16,514 |
| YORK CORRUGATING COMPANY | 21,045 |
| CEL OIL CO. | 22,839 |
| ATLAS FOOD SYSTEMS AND SERVICES INC | 22,772 |
| MACSTEEL SERVICE CENTERS USA | 22,735 |
| PROGRESSIVE METAL MFG. INC | 15,133 |
| THOMAS ENTERPRISES OF GREENSBORO, INC. | 22,541 |
| TUBE SPECIALTIES CO INC | - |
| CONMET DE MEXICO S.A. DE C.V | 22,417 |
| TRIM-MASTER | - |
| AURORA METALS DIVISION | 10,842 |
| AXLE ALLIANCE COMPANY LLC | 1,640 |
| FARRELL'S MAINTENANCE SERVICE | 437 |
| MET-ED | 21,687 |
| NATIONAL GRID | 21,451 |
| UGI UTILITIES INC | 21,095 |
| HORTON INC | 2,878 |
| ZIAMATIC CORPORATION | - |
| GRIFFITH RUBBER MILLS | 16,266 |
| JULIAN ELECTRIC INC | - |
| CAST PRODUCTS INC | 1,696 |
| POWERTECH HYDRAULICS | 16,249 |
| MERCURY PRODUCTS CORPORATION | 19,527 |
| KUSSMAUL ELECTRONICS COMPANY INC | - |
| APPLE ROCK DISPLAYS | 20,331 |
| ELECTRO-FAST DIST INC | 8,343 |
| ORSCHELN PRODUCT LLC | 10,036 |
| D&E COMMUNICATIONS | 7,895 |
| EAST PENN MANUFACTURING INC | 19,810 |
| FREIGHTLINER, STERLING, WESTERN STAR OF ARIZON | 19,500 |
| HAGEMEYER | 12,890 |
| HOSELINE INC | 13,814 |
| JPC SPECIALTY FASTENERS | 12,929 |
| HAVIS-SHIELDS EQUIPMENT CORPORATION | 8,563 |
| MYERS TOOL & MACHINE CO. INC | 9,583 |
| METROPOLITAN LIFE INSURANCE COMPANY | - |
| GREGORY POOLE EQUIPMENT COMPANY | 15,858 |
| LIFT ALL CO INC | 10,791 |
| VEE ENGINEERING INC | 5,792 |
| WW WILLIAMS | 4,064 |
| FEDEX | - |
| NATIONAL WELDERS SUPPLY CO. INC | 17,217 |
| PPC LUBRICANTS | 14,274 |
| MOBILE STORAGE GROUP INC | 12,822 |
| SCHENKER INTERNATIONAL INC | 15,976 |
| FIRECOM | 9,762 |
| PARAMONT MFG LLC | 10,427 |
| COUNTRY INN & SUITES | - |
| FLUID POWER INC | 14,400 |
| DAUPHIN ASSOCIATES INC | 4,332 |
| TELMA RETARDER INC | - |
| FAULKNER/HAYES LLC | 15,360 |
| AIRGAS | 14,753 |
| PERFORMANCE ADVANTAGE COMPANY | 8,323 |
| SEEBURGER INC | 15,000 |
| WAYTEK INC | 9,187 |
| CUMMINS POWER SYSTEMS INC | 14,906 |
| AIR-KWIK INC | 14,830 |
| CUMMINS FILTRATION INC | 14,805 |
| IGUS BEARINGS INC | 3,739 |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| SOUTHWEST STERLING, INC | 14,784 |
| TURNKEY CREATIVE | 15,464 |
| TRIDENT EMERGENCY PRODUCTS  LLC | 6,703 |
| GE FANUC | 14,576 |
| GREAT AMERICA LEASING CORPORATION | |
| THE BRIX GROUP INC | 3,516 |
| PORTLAND HWY  LLC | 13,516 |
| IBM CORPORATION | - |
| NATURES CALLING INC | 13,719 |
| TROMBETTA LLC | 13,661 |
| BRIGHTHEADLIGHTS.COM | 13,566 |
| LORD CORPORATION | 12,984 |
| AMETEK DIXSON | - |
| DUO-SAFETY LADDER CORP | 5,813 |
| WEBB WHEEL PRODUCTS INC | 10,977 |
| WEAVER FLUID POWER | 8,622 |
| NATIONAL SEATING | 13,166 |
| TRUCK EQUIPMENT MANUFACTURING CO. OF | 2,515 |
| EWH SPECTRUM INC | 490 |
| BARRY CONTROLS | 12,871 |
| MULTIPLASTICS, DIV OF CURD ENTERPRISES,INC. | 2,731 |
| TRIM-LOK INC | 9,757 |
| RED-D-ARC INC | 12,607 |
| DECHERT DYNAMICS CORPORATION | 4,131 |
| BERGSTROM CLIMATE SYSTEMS  L.L.C | 11,105 |
| CATERPILLAR INC | 11,624 |
| TECHNIFORM METAL CURVING OF TEXAS | - |
| SMC CORPORATION OF AMERICA | - |
| MCIVOR MANUFACTURING INC | 12,079 |
| MUNCIE POWER PRODUCTS INC | |
| CLASS 1 HARNESS INC | 12,369 |
| MONARCH HYDRAULICS INC | 11,877 |
| TRIMARK CORPORATION | 8,726 |
| GRAYBAR ELECTRIC COMPANY INC | 12,124 |
| MODERN MACHINE & METAL FABRICATORS INC | |
| WES-GARDE COMPONENTS GROUP INC | 3,088 |
| THYSSEN KRUPP MATERIALS | 12,174 |
| BP AMOCO OIL | 13,113 |
| STRUCTURAL FIBERGLASS | 4,446 |
| LANCASTER COUNTY TAX COLLECTION BUREAU | - |
| WASHINTON FIRE & HOSE CO. #2 | 12,005 |
| WILLIAM KOLBA | |
| CHALMERS SUSPENSIONS INTERNATIONAL INC | 2,944 |
| SRI TECHNOLOGIES INC | 11,853 |
| SERVICE PLUS DISTRIBUTORS INC | 11,198 |
| HANES SUPPLY INC | |
| GIANT RESOURCE RECOVERY-SUMTER INC | 4,548 |
| E-T-M ENTERPRISES INC | - |
| T & S CANVAS SHOP INC | |
| EDEN RESORT INN | 8,170 |
| SOUTH STATE CONTRACTORS, INC. | 11,226 |
| ACC BUSINESS | 11,153 |
| SOUTHEASTERN FREIGHT LINES | (4,700) |
| CONSOLIDATED ELECTRICAL DISTRIBUTORS-SC | |
| FIRE TECH SERVICES INC | 11,006 |
| AI CONTROL SYSTEMS INC | 6,450 |
| HOBBS CORPORATION | 7,045 |
| PAULB LLC | 3,458 |
| LANG MEKRA NORTH AMERICA | - |
| P-Q CONTROLS INC | 9,949 |
| ALCOA SUB-ASSEMBLY LOGISTICS | 10,622 |
| BORGWARNER EMISSIONS/THERMAL SYSTEMS | 10,081 |
| LONEHILL SYSTEMS INC | 10,600 |
| SURGE CUTTING SYSTEMS | - |
| CDWDIRECT  LLC | 10,507 |
| WILLIAM PAIGE DAVID HEISER | - |
| FUEL SYSTEMS LLC | |
| KREIDER'S CANVAS SERVICE INC | 3,440 |
| GROTE MANUFACTURING COMPANY | 2,430 |
| STEEL TECH INC | |
| TURTLE PLASTICS CLEVELAND RECLAIM IND | 46 |
| DOUGHERTY EQUIPMENT CO. INC | 3,516 |
| FRAISER TIRE SERVICE, INC | 8,610 |
| DEAN HENSLEY ENTERPRISES LLC | 10,106 |
| BEN'S PAINT SUPPLY | 9,742 |
| CHAMBERLAIN MARKETING GROUP INC | 9,940 |
| GOOD'S DISPOSAL | 9,923 |
| ENVIRONMENTAL COMPL. MGMT | 9,916 |
| HAMPTON HYDRAULICS LLC | 9,032 |
| FEDERAL-MOGUL CORPORATION | 1,735 |
| MICHAEL BELL | 9,900 |
| SOUTH PARK CORPORATION | - |
| HAGEMEYER NORTH AM. INC | 3,217 |
| SCANA ENERGY MARKETING INC | 9,739 |
| LINE-X OF ORLANDO | 9,730 |
| BARBEY ELECTRONICS CORPORATION | 4,855 |
| SPRINT | 9,651 |
| CHART INC | 9,586 |
| FIREQUIP | 1,201 |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
| --- | --- |
| WHEELS NOW INC | 9,570 |
| FLEXFAB INC | 7,248 |
| PORTER'S FABRICATION INC | 7,666 |
| SHEPPARD R H CO INC | 6,723 |
| VOGEL LUBRICATION INC | 1,138 |
| BOSTROM SEATING INC | - |
| ALUMINUM LADDER COMPANY | 496 |
| WILLIAMS CONTROLS INC | - |
| RELIABLE CASTINGS CORPORATION | 3,811 |
| INDUSTRIAL PIPING SYSTEMS | 8,803 |
| ORIGIN AND CAUSE INC | 8,803 |
| THERMO KING OF PALM BEACH LLC | - |
| WARN INDUSTRIES INC | 5,894 |
| HALDEX CORPORATION | - |
| FORKLIFTS INC | 8,697 |
| JOINT & CLUTCH SERVICE | - |
| KALAS MANUFACTURING INCORPORATED | 3,924 |
| CHADWICK DESIGN CONSULTING LLC | 8,480 |
| GREGORY INC | 6,474 |
| CONSOLIDATED METAL PRODUCTS INC | - |
| GENERAL TRANSERVICE INC | 8,278 |
| TACO METALS | 8,309 |
| ON-SPOT | 3,154 |
| FORESTER COMMUNICATIONS INC | 8,118 |
| NATIONAL FUEL RESOURCES INC | 8,112 |
| FIRE HOOKS UNLIMITED | 7,375 |
| SCHAEDLER YESCO DISTRIBUTION | 5,482 |
| TRAINING SPECIALTIES, INC | 8,000 |
| DANIEL J. WARSOWICK | 7,957 |
| PAWLING CORPORATION | 4,149 |
| ABF FREIGHT SYSTEM INC | 6,650 |
| DAIMLERCHRYSLER TRUCK FINANCIAL | 7,916 |
| GARNER ENGINEERING ASSOCIATES | 7,704 |
| TUTHILL TRANSPORT TECHNOLOGIES | 3,548 |
| AFLAC | 7,539 |
| PRODUCT SALES COMPANY | 7,537 |
| AMERICAN SENSOR TECHNOLOGIES | 7,490 |
| WEBEX COMMUNICATIONS INC | 7,478 |
| GRAINGER | 4,364 |
| QUERMBACK ELECTRIC INC | 6,603 |
| LADD INDUSTRIES INC | 146 |
| SUPERIOR MANUFACTURING COMPANY INC | - |
| CODE 3 INC | - |
| LINK MFG LTD | 6,532 |
| ORLANDO FREIGHTLINER INC | 7,156 |
| BEHR HEAT TRANSFER SYSTEMS INC | 7,107 |
| A&R METAL INDUSTRIES LTD | 1,783 |
| CARLING TECHNOLOGIES INC | 6,876 |
| RIVER'S TRUCK CENTER INC | 7,000 |
| FDN COMMUNICATIONS | 6,994 |
| STAM INC | - |
| KAISCO INC | 5,722 |
| ALLIANCE METALS GROUP | 6,878 |
| E.J.METALS INC | - |
| PST INC | 6,823 |
| ADVANCED FLUID SYSTEMS | - |
| STREAMLIGHT INC | 3,128 |
| CHAMPION TOOLING & MACHINING COMPANY INC | 6,765 |
| SCHOFIELD ENTERPRISES INC | - |
| CAROLINA RIM AND WHEEL | 5,537 |
| CLEVELAND IGN CO INC | 6,028 |
| A.C.P.A. | 6,477 |
| CHARGING SYSTEMS INTERNATIONAL INC | 5,379 |
| FLAMING RIVER INDUSTRIES INC | 4,276 |
| GT DEVELOPMENT CORPORATION | - |
| AVON BEARINGS CORPORATION | 6,412 |
| TUV RHEINLAND OF NORTH AMERICA INC | 6,390 |
| VEHICLE IMPROVEMENT PRODUCTS INC | 1,962 |
| RICHARD'S UPHOLSTERY | 1,305 |
| BUCKHORN RUBBER PRODUCTS INC | 4,367 |
| FARGO ASSEMBLY COMPANY OF PA. INC | - |
| CHRISTENSON OIL | 6,146 |
| GPM HYDRAULIC CONSULTING INC | 6,137 |
| DONALDSON COMPANY INC | 5,151 |
| SEN-DURE PRODUCTS INC | - |
| EBERL IRON WORKS INC | 4,841 |
| NEXT GENERATION POWER | 6,075 |
| NEWARK ELECTRONICS | 6,008 |
| AIRITE INC | 6,000 |
| REC'S INDUSTRIAL & PREVENTATIVE | 5,999 |
| OMNI FINISHING SYSTEMS | - |
| NORTHSIDE INDUSTRIES | - |
| BOYD CORPORATION | - |
| ANIXTER INC | 5,926 |
| PHILLIPS GROUP | 2,538 |
| EATON CLUTCH DIVISION | 5,870 |
| FLAMBEAU SOUTHEAST CORPORATION | 171 |
| NATALE MACHINE & TOOL CO. INC | 2,195 |
| HORTON INDUSTRIES INC | - |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| GROVER PRODUCTS COMPANY | - |
| INNOVATIVE CONTROLS INC | - |
| JOHN HANCOCK LFE INSCOMPANY | 5,717 |
| MCMASTER-CARR SUPPLY COMPANY | 5,011 |
| REALWHEELS COVER CO. INC. | 2,284 |
| NMHG FINANCIAL SERVICES | 5,692 |
| GRAKON INTERNATIONAL INC | 2,881 |
| GATES RUBBER COMPANY | |
| RAFAB SPECIALTY FABRICATION | 5,490 |
| LEHIGH VALLEY PLASTICS IN | 3,571 |
| STARLINE USA LLC | 5,450 |
| INTERNATIONAL SERVICES & TECHNICAL SOLUTIONS, I | 5,436 |
| AVIONIC STRUCTURES INC | |
| HYDRO AIR LLC | - |
| CYBERMETRICS CORPORATION | 2,501 |
| E.V.S. LTD | 5,249 |
| SHERWIN-WILLIAMS AUTOMOTIVE | 3,712 |
| LAW OFFICES OF ASHLEY DWORSKY | 5,199 |
| PREMIER S.F. | 5,100 |
| BRITECH INDUSTRIES | 5,015 |
| CALIFORNIA STATE BOARD OF EQUALIZATION | 1,250 |
| MAXIMA TECHNOLOGIES | 5,072 |
| UNIVERSAL LIFE SAFETY PRODUCTS INC | 4,164 |
| GARBER SCALE & CALIBRATION | 5,021 |
| INDIANAPOLIS MARRIOTT DOWNTOWN | 5,000 |
| SERVICE BENCH INC | 5,000 |
| DELL MARKETING L.P. | |
| ZF COMMERCIAL SUSPENSION SYSTEMS | |
| AMENO CONNECTOR SUPPLY | |
| FREEMAN DECORATING CO | |
| C.H. REED INC | |
| AMERICAN WASTE DIGEST | |
| MID-ATLANTIC RUBBER COMPANY INC | |
| SIEMENS VDO S.A. DE C.V. | |
| WYSONG | |
| CORPORATION SERVICE COMPANY | |
| BARKER PRODUCTS | |
| ENGINEERED HANDLING INC | |
| PAGE-HARMS OIL COMPANY INC | |
| GLASSMASTER CONTROLS COMPANY INC | |
| HYDRAULIC TUBES& FITTINGS LLC | |
| MGM BRAKES INC | |
| SAFETY VISION INC | |
| PREISCHEL BROTHERS SERVICE INC | |
| HARALSON METALS | |
| REHAU INC | |
| BULLDOG HIWAY EXPRESS | |
| ROCHLING ENGINEERING PLASTICS Ltd. | |
| CONSOLIDATED METCO | |
| R.L. TAYLOR & SON, INC. | |
| DAVID CLARK COMPANY INC | |
| SIGNATURE PARTNERS INC | |
| PACIFIC INSIGHT ELECTRONICS | |
| SKF SEALING SOLUTIONS | |
| PIEDMONT PLASTICS INC | |
| INDUSTRIAL DISTRIBUTION | |
| DETROIT DIESEL | |
| FERNO WASHINGTON INC | |
| CON-WAY FREIGHT | |
| IGRAPHICS, LLC | |
| PROTOTYPE TOOLING & MFG. INC | |
| SMC | |
| NATIONAL TESTING | |
| LIEBERT CORPORATION | |
| DURRETT SHEPPARD STEELCOMPANY | |
| SPITZ AUTO | |
| LAIRD PLASTICS INC | |
| PENN DETROIT DIESEL ALLISON | |
| FLUID TECH INC | |
| GLOBAL ENVIRONMENT ASSURANCE INC | |
| FEDEX NATIONAL LTL INC | |
| A.H. STOCK MANUFACTURING CORPORATION | |
| CUMBERLAND TRUCK EQUIPMENT COMPANY | |
| CIT TECHNOLOGY FIN SERV, INC | |
| CABLE COMPONENTS INC | |
| SIZEMORE WELDING INC | |
| DIAMOND MANUFACTURING COMPANY | |
| CLEAN SEAL INC | |
| G.G.SCHMITT & SONS INC | |
| TEMCO METAL PRODUCTS COMPANY | |
| CELESCO TRANSDUCER PRODUCTS INC | |
| CROSSROADS UNLIMITED | |
| WATKINS & ASSOCIATES INC | |
| EDWARD W. DANIEL | |
| J. C. EHRLICH CO. INC | |
| FOL-DA-TANK | |
| THERM-O-TANE | |
| TRISTARR STAFFING | |
| GRIFFITH TECH. ILLUSTRATI | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| SHAPIRO PHOTOGRAPHY | |
| HOLIDAY INN EXPRESS HOTEL & SUITES | |
| STRIPPIT INC. | |
| AMERICAN METAL PRODUCTS COMPANY | |
| HEAVY DUTY PARTS INC | |
| MCROBERTS AUTO CENTER | |
| K-D SUPPLY CORPORATION | |
| ALLEGIS CORPORATION | |
| M & N SALES CO INC | |
| BEI TECHNOLOGIES INC | |
| ROSS PRINTING | |
| LAVANTURE PRODUCTS | |
| PARKER INSTRUMENT CO. INC | |
| MOELLER PRODUCTS CO INC | |
| GE FANUC AUTOMATION NORTH AMERICA INC | |
| ORR & ORR INC | |
| ALLEGHENY YORK COMPANY | |
| STEPHENSON EQUPMENT INC | |
| COMMERCIAL PIPE & SUPPLY CORPORATION | |
| R J MARX INC | |
| NORTH AMERICAN INTERCONNECT | |
| GEAR PRODUCTS INC | |
| NOLT BROTHERS INC | |
| ARKANSAS MOTOR VEHICLE COMMISSION | |
| DONOVAN MARINE INC | |
| J&J MATERIAL HAND SYSTEMS | |
| KEY PLASTICS | |
| RG GROUP | |
| SUN DIGITAL VIDEO INC | |
| ROADMASTER | |
| SEMINOLE TOWEL & RAG | |
| LUXURY LIGHTING INC | |
| R & M EQUIPMENT CO | |
| VANDERSTEEN & SONS INC | |
| ALTA RESOURCES INC | |
| POWER PERSONNEL | |
| CONESTOGA FUELS | |
| JOSAM FRAME AND ALIGNMENT | |
| ROBWEN INC | |
| FLEET MAINTENANCE INC | |
| GLOBAL TRAFFIC TECHNOLOGIES LLC | |
| BROOKLINE MACHINE CO IN | |
| KARSTEDT'S AUTOMOTIVE CENTERS INC | |
| ROBERT E. GETZ INC | |
| IMAGE NETWORK OF CHARLESTON, INC. | |
| COS COMMUNICATIONS INC | |
| LEBANON FARMS DISPOSAL, INC | |
| WEB SALES TOOL | |
| TYCO ELECTRONICS CORPORATION | |
| SILVER STATE SAFETY IMAGE | |
| LINEMASTER SWITCH CORPORATION | |
| BRENTWOOD INDUSTRIES INC | |
| CUMMINS POWERCARE BUSINESS | |
| AMERICAN STAINLESS CORPORATION | |
| PYRAMID MOULDINGS INC | |
| SANFORD AUTO & TRUCK PARTS INC | |
| DPC EMERGENCY EQUIPMENT | |
| CHURCHVLLE FIRE EQUIPMENT CORPORATION | |
| VISTA MFG. | |
| MASON FORGE & DIE INC | |
| RUHL'S FRAME & ALIGNMENT | |
| KIMBERLY WRIGHT | |
| FASTENAL COMPANY | |
| NUPLA CORPORATION | |
| FALCON FIRE SYSTEMS | |
| LEO'S GOLD LION PRODUCTS INC | |
| DHS | |
| RICOH AMERICAS CORPORATION | |
| HOLIDAY INN EXPRESS CHAR/SUMMERVILLE | |
| VP SUPPLY CORPORATION | |
| DAYCO PRODUCTS | |
| MACK EMPLOYMENT SERVICES, INC | |
| BUFFALO WELDING SUPPLY CO INC | |
| THE BUFFALO NEWS | |
| MECHANICAL PRODUCTS MFG. CO. LLC | |
| TELCOVE OPERATIONS | |
| WILLIAM HINZ | |
| PACBRAKE MANUFACTURING | |
| LONSEAL INC | |
| NATIONAL TRANSFER LLC | |
| SMALL PARTS MFG CO INC | |
| XODE INC | |
| URBAN PAINT INC | |
| LOUISIANA MOTOR VEHICLE COMMISSION | |
| RILEYS EMERGENCY MEDICAL REPAIR | |
| FLORIDA SOUTHERN PLYWOOD CORPORATION | |
| ALBRIGHT OPTICIANS | |
| ENGINEERED PRODUCTS COMPANY | |
| SUPERIOR LUBRICANTS | |

Unaudited                                      Sorted by payments                                      page 17

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| ABRASIVE-TOOL CORPORATION | |
| HYDRAULIC PACKING & SEAL | |
| RHINO ASSEMBLY CORPORATION | |
| SONG CHUAN USA | |
| RED HEAD BRASS LLC | |
| TRIGON ENGINEERING CONSULTANTS, INC | |
| ATLANTIC FORD TURCK SALES, INC. | |
| CERTIFIED FLEET SERVICES INC | |
| DOUG'S WHEEL ALIGNMENT | |
| CONTROL ELECTRIC SUPPLY INC | |
| RESSLER & MATEER INC | |
| STANDARD REGISTER | |
| BEYOND COMPONENTS NY INC. | |
| TRIM SYSTEMS | |
| DIAMOND SPRINGS | |
| M & M TRUCK CENTER | |
| LOWE'S HOME CENTERS INC | |
| FLORIDA PUBLIC UTILITIES | |
| JB MATHEWS | |
| WILLIAM L. ROBERTS | |
| THOMAS SMART HOMES INC | |
| LIBERTY FIRE PROTECTION INC | |
| FIRE APPARATUS MANUFACTURERS' ASSOC. | |
| PRINT-O-STAT INC | |
| AUTOMATION TECHNOLOGY INC | |
| LAWRENCE S. DOWHOWER | |
| ALLYSON MOSER | |
| PHOTO GRAPHIC METALS COMPANY | |
| YELLOW TRANSPORTATION INC | |
| VOLLAND ELECTRIC EQUIPMENT CORPORATION | |
| VISIONMARK INC | |
| WEST EARL SEWER AUTHORITY | |
| UNITY MANUFACTURING COMPANY | |
| BENCO TECHNOLOGY LLC | |
| REFRIGERATION SALES & SERVICE INC | |
| TRAYER PRODUCTS INC | |
| L A HAZARD & SONS INC | |
| USCIS | |
| POWER TOOLS & ABRASIVES INC | |
| SUNNEX INC | |
| RIVERSIDE TANK & MFG. INC | |
| MIDWEST GEAR | |
| CRYSTAL ROCK LLC | |
| UNIFIRST CORPORATION | |
| AMERICAN SAFETY & FIRE | |
| MORE DIRECT INC | |
| DIXIE PLYWOOD | |
| JON THURMOND | |
| CHAMBERLIN RUBBER CO INC | |
| OMNEX CONTROL SYSTEMS INC | |
| LAWSON PRODUCTS INC | |
| GLAUBER EQUIPMENT CORPORATION | |
| WAYNE AUTOMATIC FIRE SPRINKLERS INC | |
| BETTS SPRING COMPANY INC | |
| EXCELLO ENGNEERED SYSTEMS LLC | |
| FLEXFAB DE MEXICOMPANY | |
| LATONYA WATERMAN | |
| BETTS TRUCK PARTS | |
| WASTE PRO | |
| LESLIE MARTINEZ | |
| ADVANCE DRIVELINE | |
| ROBERT-JAMES SALES INC | |
| NORRISEAL | |
| READING ELECTRIC | |
| ONSPOT OF NORTH AMERICA | |
| A-Z COATINGS | |
| SELIG INDUSTRIES | |
| TNCI | |
| ENDURA PLASTICS INC | |
| NORTHSIDE TRUCKS & EQUIPMENT | |
| BYERS PRECISION FABRICATORS INC | |
| FIRWIN CORPORATION | |
| PHILLIPS & TEMRO INDUSTRIES | |
| R/W CONNECTION | |
| FLORIG EQUIPMENT CO INC | |
| INTEGRATED OFFICE NETWORKS | |
| FENN-VAC INC | |
| PUROSIL  AN AFFILIATE OF MISSION RUBBER | |
| AIR CENTERS OF FLORIDA | |
| CITY OF SANFORD UTILITIES | |
| RIEKER INSTRUMENT | |
| DONALDSON CO. INC | |
| INTERTEK INDUSTRIAL CORP | |
| DEALER SOLUTION | |
| CUMMINS SOUTHEAST POWER INC | |
| TRU-FIT PRODUCTS CORP | |
| EMERGENCY VEHICLES PLUS | |
| PAMEK ENGRAVING & NAMEPLATE | |
| GUARDIAN INDUSTRIES CORPORATION | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| EXXON MOBILE | |
| UNI-GRIP INC | |
| ULINE SHIPPING SUPPLY SPECIALISTS | |
| US DIGITAL CORPORATION | |
| BATTERY POST INC. | |
| FLEXFAB | |
| VALEO CLIMATE CONTROL DE MEXICO SA DE CA | |
| WASHINGTON STATE DEPT OF REVENUE | |
| TUPPERWAY TIRES AND SERVICE | |
| COOPER STANDARD | |
| JOHN K. HASTINGS | |
| CUSTOM FIBERGLASS PRODUCTS | |
| TOMAR ELECTRONICS | |
| TIRE CONSULTANTS INC | |
| WALES ENVIRONMENTAL | |
| STRYKER MEDICAL | |
| COLE HERSEE COMPANY | |
| DIALIGHT CORPORATION | |
| LIBERTY STEEL PRODUCTS INC | |
| HI-LINE INC | |
| CERTIFIED TESTING LABORATORIES | |
| RACKSPACE LTD | |
| TRIDENT ENVIRONMENTAL SERVICES INC | |
| CHELSEA PRODUCT DIVISION | |
| EAGLE SYSTEMS INC | |
| MR. MUFFLER SHOP INC | |
| BELMOR/AUTOTRON | |
| BARNHARDT MANUFACTURING COMPANY | |
| POOLEY INC | |
| ATLANTIC STUD WELDING | |
| VELVAC INC | |
| PRAXAIR DISTRIBTION, INC | |
| TURTLE & HUGHES INC | |
| AW DIRECT INC | |
| PRECO ELECTRONICS INC | |
| FIAMM TECHNOLOGIES INC | |
| BUMPER TO BUMPER TIRE AND TRUCK REPAIR | |
| APPLIED INDUSTRIAL TECHNOLOGIES | |
| SETCOM CORPORATION | |
| RIDEWELL | |
| CHARLESTON WIRELESS GROUP | |
| CUSTOM SYSTEMS | |
| WEST LEBANON TOWNSHIP | |
| J. HERBERT CORP. | |
| PIERO'S | |
| AIR LIQUIDE HEALTHCARE AMERICAN CORPORATION | |
| ACCURATE DIESEL | |
| PAIGE ELECTRIC CORPORATION | |
| SOUTHERN TUBE FORM LLC | |
| SOUTHEAST INDUSTRIAL EQUIPMENT INC | |
| SHERRILL INDUSTRIES | |
| YEAGER SUPPLY | |
| UTICA METAL PRODUCTS INC | |
| SURE POWER INDUSTRIES INC | |
| FISHER RECYCLING INC | |
| SWAN ENGINEERING AND SUPP | |
| ROCKFORD TOOLCRAFT INC | |
| PENNSYLVANIA DEPARTMENT OF STATE | |
| MISSISSIPPI MOTOR VEHICLE COMMISSION | |
| SPARTAN CHASSIS INC | |
| STOCKER HINGE MFG COMPANY | |
| ELKHART BRASS MFG CO INC | |
| SPECIALTY FILTER INC | |
| ONEIDA MOLDED PLASTICS | |
| ASCOM HASLER | |
| COUNTY OF LANCASTER | |
| COMMONWEALTH OF PENNSYLVANIA | |
| PROGRESSIVE PRESSURE SYST | |
| ARROW SAFETY DEVICE CO. INC | |
| MODERN CORPORATION | |
| WESTFALIA INC | |
| TENNCO INC | |
| NEWARK ELECTRONICS-IL | |
| FLORIDA DETROIT DIESEL | |
| CAVIN'S BUSINESS SOLUTIONS, LLC | |
| COMCAST | |
| PLYMOUTH SPRING COMPANY INC | |
| MARMON KEYSTONE TUBE | |
| PRECISION MEDICAL | |
| MARK METALS | |
| UNITED WAY OF LANCASTER | |
| CERTIFIED SLINGS INC | |
| CHIEF MIKE KENNEDY | |
| US BANK OFFICE EQUIPMENT FINANCE SERVICES | |
| SOUTHEAST POWER SYSTEMS OF ORLANDO INC | |
| PACBRAKE COMPANY | |
| CIGNA | |
| METAL SUPERMARLETS (BUFFALO) | |
| LETHBRIDGE IRON WORKS CO. LTD | |

**American LaFrance LLC**
90 preference analysis

| Vendor Name | Preference |
|---|---|
| ARVIN RIDE CONTROL PRODUCTS | |
| NEBRASKA MOTOR VEHICLE IND LIC BOARD | |
| TORCA PRODUCTS INC | |
| ACTION COUPLING & EQUIPMENT INC | |
| TRANSPORT SERVICES & BRAKE SALES | |
| FORMS IN A WINK | |
| CARROLL MARK SIGNS & GRAPHICS | |
| FLAGLER EMERGENCY SERVICES, LLC | |
| DOLORES BANKERT | |
| AMERICAN METAL PRODUCTS | |
| CCI ENTERPRISES INC | |
| BOWEN'S SALES & SHARPENING | |
| RHODE ISLAND MOTOR VEHICLE DLR LIC COMM | |
| PRO AUTO INTERIOR REPAIRS | |
| OPTRONICS INC | |
| YORK LADDER | |
| SOUTHSIDE TRAILER SERVICE INC | |
| ART SYSTEMS OF FLORIDA | |
| BREATHING AIR SYSTEMS | |
| ACC CLIMATE CONTROL | |
| VISUAL SOUND COMPANY | |
| SUNDRAM FASTENERS LTD | |
| OCCUPATIONAL HEALTH CENTERS OF SW PA PC | |
| POSITRON CORP | |
| ERIC ANDERSON | |
| AMAZON HOSE & RUBBER | |
| HIGH FOOD SERVICES LTD | |
| IOTA ENGINEERING | |
| SOUTHCO INC | |
| IOWA METAL SPINNERS | |
| PA DEPT OF LABOR & INDUS | |
| ASTRO MANUFACTURIGN & DESIGN | |
| SAIA COMMUNICATIONS INC | |
| OEM CONTROLS INC | |
| COPYTRONICS INC | |
| MCPC COMPUTER PRODUCTS & CONSULTING | |
| NYS DEPARTMENT of ENVIRONMENTAL CONSERVATION | |
| HEHR INTERNATIONAL | |
| POLYGON COMPANY | |
| ISSPRO INC | |
| A.J.G LOCKSMITH | |
| SUB-CITY ELECTRICAL, INC | |
| LAB SAFETY SUPPLY | |
| ERIE COUNTY WATER AUTHORITY | |
| PORTLAND POLICE ALARM ADMINISTRATION | |
| HILL MANUFACTURING | |
| A. DUIE PYLE INC | |
| BOWEN MACHINE CO INC | |
| CE SUPPLY INC. | |
| SAM'S CLUB/GECF | |
| WASTE INDUSTRIES | |
| DEPARTMENT OF FINANCIAL INSTITUTIONS | |
| PITNEY BOWES INC | |
| C.R. LAURENCE CO INC | |
| NEW YORK DEPARTMENT OF STATE | |
| FLORIDA STATE MOTOR VEHICLE DIV | |
| INDIANA MILLS MFG. | |
| BUYERS PRODUCTS COMPANY | |
| HARNDEN TRANSPORT INC | |
| PHILLIPS INDUSTRIES COMMERCIAL VEHICLE | |
| CENTRAL TRANSPORT INTERNATIONAL INC | |
| WAGNER E R MFG CO ENGINEERED PROD DIV | |
| INDUSTRIAL POWER SALES INC | |
| NEWARK ELECTRONICS-NC | |
| CAROLINA OFFICE SYSTEMS | |
| PROLIFT | |
| HOME DEPOT 32-2004730739 | |
| ARIZONA CORPORATION COMMISSION | |
| AUTOMOTIVE RENTALS INC | |
| TRUCK-LITE CO INC | |
| Total | 13,062,815 |

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **AMERICAN LAFRANCE, LLC** | § | |
| | § | **Case No. 08-10178 (BLS)** |
| **Debtor.** | § | |
| | § | |

## THIRD AMENDED PLAN OF REORGANIZATION
## OF AMERICAN LAFRANCE, LLC

**KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS, LLP**
Joanne B. Wills (No. 2357)
Christopher A. Ward (No. 3877)
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone: 302.552.5555
Facsimile: 302.426.9193
Email:  jwills@klehr.com

- and -

**HAYNES AND BOONE, LLP**
Ian T. Peck
Texas State Bar No. 24013306
Abigail Ottmers
Texas State Bar No. 24037225
901 Main Street, Suite 3100
Dallas, Texas 75202
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email:  abigail.ottmers@haynesboone.com

ATTORNEYS FOR THE DEBTOR AND THE DEBTOR-IN-POSSESSION

# TABLE OF CONTENTS

Page

**ARTICLE I. SUMMARY OF THE PLAN**................................................................1

**ARTICLE II. DEFINITIONS**............................................................................1

**ARTICLE III. RULES OF CONSTRUCTION AND INTERPRETATION**..........................10

    **3.1.**    **Rule of Construction:**.....................................................10
    **3.2.**    **Additional Defined Terms:**..............................................10

**ARTICLE IV. DESIGNATION OF CLAIMS AND INTERESTS**...................................10

    **4.1.**    **Summary:**........................................................................10
    **4.2.**    **Controversy Concerning Classification, Impairment or Voting Rights:**..........................................................................11

**ARTICLE V. TREATMENT OF UNCLASSIFIED CLAIMS**........................................11

    **5.1.**    **Administrative Claims.**.....................................................11
        (a)    General:.........................................................11
        (b)    Payment of Statutory Fees:..................................11
        (c)    Bar Date for Administrative Claims:.......................11
    **5.2.**    **Allowed Priority Tax Claims:**..........................................12
    **5.3.**    **DIP Financing Claims Against Debtor:**............................13

**ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**............................................................................13

    **6.1.**    **Class 1 – Secured Claims of Pre-Petition Lenders Against the Debtor.**.................................................................13
        (a)    Classification:.................................................13
        (b)    Treatment:......................................................13
    **6.2.**    **Class 2 – Other Secured Claims Against the Debtor.**..................13
        (a)    Classification:.................................................13
        (b)    Treatment:......................................................13
    **6.3.**    **Class 3 – Allowed Priority Non-Tax Claims.**..........................13
        (a)    Classification:.................................................13
        (b)    Treatment:......................................................14
    **6.4.**    **Class 4 – General Unsecured Claims/Preference Waiver Election.**..........14
        (a)    Classification:.................................................14
        (b)    Treatment:......................................................14
        (c)    Treatment of Class 4 Claims of Freightliner:............14
    **6.5.**    **Class 5 – Convenience Claims.**........................................15
        (a)    Classification:.................................................15
        (b)    Treatment:......................................................15
    **6.6.**    **Class 6 – Assumed Liabilities.**........................................15
        (a)    Classification:.................................................15
        (b)    Treatment:......................................................15

  6.7. Class 7 –Interests.................................................................15
    (a) Classification:...........................................................15
    (b) Treatment:................................................................16

**ARTICLE VII. ALLOWANCE AND RESOLUTION OF CLAIMS...................16**

  7.1. Allowed Claims:..........................................................16
  7.2. Full Satisfaction:.........................................................16
  7.3. Post-petition Interest.....................................................16
  7.4. Alternative Treatment:...................................................16
  7.5. Post Confirmation Claim and Asset Resolution: ...................16
  7.6. Deadline to Object to Claims:..........................................16

**ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN...............17**

  8.1. Plan Funding:.............................................................17
  8.2. Reorganized Debtor:.....................................................17
  8.3. Continued Corporate Existence and Revesting of Assets: .......17
  8.4. Managers of the Reorganized Debtor:................................18
  8.5. Release of Liens:.........................................................18
  8.6. Additional Indebtedness:................................................18

**ARTICLE IX. DISTRIBUTION PROVISIONS ......................................18**

  9.1. Distributions:.............................................................19
  9.2. Distribution Delivery:...................................................19
  9.3. Method of Cash Distributions: ........................................19
  9.4. Distributions on Non-Business Days:.................................19
  9.5. No De Minimis Distribution:...........................................19
  9.6. Undeliverable or Unclaimed Distributions:.........................19
  9.7. Withholding and Reporting Requirements: ..........................20
  9.8. Defenses; Setoff:.........................................................20
  9.9. Exemption from Certain Transfer Taxes:............................20

**ARTICLE X. THE TRUST...............................................................20**

  10.1. Purpose of Trust:........................................................20
  10.2. Governing Document: ..................................................20
  10.3. Trustee and Trust Administration:...................................21
  10.4. Vesting of Assets in the Trust:........................................22
  10.5. Supervision by the Executive Committee:...........................22
  10.6. Limitations on Liability: ...............................................23
  10.7. Termination of Trust:...................................................23

**ARTICLE XI. EXECUTIVE COMMITTEE ..........................................23**

  11.1. Purpose and Procedures: ...............................................23
  11.2. No Executive Committee Compensation:.............................23
  11.3. Retention of Professionals by the Executive Committee:..........24
  11.4. Limitations on Executive Committee Liability: ....................24
  11.5. Termination of the Executive Committee: ...........................24

**ARTICLE XII. EXECUTORY CONTRACTS..........................................24**

12.1.  Rejection of Contracts And Leases: ..............................................24
12.2.  Rejection Damage Claims: ........................................................24
12.3.  Bar Date for Rejection Damages Claims: ...............................24
12.4.  Assumption and Assignment of Executory Contracts and Unexpired Leases: ......................................................................25

ARTICLE XIII. EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS25

13.1.  Impaired Classes to Vote: .......................................................25
13.2.  Acceptance by Class of Creditors: ........................................25
13.3.  Reservation of Cramdown Rights: .........................................25

ARTICLE XIV. EFFECT OF CONFIRMATION ........................................25

14.1.  Legally Binding Effect: ...........................................................26
14.2.  Injunction: ..............................................................................26

ARTICLE XV. CONDITIONS TO EFFECTIVENESS OF THE PLAN ............26

ARTICLE XVI. RETENTION OF JURISDICTION ...................................26

16.1.  Exclusive Bankruptcy Court Jurisdiction: ..............................26
16.2.  Limitation on Jurisdiction: .....................................................27

ARTICLE XVII. MISCELLANEOUS PROVISIONS ...................................27

17.1.  Termination of Creditors' Committee: ....................................27
17.2.  Amendment of the Plan: .........................................................28
17.3.  Withdrawal of Plan: ................................................................28
17.4.  Due Authorization By Creditors: ............................................28
17.5.  Filing of Additional Documentation: ......................................28
17.6.  Governing Law: .......................................................................28
17.7.  Successors and Assigns: ..........................................................28
17.8.  Transfer of Claims: .................................................................28
17.9.  Discharge: ...............................................................................28
17.10. Retention of Rights to Pursue Causes of Action: ...................28
17.11. Full and Final Satisfaction: ....................................................29
17.12. Exculpation and Limitation of Liability: ................................29
17.13. Releases: .................................................................................29
17.14. US Trustee Fees: .....................................................................30
17.15. Implementation: ......................................................................30
17.16. Severability: ............................................................................30
17.17. Computation of Time: ............................................................30
17.18. No Admissions: .......................................................................30
17.19. Notices: ...................................................................................30

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AMERICAN LaFRANCE, LLC, | § | CASE NO.  08--10178 (BLS) |
| | § | |
| Debtor. | § | CHAPTER 11 |

THIRD AMENDED PLAN OF REORGANIZATION OF
AMERICAN LAFRANCE, LLC

American LaFrance, LLC, as debtor and debtor-in-possession, submits this Third Amended Plan of Reorganization (the "Plan") pursuant to section 1121(a) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* for the resolution of the Debtor's outstanding creditor claims.  Reference is made to the Disclosure Statement (as defined below) for a discussion of the Debtor's history, business, properties, and results of operations, and for a summary of this Plan and certain related matters.

All holders of Claims (as defined below) and Interests (as defined below) are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject this Plan.  Other than the Disclosure Statement and any exhibits and schedules attached thereto or referenced therein, no materials have been approved by the Debtor for use in soliciting acceptances or rejections of this Plan.

# ARTICLE I.
## SUMMARY OF THE PLAN

An overview of the Plan is set forth in the Disclosure Statement.  The Plan generally provides for the reorganization of the Debtor's business, and specifically provides unsecured creditors in Class 4 with certain options as to how their claims will be treated.  The Plan further provides for unsecured creditors in Classes 5 and 6 to receive payment in full.

# ARTICLE II.
## DEFINITIONS

As used in the Plan, the following terms shall have the respective meanings specified below.  Any term used in the Plan but not defined below or herein shall be interpreted in accordance with the Rules of Construction and Interpretation set forth in the following Articles of this Plan.

**2.1.    Administrative Claim:**  Any cost or expense of administration of the Chapter 11 Case incurred on or before the Effective Date entitled to priority under section 507(a)(2) and allowed under section 503(b) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Debtor's estate, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, certain

taxes, fines, and penalties, any actual and necessary postpetition expenses of operating the Debtor's business, certain postpetition indebtedness or obligations incurred by or assessed against the Debtor in connection with the conduct of the business, or for the acquisition or lease of property, or for providing of services to the Debtor, including all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930. With respect to quarterly U.S. Trustee fees, the Trustee shall pay any accrued fees on the Distribution Date and timely pay all post-confirmation quarterly fees as they accrue until the date of the closing of the Chapter 11 Case.

2.2.    **Administrative Claimant**:   Any Person entitled to payment of an Administrative Claim.

2.3.    **ALF**:  American LaFrance, LLC, the Debtor.

2.4.    **Allowance Date**:  The date that a Claim becomes an Allowed Claim.

2.5.    **Allowed**:  The portion of a Claim that is not a Disputed Claim.

2.6.    **Allowed Claim**:  A Claim to the extent Allowed.

2.7.    **Allowed Administrative Claim**:  An Administrative Claim to the extent it is or becomes an Allowed Claim.

2.8.    **Allowed Convenience Claim**:  An Allowed Unsecured Claim that is (a) $2,500 or less, or (b) more than $2,500 if the holder of the Claim has elected to, on a timely basis, reduce its Claim to $2,500 in accordance with Article 6.5 of the Plan.

2.9.    **Allowed Priority Non-Tax Claim**:   Any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent Allowed and entitled to priority in payment under section 507(a) of the Bankruptcy Code.

2.10.    **Allowed Priority Tax Claim**:  Any Claim, to the extent Allowed and entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

2.11.    **Allowed Secured Claim**:  A Secured Claim of a creditor to the extent such Claim is an Allowed Claim, and the Lien securing such Claim has not become an Avoided Lien.

2.12.    **Allowed Unsecured Claim**:  An Unsecured Claim to the extent it is or becomes an Allowed Claim.

2.13.    **Assumed Liabilities**:   Certain ordinary-course liabilities that the Reorganized Debtor will pay in the ordinary course of its business.

2.14.    **Assumed Liability Claim**:  Any Claim for an Assumed Liability as identified on Schedule 6.6.1.

**2.15.    Assumed Plan Liabilities**: The obligations of the Reorganized Debtor as agreed in writing by the Reorganized Debtor under this Plan.

**2.16.    Available Cash**: All of the Cash held by the Debtor's Estate.

**2.17.    Avoidance Actions**: Any and all rights, claims and causes of action arising under any provision of chapter 5 of the Bankruptcy Code with the exception of Insider Avoidance Actions.

**2.18.    Avoidance Action Share**: (a) 100% of the affirmative recovery from the Avoidance Actions after distribution on account of any Allowed Claim under Bankruptcy Code section 502(h) resulting from the prosecution of Avoidance Actions and (b) 22.5% of the face amount of any Class 4 General Unsecured Claim settled, disallowed, or waived as a result of the prosecution of an Avoidance Action.

**2.19.    Avoided Lien**: A Lien to the extent it has been set aside, invalidated, or otherwise avoided pursuant to an Avoidance Action.

**2.20.    Balloting Agent**: Kurtzman Carson Consultants, LLC.

**2.21.    Bankruptcy Code**: The Bankruptcy Reform Act of 1978, as amended, Title 11, United States Code, as applicable to this Chapter 11 Case.

**2.22.    Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

**2.23.    Bar Date**: The deadline for filing proofs of claim established by the Bankruptcy Court and any supplemental bar dates established by the Bankruptcy Court pursuant to any other Final Order.

**2.24.    Business Day**: Any day other than a Saturday, a Sunday, or any other day on which banking institutions in Delaware are required or authorized to close by law or executive order.

**2.25.    Cash**: Cash, wire transfer, certified check, cash equivalents, and other readily marketable securities or instruments, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks, and commercial paper of any Person, including interest accrued or earned thereon, or a check from the Debtor's Estate.

**2.26.    Causes of Action**: Any and all claims, causes of action or rights to legal or equitable remedies, whether known or unknown, reduced to judgment or not, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including Avoidance Actions.

**2.27.    Chapter 11 Case**: The Debtor's case in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

**2.28.**    **Claim**: Any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to any equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured, or unsecured.

**2.29.**    **Claimant or Claimholder**:   A person asserting a Claim against the Debtor, property of the Debtor, or the Debtor's Estate.

**2.30.**    **Claim Objection Deadline**: As applicable, (a) the day that is the later of (i) the first Business Day that is 45 days after the Effective Date or (ii) as to proofs of claim Filed after the applicable Bar Date, the first Business Day that is 45 days after a Final Order is entered deeming the late-filed claim to be treated as timely Filed, or (b) such later date as may be established by the Bankruptcy Court.

**2.31.**    **Class**: One of the classes of Claims or Interests defined in Article IV hereof.

**2.32.**    **Collateral**:   Any property of the Debtor or interest in property of the Debtor that serves as security for the repayment of a debt or the performance of an obligation owed by the Debtor to the holder of an Allowed Secured Claim.

**2.33.**    **Confirmation**: Entry of the Confirmation Order confirming this Plan at or after the Confirmation Hearing before the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

**2.34.**    **Confirmation Date**: The date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**2.35.**    **Confirmation Hearing**:  The hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**2.36.**    **Confirmation Order**: The Order of the Bankruptcy Court approving and confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**2.37.**    **Convenience Claim**:   An Allowed Unsecured Claim in an amount of $2,500 or less or in an amount that has been reduced to $2,500 by the election of its Claimholder on the ballot for voting pursuant to the provisions of this Plan and Section 6.5 hereof.

**2.37.**    **Creditor**: Any Person that holds a Claim against the Debtor that arose on or before the Petition Date, or a Claim against the Debtor of any kind specified in sections 502(f), 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**2.38.**    **Creditors' Committee**:  The Official Committee of Unsecured Creditors duly constituted in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

**2.39.    Debtor**: American LaFrance, LLC.

**2.40.    Debtor-in-Possession**:  The Debtor in its capacity as Debtor in Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**2.41.    Deficiency Claim**:  The amount by which an Allowed Claim exceeds the value of any Collateral securing such Claim as may be determined by the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code.  A Deficiency Claim is a General Unsecured Claim, but only if the holder of the Claim had recourse against the Debtor prior to any foreclosure on Collateral.

**2.42.    DIP Financing**:  That certain *Debtor In Possession Financing Amendment To Credit Agreement* attached as Exhibit 1 to the Interim Agreed Order Authorizing Limited Use Of Cash Collateral, Obtaining Postpetition Credit Secured By Senior Liens, And Granting Adequate Protection To Existing Lienholders (Docket No. 40), as amended, restated, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith, by and between the Debtor and Patriarch Partners Agency Services, LLC, as agent for certain lenders and any final Order approving the same.

**2.43.    DIP Financing Claim**:  The Allowed Claim on account of the DIP Financing.

**2.44.    Disallowed Claim**:  A Claim, or any portion thereof, that (a) has been disallowed by either a Final Order or pursuant to a settlement, or (b)(i) is set forth in the Schedules at zero or as contingent, disputed, or unliquidated and (ii) as to which a Bar Date has been established but no proof of claim has been Filed or deemed timely Filed with the Bankruptcy court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

**2.45.    Disclosure Statement**:  The Amended Disclosure Statement with respect to the Amended Chapter 11 Plan of Reorganization Filed by the Debtor with the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as may be amended or supplemented.

**2.46.    Disputed Claim**:  A Claim as to which (i) a proof of claim has been Filed or deemed Filed under applicable law, as to which an objection has been timely Filed and which objection, if timely Filed, has not been withdrawn on or before any date fixed for Filing such objections by the Plan or Order of the Bankruptcy Court and has not been overruled or denied by a Final Order or (ii) no proof of claim was timely filed and such Claim was identified in the Schedules as contingent, unliquidated, and/or disputed.

**2.47.    Distribution**:  The property required by the Plan to be distributed to the holders of Allowed Claims.

**2.48.    Distribution Date**:  As to all Allowed Claims, the date that is within 90 days after the date upon which the Reorganized Debtor or Trustee (as appropriate), in its sole discretion, has sufficient funds to pay Allowed Claims of the highest priority of previously unpaid Allowed Claims.

**2.49.    Earned Interest**:  Interest, for purposes of Cash Distribution under the Plan, for each day during any calendar month, at an assumed rate per annum for each calendar month (or portion thereof) after the Effective Date, equal to the 30-Day Treasury Rate in effect on the first Business Day of such month.

**2.50.    Effective Date**:  The first Business Day after the Confirmation Date that (a) all conditions precedent to the occurrence of the Effective Date specified in the Plan have been satisfied or waived and (b) no stay of the Confirmation Order is in effect.

**2.51.    Estate**:  The estate created upon the filing of the Chapter 11 case pursuant to section 541 of the Bankruptcy Code, together with all rights, claims, and interests appertaining thereto.

**2.52.    Executive Committee**:  The Executive Committee established under the Plan, and, as of the Effective Date, is comprised of three individuals to be selected by the Creditors' Committee and named in the Plan Supplement.

**2.53.    Executory Contract**:  Any unexpired lease or executory contract as set forth in section 365 of the Bankruptcy Code.

**2.54.    File or Filed**:  The filing of any document in this Chapter 11 Case.

**2.55.    Final Distribution**:  A Distribution made under the Plan that represents the only or last Distribution to be made to a particular Class of Creditors.

**2.56.    Final Distribution Date**:  The date on which the Reorganized Debtor or the Trustee (as appropriate) makes a Final Distribution.

**2.57.    Final Order**:  An order or judgment that has not been reversed, vacated, stayed, or amended, and is no longer subject to appeal, *certiorari* proceeding or other proceeding for review, re-argument, or rehearing, or as to which no appeal, *certiorari* proceeding or other proceeding for review, reargument, or rehearing has been requested or is then pending and the time to file any such appeals, *certiorari*, proceeding or other proceeding for review, reargument, or rehearing has expired, or as to which any right to appeal, petition for *certiorari*, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor; or, in the event that an appeal, writ of *certiorari* or reargument or rehearing thereof has been sought, such order or judgment shall have been determined by the highest court to which such order or judgment was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state laws, may be filed with respect to such order or judgment shall not preclude it from being a Final Order.

**2.58.    Freightliner**:  Freightliner, LLC, now known as Daimler Trucks North America, LLC.

**2.59.    General Unsecured Claim**:  A Claim other than a Secured Claim, a DIP Financing Claim, an Administrative Claim, a Priority Non-Tax Claim, a Priority Tax Claim, an Assumed Liability Claim, or a Convenience Claim.

**2.60.    Governmental Bar Date**:  The deadline for governmental units to file proofs of claim related to pre-Petition Date period established by prior order of the Bankruptcy Court.

**2.61.    Insider Avoidance Actions**:  Claims for recovery of (a) preferential payments or transfers to Freightliner (as defined in Bankruptcy Code section 101(31)) made within the period of one year prior to the Petition Date and (b) fraudulent transfers to Freightliner.

**2.62.    Insider Avoidance Action Share**:  50% of any proceeds received from the Insider Avoidance Actions after (a) distribution to Freightliner on account of any Allowed Class 4 Claim under Bankruptcy Code section 502(h), as described in Article 6.4 herein, and (b) professional fees and costs related to the prosecution of any Insider Avoidance Action.

**2.63.    Interest**:  Any membership interest or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest.

**2.64.    Interest Holder**:  Any holder or owner of an Interest.

**2.65.    Lebanon Real Property**:   The Debtor's real property, land and building(s), located at 1800 Lehman Street, Lebanon, PA 17046.

**2.66.    Lien**:  A charge against or interest in property to secure payment of a debt or performance of an obligation that has not been avoided or invalidated under any provision of the Bankruptcy Code or other applicable law.

**2.67.    Order**:  Any mandate, precept, command, or direction given by a court.

**2.68.    Person**:  An individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association or organization, a governmental unit or any agency or subdivision thereof or any other entity.

**2.69.    Petition Date**:  January 28, 2008, the date on which the Debtor Filed its voluntary Chapter 11 petition commencing the Chapter 11 Case.

**2.70.    Plan**:  This Plan of Reorganization of the Debtor, as it may be amended or modified.

**2.71.    Plan Ballot**:  The form of ballot that the Debtor will transmit to Creditors who are, or may be, entitled to vote on the Plan.

**2.72.    Plan Supplement**:  The documents, including the forms of Restructured Note, Restructured Security Documents, the members of the Executive Committee, the Trust

Security Documents, and a list of the Executory Contracts, if any, to be assumed pursuant to the Plan, that shall be contained in a separate plan supplement Filed with the Clerk of the Bankruptcy Court at least fifteen (15) days prior to the date on which the Confirmation Hearing shall commence or such shorter period as ordered by the Bankruptcy Court. A copy of the Plan Supplement will be provided upon written request from the Debtor's counsel.

      **2.73.    Post-Confirmation Service List**:  The list of those parties who have notified the Reorganized Debtor in writing, at or after the Confirmation Hearing, of their desire to receive electronic notice of all pleadings Filed by the Reorganized Debtor and have provided the e-mail address to which such notices shall be sent.

      **2.74.    Preference Claim**:  Claim for recovery of a non-insider preferential transfer made within ninety (90) days prior to the Petition Date pursuant to 11 USC § 547(b).

      **2.75.    Pre-Petition Lenders**:  Zohar CDO 2003-1, Limited ("Zohar"), Zohar II 2005-1, Limited ("Zohar II"), and Zohar III, Limited ("Zohar III") and Patriarch Partners Agency Services, LLC ("PPAS") as agent.

      **2.76.    Priority Non-Tax Claim**:  Any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent entitled to priority in payment under section 507(a) of the Bankruptcy Code including, without limitation, a Claim of an employee of the Debtor for wages, salaries, or commissions, including vacation, severance or sick leave pay, earned within one hundred eighty (180) days prior to the Petition Date (to the extent of $10,950 per employee).

      **2.77.    Priority Tax Claim**:  Any Claim entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

      **2.78.    Pro Rata**:  The proportion that the dollar amount of an Allowed Claim in a Class bears to the aggregate amount of all Allowed Claims in such Class.

      **2.79.    Professional**:  A person employed under sections 327 or 1103 of the Bankruptcy Code.

      **2.80.    Reorganized Debtor**:  The Debtor as it will be reorganized as of the Effective Date in accordance with the Plan.

      **2.81.    Restructured Note**:  The Restructured Promissory Note issued by the Reorganized Debtor to the Pre-Petition Lenders.

      **2.82.    Restructured Security Documents**:  Credit and security documents necessary to grant liens in all the assets of the Reorganized Debtor to secure the Restructured Note.

      **2.83.    Sanford Assets**:  The Debtor's real property, land and buildings located at 3705 St. Johns Parkway, Sanford, Florida, 32771 together with all tangible and intangible personal property utilized in ALF's operations in Sanford, Florida.

**2.84.    Schedules**:  The Debtor's Schedules of Assets and Liabilities, as may be amended or supplemented, and Filed with the Bankruptcy Court in accordance with section 521(a)(1) of the Bankruptcy Code.

**2.85.    Secured Claim**:  A Claim to the extent of the value, as may be determined by the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code, of any interest in property of the Debtor's Estate securing such Claim, or any Claim to the extent that it is subject to setoff under section 553 of the Bankruptcy Code.  To the extent that the value of such interest is less than the amount of the Claim that has the benefit of such security, such Claim is a Deficiency Claim unless, in any such case, the class of which such Claim is part makes a valid and timely election under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

**2.86.    Subordinated Claim**:  A Claim that the Bankruptcy Court has entered a Final Order subordinating the Claim of such holder to the claims of General Unsecured Creditors.

**2.87.    Trust**:  The trust created pursuant to the provisions of Article 10 hereof.

**2.88.    Trust Agreement**:   The Liquidating Trust Agreement that will be substantially in the form contained in the Plan Supplement.

**2.89.    Trust Beneficiaries**:  The holders of Allowed Class 4 Claims that shall be satisfied only from Trust Property in accordance with the terms of the Plan.

**2.90.    Trust Expenses**:  All costs, expenses, and obligations incurred by the Trust, the Trustee, the Trustee's Professionals, or the Executive Committee in administering the Trust or in any manner incidental thereto.

**2.91.    Trust Property**:  The Trust Property shall include (a) the $6,100,000.00 of Cash described in Article 8.1(c) herein, (b) the Avoidance Action Share, (c) the Insider Avoidance Action Share, and (d) the lien and security rights granted in Trust Security Documents.  After Holders of Allowed General Unsecured Claims in Class 4 have received the 22.5% Distribution as provided in Article 6.4, the lien and security rights granted in Trust Security Documents shall be released and the assets secured thereby, or the proceeds thereof remaining after payment of such 22.5% Distribution (and the costs of foreclosure, if any), will revert to the Reorganized Debtor.

**2.92.    Trust Security Documents**:  Security documents in form and content reasonably acceptable to the Debtor and the Creditors' Committee necessary to grant the Trust first-priority liens on the Lebanon Real Property and Sanford Assets pursuant to Article 8.1(c) of the Plan and to permit proper perfection of such liens.

**2.93.    Trustee**:  The Trustee of the Trust or any successor trustee designated or selected in accordance with the terms of the Plan and the Trust Agreement.  The identity of the initial Trustee, who will designated by the Creditors' Committee, shall be contained in the Plan Supplement.

2.94. **Unsecured Claim**: A Claim not secured by a charge, mortgage or lien against or interest in property in which the Estate has an interest, including, without limitation, any Deficiency Claim and any claim for damages resulting from the rejection of an Executory Contract.

# ARTICLE III.
## RULES OF CONSTRUCTION AND INTERPRETATION

3.1. **Rule of Construction**: The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan, unless the context requires otherwise. Whenever from the context it appears appropriate, each term stated in either the singular or the plural includes the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender include the masculine, feminine, and the neuter. The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

3.2. **Additional Defined Terms**: A term used in this Plan and not defined herein but that is defined in the Bankruptcy Code has the meaning ascribed to the term in the Bankruptcy Code. A term used in this Plan and not defined herein or in the Bankruptcy Code, but which is defined in the Bankruptcy Rules, has the meaning assigned to the term in the Bankruptcy Rules.

# ARTICLE IV.
## DESIGNATION OF CLAIMS AND INTERESTS

4.1. **Summary**: The following is a designation of the classes of Claims and Interests under the Plan:

| | | |
|---|---|---|
| Class 1: Allowed Secured Claims of Pre-Petition Lenders | Impaired | Yes |
| Class 2: Other Allowed Secured Claims Against Debtor | Unimpaired | No |
| Class 3: Allowed Priority Non-Tax Claims | Unimpaired | No |
| Class 4: Allowed General Unsecured Claims | Impaired | Yes |
| Class 5: Allowed Convenience Claims | Impaired | Yes |
| Class 6: Assumed Liabilities | Unimpaired | No |
| Class 7: Interests | Unimpaired | No |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Post-Petition Tax Claims described in Article V of the Plan have not been classified and are excluded from the following classes. A Claim or Interest is classified in a particular class only to the extent that the Claim or Interest qualifies within the description of that class, and is classified in another class or classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other class or classes. A Claim or Interest is classified in a particular class only to the extent that the Claim or Interest is an Allowed Claim or Allowed Interest in that class and has not been paid, released, or otherwise satisfied before the Effective Date; a Claim or Interest that is not an Allowed Claim or Interest is not in any Class. Notwithstanding anything to the contrary contained in the Plan, no Distribution shall be made on account of any Claim or Interest that is not an Allowed Claim or Allowed Interest.

**4.2.    Controversy Concerning Classification, Impairment or Voting Rights**: If a controversy or dispute arises involving issues related to the classification, impairment, or voting rights of any Creditor or Interest Holder under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy. Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes the amount of any contingent or unliquidated Claim if the fixing or liquidation of the Claim through ordinary judicial processes would unduly delay the administration of the Chapter 11 Case. In addition, the Bankruptcy Court may, in accordance with section 506(b) of the Bankruptcy Code, conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

# ARTICLE V.
## TREATMENT OF UNCLASSIFIED CLAIMS

### 5.1.    Administrative Claims.

(a)    <u>General</u>: Subject to the deadlines set forth herein, unless otherwise agreed to by the parties, each holder of an Allowed Administrative Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Claim on the later of, or as soon as practicable thereafter, (i) the Effective Date or as soon as practicable thereafter, (ii) the Allowance Date, or as soon as practicable thereafter, (iii) such date as is mutually agreed on by the Debtor or, after the Effective Date, the Reorganized Debtor and the holder of such Claim, and (iv) the Distribution Date.

(b)    <u>Payment of Statutory Fees</u>: All fees payable pursuant to 28 U.S.C. §1930 shall be paid in Cash equal to the amount of such Administrative Claim when due.

(c)    <u>Bar Date for Administrative Claims</u>:

(i)    <u>General Provisions</u>: Except as provided below in Sections 5.1(c)(iii) of the Plan, requests for payment of Administrative Claims must be Filed no later than **forty-five (45) days after the Effective Date**. Holders of Administrative Claims (including, without limitation, professionals requesting compensation or reimbursement of expenses, members of the Creditors' Committee for reimbursement of expenses, holders of any Claims for federal, state or local taxes, the holders of any Claims under section 503(b)(9) of the Bankruptcy

Code) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against the Debtor or any of its property.

        (ii)    <u>Professionals</u>:    All professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any professional or any other entity for making a substantial contribution in the Chapter 11 Case) shall File and serve on the Reorganized Debtor and Post-Confirmation Service List an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date.  Objections to applications of professionals for compensation or reimbursement of expenses must be Filed and served on the Reorganized Debtor and the professionals to whose application the objections are addressed no later than seventy (70) days after the Effective Date.  Any professional fees and reimbursements or expenses incurred by the Reorganized Debtor subsequent to the Effective Date may be paid without application to the Bankruptcy Court.  To the extent Allowed, the foregoing fees and expenses will be paid by the Reorganized Debtor.

        (iii)    <u>Tax Claims</u>:  All requests for payment of Administrative Claims and other Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, that accrued or were assessed within the period from and including the Petition Date through and including the Effective Date ("Post-Petition Tax Claims") and for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) forty-five (45) days after the Effective Date; and (ii) ninety (90) days after the filing with the applicable governmental unit of the tax return for such taxes for such tax year or period.  Any holder of any Post-Petition Tax Claim that is required to File a request for payment of such taxes and does not File such a request by the applicable bar date shall be forever barred from asserting any such Post-Petition Tax Claim against the Debtor or its property, whether any such Post-Petition Tax Claim is deemed to arise before, on, or subsequent to the Effective Date.  To the extent that the holder of a Post-Petition Tax Claim holds a lien to secure its Claim under applicable state law, the holder of such Claim shall retain its lien until its Allowed Claim has been paid in full.

        **5.2.**    **Allowed Priority Tax Claims**:  On, or as soon as reasonably practicable after, the later of (a) the Distribution Date, (b) the Allowance Date, and (c) the date on which such Allowed Claim would have been due had the Chapter 11 Case not been commenced (without regard to acceleration of the Claim), each holder of an Allowed Priority Tax Claim against a Debtor shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the amount of such Allowed Priority Tax Claim plus interest from the Effective Date to the Distribution Date at a rate of 8% per annum, or (ii) such other less favorable treatment to the holders of an Allowed Priority Tax Claim as to which the Debtor or, after the Effective Date, the Reorganized Debtor and the holder of such Allowed Priority Tax Claims shall have agreed on in writing; <u>provided</u>, <u>however</u>, that any Claim or demand for payment of a penalty (other than a penalty of the type specified in section 507(a)(8)(G) of the Bankruptcy Code) shall be disallowed pursuant to the Plan, and the holder of an Allowed Priority Tax Claim shall not be allowed to assess or attempt to collect such penalty from the Debtor, its Estate, or the Reorganized Debtor.  To the extent that there is

insufficient Available Cash to pay all Allowed Class 3 Claims in full, no Distributions will be made on account of Allowed Priority Tax Claims until the Reorganized Debtor holds sufficient Available Cash to pay all Allowed Class 3 Claims in full.

      **5.3.**    **DIP Financing Claims Against Debtor:**  On, or as soon as reasonably practicable after, the later of (a) the Distribution Date, and (b) the Allowance Date, the DIP Financing Claims shall receive the same treatment as holders of Allowed Class 1 Claims in an amount equal to the then outstanding amount of the DIP Financing Claims (including, without limitation, all accrued and unpaid interest, fees, and expenses and any other amounts that may then be due and payable under the DIP Financing) or such other less favorable treatment as agreed in writing by the holders of such DIP Financing Claims and the Debtor or, after the Effective Date, the Reorganized Debtor.


# ARTICLE VI.
## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

      **6.1.**    **Class 1 – Secured Claims of Pre-Petition Lenders Against the Debtor.**

      (a)    <u>Classification:</u>  Class 1 consists of the Allowed Secured Claim of the Pre-Petition Lenders.

      (b)    <u>Treatment:</u>  Class 1 is impaired, and the holder of the Allowed Secured Claim in Class 1 is entitled to vote on the Plan.  On the Effective Date, in full satisfaction, release, and discharge of and in exchange for the Allowed Secured Claim in Class 1, the Pre-Petition Lenders shall receive a Restructured Note issued and Restructured Security Documents granted by the Reorganized Debtor to the Pre-Petition Lenders substantially in the form included in the Plan Supplement.

      **6.2.**    **Class 2 – Other Secured Claims Against the Debtor.**

      (a)    <u>Classification:</u>  Class 2 consists of all Allowed Secured Claims other than the Secured Claims of the Pre-Petition Lenders.

      (b)    <u>Treatment:</u>  Class 2 is unimpaired, and the holders of the Allowed Secured Claims in Class 2 are not entitled to vote on the Plan. On the Effective Date, or as soon as reasonably practicable thereafter, at the Debtor's option, (a) the Plan may leave unaltered the legal, equitable, and contractual rights of the holder of an Allowed Secured Claim, or (b) the Reorganized Debtor may pay the Allowed Secured Claim in full, in cash, on the later of the Allowance Date or the Distribution Date, or (c) the Reorganized Debtor may deliver to the holder of an Allowed Secured Claim the property securing such Claim, or (d) the Reorganized Debtor may pay an Allowed Secured Claim in such manner as may be mutually agreed to by the holder of such Claim and the Reorganized Debtor.

      **6.3.**    **Class 3 – Allowed Priority Non-Tax Claims.**

      (a)    <u>Classification:</u>  Class 3 Consists of Allowed Priority Non-Tax Claims.

(b)    Treatment: Class 3 is unimpaired, and the holders of Allowed Claims in Class 3 are not entitled to vote on the Plan.  On, or as soon as reasonably practicable after, the later of (a) the Distribution Date, (b) the Allowance Date, and (c) the date on which such Allowed Claim would have been due had the Chapter 11 Case not been commenced (without regard to acceleration of the Claim), each Allowed Priority Non-Tax Claim shall be assumed and paid by the Reorganized Debtor in full from Available Cash or on such other terms as may be agreed upon in writing by and between the holder of such Claim and the Reorganized Debtor.  If there is insufficient Available Cash to pay all Allowed Claims in Class 3 in full, holders of Allowed Claims entitled to priority under section 507(a)(3) of the Bankruptcy Code shall be paid in full in Cash before Distributions are made to holders of Allowed Claims entitled to priority under section 507(a)(4).  If there is insufficient Available Cash to pay all Class 3 Claims entitled to priority under a section of the Code in full, the Claimholders of that priority will receive Pro Rata Distributions.

**6.4.    Class 4 – General Unsecured Claims/Preference Waiver Election.**

(a)    Classification:  Class 4 consists of Allowed General Unsecured Claims other than Allowed Convenience Claims.

(b)    Treatment:  Class 4 is impaired, and the holders of Allowed General Unsecured Claims are entitled to vote on the Plan.  On the Distribution Date and from time to time thereafter as Trust Property is converted to Cash, the holders of Allowed General Unsecured Claims shall each receive (i) 22.5% of the amount of their Allowed General Unsecured Claim; (ii) their pro-rata portion of the Avoidance Action Share; and (iii) their pro-rata portion of the Insider Avoidance Action Share.

If the Debtor holds a potential Preference Claim against a holder of an Allowed General Unsecured Claim, the Claimant may settle its liability (the "Preference Amount") for such Preference Claim and be released therefrom by electing and agreeing (the "Preference Election") to provide the Reorganized Debtor, for a period of twelve (12) months after the Effective Date, with pricing for goods and services equal to or more favorable than the best pricing offered to ALF during 2007. The Preference Amount for each Holder of a Class 4 Claim, except Freightliner, shall be the amount set forth on **Exhibit D** of the Disclosure Statement under the column titled "Preference" and shall be binding on any Claimant exercising the Preference Election.

A Claimant making such Preference Election shall, subject to the occurrence of the Effective Date, be deemed released from any Preference Claim.  The sole method of exercising the Preference Election is to vote in favor of the Plan by checking the box titled "Accept the Plan and Exercise the Preference Election" on the Ballot for General Unsecured Creditors – Class 4 included in the solicitation package containing this Plan. If enough affirmative votes for the Plan are not obtained and the Plan is not approved by the Court, or the Plan is not approved by the Court for any other reason, the Preference Election is null and void and the Debtor may prosecute all Preference Claims.

(c)    Treatment of Class 4 Claims of Freightliner: Freightliner shall receive the (i) 22.5% of the amount of their Allowed General Unsecured Claim and (ii) their pro-rata portion

of the Avoidance Action Share, but shall not receive any portion of the Insider Avoidance Action Share. Additionally, to the extent that Freightliner has an Allowed Claim pursuant to Bankruptcy Code section 502(h) in connection with an Insider Avoidance Action, the amount of the Distribution on such Allowed Claim shall be determined by multiplying Freightliner's total liability in connection with the Insider Avoidance Action by the percentage that results from dividing (y) the amount of its Allowed Class 4 Claims (including any Allowed Class 4 Claim by Freightliner under Bankruptcy Code section 502(h)) by (z) the aggregate amount of all Allowed Class 4 General Unsecured Claims (including any Allowed Class 4 Claim by Freightliner under Bankruptcy Code section 502(h)). Any Allowed Class 4 Claim by Freightliner under Bankruptcy Code section 502(h) will be paid or satisfied through a setoff of the amount of its section 502(h) claim against Freightliner's liability under any Insider Avoidance Action.

The Preference Election is <u>not</u> available to recipients of transfers that are subject to Insider Avoidance Actions.

### 6.5.    Class 5 – Convenience Claims.

(a)    <u>Classification:</u>  Class 5 consists of Allowed General Unsecured Claims that would otherwise be included in Class 4 that are either (i) $2,500 or less or (ii) greater than $2,500 but as to which the holder thereof elects ("Convenience Class Election"). The sole method of exercising the Convenience Class Election is to timely submit a "Ballot for Claim in Class 5 (Convenience Class) Against American LaFrance, LLC" included in the solicitation package containing this Plan. Any such election shall be effective only upon the receipt thereof by the Balloting Agent prior to the Ballot Deadline. Once the election is made and received by Balloting Agent, such election shall be irrevocable and binding on any successor-in-interest or assignee with respect to such Claim, but shall not preclude the Debtor or others from objecting to such Claim as reduced.

(b)    <u>Treatment:</u>  Class 5 is impaired, and the holders of Allowed Convenience Claims are entitled to vote on the Plan. The Reorganized Debtor will deliver to holders of Allowed Convenience Claims on the Distribution Date, Cash in an amount equal to 100% of the Allowed Amount of the Claim not to exceed $2,500.

### 6.6.    Class 6 – Assumed Liabilities.

(a)    <u>Classification:</u>  Class 6 consists of Assumed Liability Claims. A list of Assumed Liability Claims is set forth on Schedule 6.6.1, which may be amended or supplemented in the Plan Supplement.

(b)    <u>Treatment:</u>  Class 6 is unimpaired, and the holders of Allowed Assumed Liability Claims are not entitled to vote on the Plan. All Assumed Liabilities Claims shall be assumed by the Reorganized Debtor and paid pursuant to their ordinary terms.

### 6.7.    Class 7 –Interests.

(a)    <u>Classification:</u>  Class 7 consists of all Interests.

(b)    Treatment: The holders of Interests are unimpaired, and the holders of Interests are not entitled to vote on the Plan. Each holder of an Interest shall retain its Interest. In exchange for retention of Interests, the holders of Interests that are also holders of Class 1 Claims will release $4,225,767.09 of their Class 1 Claims. In addition, the holders of Interests will contribute $500,000.00 in cash to the Reorganized Debtor.

# ARTICLE VII.
## ALLOWANCE AND RESOLUTION OF CLAIMS

**7.1.    Allowed Claims**: Notwithstanding any contrary provision herein, the Reorganized Debtor and Trustee (as appropriate) shall make Distributions only on account of Allowed Claims. No holder of a Disputed Claim will receive any Distribution on account thereof until, and then only to the extent that, its Disputed Claim becomes an Allowed Claim. The Reorganized Debtor and Trustee (as appropriate) shall withhold Distributions otherwise due hereunder to the holder of a Disputed Claim for a reasonable period of time to enable the Trustee or the Reorganized Debtor, as appropriate, to determine whether to object to the Claim. The presence of a Disputed Claim in any class will not be cause to delay Distribution to Allowed Claims in that class or in other classes, so long as a reserve is created for the Disputed Claim in accordance herewith. Any holder of a claim that becomes an Allowed Claim after the Distribution Date will receive its Distribution on the next Distribution Date.

**7.2.    Full Satisfaction**: The Reorganized Debtor shall make, and each holder of an Allowed Claim shall receive, the Distributions provided for in the Plan in full and final satisfaction and discharge of the Claim.

**7.3.    Post-petition Interest**. Except as otherwise expressly provided herein, no holder of a Claim is entitled to or will receive post-petition interest.

**7.4.    Alternative Treatment**: Notwithstanding any contrary provision herein, any holder of an Allowed Claim may receive, instead of a Distribution or treatment to which it is entitled hereunder, any less favorable Distribution or treatment to which it and, as appropriate, (a) the Reorganized Debtor or (b) the Trustee may agree in writing.

**7.5.    Post Confirmation Claim and Asset Resolution**: After the Effective Date, the Reorganized Debtor may defend, pursue or settle, without Bankruptcy Court approval, any Disputed Claim or any Cause of Action related to any right or asset of the Reorganized Debtor, including the Avoidance Actions and the Insider Avoidance Actions.

**7.6.    Deadline to Object to Claims**: No later than the Claims Objection Deadline (unless extended by an order of the Bankruptcy Court on motion by the Reorganized Debtor or the Trustee), the Reorganized Debtor shall file objections to Claims with the Bankruptcy Court and serve such objections on holders of each Claim(s) to which objections are made. Nothing contained herein, however, shall limit the Reorganized Debtor's right to object to Claims, if any, Filed or amended after the Claims Objection Deadline. Further, notwithstanding the expiration of the Claims Objection Deadline and unless subsequently ordered for good cause shown to shorten time, the Reorganized Debtor shall continue to have the right to amend any

objection and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.

# ARTICLE VIII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 8.1.    Plan Funding:

(a)    Other than Allowed Class 4 Claims, which shall be paid from Trust Property, the Plan obligations shall be funded by the Reorganized Debtor in accordance with this Plan. All proceeds realized from the liquidation of the Trust Property shall be maintained by the Trustee for Distribution to holders of Allowed Class 4 Claims as provided herein. Allowed Class 4 Claims will not be paid by the Reorganized Debtor.

(b)    The Reorganized Debtor shall fund and maintain an escrow account of $3 million to be used to pay Allowed Administrative Claims of professionals described in Article 5.1(c)(ii) herein. If the escrow is insufficient to pay the Allowed Administrative Claims of professionals, it will be shared pro rata by such professionals, and the Reorganized Debtor shall pay any deficiency. All professionals reserve the right to (a) request at the Confirmation Hearing a greater escrow or (b) oppose such a request.

(c)    To fund and secure the 22.5% distribution to holders of Class 4 Allowed General Unsecured Claims, the Reorganized Debtor shall transfer to the Trust $6.1 million in cash ($1.1 million of which shall be allocated to distribution for any Allowed Class 4 Claim of Freightliner) and grant the Trust first-priority liens on and proceeds of both the Lebanon Real Property and the Sanford Assets pursuant to the Trust Security Documents. Both properties have been listed for sale, and the Reorganized Debtor will keep the Trustee apprised of the marketing efforts and any proposed sale of such properties. The Trust Security Documents shall provide that if the Lebanon Real Property and the Sanford Assets have not been sold within fifteen (15) months following the Effective Date, (i) the Reorganized Debtor shall immediately pay the Trust the amount necessary to fund the balance necessary to achieve the 22.5% distribution to Class 4 and (ii) failing such payment, the Trust may foreclose on either or both properties to satisfy the 22.5% distribution. After such foreclosure and application of the proceeds therefrom, after fees and costs incurred in connection therewith, toward payment of the 22.5% Distribution to Class 4, the Reorganized Debtor will pay to the Trust any shortfall in the 22.5% distribution. Any Trust Property not necessary to satisfy the 22.5% distribution will be promptly returned to the Reorganized Debtor and any liens thereon released.

### 8.2.    Reorganized Debtor: The Debtor will continue to operate its business as a debtor-in-possession and retain all assets other than Trust Property until the Effective Date. On the Effective Date, the Debtor will be reorganized into the Reorganized Debtor and all assets of the Estate other than Trust Property will vest into the Reorganized Debtor. The Trust Property will be held by the Trustee subject to the provisions of the Trust Agreement.

### 8.3.    Continued Corporate Existence and Revesting of Assets:

(a)     ALF shall continue to exist after the Effective Date in accordance with the laws of the State of Delaware.  ALF may amend its limited liability company agreement as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.

(b)     Except as otherwise provided in the Plan or the Confirmation Order, pursuant to sections 1123(a)(5) and 1141 of the Bankruptcy Code, on the Effective Date, and other than the Trust Assets, all property comprising the Estate shall revest in the Reorganized Debtor or its successors, free and clear of all Claims and Liens of Creditors.  From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property, and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code, subject to the terms and conditions of this Plan.

**8.4.     Managers of the Reorganized Debtor**:  On the Effective Date, the operation of the Reorganized Debtor shall become the general responsibility of its Board of Managers.  Such managers shall be deemed elected or appointed pursuant to the Confirmation Order.

**8.5.     Release of Liens**:  Except as otherwise provided in this Plan, any document related to the Plan, or the Confirmation Order:  (i) each Creditor holding a Secured Claim or a judgment, shall on the Effective Date (a) turn over and release to the Reorganized Debtor any and all Collateral that secures or purportedly secures such Claim as it pertains to the properties currently owned or leased by the Debtor, or such Lien shall automatically, and without further action by the Debtor or Reorganized Debtors, be deemed released, and (b) execute such documents and instruments as the Reorganized Debtor requests to evidence such Creditor's release of such property or Lien; and (ii) all right, title, and interest in any and all property of the Estate shall revert or be transferred to the Reorganized Debtor, free and clear of all Claims, including, without limitation, Liens, escrows, charges, pledges, encumbrances, security interests, and/or other interests of any kind.  No Distribution hereunder shall be made to or on behalf of any Creditor unless and until such Creditor executes and delivers to the Debtor or Reorganized Debtor such release of Liens or otherwise turns over and releases such Cash, pledge or other possessory Lien.  Notwithstanding the immediately preceding sentence, any holder of a Disputed Claim shall not be required to execute and deliver such release until such time as the Claim is Allowed or Disallowed.

**8.6.     Additional Indebtedness**:  On the Effective Date, the Pre-Petition Lenders and the lenders providing the DIP Financing shall create a loan facility for the Reorganized Debtor pursuant to terms and conditions set forth in the Restructured Note and Restructured Security Documents.  This loan facility shall be secured by substantially all of the Reorganized Debtor's assets.  This loan facility is necessary for the feasibility of this Plan and must be entered into as a condition precedent to the Confirmation of this Plan.  On the Effective Date, the Reorganized Debtor shall execute and deliver such documents, instruments, and agreements as are necessary to grant Liens provided to secure this loan facility.

# ARTICLE IX.
## DISTRIBUTION PROVISIONS

**9.1.   Distributions:** The Reorganized Debtor, through its distribution agent, on behalf of the Trust but at the Reorganized Debtor's expense, upon instruction and funding by the Trustee, shall make Distributions related to Class 4 Claims from the Trust Property. The Reorganized Debtor shall make all other Distributions. Neither the Trustee nor the Reorganized Debtor shall be required to post a bond in connection with the making of any Distribution pursuant to the Plan.

**9.2.   Distribution Delivery:** All Distributions shall be made to each holder of an Allowed Claim by regular mail, postage-prepaid, in an envelope addressed to (a) the address shown on the list of creditors Filed with the Bankruptcy Court, (b) the address listed in the Schedules if different than the address shown on the list of creditors Filed with the Bankruptcy Court, or (c) if a proof of claim is Filed, and the address is different than the address listed in the Schedules, at the address shown on the proof of claim. The Distribution Date shall be the date of mailing, and property distributed in accordance with this Section shall be deemed delivered to such Person regardless of whether such property is actually received by that Person. A holder of a Claim or Interest may designate a different address for notices and Distributions by notifying the Debtor, the Reorganized Debtor, or the Trustee of that address in writing. The new address shall be effective upon receipt by the Debtor, the Reorganized Debtor, or the Trustee (as appropriate).

**9.3.   Method of Cash Distributions:** Any Cash payment to be made pursuant to this Plan may be made by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or by applicable law.

**9.4.   Distributions on Non-Business Days:** Any Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

**9.5.   No De Minimis Distribution:** Other than the final Distribution made by the Trust in accordance with the Trust Agreement, no Distribution in an amount of less than $100.00 shall be made on account of any Allowed Claim. Such undistributed amount will be instead retained by the Reorganized Debtor or Trust (as appropriate) and added to subsequent Distributions until such Distribution equals or exceeds $100.00.

**9.6.   Undeliverable or Unclaimed Distributions:** If a holder of an Allowed Claim fails to negotiate a check issued to such holder pursuant to this Plan within ninety (90) days of the date such check was forwarded to such holder and such check was not returned to the Reorganized Debtor or Trustee due to an incorrect or incomplete address, the Reorganized Debtor or Trustee (as appropriate) shall issue a "stop payment order" for that non-negotiated check. The amount attributable to that non-negotiated check will be deemed vested in the Reorganized Debtor or the Trust (as appropriate), and the payee of such check and holder of such Claim will be deemed to have no further Claim and will not participate in any further Distributions under this Plan.

If a Distribution under this Plan to any holder of an Allowed Claim is returned to the Reorganized Debtor due to an incorrect address for such holder and such holder does not present itself within ninety (90) days of the date such check was forwarded to said holder, the amount of cash attributable to such check will be deemed vested in the Reorganized Debtor or the Trust (as

appropriate), and the payee of such check and holder of such Claim will be deemed to have no further Claim and will not participate in any further Distributions under this Plan.

        **9.7.**    **Withholding and Reporting Requirements**:  In making Distributions, the Reorganized Debtor or Trustee (as appropriate) shall comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.

        **9.8.**    **Defenses; Setoff**:  Any defenses, counterclaims, rights of setoff or recoupment of the Debtor with respect to any Claim shall vest in and inure to the benefit of the Reorganized Debtor.  To the extent permitted by law, the Reorganized Debtor may but is not required to set off a claim of any nature, the payments or other Distributions to be made with respect thereof that the Debtor, Reorganized Debtor, or the Trust may have against a Claim or its holder. Neither the failure to so set off nor the allowance of such Claim shall constitute a waiver or release of a claim or cause of action of the Reorganized Debtor or Trustee.  Nothing in this Article 9.8 is intended to alter any setoff rights of Claimants under applicable law

        **9.9.**    **Exemption from Certain Transfer Taxes**:  In accordance with section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security or the making or delivery of an instrument of transfer under this Plan may not be taxed under any law imposing a stamp tax or similar tax.  All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**ARTICLE X.**
**THE TRUST**

        **10.1.**    **Purpose of Trust**:  The Trust is created pursuant to the Plan for the primary purpose of (a) collecting, liquidating, and distributing the Trust Property; (b) initiating actions to resolve any issues regarding the payment of Class 4 Claims, including, as necessary, initiation and participation in proceedings or matters before the Bankruptcy Court and intervening in any proceeding regarding allowance of Class 4 Claims (except for Claims of Freightliner); and (c) enforcing all rights with respect to the Trust Property.  The Trust has no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.  The Trust is intended to be classified as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulation § 301.7701-4(d).  The Trustee shall ascribe valuations to the assets assigned or transferred to the Trust on the dates of assignment and transfer of such assets to the Trust, and such valuations shall be used by the Debtor and the Trustee for all federal income-tax reporting purposes.  The Trust will be organized and will operate in such a manner as to minimize its tax obligations.  The Trust will be responsible for paying any quarterly U. S. Trustee fees that accrue after the Effective Date. The Trust shall be approved by the Bankruptcy Court. The Trust Agreement shall designate a Trustee.

        **10.2.**    **Governing Document**:  The Trust shall be governed by the Trust Agreement, which shall be made available for inspection by any party in interest at the offices of the Debtor's counsel prior to the Confirmation Hearing.  Among other things, the Trust

Agreement shall identify the Trustee as the initial trustee of the Trust, the compensation of the Trustee, and the authorities and powers of the Trustee and the Executive Committee consistent with this Plan. If there are inconsistencies between this Article and the Trust Agreement, the Trust Agreement shall control.

**10.3.    Trustee and Trust Administration**: From and after the Effective Date, the Trustee may administer the Trust pursuant to the terms of the Plan and the Trust Agreement, and may, among other things, borrow money and use, pledge, acquire, and dispose of Trust Property free of any restrictions imposed under the Bankruptcy Code. The Trustee shall accept his or her duties under the Trust Agreement on or before the Effective Date. The Trustee shall be approved by the Bankruptcy Court. The Trustee shall make all Distributions as and when provided for under the Plan. The Trustee shall serve without bond and shall receive no other fee for its services other than its fees earned as the Trustee. The Trustee shall receive compensation for his or her services in accordance with the Trust Agreement. Except as otherwise reserved for the Reorganized Debtor by the Plan, the Trustee shall have the power and authority to perform the following acts:

(a)    Perfect and secure his right, title, and interest to the Trust Property;

(b)    Reduce the Trust Property to cash and hold the same;

(c)    Distribute the Trust Property and any net proceeds therefrom in accordance with the Plan and the Trust Agreement.

(d)    Manage and protect the Trust Property;

(e)    Release, convey, or assign any right, title, or interest in or about the Trust Property;

(f)    Pay and discharge any costs, expenses, collection fees or obligations deemed necessary to preserve the Trust Property, or any part thereof, which shall be governed by the Trust Agreement;

(g)    Deposit funds of the Trust and draw checks and make disbursements thereof;

(h)    Employ and have such professionals, including, without limitation, attorneys and accountants and such other agents, consultants, and employees on behalf of the Trust as the Trustee shall deem necessary; provided, however, that the Trustee's authority to pay such professionals shall be governed by the provisions of the Trust Agreement. Notwithstanding the foregoing, the Trustee must disclose to the Bankruptcy Court, in advance, with notice to the Office of the United States Trustee, the Reorganized Debtor, and any other person that specifically requests notice of the post-Effective Date matters brought before the Bankruptcy Court, the identity of any insider of the Trustee or any member of the Executive Committee that the Trustee intends to employ at the Trust's expense. Nothing contained herein shall prohibit the Trustee from retaining counsel or such other person employed by the Creditors' Committee in the Chapter 11 Case.

(i)    Except as expressly provided in the Plan, determine when Distributions should be made to the Trust Beneficiaries.

(j)    Exercise any and all powers granted to the Trustee by any agreement or by common law or any statute that serves to increase the extent of the powers granted to the Trustee hereunder;

(k)    Take any action required or permitted by the Plan, including, if necessary, prosecuting foreclosure proceedings pursuant to the Trust Security Documents and deficiency proceedings against the Reorganized Debtor to ensure the 22.5% distribution to holders of Class 4 Allowed General Unsecured Claims;

(l)    Negotiate, renegotiate, and enter into contracts and execute obligations negotiable and non-negotiable;

(m)    Sue and be sued; provided, however, that any suit against the Trust or the Trustee acting in his or her capacity as Trustee of the Trust must be commenced in the Bankruptcy Court;

(n)    Pursue rights related to the Trust Property;

(o)    Institute, settle, or compromise or abandon the Trust Property;

(p)    Waive or release rights of any kind;

(q)    Intervene in any objection to any Class 4 Claim filed by the Debtor or Reorganized Debtor (except for any objection to a Claim filed by Freightliner);

(r)    File all income and informational tax returns and forms of the Trust and reserve for Disputed Claims;

(s)    Enforce all provisions of this Plan any Order of the Bankruptcy Court for the benefit of the Trust; and

(t)    Without limiting any of the foregoing, deal with the Trust Property or any parts thereof and the Trust in ways that would be lawful.

**10.4.    Vesting of Assets in the Trust**:  Unless otherwise dealt with under the Plan, the Trust Property shall vest in the Liquidating Trust on the Effective Date without further act or action under any applicable agreement, law, or regulation.  The Trust Property shall be subject to the Class 4 Claims but free and clear of all liens, claims, encumbrances, and interests of holders of Claims and Interests.  Additionally, the Debtor shall transfer $75,000 to the Trust to defray Trust Expenses.  Trust Expenses shall be paid from Trust Property prior to any Distribution to Trust Beneficiaries.

**10.5.    Supervision by the Executive Committee**:  The Trustee, and all activities of the Trust, shall be subject to review and supervision of an Executive Committee.  The Executive Committee shall have the powers and duties with respect to the Trust, the Trustee, and

the Trust Property as set forth in the Trust Agreement. If there is a dispute between the Trustee and the Executive Committee, the Bankruptcy Court shall have jurisdiction to determine whether the proposed action should be taken.

    **10.6.**    **Limitations on Liability**: The Trustee shall not be liable for any act he or she may do or fail to do as the Trustee hereunder while acting in good faith and in the exercise of his or her best judgment. The fact that such act or omission was approved by the Executive Committee or advised or approved by counsel for the Trust shall be conclusive evidence of such good faith and best judgment. The Trustee shall not be liable in any way for claims, liabilities, or damages based on or arising out of conduct of the Trustee in the course of his or her duties as the Trustee, unless such claims, liabilities, or damages arise from his or her personal gross negligence or willful misconduct.

    Neither the Trustee, the Executive Committee, nor any member of the Executive Committee shall be liable for any debt, liability, or obligation incurred or entered into on the Trust's behalf. No claim or cause of action may be asserted against the Trustee, the Executive Committee, or any member of the Executive Committee on account of any indebtedness, liability, or obligation entered into on the Trust's behalf, whether by legal or equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule, or regulation.

    **10.7.**    **Termination of Trust**: The Trustee shall continue until the earlier of: (a) the date that all Trust Property has been liquidated, all proceeds have been converted to Cash or distributed in kind, all Trust Expenses have been paid, all Claims to be paid under the Plan for which the Trustee is obligated to make Distributions have been paid, all Distributions to be made with respect to Trust Beneficiaries have been made, all litigation to which the Trust is a party has been concluded by dismissal or an Order by a court in which such litigation is pending, and the Chapter 11 Case is closed and (b) the expiration of five (5) years from the Effective Date; provided, however, the Trustee may ask the Bankruptcy Court to extend the permitted life of the Trust for such additional period as is reasonably necessary to conclude the liquidation and Distribution but not to exceed a total of ten (10) years from the Effective Date. Upon termination of the Trust, any unused portion of the $75,000 described in Article 10.4 above shall be returned to the Reorganized Debtor.

## ARTICLE XI.
### EXECUTIVE COMMITTEE

    **11.1.**    **Purpose and Procedures**: The Executive Committee is to monitor the implementation of the Plan, supervise the activities of the Trust, and monitor the Distributions to holders of Allowed Claims under the Plan. The Executive Committee shall prescribe its own rules of procedures and bylaws; provided, however, that such rules of procedure and bylaws shall not be inconsistent with the terms of the Plan or the Trust Agreement. These rules of procedure may provide for the appointment or replacement of any current member without approval of the Bankruptcy Court.

    **11.2.**    **No Executive Committee Compensation**: Except for reimbursement of reasonable actual costs and expenses incurred in with connection with duties to the Executive Committee, the members of the Executive Committee shall serve without compensation.

Reasonable actual costs and expenses of members of the Executive Committee shall be paid by the Trust without the need for Bankruptcy Court approval.

**11.3.    Retention of Professionals by the Executive Committee:** The Executive Committee shall have the authority to employ, at the Trust's expense, counsel and such other professionals as may be reasonably necessary, in its sole discretion, to assist in the Executive Committee's duties under the Plan. Such employment need not be approved by the Bankruptcy Court; provided, however, that such counsel and professionals disclose all connections to and conflicts with the Debtor, the Reorganized Debtor, and the Trust with regard to such employment. Nothing contained herein shall prohibit the Executive Committee from retaining counsel or such other Professionals

**11.4.    Limitations on Executive Committee Liability:** Neither the Executive Committee nor its members shall be liable for any act or failure to act while made or omitted in good faith and in the exercise of best judgment. The fact that such act or omission was advised, directed, or approved by counsel acting for the Executive Committee shall be conclusive evidence of such good faith and best judgment. No Executive Committee member shall be liable for Claims, liabilities, or damages unless they arise from such member's gross negligence or willful misconduct.

**11.5.    Termination of the Executive Committee:** The Executive Committee shall dissolve upon the completion of all Distributions under the Trust and the termination of the Trust in accordance with the terms of the Plan and the Trust Agreement.

## ARTICLE XII.
## EXECUTORY CONTRACTS

**12.1.    Rejection of Contracts And Leases:** Except as otherwise provided in the Confirmation Order, the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all Executory Contracts to which the Debtor is a party on and subject to the occurrence of the Effective Date unless such contract or lease (a) previously was assumed or rejected by the Debtor, (b) previously expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is listed in the Plan Supplement as an executory contract to be assumed.

**12.2.    Rejection Damage Claims:** Any Claim arising from the rejection of an Executory Contract and not barred by this Plan shall be treated as a Class 4 Unsecured Claim pursuant to this Plan; *provided, however,* that any Claim based on the rejection of an unexpired lease of real property shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and any other applicable state law. Nothing contained herein shall be deemed an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor of any objections to such Claim if asserted.

**12.3.    Bar Date for Rejection Damages Claims:** Damages arising from the rejection of an Executory Contract shall be a General Unsecured Claim. Any Claim for damages

arising from the rejection of an Executory Contract must be asserted in a timely filed proof of claim. The bar date (deadline) for filing claims arising out of the rejection of all other Executory Contracts pursuant to this Plan shall be forty-five (45) days after the Effective Date. Any Claims not Filed by the appropriate date shall be forever barred from assertion against the Debtor, the Estate, the Reorganized Debtor and the Trust.

**12.4.    Assumption and Assignment of Executory Contracts and Unexpired Leases**:  Except as otherwise provided in the Confirmation Order, the Plan, or in any contract, instrument, release, or other agreement or document entered in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code authorizing the Debtor to assume the Executory Contracts set forth in a schedule to be included in the Plan Supplement; provided, however, that the Debtor may amend the schedule at any time prior to the Confirmation Date.  Any monetary amounts by which any Executory Contract set forth in the schedule to be included in the Plan Supplement is in default shall be subject to cure under section 365(b)(1) of the Bankruptcy Code from Available Cash or as agreed by the Debtor and the other party to that Executory Contract.  If there is a dispute regarding the amount owed as any cure payment, the cure of any other default, the ability of any party to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Debtor shall make such cure payment and cure such other defaults and provide adequate assurance of future performance, all as may be required by section 365(b) of the Bankruptcy Code only after entry of a Final Order resolving such dispute.  If a party to an assumed Executory Contract has not Filed an appropriate pleading with the Bankruptcy Court on or before the thirtieth (30) day after the Effective Date disputing the amount of any cure payments offered to it, disputing the cure of any other defaults, disputing the promptness of the cure payments, or disputing the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters.

# ARTICLE XIII.
## EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

**13.1.    Impaired Classes to Vote**:  Each impaired class of Claims and Interests shall be entitled to vote separately to accept or reject the Plan. A holder of a Disputed Claim which has not been temporarily allowed for purposes of voting on the Plan may vote only such Disputed Claim in an amount equal to the portion, if any, of such Claim shown as fixed, liquidated, and undisputed in the Debtor's Schedules.

**13.2.    Acceptance by Class of Creditors**:  A class shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such class that have voted to accept or reject the Plan.

**13.3.    Reservation of Cramdown Rights**:  In the event that any impaired class shall fail to accept this Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to request the Bankruptcy Court to confirm the Plan in accordance with the provisions of the section 1129(b) of the Bankruptcy Code.

# ARTICLE XIV.
## EFFECT OF CONFIRMATION

**14.1.    Legally Binding Effect**:  The provisions of this Plan shall bind all Creditors and Interest Holders, whether or not they accept this Plan.  On and after the Effective Date, all Claimholders shall be precluded and enjoined from asserting any Claim against the Debtor or its assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date except as permitted under the Plan.

**14.2.    Injunction**:  <u>Except as otherwise provided in the Plan, all Claimants of the Debtor are enjoined from threatening, commencing, or continuing any lawsuit or other legal or equitable action against the Debtor or the Debtor's property to recover any Claim or Interest.</u>

# ARTICLE XV.
## CONDITIONS TO EFFECTIVENESS OF THE PLAN

The Plan shall not become operative unless and until the Effective Date occurs.  The Effective Date shall occur after the following conditions have been satisfied; provided, however, the Debtor may waive any and all of the following conditions, whereupon the Effective Date shall occur without further action by any Person:

(a)    All documents useful and necessary to implement this Plan shall be in the form and substance satisfactory to the Debtor and fully executed;

(b)    All governmental and regulatory approvals necessary to consummate this Plan have been obtained or waived in writing;

(c)    The Restructured Note, Restructured Security Documents, and the Trust Security Documents have been fully executed;

(d)    The Confirmation Order has become a Final Order;

(e)    The Debtor has received all authorizations, consents, regulatory approvals, rulings, tax rulings, tax determinations, letters, no-action letters, opinions or documents that are determined by the Debtor to be necessary to implement the Plan;

(f)    The Executive Committee and Trustee have been appointed; and

(g)    The Trust Agreement shall be executed.

# ARTICLE XVI.
## RETENTION OF JURISDICTION

**16.1.    Exclusive Bankruptcy Court Jurisdiction**:  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, for the following purposes:

(a)    To allow, disallow, determine, liquidate, classify, or establish the priority or secured or unsecured status of or estimate any Claim or Interest, including, without

limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

(b)     To ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)     To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including, without limitation, any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)     To consider and approve any modification of this Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(e)     To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement, or consummation of this Plan or any entity's obligations in connection with the Plan;

(f)     To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor;

(g)     To decide or resolve any and all applications motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date or that may be brought after the Effective Date, including claims arising under chapter 5 of the Bankruptcy Code;

(h)     To issue orders in aid of execution and implementation of this Plan to the extent authorized by 11 U.S.C. § 1142 or provided by the terms of this Plan;

(i)     To decide issues concerning the federal or state tax liability of the Debtor which may arise in connection with the confirmation or consummation of this Plan; and

(j)     To enter an order closing this Chapter 11 Case.

**16.2.     Limitation on Jurisdiction**:  In no event shall the provisions of this Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334.

# ARTICLE XVII.
## MISCELLANEOUS PROVISIONS

**17.1.     Termination of Creditors' Committee**:   On the Effective Date, the Creditors' Committee shall be terminated.

**17.2.    Amendment of the Plan**: The Plan may be may be amended or modified by the Debtor before the Effective Date. After the Effective Date, the Plan may be amended or modified by the Reorganized Debtor.

**17.3.    Withdrawal of Plan**: The Debtor reserves the right to withdraw this Plan at any time prior to the Confirmation Date. If the Debtor withdraws this Plan prior to the Confirmation Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute an admission, waiver, or release of any Claims by or against the Debtor or any other person, or to prejudice in any manner the rights of the Debtor, the Estate or any Person in any further proceedings involving the Debtor.

**17.4.    Due Authorization By Creditors**: Each and every Creditor who elects to participate in the Distributions provided for herein warrants that the Creditor is authorized to accept in consideration of its Claim against the Debtor the Distributions provided for in this Plan and that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by the Creditor under this Plan.

**17.5.    Filing of Additional Documentation**: On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**17.6.    Governing Law**: Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

**17.7.    Successors and Assigns**: The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**17.8.    Transfer of Claims**: Any transfer of a claim shall be in accordance with Bankruptcy Rule 3001(e) and this section. Notice of any such transfer shall be forwarded to the Debtor, before the Effective Date, or the Reorganized Debtor and the Trustee, after the Effective Date, by registered or certified mail, as set forth in the next section. Both the transferee and transferor shall execute any notice, and the signatures of the parties shall be acknowledged before a notary public. The notice must clearly describe the interest to be transferred. No transfer of a partial interest shall be allowed. All transfers must be of one hundred percent (100%) of the transferee's interest in the Claim.

**17.9.    Discharge**: Except as otherwise provided in the Plan, the Debtor shall be discharged to the full extent provided by section 1141 of the Bankruptcy Code on the Effective Date.

**17.10.    Retention of Rights to Pursue Causes of Action**: Under section 1123(b)(3) of the Bankruptcy Code, and except as otherwise provided in the Plan, the

Reorganized Debtor shall retain and is authorized but not required to enforce all or any Cause of Action and all other similar claims arising under applicable state laws, if any, and the Bankruptcy Code, including 11 U.S.C. § 501 *et seq.*, including the Avoidance Actions and the Insider Avoidance Actions. In its sole discretion, the Reorganized Debtor may determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing) and shall not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtor or any successors may pursue such rights, Causes of Action, and Claims in accordance with the Reorganized Debtor's best interests or any successors holding such rights, causes of action, or Claims.

**17.11.    Full and Final Satisfaction**: Except as otherwise specifically provided by the Plan, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of (i) all Claims and Causes of Action against, liabilities of, liens on, and obligations of the Debtor or the Reorganized Debtor and the assets and properties of the Debtor or the Reorganized Debtor, whether known or unknown, and (ii) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtor or the Reorganized Debtor) against, Claims (as defined in section 101 of the Bankruptcy Code) against, liabilities (as guarantor of a Claim or otherwise) of, Liens on the direct or indirect assets and properties of, and obligations of successors and assigns of, the Debtor, the Reorganized Debtor, and their respective successors and assigns based on the same subject matter as any Claim or based on any act or omission, transaction, or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case, regardless of whether a proof of Claim was Filed, whether or not Allowed and whether or not the holder of the Claim has voted on the Plan.

**17.12.    Exculpation and Limitation of Liability**:   To the maximum extent permitted by law, none of the Trust, the Debtor, the Reorganized Debtor, the Creditors' Committee, the Estate, Pre-Petition Lenders, PPMG, any lender providing post-petition financing, or any of their respective employees, officers, directors, managers, agents, members, representatives, Professionals, or attorneys employed or retained by any of them, whether or not by Order of the Bankruptcy Court (each an "Exculpated Person"), shall have liability to nor Claim from any entity for an act taken or not taken in good faith, whether taken or not before or after the Petition Date, in connection with or related to the formulation of the Plan, the Disclosure Statement, a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, the consummation and implementation of the Plan, and the transactions contemplated therein, or any act or omission in connection with or arising out of the Chapter 11 Case, unless the act or omission constituted gross negligence or willful misconduct, and all Exculpated persons are excepted from any such liability.

**17.13.    Releases**:   On the Effective Date, to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the Debtor, the Estate, and the Reorganized Debtor, on behalf of itself, shall be deemed to release unconditionally, and hereby are deemed to release unconditionally on such date (i) each present: officer, director, manager, member, employee, consultant, financial advisor, attorney, accountant

and other representatives of the Debtor; (ii) Persons serving on the Creditors' Committee and, solely in their capacity as members or representatives of the Creditors' Committee or the Executive Committee, each consultant, attorney, and accountant or other representative or member of the Creditors' Committee; (iii) the Pre-Petition Lenders and, solely in their capacity as representatives of such Pre-Petition Lenders, each of such Lender's respective officers, directors, managers, members, shareholders, partners, agents, employees, consultants, attorneys, accountants, advisors, affiliates and other representatives; and (iv) PPMG (the Entities specified in clauses (i) through (iv) are referred to collectively as the "Releasees"), from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon or related to any act or omission, transaction, event or other occurrence taking place on or at any time prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or the Plan, except that no Releasees shall be released from acts or omissions that are the result of willful misconduct or fraud.

    **17.14. US Trustee Fees**:  The Debtor will pay pre-confirmation fees owed to the U. S. Trustee on or before the Effective Date of the Plan.  After confirmation, the Reorganized Debtor will file with the Bankruptcy Court and serve on the U. S. Trustee quarterly financial reports in a format prescribed by the U. S. Trustee, and the Reorganized Debtor will pay post-confirmation quarterly fees to the U. S. Trustee until a final decree is entered or the case is converted or dismissed in accordance with 28 U.S.C. § 1930(a)(6).

    **17.15. Implementation**:  The Debtor, the Reorganized Debtor, and the Trustee shall be authorized to perform all reasonable, necessary, and authorized acts to consummate the terms and conditions of the Plan.

    **17.16. Severability**:  If, before confirmation, the Bankruptcy Court holds that any Plan provision is invalid, void, or unenforceable, the Debtor may correct the defect by amending or deleting the invalid, void, or unenforceable provision or withdrawing the Plan.  The Confirmation Order shall constitute a judicial determination that each Plan provision is valid and enforceable.

    **17.17. Computation of Time**:  Bankruptcy Rule 9006(a) governs the computation of any period of time prescribed or allowed by the Plan.

    **17.18. No Admissions**:  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtor, the Reorganized Debtor, or the Trustee with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of any Claim's classification.

    **17.19. Notices**:  Any notice required to be given under this Plan shall be in writing.  Any notice that is allowed or required hereunder, except for a notice of change of address, shall be considered complete on the earlier of (a) three days after the date the notice is sent by United States mail, postage-prepaid, or by overnight courier service, or in the case of mailing to a non-United States address, air mail, postage-prepaid, or personally delivered; or (b) the date the notice is actually received by facsimile or computer transmission.

(a)    <u>If to the Debtor:</u>

American LaFrance, LLC .
1090 Newton Way
Summerville, South Carolina  29483
Attention: William Hinz, Chief Executive Officer
Fax No.:  843.486.7500

with mandatory copies to:

Haynes and Boone, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202
Attention: Ian T. Peck
Fax No.:  817.348.2350

and

Klehr, Harrison, Harvey, Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Attn:  Christopher A. Ward
Fax No.:  302.426.9193

(b)    <u>If to the Pre-Petition Lenders:</u>

Patriarch Partners Management Group ("PPMG")
227 West Trade Street, Suite 1400
Charlotte, NC 28202
Attention:  Lara Parker
Fax:  704.227.1208

and

Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX  75201-4761
Attention:  Richard M. Roberson
Fax No.:  214.999.3955

and

Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
Attn:  Don A. Beskrone
Fax No.:  302.654.2067

(c)    <u>If to the U.S. Trustee:</u>

Richard L. Schepacarter
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 North King Street, 2nd Floor
Wilmington, Delaware  19801
Fax:  302.573.6497

Dated: March 27, 2008

Debtor and Debtor-In-Possession

/s/ William J. Hinz
By: William J. Hinz
Its: President and Chief Executive Officer

HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202
Tel. No. (214) 651-5000
Fax No. (214) 651-5940

/s/ Ian Peck
Texas State Bar No. 24013306

COUNSEL TO THE DEBTOR AND THE DEBTOR-IN-POSSESSION

## SCHEDULE 6.6.1
## ASSUMED LIABILITY CLAIMS

1.    All bid and performance bonds ("Bonds").

2.    All letters of credit that collateralize the Bonds.

3.    All customer deposits.

4.    All customer warranty obligations.

5.    With respect to Executory Contracts assumed pursuant to Article XII of the Plan, all of the following:

        a.    Customer deposits;

        b.    Commissions;

        c.    Rent or lease obligations; and

        d.    Cure amounts due pursuant to section 365(b)(1) of the Bankruptcy Code.

6.    All insurance premiums (or related premium-financing charges) due and owing prior to the Petition Date.

7.    All income-tax reimbursement payments in the amount of $3,382,838.00 due to PPAS.

8.    All management fees in the amount of $297,522.54 due to Patriarch Partners Management Group.



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| AMERICAN LAFRANCE, LLC | § | |
| | § | Case No. 08-10178 (BLS) |
| Debtor. | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER CONFIRMING THIRD AMENDED PLAN OF REORGANIZATION OF AMERICAN LAFRANCE, LLC
### (Related to Docket No. 392)

Upon the Third Amended Plan of Reorganization of American LaFrance, LLC dated March 27, 2008 (Doc. No. 392) (the "Plan")[1] and the Fourth Amended Disclosure Statement Under 11 U.S.C. § 1125 in Support of Plan of Reorganization of American LaFrance, LLC dated March 27, 2008 (Doc. No. 393) (the "Disclosure Statement") filed by American LaFrance, LLC ("Debtor" or "ALF"), debtors and debtors-in-possession in the above captioned case (the "Case"); and the Court having held hearings on March 24, 2008 and March 28, 2008 to consider approval of the Disclosure Statement (the "Disclosure Statement Hearing"); and upon the Amended Order Pursuant to Sections 105, 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, 3018 and 3020, and Local Rule 3017-1 (A) Approving Adequacy of Disclosure Statement, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, (C) Fixing a Record Date for Distribution, and (D) Fixing Date, Time and Place for Confirmation Hearing (the "Disclosure Statement Order") (Doc. No. 417), approving the Disclosure Statement and establishing certain procedures for the solicitation and tabulation of votes in connection with the Plan; and upon the Affidavit of Michael J. Paque Regarding Votes Accepting or Rejecting the Debtor's Third Amended Plan of Reorganization of

---

[1] Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Plan.

American LaFrance, LLC (Doc. No. 603), certifying the Plan solicitation and tabulation results in the Debtor's Chapter 11 case (the "Tabulation Certification"); and solicitation packages (the "Solicitation Packages"), containing copies of (i) the Disclosure Statement, (ii) the Plan, (iii) the Notice of Hearing to Consider Confirmation of Chapter 11 Plan of Reorganization (the "Notice of Confirmation Hearing"), (iv) Notice of Rescheduled Hearing on Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (a) Authorizing the Sale of Substantially all of its Assets; (b) Approving an Asset Purchase Agreement, Subject to Higher and/or Better Offers; (c) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (d) Granting Related Relief (v) Notice of Unimpaired Non-Voting Status of Chapter 11 Plan of Reorganization for Classes 2, 3, 6, and 7 (the "Non-Voting Classes"); (vi) solicitation letters from the Committee and from the Debtor; (vii) a ballot, in the form approved by the Court (the "Ballot") (for Classes 1, 4, and 5); and (viii) and a self-addressed, postage prepaid return envelope for Ballot return having been transmitted in accordance with the terms of the Disclosure Statement Order; and the solicitation of acceptances from holders of claims and interests other than the Non-Voting Classes, being conducted in accordance with the terms of the Disclosure Statement Order; and upon the Affidavit of Service of Michael Paque, Senior Consultant, Kurtzman Carson Consultants, LLC ("KCC"), as the Court-appointed claims agent in the Case (Doc. No. 565) (the "Affidavit"), being filed with respect to the mailing of the Solicitation Packages in accordance with the Disclosure Statement Order; and the Disclosure Statement Order having fixed 12:00 p.m. (ET) on April 18, 2008 as the deadline for the filing of objections to confirmation of the Plan (the "Plan Objection Deadline") and 4:30 p.m. (PT) on April 18, 2008 as the deadline for submitting votes to accept or reject the Plan (the "Plan Voting

Deadline"); and all objections to the Plan having been withdrawn, resolved, deferred, or overruled; and a hearing to consider confirmation of the Plan having been held before this Court on May 22, 2008 (the "Confirmation Hearing"); and upon the full and complete record of the Confirmation Hearing and all matters and proceedings heretofore part of the record of the Case and after due deliberation and sufficient cause appearing therefore, the Court, having considered the Plan, the statements of counsel, the evidence presented or proffered, the pleadings, the record in this case, and being otherwise fully advised, makes the following findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052 and 9014:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. <u>Jurisdiction</u>. The Court has jurisdiction over the Case and authority to confirm the Plan pursuant to 28 U.S.C. ¶ 1334. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) and the Court has jurisdiction to enter a final order with respect thereto. The Debtors are eligible debtors under section 109 of the Bankruptcy Code. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B. <u>Judicial Notice</u>. The Court takes judicial notice of the docket of the Chapter 11 Case maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the various hearings held before the Court during the pendency of the Case.

C. <u>Burden of Proof.</u> The Debtor has the burden of proving the elements of section 1129(a) and (b) of the Bankruptcy Code by a preponderance of evidence.

D. <u>Solicitation Procedures Order.</u> On March 28, 2008, after notice and a hearing, the Court entered the Disclosure Statement Order (i) approving the Disclosure Statement, (ii) establishing procedures for solicitation and tabulation of votes to accept or reject the Plan, (iii) approving the

form of ballot and solicitation materials, (iv) scheduling a hearing on confirmation of the Plan, and (v) approving related notice procedures.

E. Transmittal of Solicitation Package. KCC, the Debtor's claims, noticing and solicitation agent, transmitted copies of the Solicitation Packages consistent with the Disclosure Statement Order, in order to solicit acceptances of the Plan from Classes 1, 4 and 5, as permitted under sections 105, 1126 and 1127 of the Bankruptcy Code, pursuant to the Disclosure Statement Order, on or before April 1, 2008.

All parties required to be given the Notice of Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Plan) have been provided due, proper, timely, and adequate notice in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the Disclosure Statement Order, and have had an opportunity to appear and to be heard with respect thereto. No other or further notice is required.

F. Notice of Confirmation Hearing. On May 22, 2008, the Court conducted a hearing (the "Confirmation Hearing") to consider confirmation of the Plan, in accordance with section 1128 of the Bankruptcy Code. The Court finds that due and proper notice has been given to all Claimholders, Interest Holders, and to various other parties in interest, as evidenced by the Affidavit. Such notice is adequate and sufficient notice of the Confirmation Hearing under the particular circumstances of this case and for purposes of sections 102(1), 105, 1127, 1128 and 1129 of the Bankruptcy Code, and Rules 2002, 3017, 3018 and 3019 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and other applicable law and rules of Court.

G. Distribution and Tabulation. All procedures used to distribute the ballots and to tabulate such ballots were fair and conducted in accordance with the Bankruptcy Code, Bankruptcy Rules, the local rules of the Bankruptcy Court and all other rules, laws and regulations.

H. Plan Compliance with Bankruptcy Code Section 1129(a)(1). The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

I. Plan Compliance with Bankruptcy Code Sections 1122 and 1123(a)(1). The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. Valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes and the Plan's treatment thereof do not unfairly discriminate between holders of Claims and Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

J. Plan Compliance with Bankruptcy Code Section 1123(a)(2). Article VI of the Plan properly specifies that Claims and Interests in Classes 2, 3, 6, and 7 are unimpaired, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

K. Plan Compliance with Bankruptcy Code Section 1123(a)(3). Article VI of the Plan specifies the treatment of Claims and/or Interests in Classes 1, 4, and 5 thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

L. Plan Compliance with Bankruptcy Code Section 1123(a)(4). The Plan provides for the same treatment for each Claim and/or Interest within a particular class, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

M. Plan Compliance with Bankruptcy Code Section 1123(a)(5). The Plan provides adequate and proper means for its implementation, as specified in Articles VI and VII of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

N. Plan Compliance with Bankruptcy Code Section 1123(a)(6). Section 1123(a)(6) is not applicable to the Debtor.

O. Plan Compliance with Bankruptcy Code Section 1123(a)(7). The Plan Supplement, filed on April 14, 2008, adequately discloses the selection of the Trustee, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

P. Plan Compliance with Bankruptcy Code Section 1123(b). The Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1123(b).

Q. Proponent Compliance with Bankruptcy Code Section 1129(a)(2). The proponents of the Plan have (i) complied with the applicable provisions of the Bankruptcy Code, (ii) complied with all applicable provisions of the Disclosure Statement Order, and (iii) solicited votes on the Plan in good faith, thereby satisfying Bankruptcy Code section 1129(a)(2). The proponents' solicitation in good faith entitles them to the protections contained in Bankruptcy Code section 1125(e).

R. Proponent Compliance with Bankruptcy Code Section 1129(a)(3). The proponents have proposed the Plan in good faith and not by any means forbidden by law. The Plan represents extensive arms-length negotiations among the Debtor, the Committee, and the Pre-Petition Lenders. As such, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the formulation of the Plan and the evidence presented at the Confirmation Hearing.

S. Plan Compliance with Bankruptcy Code Section 1129(a)(4). Any payment made or to be made for services or for costs and expenses in or in connection with the Chapter 11 Case or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject

to the approval of, the Bankruptcy Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

T.  Plan Compliance with Bankruptcy Code Section 1129(a)(5).  The Debtor has identified the post-confirmation officers and directors of the Debtor, and the Plan Complies with section 1129(a)(5) of the Bankruptcy Code.

U.  Plan Compliance with Bankruptcy Code Section 1129(a)(6).  Section 1129(a)(6) of the Bankruptcy Code only applies to debtors whose rates are subject to governmental regulation following confirmation and is thus not applicable to this case.

V.  Plan Compliance with Bankruptcy Code Section 1129(a)(7).  The Plan satisfies section 1129(a)(7) of the Bankruptcy Code because each non-consenting member of an impaired Class will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount it would receive in a Chapter 7 liquidation of the Debtor's asset on such date, thereby satisfying section 1129(a)(7) of the Bankruptcy Code.

W.  Plan Compliance with Bankruptcy Code Section 1129(a)(8).  All Classes permitted to vote on the Plan have voted to accept the Plan.

X.  Plan Compliance with Bankruptcy Code Section 1129(a)(9).  Article V of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code by providing for payment in accordance with the express terms of section 1129(a)(9) of the Bankruptcy Code or by providing such other treatment as to which the holders of Claims have agreed upon in writing.

Y.  Plan Compliance with Bankruptcy Code Section 1129(a)(10).  Impaired Classes 4 and 5 determined without including any acceptances of the Plan by any insider, have voted to accept

the Plan, thereby satisfying Bankruptcy Code section 1129(a)(10). In addition, Class 1 has voted to accept the Plan.

Z. Plan Compliance with Bankruptcy Code Section 1129(a)(11). The Plan provides for a distribution to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. The Disclosure Statement and the evidence proffered or adduced at the Confirmation Hearing (i) is persuasive and credible, (ii) has not been controverted by other persuasive evidence or challenged in any of the objections to confirmation, (iii) are based upon reasonable and sound assumptions, and (iv) establishes that the Plan is feasible, thus satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

AA. Plan Compliance with Bankruptcy Code Section 1129(a)(12). All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan (or, if such fees become due post-Confirmation, as and when such fees become due), thus the Plan complies with Bankruptcy Code section 1129(a)(12).

BB. Plan Compliance with Bankruptcy Code Section 1129(a)(13). The Debtor has no retirees to whom it must continue payment of retiree benefits post-confirmation, thus section 1129(a)(13) of the Bankruptcy Code is inapplicable to this case.

CC. Principal Purpose of Plan – Bankruptcy Code Section 1129(d). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

DD. Satisfaction of Confirmation Requirements. The Plan satisfies the requirements for confirmation in section 1129 of the Bankruptcy Code.

EE.     Satisfaction of Conditions to Confirmation. The conditions to confirmation set forth in the Plan, if any, have been satisfied or waived or will be satisfied or waived by entry of this Confirmation Order.

FF.     Effectiveness of Confirmation Order. There is good cause to waive the provisions of Bankruptcy Rule 3020(e) and for this Confirmation Order to be effective immediately upon its entry.

GG.    Exit Financing. The credit extended in the Amended and Restated Credit Agreement (the "Exit Facility") was the result of arms-length negotiations conducted in good faith. The credit extended in the Exit Facility has been made to a solvent Borrower (as defined therein), after giving effect to the Plan, for reasonably equivalent value in an arms-length transaction. In light of the good-faith, arms-length negotiations between the parties, the fees, deposits, and other charges paid or to be paid by or on behalf of the Borrower under the Exit Facility are reasonable and necessary and made by solvent borrowers, after giving effect to the Plan, for reasonably equivalent value. The liens, covenants, and protections afforded to the Lenders (as defined in the Exit Facility) and reaffirmed in and under the Exit Facility are reasonable and necessary for the Borrower to obtain credit thereunder and were not given to any Lender for any improper purpose. The liens and security interests of the Lenders reaffirmed in the Exit Facility are senior to all other liens and security interests except and only to those granted under the Trust Security Documents. The Lenders are extending the credit under the Exit Facility in reliance on the terms of this Confirmation Order and the Exit Facility.

Based on the foregoing findings of fact and conclusions of law (and those made during the Confirmation Hearing, which are incorporated herein for all purposes),

**IT IS HEREBY ORDERED THAT:**

1.   Confirmation.   The Plan, which includes all modifications set forth in this Confirmation Order or on the record at the Confirmation Hearing, is hereby **CONFIRMED** and **APPROVED** in all respects pursuant to sections 1122, 1123 and 1129 of the Bankruptcy Code, as applicable.   The Debtors has complied with section 1125 with respect to the Disclosure Statement and the Plan.

2.   Incorporation of Findings of Facts and Conclusions of Law.   The Findings of Fact and Conclusions of Law are hereby approved in their entirety, and are incorporated into, and are an integral part of this Confirmation Order.

3.   Incorporation of Plan.   The terms of the Plan and any and all exhibits thereto and all other agreements, contracts, documents and instruments contemplated by the Plan and the transactions contemplated thereby are incorporated by reference into, and are an integral part of, this Confirmation Order. Such documents shall be binding and enforceable as of the Effective Date, in accordance with their respective terms and without need for any further action by the parties thereto.

4.   Objections.   Except to the extent expressly reserved in any stipulation filed or stated on the record in connection with the Confirmation Hearing, all objections to the Plan that have not been withdrawn, waived, deferred, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits.

5.   Provisions of Plan and Confirmation Order Non-Severable and Mutually Dependent. The provisions of this Confirmation Order shall not be severable and are mutually dependent.

6.   Plan Classification Controlling.   The classification of Claims and Interests for purposes of distributions to be made under the Plan shall be governed solely by the terms of the

Plan. The classification set forth on the ballots tendered to or returned by the Debtor's creditors in connection with voting on the Plan were set forth solely for the purposes of voting and do not necessarily represent and in no event shall modify or otherwise affect, the actual classification of such Claims or Interest under the Plan for distribution purposes and shall not be binding upon the Debtor, the Reorganized Debtor, or the Trustee.

7. <u>Binding Effect.</u> The Plan shall be and is binding upon the Debtor, the Reorganized Debtor, the Trustee, any entity acquiring property under the Plan, and any Claimholder or Interest Holder of the Debtor, and any of the foregoing's heirs, successors, assigns, trustees, executors, administrators, affiliates, directors, agents, representatives, attorneys, beneficiaries or guardians, regardless of whether a proof of Claim or Interest therefor was filed, whether the Claim or Interest is an Allowed Claim or Interest, or whether the Holder thereof voted to accept the Plan.

8. <u>Vesting of Assets.</u> Upon the Effective Date, with the exception of the Trust Property all of the interests and property of the Debtor, tangible and intangible, whether acquired before or after the Petition Date or the Effective Date, shall be vested in the Reorganized Debtor, but free and clear of all liens, claims and encumbrances, subject to the terms of the Plan and the liens and interests of the Trust and of the Holders of Allowed Secured Claims. Upon the Effective Date, the Trust Property will be transferred to the control of the Trust, subject to the terms of the Plan and the Trust Agreement.

9. <u>Distributions on Class 4 Claims.</u> If the Lebanon Real Property and the Sanford Assets have not been sold within fifteen (15) months following the Effective Date, (i) the Reorganized Debtor shall immediately pay the Trust the amount necessary to fund the balance necessary to achieve the 22.5% distribution to Class 4 including the claims asserted by

Freightliner and (ii) failing such payment, the Trust may foreclose on either or both the Lebanon Real Property and the Sanford Assets to satisfy the 22.5% distribution. After such foreclosure, and application of the proceeds therefrom, after fees and costs incurred in connection therewith, toward payment of the 22.5% Distribution to Class 4, the Reorganized Debtor shall remain obligated to the Trust for any shortfall in the 22.5% distribution.  Any proceeds from the foreclosure sale of the Lebanon Real Property or the Sanford Assets and Trust Property in excess of amounts necessary to satisfy the 22.5% distribution shall be promptly returned to the Reorganized Debtor and any liens of the Trust thereon shall be released. On the Effective Date, the Reorganized Debtor shall cause a sum of $6.675 million to be wired to the client funds account of Pepper Hamilton, LLP for delivery to the Trust pursuant to the Plan. The initial cash component of Trust Property is increased from $6.1 million to $6.6 million. The parenthetical in section 8.1(c) of the Plan is revised to read: "($1.1 million of which shall be allocated toward the 22.5% distribution for any Allowed Class 4 Claim of Freightliner, and shall revert to the Trust as general Trust Property if not necessary for such purpose)."

10. Marketing Process.  Until the full 22.5% dividend has been paid to holders of Allowed Class 4 Claims, the Reorganized Debtor, in consultation with the Trust, shall actively market for sale the assets that are subject to the Trust Security Documents, with the objective of securing as promptly as reasonably practicable the sale of such assets. The Court shall retain jurisdiction to resolve any disputes regarding the marketing process.

11. Confession of Judgment Procedure. If, by the 15 month anniversary of the Effective Date, the Reorganized Debtor has not delivered to the Trust sufficient Cash to fully fund the 22.5% dividend to holders of Allowed Class 4 Claims under the Plan, then on motion of the Trust, on notice to the Reorganized Debtor, the Court shall determine the amount of additional

Cash required to permit the Trust to fully fund such 22.5% dividend (the "Deficiency"). The Reorganized Debtor shall pay the Deficiency, if any, to the Trust within 10 days following entry of the order making such determination. If the Reorganized Debtor fails to timely pay the Deficiency, then without limiting any other rights of the Trust under the Plan, the Trust Security Documents or applicable law, the Trust shall be entitled to exercise rights under the confession of judgment provisions of the Trust Security Documents.

12. First Priority Liens Under Trust Security Documents. Notwithstanding any lien, security interest or provision of law to the contrary, the liens and security interests to be created pursuant to the Trust Security Documents (a) shall, as of the Effective Date, constitute first priority, perfected and unavoidable liens on the Lebanon Real Property and Sanford Assets, to which all other liens and security interests on such assets are fully subordinate thereto, and (b) are perfected upon entry of this Confirmation Order.

13. Potential RT Jedburg Unsecured Claim. If a Class 4 Claim in favor of RT Jedburg Commerce Park, LLC becomes Allowed pursuant to the terms of paragraph 5 (a) of the Agreed Order Regarding Assumption of Lease Between RT Jedburg Commerce Park, LLC and American LaFrance, LLC as Modified, entered concurrently herewith, then $3 million of such RT Jedburg Commerce Park, LLC's Allowed Class 4 Claim shall receive a 22.5% dividend as contemplated by section 6.4(b)(i) of the Plan only if all other Allowed Class 4 Claims including $5 million of such RT Jedburg Commerce Park, LLC Class 4 Claim have first been paid a full 22.5% dividend as contemplated by section 6.4(b)(i) of the Plan. The Trustee shall make appropriate reserve for such RT Jedburg Commerce Park, LLC Class 4 Claim if the Trust makes any distributions prior to such RT Jedburg Commerce Park, LLC Class 4 Claim becoming allowed.

14. <u>Assignment of Claims.</u>    The Reorganized Debtor shall retain and is authorized but not required to enforce all or any Cause of Action and all other similar claims arising under applicable state laws, if any, and the Bankruptcy Code, including 11 U.S.C. § 501 *et seq.*, including the Avoidance Actions and the Insider Avoidance Actions. In its sole discretion, the Reorganized Debtor may determine whether to bring, settle, release, compromise, or enforce such rights (or decline to do any of the foregoing) and shall not be required to seek further approval of the Bankruptcy Court for such action. Subject only to the provisions of section 6.4(b) of the Plan regarding sharing of recoveries, the Reorganized Debtor or any successors may pursue such rights, Causes of Action, and Claims in accordance with the Reorganized Debtor's best interests or any successors holding such rights, causes of action, or Claims.

15. <u>Effect of Plan and Confirmation Order.</u>  The Reorganized Debtor's retained causes of action include bankruptcy and non-bankruptcy claims against non-debtors including, without limitation, Daimler Trucks North America LLC (f/k/a Freightliner LLC) ("Freightliner"), IBM Corporation, and Avoidance Actions against creditors who did not make the Preference Election. Nothing contained in the Plan or this Order shall diminish, release or otherwise limit the right of the Reorganized Debtor to prosecute such claims and causes of action in any court of competent jurisdiction irrespective of whether persons against whom such claims have been asserted has filed a claim, entered an appearance or otherwise participated in the case.

16. <u>Assumption of Certain Executory Contracts and Unexpired Leases.</u>  Other than with respect to contracts covered by Unresolved Assumption Issues (as defined below), the First Amended Motion of American LaFrance, LLC for an Order Authorizing Assumption of Executory Contracts Pursuant to 11 U.S.C. §365(a), Rule 6006 of the Federal Rules of Bankruptcy Procedure and Third Amended Plan of Reorganization (Doc. Nos. 512, 513, 517,

547, 652, and 665), as Supplemented (the "Motion to Assume") is granted to the extent set forth herein.    Each executory contract and unexpired lease of the Debtor identified on **Exhibit A** hereto is hereby assumed by the Debtor and assigned to the Reorganized Debtor pursuant to section 12.4 of the Plan and sections 365(a) and 1123(b)(2) of the Bankruptcy Code.  With respect to each such contract or lease, either (a) there have been no defaults under such executory contract or unexpired lease other than defaults of the nature set forth in section 365(b)(2) of the Bankruptcy Code or (b) with respect to defaults other than those specified in such section, the Debtor (i) has cured or provided adequate assurance that the Reorganized Debtor will cure such defaults on or as soon as practicable after the Effective Date and (ii) has compensated, or provided adequate assurance that the Reorganized Debtor will compensate, on or as soon as practicable after the Effective Date, parties to such executory contracts or unexpired leases for any actual pecuniary loss resulting from such default as set forth in the Plan Supplement or Motion to Assume.  Subject to paragraph 17, to the extent cure amounts remain owing for any of the executory contracts and unexpired leases assumed pursuant to the Plan, such cure amounts shall be those proposed cure amounts set forth in the Plan Supplement or the Motion to Assume. All monetary cure amounts required by section 365(b)(1) of the Bankruptcy Code shall be paid by or on behalf of the Debtor in Cash as soon as practicable after and in no event later than thirty (30) days after the later of (a) the Effective Date; (b) the date following notice to the Reorganized Debtor of the amount due; (c) the resolution by Final Order of any dispute between the Reorganized Debtor and the other party to the assumed executory contract as to such amounts due; and (d) upon such other terms as the parties to such assumed executory contract may agree (provided that no portion of a cure claim shall be allowed as a Class 4 Claim absent

further order of the Court on notice to the Trust and an opportunity for the Trust to object) or, in each case, as soon thereafter as practicable.

17. If there is a dispute regarding the amount of any cure payment or the Debtor's ability to assume certain executory and unexpired leases (the "Unresolved Assumption Issues"), which such dispute is evidenced by a timely filed objection to such proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such dispute. The Reorganized Debtor and the counterparty to the executory contract or unexpired lease shall work to resolve such a dispute without Court intervention. If Court intervention is necessary, the parties to such dispute shall confer in good faith in an attempt to agree on a mutually acceptable scheduling order and seek Court approval of the same. The Court maintains jurisdiction over the Unresolved Assumption Issues. The Court will conduct post-confirmation hearings to address the Unresolved Assumption Issues. Except for those amounts identified in the Plan Supplement or Motion to Assume or subject to a dispute evidenced by a timely filed objection to assumption, there are no cure amounts required to be paid by the Debtor in connection with the assumption of executory contracts and unexpired leases listed on the Plan Supplement or Motion to Assume. No cure amount shall be paid to a contract or lease counterparty on a contract for which a cure dispute exists until there is a resolution of that dispute by entry of a Final Order from this Court.

18. Assumption of any vehicle contract or purchase order between the Debtor and any counterparty does not affect or impact the counterparty's rights pursuant to any applicable performance or payment bond for any breach of the vehicle contract or purchase order.

19. Assumption of any vehicle contract or purchase order between the Debtor and any counterparty with a cure amount identified as "zero" does not eliminate the counterparty's rights

under any applicable state or federal law, including the Uniform Commercial Code, if the Debtor subsequently breaches the assumed contract or purchase order.

20. All rights of any counterparty to any vehicle contract or purchase order shall be preserved notwithstanding the assumption by the Debtor.

21. Rejection of Executory Contracts and Unexpired Leases.  With the exception of (a) those executory contracts and/or unexpired leases that have been either assumed or assumed and assigned by the Debtor prior to the Confirmation Date or pursuant to the immediately preceding paragraph; (b) those executory contracts and unexpired leases that have already been rejected pursuant to section 365 of the Bankruptcy Code; (c) the Sublease dated June 15, 2004 between CCS Holdings, Inc. and the Debtor referenced in the Limited Objection to Debtor's Motion for Order Authorizing Assumption of Executory Contracts (Doc No. 557) (the "CCS Sublease"); (d) the Lease Agreement between RT Jedburg Commerce Park, LLC, as successor in interest to Jedburg Industrial Properties, LLC and the Debtor dated August 4, 2006, as amended by the First Amendment to Lease Agreement dated January 26, 2007 (the "Summerville Lease"); and (e) the Rejected Condor Purchase Orders; each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date which has not previously expired or terminated pursuant to its own terms shall be deemed rejected by operation of the Plan pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date.  Pursuant to section 365 of the Bankruptcy Code, the deemed rejections described in the immediately preceding sentence are hereby authorized and approved as of the Effective Date.   Claims based on any executory contracts or unexpired leases that are being deemed rejected by operation of the Plan must be filed on or before that date which is forty-five (45) days after the Effective Date or they shall be disallowed and forever barred.

22. Pursuant to the agreement of the Debtor and CCS Sublease, the CCS Sublease will not be deemed rejected effective as the Effective Date, and the treatment of the CCS Sublease will be addressed at a later date. The Summerville Lease shall be assumed as modified pursuant to the Agreed Order Regarding Assumption of Lease Between RT Jedburg Commerce Park, LLC and American LaFrance, LLC as Modified, which order must become final as a condition precedent to the Effective Date of the Plan, which condition may be waived by the Debtor. The Court will conduct post-confirmation hearings to address the Debtor's request to reject the Rejected Condor Purchase Orders (the "Condor Rejection Hearing"). To the extent that ALF reaches an agreement with any counterparty to assume a Rejected Condor Purchase Order with modified terms, ALF will submit such agreement at or prior to the Condor Rejection Hearing.

23. <u>Sale of Assets</u>. The Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Sale of Substantially all of its Assets; (B) Approving an Asset Purchase Agreement, Subject to Higher and/or Better Offers; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (Doc. No. 60) is deemed withdrawn.

24. <u>Releases by Debtors.</u>   On the Effective Date, the Debtor, the Estate, and the Reorganized Debtor, on behalf of itself, is deemed to release unconditionally on such date (i) each present: officer, director, manager, member, employee, consultant, financial advisor, attorney, accountant and other representatives of the Debtor; (ii) persons serving on the Creditors' Committee and, solely in their capacity as members or representatives of the Creditors' Committee or the Executive Committee, each consultant, attorney, and accountant or other representative or member of the Creditors' Committee; (iii) the Pre-Petition Lenders and,

solely in their capacity as representatives of such Pre-Petition Lenders, each of such Lender's respective officers, directors, managers, members, shareholders, partners, agents, employees, consultants, attorneys, accountants, advisors, affiliates and other representatives; and (iv) PPMG (the Entities specified in clauses (i) through (iv) are referred to collectively as the "Releasees"), from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon or related to any act or omission, transaction, event or other occurrence taking place on or at any time prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or the Plan, except that no Releasees shall be released from acts or omissions that are the result of willful misconduct or fraud.

25. Exculpation and Limitation of Liability:    None of the Trust, the Debtor, the Reorganized Debtor, the Creditors' Committee, the Estate, Pre-Petition Lenders, PPMG, any lender providing post-petition financing, or any of their respective employees, officers, directors, managers, agents, members, representatives, Professionals, or attorneys employed or retained by any of them, whether or not employed or retained by Order of the Bankruptcy Court (each an "Exculpated Person"), shall have liability to any Person or entity for any act taken or not taken in good faith, whether taken or not before or after the Petition Date, in connection with or related to the formulation of the Plan, the Disclosure Statement, a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for confirmation of the Plan, the consummation and implementation of the Plan, and the transactions contemplated therein, or any act or omission in connection with or arising out of the Chapter 11

Case, unless the act or omission constituted gross negligence or willful misconduct, and all Exculpated persons are excepted from any such liability.

26. Exit Financing.    The Lenders in the Exit Facility are good-faith lenders under 11 U.S.C. § 364.  The liens and security interests of the Lenders reaffirmed in the Exit Facility and to the Lenders in the Exit Facility are, upon the Effective Date, hereby senior to all other liens and security interests (except those granted under the Trust Security Documents) and perfected upon entry of the Confirmation Order and the advance of funds under the Exit Facility.

27. DIP Financing Claims.    On the Effective Date, all DIP Financing Claims under or evidenced by amounts outstanding under that certain Debtor In Possession Financing Amendment To Credit Agreement, which is attached as Exhibit 1 to the Interim Agreed Order Authorizing Limited Use of Cash Collateral, Obtaining Postpetition Credit Secured by Senior Liens, And Granting Adequate Protection to Existing Lienholders (Docket No. 40) as amended, restated, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith, and approved on a final basis by the docket no. 202, shall be indefeasibly paid in full in accordance with the Plan through the Exit Financing.  All security interests and liens granted to the Lenders related to the DIP Financing shall remain in full force and effect from after entry of this Confirmation Order through the Effective Date; at which time, such security interests and liens shall be reaffirmed (but junior to those liens and security interests granted in the Trust Security Documents) in the Exit Financing.

28. Trust and Trust Agreement.    Executive Sounding Board Associates, Inc. (acting through Neil Gilmour III or such other person as it shall designate) is appointed as the initial Trustee of the Trust, and the Executive Committee of the Trust initially shall be comprised of Daimler Trucks North America, LLC (acting through Stefan H. Kurschner or such other person

as it shall designate); Bennett Motor Express, LLC (acting through Grant R. Booker or such other person as it shall designate); and Ryder Integrated Logistics (acting through Michael Mandell or such other person as it shall designate).    The Trustee, the Debtor, and the Reorganized Debtor, as may be necessary, are authorized to execute the Trust Agreement or any amended or modified version of the Trust Agreement, and to take any action necessary or appropriate to implement, effectuate or consummate the Trust Agreement, or any amended or modified version of the Trust Agreement, provided that any such modifications do not materially adversely modify the terms of the Trust Agreement.  The Trust and the Trustee shall have the rights, powers, duties and obligations assigned to them in the Plan and the Trust Agreement.

29. <u>Governmental Approvals Not Required.</u>  The Confirmation Order shall constitute all approvals and consents, if any, required by the laws, rules or regulations of any State or any other governmental authority with respect to the implementation and consummation of the Plan, the plan documents and this Confirmation Order and the transactions contemplated hereby.

30. <u>Exemption from Stamp Taxes.</u>  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security, or the making, delivery, filing, or recording of any instrument of transfer, under, pursuant to, or in implementation of the Plan, including, without limitation, any Trust Security Documents, shall not be taxed under any law imposing a stamp tax or similar tax.  Without limiting the generality of the foregoing, the making, delivery, filing, or recording at any time of any Trust Security Documents, deed, bill of sale, mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, memorandum of lease, notice of lease, assignment, leasehold assignment, security agreement, financing statement, or other instrument of absolute or collateral transfer executed, required, or deemed necessary or desirable, by the

Debtor, the Reorganized Debtor, the Pre-Petition Lenders, or the Trustee, and other agreements or instruments related thereto shall not be so taxed.

31. All filing or recording officers, wherever located and by whomever appointed, are hereby directed to accept for filing or recording, and to file or record immediately upon presentation thereof, all such Trust Security Documents, deeds, bills of sale, mortgages, leasehold mortgages, deeds of trust, leasehold deeds of trust, memoranda of lease, notices of lease, assignments, leasehold assignments, security agreements, financing statements, and other instruments of absolute or collateral transfer without payment of any stamp tax, transfer tax, or similar tax imposed by federal, state, or local law. A copy of this Order certified by the Clerk of this Court (i) shall constitute sufficient notice of the entry of this Order to such filing and recording officers, and (ii) shall be a recordable instrument notwithstanding any contrary provision of nonbankruptcy law. This Court specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

32. Bar Date for Administrative Claims. Pursuant to section 5.1 of the Plan, all requests for the payment of an Administrative Claim must be filed with the Bankruptcy Court and served no later than forty-five (45) days after the Effective Date (the "Administrative Claims Bar Date") or forever be barred from seeking payment from the Debtor or any of its property.

33. Professional Fees. Pursuant to section 5.1 of the Plan, all professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any professional or any other entity for making a substantial contribution in the Chapter 11 Case) shall file and serve on the Reorganized Debtor and Post-Confirmation Service List an application for final allowance of

compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date. Objections to applications of professionals for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtor and the professionals to whose application the objections are addressed no later than seventy (70) days after the Effective Date. Any professional fees and reimbursements or expenses incurred by the Reorganized Debtor subsequent to the Effective Date may be paid without application to the Bankruptcy Court. To the extent Allowed, the foregoing fees and expenses will be paid by the Reorganized Debtor. Without limiting the foregoing, on the Effective Date, the professional fees escrow account established as of March 27, 2008 shall not be less than $3,000,000.00.

34. Tax Claims: All requests for payment of Administrative Claims and other Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, that accrued or were assessed within the period from and including the Petition Date through and including the Effective Date ("Post-Petition Tax Claims") and for which no bar date has otherwise been previously established, must be filed on or before the later of (i) forty-five (45) days after the Effective Date; and (ii) ninety (90) days after the filing with the applicable governmental unit of the tax return for such taxes for such tax year or period. Any holder of any Post-Petition Tax Claim that is required to file a request for payment of such taxes and does not file such a request by the applicable bar date shall be forever barred from asserting any such Post-Petition Tax Claim against the Debtor or its property, whether any such Post-Petition Tax Claim is deemed to arise before, on, or subsequent to the Effective Date. To the extent that the holder of a Post-Petition Tax Claim holds a lien to secure its Claim under applicable state law, the holder of such Claim shall retain its lien until its Allowed Claim has been paid in full.

35. <u>Continuance of Injunctions and Automatic Stay.</u> In accordance with section 1141 of the Bankruptcy Code, the consideration distributed under the Plan shall be in exchange for and in complete satisfaction, discharge, release, and termination of, all Claims of any nature whatsoever against the Debtor or any of its assets; and, except as otherwise provided herein or in the Plan, or the instruments or other documents executed in connection with the Plan (and except with respect to obligations which the Debtor is required to perform under the Plan), the Debtor shall be discharged and released pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. This Confirmation Order shall be a judicial determination, effective upon the occurrence of the Effective Date, of discharge and termination of all liabilities of and all Claims against the Debtor, except as expressly set forth, or provided for, in the Plan, the instruments, and other documents executed in connection with the Plan, and the Confirmation Order. Pursuant to this Confirmation Order and the Plan, every holder of any discharged debt or Claim is permanently enjoined and precluded from asserting against the Debtor, the Reorganized Debtor, or against their assets or properties, any other or further Claim based upon any document, instrument or act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, except as expressly set forth, or provided for, in the Plan, the instruments, and other documents executed in connection with the Plan and the Confirmation Order.

36. Payment of Fees. All fees payable by the Debtor under 28 U.S.C. §1930 shall be paid on or before the Effective Date, and the Reorganized Debtor shall thereafter pay any such statutory fees that come due after the Effective Date until the case is closed.

37. Existing Securities. The equity securities of the Debtor shall remain in existence and be deemed equity securities of the Reorganized Debtor on the Effective Date. The Interest Holders shall retain their Interests except as expressly provided in the Plan.

38. Authorization to Consummate Plan. Upon the Effective Date, the Debtor, the Reorganized Debtor, the Trustee, and each other person or entity having duties or responsibilities under the Plan, and all documents related thereto, and their respective general partners, managers, agents, representatives and attorneys, are authorized and empowered to: (a) carry out all of the provisions of the Plan and such plan documents; (b) to issue, execute, deliver, file and record, as appropriate, the Plan, the plan documents and any related agreements or documents; (c) to take any action contemplated by the Plan, the plan documents or this Confirmation Order; and (d) to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, bills of sale, assignments or other agreements or documents, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Plan, the plan documents and this Confirmation Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court.

39. Notice of Entry of Confirmation Order. Promptly after entry of this Confirmation Order, the Debtor shall give all creditors, all equity holders, all parties who have appeared and requested notice pursuant to Bankruptcy Rule 2002, and other parties in interest a written notice of entry of the Confirmation Order by first class United States Mail, as provided in Bankruptcy

Rules 2002(f)(7) and 3020(c). The foregoing notice and service is and shall be adequate and sufficient notice of the entry of this Confirmation Order, pursuant to sections 102(1) and 1129 of the Bankruptcy Code, Bankruptcy Rules 2002, 3020, 9007, 9021, 9022, and other applicable law and rules of Court.

40. <u>Notice of Entry of Effective Date.</u> Promptly after entry of the Effective Date, the Reorganized Debtor shall give all creditors, all equity holders, all parties who have appeared and requested notice pursuant to Bankruptcy Rule 2002, and other parties in interest a written notice of entry of the Effective Date by first class United States Mail.

41. <u>Reference to Plan Provisions.</u> The failure specifically to include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety.

42. <u>Inconsistency.</u> In the event of an inconsistency between the Plan and any other agreement, instrument, or document intended to implement the provisions of the Plan, the provisions of the Plan shall govern unless otherwise expressly provided for in such agreements, instruments, or documents. In the event of any inconsistency between the Plan and any agreement, instrument or document intended to implement the Plan and this Confirmation Order, the provisions of this Confirmation Order shall govern. The Plan and this Confirmation Order shall supersede any orders of this Court issued prior to the Effective Date that are inconsistent herewith. Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code and this Confirmation Order, the Plan shall apply and be enforceable, notwithstanding any otherwise applicable non-bankruptcy law.

43. Retention of Jurisdiction.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law.

44. Effectiveness of Confirmation Order.  The provisions of Bankruptcy Rule 3020(e) are hereby waived and the Confirmation Order shall be effective immediately upon its entry.

45. Provision regarding Incat Systems Inc. and Dassault Systemes Americas Corp.  On or before the Effective Date, the Debtor shall assume the End User License Agreement and any services agreements (collectively the "Contract") between one or more of INCAT Systems Inc. ("INCAT"), Dassault Systemes Americas Corp. ("Dassault") and simultaneously pay to INCAT and Dassault the cure costs for assumption of such Contract in the amount of $458,550.91 (the "Cure Costs").  Upon payment of the Cure Costs, INCAT and Dassault shall provide the Debtor with their written consent for the Contract assumption.

46. Provision regarding Thurston County Fire District #11.  The Debtor and Thurston County Fire District #11 agree that the Debtor will assume sale order numbers 60199 and 60200 pursuant to section 365 of the Bankruptcy Code, at the Effective Date of the Plan.

47. Provision regarding Freightliner of San Antonio.  Notwithstanding the foregoing, the Debtor and Freightliner of San Antonio shall promptly finalize the terms of the agreement in principle between the parties, and the Debtor shall submit an Agreed Order approving such agreement.

48. Provision regarding Clayton County, Georgia.  Pursuant to agreement by the parties, the Debtor will assume the following contracts:  four (4) ambulances (Purchase Order Numbers 070060, 070061, 070062, and 070092) (the "Clayton Ambulances") and three (3) pumpers

(Purchase Order Numbers 070063, 070064, and 070065) to Clayton County, Georgia. American LaFrance further agrees to use its best efforts to deliver the Clayton Ambulances within four (4) weeks of the date of this Order. Based on this agreement, Clayton County has agreed to withdraw its cure objection and its objection to the Debtor's proposed rejection of its contracts.

49. <u>Provision regarding Hi-Tech Emergency Vehicle Service, Inc.</u> Notwithstanding any provision in this Confirmation Order or in the Plan, including but not limited to Articles 12.2 and 12.3 of the Plan, the rejection damages claims, if any, of Hi-Tech Emergency Vehicle Service, Inc. ("Hi-Tech") shall not by virtue of the Plan, be deemed to be Class 4 unsecured claims. Hi-Tech shall, subsequent to entry of this Confirmation Order, continue to be able to assert that any rejection damages claims are secured by its rights of set-off and that such claims should be classified as Class 2 Other Secured Claims.

50. <u>Provision regarding ACE-USA.</u> On or before the Effective Date, the Reorganized Debtor shall execute a new form of indemnity agreement dated as of the Effective Date (the "2008 Indemnity Agreement"), which will incorporate all existing and future obligations, in favor of ACE USA/Westchester Fire Insurance Company, et al. (collectively, "ACE") on the same terms as the Agreement of Indemnity dated as of January 9, 2006, executed by the Debtor in favor of ACE (the "2006 Indemnity Agreement"). Although not set forth expressly on Schedule 6.6.1 of the Plan, pursuant to section 365 of the Bankruptcy Code, the Reorganized Debtor hereby assumes all outstanding obligations to ACE, including indemnification obligations arising under the 2006 Indemnity Agreement and the bonds issued in connection therewith. The letter(s) of credit previously issued by the Debtor in favor of ACE, shall continue in full force and effect and shall continue to secure any and all obligations arising under either the 2006 or 2008 Indemnity Agreements.

Dated:  May 23, 2008
        Wilmington, Delaware

_____
The Honorable Brendan L. Shannon
United States Bankruptcy Judge

Exhibit A

Contracts

| Name | Notice Name | Address 1 | Address 2 | Address 3 | City | State | ZIP | Contract Date | Contract Type | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| ACC Business | Chief Financial Officer | PO BOX 13136 | | | NEWARK | NJ | 07101-5636 | 5/1/2006 | Services Agreement | 16,519 |
| ADP Inc. | Chief Financial Officer | PO BOX 9001007 | | | LOUISVILLE | KY | 40290-1007 | 7/28/2006 | Services Agreement | - |
| ADP Inc. | Chief Financial Officer | 5800 Windward Parkway | | | Alpharetta | GA | 30005 | 7/28/2006 | Services Agreement | - |
| Aercosk OE | Chief Financial Officer | 17321 Parkway Dr. | | | Hanover | MD | 21076 | | Services Agreement | - |
| AIC Ventures L.P. | Chief Financial Officer | 301 Congress | Suite 320 | | Austin | TX | 78701 | 7/17/2007 | Confidentiality Agreement | - |
| American Cardel Guard, Inc. | Chief Financial Officer | 6930 Unity Drive Ste D | | | Norcross | GA | 30071 | 5/1/2007 | Services Agreement | - |
| American LaFrance, LLC | Michael Fay | 227 West Trade Street | Suite 1600 | | Charlotte | NC | 28202 | 12/14/2005 | Agreement | - |
| Apple Posix Advertising & Promotion Inc. | Attn Eric L Burg President | 1200 Eastchester Dr | | | High Point | NC | 27265 | 3/1/2007 | Services Agreement | 24,500 |
| Archivos One | Chief Financial Officer | 1367 Arcadia Rd | | | Lancaster | PA | 17602 | 6/2/2004 | Service Agreement | 2,562 |
| Ascom Hasler | Chief Financial Officer | PO Box 828 | | | Deerfield | IL | 60015 | na | Postage Meter | - |
| AT&T Corp | Chief Financial Officer | 55 Corporate Drive | | | Bridgewater | NJ | 08807 | na | Services Agreement | - |
| Automated Technologies | Chief Financial Officer | 52 Pondicoe Lane | | | Rocky Hill | CT | 6067 | 5/14/2007 | ALF P/O | - |
| BERKELEY COUNTY, SC | County Supervisor | 1003 Highway 52 | PO Box 6122 | | Monoks Corner | South Caro | 29461 | na | Fee Agreement | - |
| Berkeley Electric Cooperative | Chief Financial Officer | PO Box 1234 | | | Monoks Corner | SC | 29461 | 5/14/2007 | Electric Service Contract | 12,512 |
| Billy-Lee LLC | Chief Financial Officer | PO Box 845 | | | Hamburg | NY | 14075 | 12/15/2005* | Real Property Sublease | - |
| Billy-Lee LLC | William A. Savage | P.O. 845 | | | Hamburg | NY | 14075 | na | Waiver | - |

Contracts

| Name | Notice Name | Address 1 | Address 2 | Address 3 | City | State | ZIP | Contract Date | Contract Type | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Carolina Handling LLC | Chief Financial Officer | 3101 Piper Ln | | | Charlotte | NC | 28208 | na | Equipment Lease | - |
| Cardinal Office Systems | Chief Financial Officer | 730 SALISBURY RD | | | STATESVILLE | NC | 28677-6206 | na | Xerox | - |
| Child and Family Services of Erie County | Chief Financial Officer | 330 Delaware Avenue | | | Buffalo | NY | 14202 | 11/12/2007 | Services Agreement | - |
| Cisco | Chief Financial Officer | 176 West Tasman Dr. | | | San Jose | CA | 95134 | na | Switch Maintenance | - |
| Citrix | Chief Financial Officer | 5385 HOLLISTER AVE. | | | SANTA BARBARA | CA | 93111 | na | Software License | - |
| Comcerce | Chief Financial Officer | 16760 Rivers Avenue | | | North Charleston | SC | 29406 | na | Employee Benefits | - |
| Corporate Regain | Chief Financial Officer | Fourth & Walnut Streets | | | Lebanon | PA | 17042 | 1/15/2007 | Consortium Agreement | - |
| D&E Communications | Chief Financial Officer | 124 E. Main St | | | Ephrata | PA | 17522 | 2/18/2004 | Services Agreement | - |
| Diesque Systemes Americas Corp | Chief Financial Officer | University Research Park | Two Resource Square | 10330 David Taylor Dr Charlotte | | NC | 28262 | na | Computer Services Agreement | - |
| Dealer Solutions LLC | Chief Financial Officer | 209 Billings St Ste 410 | | | Arlington | TX | 76010 | 1/22/2007 | Computer Services Agreement | 3,285 |
| Dell Financial Services LP | Chief Financial Officer | 99055 COLLECTION CENTER DRIVE | | | CHICAGO | IL | 60693 | 5/15/2006 | NDA | - |
| Eastern Stores | Chief Financial Officer | 5647 Seneca St | | | Buffalo | NY | 14224 | na | Building security | - |
| Ecomm, Inc. | Chief Financial Officer | 1866 Colonial Village Lane | | | Lancaster | PA | 17604 | na | Services Agreement | - |
| EMC | Chief Financial Officer | 4246 COLLECTION CENTER DRIVE | | | CHICAGO | IL | 60693 | na | VMWare Networker | - |
| Environmental Compliance Management Inc | Chief Financial Officer | 545 King Street | | | Myerstown | PA | 17067 | | Hazardous Waste Reporting | - |
| Evergreen Data Systems | Chief Financial Officer | 5350 SCOTT BLVD | | | SANTA CLARA | CA | 95054 | na | Software Consultancy | - |

Contracts

| Name | Notice Name | Address 1 | Address 2 | Address 3 | City | State | ZIP | Contract Date | Contract Type | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| FRLOT | Charleston County Attorney | O.T. Wallace County Office Building | 101 Meeting Street, Suite 300 | | Charleston | SC | 29401 | na | Property Tax Settlement and Release | - |
| Forklifts, Inc. | Chief Financial Officer | 741 Independence Ave | | | Mechanicsburg | PA | 17055 | 4/27/2004 | Services Agreement | - |
| Freightliner of San Antonio, Inc. | Chief Financial Officer | 2701 NW VAUGHN STREET | | | PORTLAND | OR | 97210 | 10/26/2007 | Sales Contract | - |
| Gallagher Benefit Services of Kansas City, Inc. | Chief Financial Officer | 2345 Grand Boulevard | Suite 500 | | Kansas City | MO | 64108 | 12/15/2005 | Consulting Agreement | - |
| GGS Information Services | Buc Bell | 3285 Ferntrail Rd | | | York | PA | 17402 | 8/1/2006 | Computer Services Agreement | 104,570 |
| Good Samaritan Hospital | Chief Financial Officer | 4th & Walnut Streets | | | Lebanon | PA | 17042 | na | Random Urine Controlled Substances and Equipment Lease | - |
| GreatAmerical Leasing Corporation | Chief Financial Officer | PO Box 609 | | | Cedar Rapids | IA | 52406-0609 | na | Equipment Lease | 474 |
| GreatAmerical Leasing Corporation | Chief Financial Officer | 625 First St SE | | | Cedar Rapids | IA | 52401 | na | Equipment Lease | - |
| GreatAmerical Leasing Corporation | Chief Financial Officer | One GreatAmerica Plaza | | | Cedar Rapids | IA | 52401 | na | Equipment Lease | - |
| GreatAmerical Leasing Corporation | Chief Financial Officer | PO Box 609 | 625 First St SE | | Cedar Rapids | IA | 52406-0609 | na | Equipment Lease | - |
| GreatAmerical Leasing Corporation | Chief Financial Officer | One GreatAmerica Plaza | 625 First St SE | | Cedar Rapids | IA | 52401 | na | Equipment Lease | - |
| GreatAmerical Leasing Corporation | Econm | PO Box 609 | | | Cedar Rapids | IA | 52406-0609 | na | Equipment Lease | 12,383 |
| GreatAmerical Leasing Corporation Lessor | Econm - Lancaster | PO Box 609 | | | Cedar Rapids | IA | 52406-0609 | na | Equipment Lease | - |
| Hitachi Capital America Corp. | Attn: Credit and Portfolio Administration | 800 Connecticut Ave. | | | Norwalk | CT | 06854 | na | Fire Equipment Financing Agreement | - |
| Hugh M and Agnes E Davenport | Hugh M and Agnes E Davenport | PO Box 371 | | | Etiwanda | CA | 91739 | na | Real Property Lease | - |

Contracts

| Name | Notice Name | Address 1 | Address 2 | Address 3 | City | State | ZIP | Contract Date | Contract Type | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| IBM Credit LLC | Chief Financial Officer | Two Lincoln Center | | | Oakbrook Terrace | IL | 60181 | 6/31/2005 | Value Plan Lease Agreement | 5,000.00 |
| INCAT | Chief Financial Officer | 4-370 Bridge St | | | Novi | MI | 48375 | 5/25/2007 | Computer Services Agreement | 261,135 |
| INCAT | Logan Gilbrao | a TATA Technologies Company | 214 Ajermont Dr | | Charleston | SC | 29492 | 3/15/2007 | Computer Services Agreement / Data Import Assistance | 174,864 |
| Jredburg Industrial Properties, LLC | Chief Financial Officer | CBRE INVESTORS AAF CBRE REALTY | | | ATLANTA | GA | 30353-5157 | na | Waiver | |
| Lion Apparel | Chief Financial Officer | 6450 Poe Avenue | Suite 300 | | Dayton | OH | 45414 | 4/15/2007 | Settlement | |
| Los Angeles Truck Centers, LLC | Chief Financial Officer | 13600 Valley Blvd | | | Fontana | CA | 92335-5216 | 1/25/2007 | Purchase Agreement | |
| M&T Real Estate Trust | Chief Financial Officer | | | | | | | 12/14/2005 | Guaranty | |
| MCI | Chief Financial Officer | 27732 NETWORK PL | | | CHICAGO | IL | 60673-1277 | na | Alternate Phone Lines | |
| Met Life | Chief Financial Officer | P.O. Box 10579 | | | Palatine | IL | 60055-0051 | na | Employee Benefits | |
| Michelin North America, Inc. | Chief Financial Officer | #1 PARKWAY SOUTH | | | GREENVILLE | SC | 29615 | 4/18/2007 | NDA | |
| Microsoft Corporation | Chief Financial Officer | Law and Corporate Affairs | Volumn Licensing Group | One Microsoft Way | Redmond | WA | 98052 | 8/1/2006 | Services Agreement | 327,938 |
| Microsoft Licensing GP | Chief Financial Officer | Dept 551 Volume Licensing | 6100 Neil Rd Ste 210 | | Reno | NV | 89511-1137 | 8/1/2006 | Services Agreement | |
| Modern Corporation | Chief Financial Officer | 4745 Model City Rd. | | | Model City | NY | 14174-0068 | 4/1/2007 | Services Agreement | 410 |
| Modern Disposal | Chief Financial Officer | 4746 Model City Road | PO Box 209 | | Model City | NY | 14107 | na | | |
| National City Vendor Finance, LLC | Chief Financial Officer | 2300 Cabot Drive, Suite 355 | | | Lisle | IL | 60532 | na | License Lease | |
| Nationwide Life Insurance Company | Chief Financial Officer | One Nationwide Plaza | | | Columbus | OH | 43218 | na | Employee Benefits | |

Contracts

| Name | Notice Name | Address 1 | Address 2 | Address 3 | City | State | ZIP | Contract Date | Contract Type | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Nexsen Pruet Adams Kleemeier PLLC | A. Scott Jackson Esq | 701 Green Valley Rd Ste 101 | | | Greensboro | NC | 27408 | 3/1/2007 | Services Agreement | - |
| Oracle Creditor Corporation | Chief Financial Officer | PO BOX 71028 | | | CHICAGO | IL | 60694-1029 | 5/31/2006 | Computer Services Agreement | - |
| Oracle USA Inc | Chief Financial Officer | PO BOX 71028 | | | CHICAGO | IL | 60694-1029 | 5/31/2006 | Computer Services Agreement | 699,931 |
| pcOfficePro | Chief Financial Officer | 1260 KEPLEY RD | | | SALISBURY | NC | 28146 | na | Software | - |
| Philips Capital | Chief Financial Officer | 501 Fulling Mill Road | | | Middletown | PA | 17057 | 6/27/2003 | Lease | - |
| Philips Capital | Chief Financial Officer | 501 Fulling Mill Road | | | Middletown | PA | 17057 | 8/26/2004 | Lease | - |
| Pitney Bowes Inc | Chief Financial Officer | 2225 American Dr | | | Neenah | WI | 54956 | na | Equipment Lease | - |
| Pitney Bowes Inc | Chief Financial Officer | 2225 American Dr | | | Neenah | WI | 54956 | na | Equipment Lease | - |
| Prion Engineering, Inc. | Chief Financial Officer | 4201 Ellsworth Avenue | | | Hamburg | NY | 14075 | na | Engineering Software - CAD System | - |
| Quattlebaum Brothers, LLC | Alex M. Quattlebaum III | 1028 Legrand Blvd | | | Charleston | SC | 29492 | 4/5/2005 | Consent | - |
| Rackspace | Chief Financial Officer | PO BOX 990177 | | | DALLAS | TX | 75389 | na | Email and Web hosting | - |
| Ray E. Garner Jr. | Chief Financial Officer | 136 W Main St | Suite 300 | | Leola | PA | 17540-1749 | na | Engineering Services | - |
| Red-D-Arc Limited | Chief Financial Officer | 695 Lee Industrial Blvd | | | Austel | GA | 30168 | na | | - |
| Redgate Partners, LLC | Conal Barker | 2429 S. Peck Rd. | | | Whittier | CA | 90601 | na | Waiver | - |
| Safety Kleen | Chief Financial Officer | 5400 Legacy Dr | | | Plano | TX | 75024 | na | | - |
| ServiceBench | Chief Financial Officer | PO BOX 673206 | | | DETROIT | MI | 48267-3206 | 8/4/2006 | Computer Services Agreement | 5,000 |

Contracts

| Name | Notice Name | Address 1 | Address 2 | Address 3 | City | State | ZIP | Contract Date | Contract Type | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Softchoice | Chief Financial Officer | PO BOX 18992 | | | NEWARK | NJ | 07191-8992 | na | Software – Red Hat, Websense, WUP Cold, Trend Micro & InCad | |
| Solid Works | Chief Financial Officer | 455 Business Center Dr. | Suite 225 | | Horsham | PA | 19044 | 3/14/2007 | Software Agreement | 4,437 |
| Sorited | Chief Financial Officer | 195 Elm Street | | | Buffalo | NY | 14203-2098 | 5/9/2007 | Services Agreement | |
| South Carolina Electric & Gas Company | Chief Financial Officer | Contract Administration Mail Code 102 | | | Columbia | SC | 29218 | 6/1/2007 | Services Agreement | 8,556 |
| Speciera | Chief Financial Officer | | | | | | | na | Employee Benefits | |
| Sonic Data Svc | Chief Financial Officer | 2001 Edmund Halley Drive | | | Reston | VA | 22191 | na | Internet | |
| SSA Global Technologies, Inc. / Infor Systems | Chief Financial Officer | 500 W MADISON ST  STE 2200 | | | CHICAGO | IL | 60661 | 6/13/2006 | Software Agreement | |
| Starsive | Chief Financial Officer | 192 TeaRidan Highway | Suite 205 | | E. Falmouth | MA | 2536 | na | Employee Benefits | |
| Symantec | | 20330 Stevens Creek Blvd | | | Cupertino | CA | 95014 | na | IT | |
| The Guardian Life Insurance Company of America | Chief Financial Officer | 7 Hanover Square | | | New York | NY | 10004 | na | Employee Benefits | |
| TNCI | Chief Financial Officer | PO BOX 981098 | | | BOSTON | MA | 02298-1098 | na | Long Distance | |
| ToolsEver | Chief Financial Officer | 381 SUNRISE HIGHWAY | | | LYNBROOK | NY | 11563 | na | Software SRIP | |
| Unifirst | Chief Financial Officer | 3999 Jeffrey Blvd | | | Buffalo | NY | 14219 | na | Uniforms | |
| United Health / Uimerica | Chief Financial Officer | Administrative Office | 6300 Olson Memorial Hwy | | Golden Valley | MN | 55427 | na | Employee Benefits | |
| Univera Healthcare | Chief Financial Officer | 205 Park Club Lane | | | Buffalo | NY | 14221 | na | Employee Benefits | |
| Utility Refund Agency | Chief Financial Officer | 151 Freeport Road | | | Pittsburgh | PA | 15238 | na | Analysis and Petition for a Sales Tax Refund | |

Contracts

| Name | Notice Name | Address 1 | Address 2 | Address 3 | City | State | ZIP | Contract Date | Contract Type | Cure Amount |
|------|-------------|-----------|-----------|-----------|------|-------|-----|---------------|---------------|-------------|
| Vectia | Chief Financial Officer | 398 Cedar Hill St | | | Marlboro | MA | 1752 | na | | - |
| WebEx | Chief Financial Officer | 230 STUEVWE RD | | | GETZVILLE | NY | 14268 | na | | - |
| Western Star Trucks Australia Pty Ltd | Chief Financial Officer | 72 Formation Street | PO Box 416 | RICHLANDS QLD 407 | Wacol QLD 4076 | AUSTRALIA | | na | Dealer Agreement | - |
| Western Star Trucks Australia Pty Ltd | Chief Financial Officer | 72 Formation Street | PO Box 415 | RICHLANDS QLD 407 | Wacol QLD 407 | AUSTRALIA | | na | Importer Agreement | - |
| Western Star Trucks Australian Pty Ltd | Chief Financial Officer | 72 Formation Street | PO Box 415 | RICHLANDS QLD 407 | Wacol QLD 4076 | AUSTRALIA | | 6/26/2007 | Importer Agreement | - |
| Western Star Trucks Australian Pty Ltd | Chief Financial Officer | 72 Formation Street | PO Box 415 | RICHLANDS QLD 407 | Wacol QLD 4076 | AUSTRALIA | | 6/26/2007 | Importer Agreement | - |
| William L Kolba | Chief Financial Officer | 8858 NEW ENGLAND DR | | | N CHARLESTON | SC | 29420 | na | Software Consultancy and hosting dealer website | - |
| Williams Scotsman Inc. | Chief Financial Officer | 171 Farmington Road | | | Summerville | SC | 29483 | 3/26/2007 | Lease Agreement | 4,800 |
| ZIMCO Partners LP / Great American Leasing | Ann Kevin L Zimmerman / Manager | 204 S Conestoga View Dr | | | Akron | PA | 17501 | 12/21/2007 | Equipment Lease | - |
| Zinco Partners, LP | Chief Financial Officer | 204 South Conestoga View Drive | | | Akron | PA | 17501 | 1/1/2004 | Real Property Lease | 8,533 |

Fire Contracts

| ALF SRO # | Customer PO # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 70046 | N001011888 | ALF AZ | SALT RIVER PRIMA MARICOPA INDIAN COMMUNITY | Salt River Pima-Maricopa Indian Community | W. David Burca | 10205 E. Osborn Road | Scottsdale | AZ | 85256 | |
| 7003C | 20410 | ALF Corp - Direct | PINE GROVE VFD | Pine Grove VFD | Terry Johnson | 5011 Highway 48 | Linville | AL | 36298-3910 | |
| 60527 | | ALF Corp - Direct | ALF CORP DEMO | ALF Corp - Stock / Demo | | 1060 Newton Way | Summerville | SC | 29483 | |
| 70048 | | ALF Corp - Direct | ALF CORP SHOW TRUCK | ALF Corp - Stock / Demo | | 8600 Palmetto Commerce Parkway | Ladson | SC | 29456 | |
| 70138 | | ALF Corp - Direct | CITY OF CAMILLA | Camilla, City of | Randy Walker | 60 East Broad St. | Camilla | GA | 31730 | |
| 70038 | | ALF Corp - Direct | ANGEL STATION FD | Angel Staton VFD | Michael Garret | 55 Angel Station Road | Jacksonville | AL | 36265 | |
| 70058 | | ALF Corp - Direct | CITY HARTSELLE FD | Hartselle, City of FD | Steven Snelbor | 200 Sparrcram Street NW | Hartselle | AL | 35640 | |
| 70004 | | ALF Corp - Direct | ALF CORP DEMO | ALF Corp - Stock / Demo | | 8600 Palmetto Commerce Parkway | Ladson | SC | 29456 | |
| 70210 | | ALF Corp - Direct | ALF CORP SHOW TRUCK | ALF Corp - Stock / Demo | N/A | 8600 Palmetto Commerce Parkway | Ladson | SC | 29456 | |
| 70215 | | ALF Corp - Direct | ALF CORP TEST TRUCK | ALF Corp - Stock / Demo | N/A | 1060 Newton Way | Summerville | SC | 29483 | |
| 50347 | 1020 | ALF Corp - Ephrata | ALF AERIALS-DEMO | ALF Corp - Aerial Stock / Demo | | 64 Cocalico Creek Road | Ephrata | PA | 17522 | |
| 70503 | | ALF Corp - Ephrata | CITY OF MAPLE GROVE | Maple Grove, City of | Scott Anderson | 12800 Arbor lakes Parkway | Maple Grove | MN | 55369 | |
| 60568 | | ALF Corp - Ephrata | ALF AERIALS-DEMO | ALF Corp - Aerial Stock / Demo | | | | PA | 17522 | |
| 70108 | 4500044627 | ALF Corp - Florida | BREVARD COUNTY FIRE RESCUE | Brevard County Fire Rescue | Bob Thielsson | 1040 S. Florida Ave | Rockledge | FL | 32955 | |
| 70165 | | ALF Corp - Hamburg | VILLAGE OF HAMILTON | Hamilton, Village of | Ross Hobim | 3 Broad Street | Hamilton | NY | 13346 | |
| 60421 | | ALF Corp - Hamburg | SANBORN FIRE COMPANY | Sanborn Fire Company | Robert E Hoover | 5611 Buffalo Street | Sanborn | NY | 14132 | |
| 60490 | | ALF Corp - Hamburg | SOUTHLINE FIRE DISTRICT NO. 10 | South Line Fire District No. 10 | Edward Fiatkowski | 1049 French Road | Cheektowaga | NY | 14227 | |
| 70212 | | ALF Corp - Hamburg | CITY OF AUBURN, NY | Auburn, City of | Mark Hammon | 24 South Street | Auburn | NY | 13201 | |
| 70232 | | ALF Corp - Hamburg | CITY OF AUBURN, NY | Auburn, City of | Mark Hammon | 24 South Street | Auburn | NY | 13201 | |
| 70012 | | ALF Corp - Hamburg | NIAGRARA | Niagara Active Hose Company | Dan Hose | 6010 Lockport Road | Niagara Falls | NY | 14305 | |
| 70199 | C7-0D01523-001 | ALF Corp - MerckMaster | CITY OF GREENACRES | Greenacres, City of | Mark Pure Div. Ch. | 5985 10th Ave North | Greenacres | FL | 33463-2399 | |

Fire Contracts

| ALF SRO # | Customer PO # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Curr Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 6551.3 | VPO12010046 | ALF Gulf Coast | COLLEGE STATION | College Station FD | Jim Miles | 300 Krenek Tap Road | College Station | TX | 77942 | |
| 70159 | 3246 | ALF Iowa | CITY OF URBANDALE | Urbandale, City of | Jerry Holt | 3600 86th Street | Urbandale | IA | 50322 | |
| 60391 | 3230 | ALF Iowa | CITY OF WEST DES MOINES | West Des Moines, City of | Donald L. Cox | 4200 Mills Civic Parkway | West Des Moines | IA | 50265 | |
| 60392 | 3230 | ALF Iowa | CITY OF WEST DES MOINES | West Des Moines, City of | Donald L. Cox | 4200 Mills Civic Parkway | West Des Moines | IA | 50265 | |
| 60199 | | ALF Northwest | THURSTON COUNTY FIRE DISTRICT #11 | Thurston County Fire District 11 | Russ Kalewalne | 10028 Littlerock Road SW | Olympia | WA | 98512 | |
| 60200 | | ALF Northwest | THURSTON COUNTY FIRE DISTRIC #11 | Thurston County Fire District #11 | Russ Kalewalne | 10028 Littlerock Road SW | Olympia | WA | 98512 | |
| 70052 | 4590009941 | ALF of Arizona | CITY OF PHOENIX FD | Phoenix FD | Bob Khan | 251 Washington Street 5th Floor | Phoenix | AZ | 85003-2295 | |
| 60406 | 4590009940 | ALF of Arizona | CITY OF PHOENIX FD | Phoenix FD | Bob Khan | 251 Washington Street 5th Floor | Phoenix | AZ | 85003-2295 | |
| 60407 | 4590009940 | ALF of Arizona | CITY OF PHOENIX FD | Phoenix FD | Bob Khan | 251 Washington Street 5th Floor | Phoenix | AZ | 85003-2295 | |
| 60408 | 4590009941 | ALF of Arizona | CITY OF PHOENIX FD | Phoenix FD | Bob Khan | 251 Washington Street 5th Floor | Phoenix | AZ | 85003-2295 | |
| 60409 | 4590009941 | ALF of Arizona | CITY OF PHOENIX FD | Phoenix FD | Bob Khan | 251 Washington Street 5th Floor | Phoenix | AZ | 85003-2295 | |
| 60410 | 4590009941 | ALF of Arizona | CITY OF PHOENIX FD | Phoenix FD | Bob Khan | 251 Washington Street 5th Floor | Phoenix | AZ | 85003-2295 | |
| 60411 | 4590009941 | ALF of Arizona | CITY OF PHOENIX FD | Phoenix FD | Bob Khan | 251 Washington Street 5th Floor | Phoenix | AZ | 85003-2295 | |
| 70286 | COPAZ-0000043562 | ALF of Arizona | CITY OF PEORIA | Peoria, City of | Bill Berna, PRS | 8950 N 79th Avenue | Peoria | AZ | 85345 | |
| 70002 | 3501 | ALF of Arizona | VERDE VALLEY FIRE DISTRICT | Verde Valley Fire District | Mark Dooth-Chef. | 2700 Godard Road | Cottonwood | AZ | 86326 | |
| 70006 | VPO01003865 | ALF of BC | BIG WHITE FD | Big White FD | Porcupine R | PO Box 2039, Station R-7565 | Big White | BC | V1Z 4K5 | |
| 60492 | VPO01003902 | ALF of BC | LANGFORD FIRE RESCUE | Langford Fire Rescue | Bob Beckett | 2625 Peatt Rd | Langford | BC | V9B5T9 | |
| 60550 | VPO01003831 | ALF of BC | CHETWYND FD | Chetwynd FD | Leo Sabulsky | 5400 North Access Road | Chetwynd | BC | V0C 1J0 | |
| 60543 | VPO01003779 | ALF of BC | KAMLOOPS FIRE RESCUE | Kamloops Fire Rescue | Neil Moroz, Depy Ch. | 1205 Summit Drive | Kamloops | BC | V2C 5R9 | |
| 70291 | VPO01004869 | ALF of BC | CITY OF ABBOTSFORD | Abbotsford FD | Dale Unrau, Assist. Ch. | 32270 George Ferguson Way | Abbotsford | BC | V2T 1W7 | |
| 70292 | VPO01004860 | ALF of BC | CITY OF ABBOTSFORD | Abbotsford FD | Dale Unrau, Dply Ch. | 32270 George Ferguson Way | Abbotsford | BC | V2T 1W7 | |
| 70190 | VPO01004652 | ALF of BC | SALMON ARM FD | Salmon Arm FD | Brad Shirley | 141 Ross Street | Salmon Arm | BC | V1E 4N8 | |
| 80013 | VPO01004923 | ALF of BC | High Level, Town of | High Level, Town of | Rodney Schmidl | 10203-105 Ave | High Level | AB | T0H 1Z0 | |
| 70272 | VPO01004699 | ALF of BC | SALT SPRING ISLAND FIRE | Saltspring Island Fire | Jamie Holman/Training Officer | 105 Lower Ganges Road | Saltspring Island | BC | V8K 2T1 | |

Fire Contracts

| ALF S/O # | Customer PID # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Core Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 70259 | VP001004658 | ALF of BC | BRITANNIA WILTON FD | Britannia Wilton FD | Jeff Mahr-Selfy Chief | Box 651 | Lloydminster | SK | S9V 0Y7 | |
| 60124 | VP0180x694 | ALF of BC | KAMLOOPS FIRE RESCUE | Kamloops Fire Rescue | Neil Moroz | 1205 Summit Drive | Kamloops | BC | V2C 5R9 | |
| 60549 | VP001002378 | ALF of BC | CSRD - SORRENTO | CSRD - Sorrento | Jack Blair | 781 Marine Park Dive NE | Salmon Arm | BC | V1E 4P1 | |
| 60542 | VP001003746 | ALF of BC | KAMLOOPS FIRE RESCUE | Kamloops Fire Rescue | Neil Moroz Deply Ch. | 1205 Summit Dr | Kamloops | BC | V2C 5R9 | |
| 70114 | VP00100354 | ALF of BC | DISTRICT OF NO COWICHAN, MAPLE BAY | Dist of No Cowichan Maple Bay | Andy Stewart | 7030 Trans Canada Highway | Duncan | BC | V9L3X4 | |
| 60298 | VP01003215 | ALF of BC | CITY OF ABBOTSFORD | Abbotsford FD | Dale Unrau (Assist.) | 32316 South Fraser Way | Abbotsford | BC | V2Z 1W7 | |
| 60296 | VP00100923 | ALF of BC | CITY OF ABBOTSFORD | Abbotsford FD | Dale Unrau (Assist) | 32315 South Fraser Way | Abbotsford | BC | V2Z 1W7 | |
| 80016 | VP001004930 | ALF of BC | Buckland Fire & Rescue | Buckland Fire & Rescue | James H. Miller | Box 1183 | Prince Albert | Sask. | | |
| 70114 | 28478 | ALF of Los Angeles | CITY OF NEWPORT BEACH | Newport Beach City of FD | Steve Lewis | 3300 Newport Blvd | Newport Beach | CA | 92658 | |
| 60439 | AN10405 | ALF of Los Angeles | CITY OF COSTA MESA FD | Costa Mesa City of FD | Ron Cloe | 77 Fair Drive 1st Floor | Costa Mesa | CA | 92622 | |
| 70168 | 10I043 | ALF of Los Angeles | CITY OF SANTA ANA FD | Santa Ana Fire Dept. | Kevin Jaes | 1439 South Broadway | Santa Ana | CA | 92707 | |
| 70254 | 0000611713 | ALF of Los Angeles | CITY OF LOS ANGELES FD | Los Angeles FD | Craig Nelson | 140 N Avenue 19 | Los Angeles | CA | 90031 | |
| 70255 | 0000611715 | ALF of Los Angeles | CITY OF LOS ANGELES FD | Los Angeles FD | Craig Nelson | 140 N Avenue 19 | Los Angeles | CA | 90031 | |
| 70256 | 0000611713 | ALF of Los Angeles | CITY OF LOS ANGELES FD | Los Angeles FD | Craig Nelson | 140 N Avenue 19 | Los Angeles | CA | 90031 | |
| 70257 | 0000611713 | ALF of Los Angeles | CITY OF LOS ANGELES FD | Los Angeles FD | Craig Nelson | 140 N Avenue 19 | Los Angeles | CA | 90031 | |
| 70285 | UP002000079 | ALF of New Mexico | LAS CRUCES FD | Las Cruces FD | Alfred Lujan, Battalion Ch. | 201 E Picatho | Las Cruces | NM | 88001 | |
| 70286 | UP002000079 | ALF of New Mexico | LAS CRUCES FD | Las Cruces FD | Alfred Lujan, Battalion Ch. | 201 E Picatho | Las Cruces | NM | 88001 | |
| 60323 | 2006-0767 | ALF of Southern New England | TOWN OF WOLCOTT | Wolcott, Town of | Dennis Maurice | 10 Kenea Avenue | Wolcott | CT | 06716 | |
| 60494 | 2006-1023 | ALF of Southern New England | TOWN OF BERLIN | Berlin, Town of | Herman Middlebrooks, Jr, Twn Mgr | 240 Kensington Road | Berlin | CT | 06037 | |
| 70128 | 2007-0323 | ALF of Southern New England | TOWN OF NORFOLK | Norfolk, Town of | Darrell Bryce | 19 Maple Avenue | Norfolk | CT | 06058 | |
| 76157 | 2007-0713 | ALF of Southern New England | SALEM VFD | Salem VFD | R. Terry Retz | 270 Hartford Road | Salem | CT | 06420 | |

Fire Contracts

| ALF SKO # | Customer PXO # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Core Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 70034 | 2007-1214 | ALF of Southern New England | TOWN OF FRAMINGHAM | Framingham, Town of | Patsy Morgan Purchasing Agent | 150 Concord Street | Framingham | MA | 01702 | |
| 70294 | 1095 | ALF Southeast | ETOWAH HORSE SHOE FIRE & RESCUE | Etowah-Horse Shoe Fire and Rescue | Roger Freeman | Highway 64 West | Horse Shoe | NC | 28742 | |
| 70295 | 1099 | ALF Southeast | ETOWAH HORSE SHOE FIRE & RESCUE | Etowah-Horse Shoe Fire and Rescue | Roger Freeman | Highway 64 West | Horse Shoe | NC | 28742 | |
| 60053 | 1152 | ALF Southeast | Lancaster Fire Department | Lancaster Fire Department | Ted Williams | Post Office Box 100 | Lancaster | NC | 28746 | |
| 70063 | 513221 | Atlanta Freightliner | CLAYTON COUNTY FD | Clayton County FD | Allen McGchorey, Deputy Ch. | 7810 Highway 85 | Riverdale | GA | 30274 | |
| 70064 | 513221 | Atlanta Freightliner | CLAYTON COUNTY FD | Clayton County FD | Allen McGchorey, Deputy Ch. | 7810 Highway 85 | Riverdale | GA | 30274 | |
| 70065 | 513221 | Atlanta Freightliner | CLAYTON COUNTY FD | Clayton County FD | Allen McGchorey, Deputy Ch. | 7810 Highway 85 | Riverdale | GA | 30274 | |
| 60505 | | Bay Fire Products | NEWTON VFD | Newton VFD | Jeffery Bostwick, Assist. Ch. | 72 Spring St. | Newton | AL | 36352 | |
| 70014 | 06 3405 | Big Red Engines | CITY OF TYBEE ISLAND | Tybee Island, City of | Jan Fox, City Adm | 403 Butler Ave. | Tybee Island | GA | 31328-2749 | |
| 80433 | VP005000017 | Campbell Supply | WARRIOR RUN | Warrior Run - Campbell Supply - DEMO | John Roselli, Dist Mgr | 86 Griffin Road | Muncy | PA | 17756 | |
| 70116 | vp001000565 | Campbell Supply | City of Garfield | Garfield, City of | Michael Adams, Asst. Ch. | 111 Outwater Lane | Garfield, Bergen County | NJ | 07026 | |
| 70095 | N003000006 | Campbell Supply | AMERICAN HOSE AND CHEMICAL CO, PA | American Hose and Chemical Co. | Jim Rhea | 250 S. Vine Street | Mount Carmel | PA | 17851 | |
| 70203 | VP001000540 | Campbell Supply | SEASIDE HEIGHTS FD | Seaside Heights FD | James Samarelli | PO Box 386 | Seaside Heights-Ocean | NJ | 08751 | |
| 70081 | P99606 | Campbell Supply | CITY OF YONKERS, NY | Yonkers Fire Dept | William Fitzpatrick, Div of Operations | 40 South Broadway | Yonkers | NY | 10701 | |
| 70086 | P99806 | Campbell Supply | CITY OF YONKERS, NY | Yonkers Fire Dept | William Fitzpatrick, Div of Operations | 40 South Broadway | Yonkers | NY | 10701 | |
| 70032 | VP202000120 | Campbell Supply | GREAT NECK VIGILANT FC | Great Neck Vigilant Fire Company | Mark Maione | 83 Cuttermill Road | Great Neck | NY | 11021 | |
| 60334 | VP01000495 | Campbell Supply | CITY OF NEWARK | Newark, City of | David Giordano, Fire Dir. | 10 0 18th Ave | Newark | NJ | 07106 | |
| 60140 | VP01000577 | Campbell Supply | CITY OF BAYONNE | Bayonne FD, City of | Thomas Lynch | 630 Avenue C | Bayonne | NJ | 07002 | |
| 70072 | N003000003 | Campbell Supply | LITITZ FIRE COMPANY | Lititz Fire Company | Mike Smith Deputy Ch. | 24 West Main St | Lititz | PA | 17543 | |
| 70076 | VP001000526 | Campbell Supply | TOWNSHIP OF MILLBURN | Millburn FD, Township of | Mike Roberts, Depart. Ch. | 375 Millburn Avenue | Millburn | NJ | 07041 | |
| 70200 | VP003000010 | Campbell Supply | UNION FIRE COMPANY | Union Fire Company | Donald Hatchran | 200 North 4th Street | Hamburg | PA | 19526 | |

Fire Contracts

| ALF S/O # | Customer PVO # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 70207 | VFSC1000617 | Campbell Supply | TOWNSHIP OF EGG HARBOR | Egg Harbor Township | Judy Bond | 3515 Bargaintown Road | Egg Harbor Township | NJ | 08234 | |
| 70186 | VFSC1000591 | Campbell Supply | CITY OF EAST ORANGE | East Orange City of | Dean Spencer | 44 City Hall Plaza | East Orange | NJ | 27019 | |
| 70297 | VP001000560 | Campbell Supply | BOROUGH OF KENILWORTH | Kenilworth Borough of | Lou Giordano | 567 Boulevard | Kenilworth | NJ | 07033 | |
| 70296 | VP001000563 | Campbell Supply | TOWNSHIP OF EDISON | Edison Twp Township of | Ralph Ambrose, Dpty Ch. | 100 Municipal Blvd | Edison | NJ | 08817 | |
| 70225 | VP003000012 | Campbell Supply | WESCOSVILLE FIRE CO / LOWER MACUNGIE | Wescosville Fire Co./Lower Macungie FD | Brant McNabb Asst Chief | PO Box 3002 | Allentown | PA | 18106 | |
| 60550 | VP001000503 | Campbell Supply | TOWNSHIP OF EWING, PROSPECT HEIGHTS | Ewing Township - Prospect Heights FC | Shannon Noyes, CFC | 2 Jake Garzio Drive | Ewing | NJ | 08628 | |
| 65299 | VP001000418 | Campbell Supply | EAST WINDSOR TOWNSHIP | East Windsor Township | Tony Kulawiez | 16 Lanning Boulevard | East Windsor | NJ | 08520 | |
| 70175 | VP001000606 | Campbell Supply | TOWNSHIP OF SOUTH HACKENSACK, N. | South Hackensack Township | Jim Reilly | 227 Philips Avenue | South Hackensack | NJ | 07606 | |
| 65493 | Cambridge0206 | Darch Fire | CAMBRIDGE FD | Cambridge FD | Doug Tennant, Deputy Ch. | 1805 Bishop Street North | Cambridge | ON | K1R2J4 | |
| 70106 | IAA019 | Deep South | LIMESTONE COVE VFD | Limestone Cove VFD | Ben Gouge | 4220 Simerly Creek Road | Unicoi | TN | 37692 | |
| 60011 | as155 | Deep South | Brayton VFD | Brayton VFD | Mike Powell | 11667 Hendon Rd. | Graysville | TN | 37338 | |
| 60263 | PO# A002 | Deep South | DEEP SOUTH DEMO | Deep South - DEMO | Richard Ellis | 2342 Hwy 49 North | Seminary | MS | 39478 | |
| 70027 | | Delmarva - DPC | REHOBOTH BEACH VFC | Rehoboth Beach VF Company, Inc. | Leonard Tylecki, Comm. Chair | PO Box 337 219 Rehoboth Ave | Rehoboth Beach | DE | 19971 | |
| 60054 | | Delmarva - DPC | WALDORF VFD | Waldorf VFD | Dan Stevens | 3245 Old Washington St. | Waldorf | MD | 20602 | |
| 70056 | | Emergency Vehicles Plus | LEXINGTON FD | Lexington Fire/Rescue | Greg Stover Capt. | 7227 Huron Avenue | Lexington | MI | 48450 | |
| 72066 | 20443 | Emergency Vehicles Plus | CITY OF OAK PARK | Oak Park, City of | Christopher Peroles, LT | 13600 Oak Park Blvd. | Oak Park | MI | 48237 | |
| 66541 | | Emergency Vehicles Plus | Pennfield Township FD | Pennfield Township FD | Tim Smith | 20260 Capital Ave NE | Battle Creek | MI | 49017 | |
| 60247 | | Empire ALF | WINN PARISH FPD #3 | Winfield - Winn Parish | Crawford Jordan | PO Box 70 | Winfield | LA | 71483 | |
| 60304 | RC069902 | Fire Service | CITY OF NAPOLEON | Napoleon, City of | Robert Barnett | 255 West Riverview Avenue | Napoleon | OH | 43545 | |
| 60483 | | Fire Service | LAKE RIDGE VFD, IN | Lake Ridge VFD, Inc. | Michael Road/Pres | 3955 West 40th Avenue | Gary | IN | 46408 | |
| 70158 | | Fire Service | HANOVER TOWNSHIP-CEDAR LAKE FD, IN | Hanover Township-Cedar Lake FD | Todd Wilkening | 9400 West 133rd Avenue | Cedar Lake | IN | 46303 | |

Fire Contracts

| ALF S/O | Customer PO # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Curr. Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 70113 | | Fire Service | CITY OF COLUMBUS | Columbus FD, INDIANA | Gary Henderson | 1101 Jackson Street | Columbus | IN | 47201 | |
| 70091 | | Fire Service | HANOVER TOWNSHIP-CEDAR LAKE FD. IN | Hanover Township-Cedar Lake FD | Todd Wilkening | 9430 West - 133rd Avenue | Cedar Lake | IN | 46303 | |
| 60338 | | Fire Service | OTTERBEIN AREA VOLUNTEER FD | Otterbein Area Volunteer FD | Jerry Robson, Chairman | 7626 South 1150 East | Otterbein | IN | 47970 | |
| 60555 | 20398 | Fire Service | DELAWARE TOWN-SHIP FD | Delaware Township FD | Dave Roosenaugh | 651 South Main Street | Mt. Blanchard | OH | 45867 | |
| 60343 | | Fire Service | SHADELAND FD | Shadeland FD | Dan Dowell, 1st Assist | 5209 South 250 West | Lafayette | IN | 47909 | |
| 70121 | | Fire Service | BLOOMFIELD FD, IN | Bloomfield FD | Eric Aleno | 73 West Mill Street | Bloomfield | IN | 47424 | |
| 60505 | | Fire Service | PERRYSBURG TOWNSHIP- OH | Perrysburg Township Trustees | Michael Dimick | 26050 Lime City Road | Perrysburg | OH | 43551 | |
| 60561 | | Fire Service | CITY OF DELPHOS | Delphos, City of | Dave McNeid | 608 North Canal Street | Delphos | OH | 45833 | |
| 60456 | | First Out | TOWN-SHIP OF MOON | Moon, Township of | Charles Belgie | 1000 Beaver Grade Road | Moor Township | PA | 15108 | |
| 60447 | | First Out | UPPER ST CLAIR FD | Upper St. Clair FD | Ray Tormay | 2001 Washington Road | Upper St. Clair | PA | 15241 | |
| 60540 | | First Out | BLUE KNOB VOLUNTEER FIRE COMPANY | Blue Knob Volunteer Fire Company | Rex Walters, Pres. | Road 2 Box 344C | Portage | PA | 15946 | |
| 60096 | | First Out | BRIDGEVILLE VFD | Bridgeville VFD | Bill Chifoo | 370 Commercial Street | Bridgeville | PA | 15017 | |
| 70172 | REFURB | First Out | HILL TOP HOSE COMPANY | Hill Top Hose Company | Jeff Balog | 209 Allenmoor Drive | National Heights | PA | 15065 | |
| 70047 | | Garrison ALF | McKOWNSVILLE FIRE DIST* | McKownsville Fire District | Stephen Haggerty, Chair Brd of F Comm. | 1260 Western Avenue | Albany | NY | 12203 | |
| 60485 | 22252 | Garrison ALF | CITY OF WHITE PLAINS | White Plains, City of | Steven Rockler, Public Works | 265 Main Street | White Plains | NY | 10601 | |
| 70080 | PO 178 | Garrison ALF | VILLAGE OF LARCHMONT | Larchmont, Village of | Denis Brucian, Treasurer | 120 Larchmont Avenue | Larchmont | NY | 10538 | |
| 70149 | #70000087-00 | Garrison ALF | CITY OF SCHENECTADY | Schenectady, City of | Robert Farstad | 360 Veeder Avenue | Schenectady | NY | 12305 | |
| 70150 | #70000087-00 | Garrison ALF | CITY OF SCHENECTADY | Schenectady, City of | Robert Farstad | 360 Veeder Avenue | Schenectady | NY | 12305 | |
| 70258 | | Garrison ALF | MEDWAY-GRAPEVINE FIRE DIST* | Medway-Grapeville Fire District | Loris Ant, Chr Brd of Commissioners | 2537 County Route 26 | Climax | NY | 12042 | |
| 60017 | | Garrison ALF | Peru Fire District | Peru Fire District | Greg Timmons, Commissioner | 753 Bear Swamp Road | Peru | NY | 12972 | |
| 60560 | 0066462 | H-TECH | CITY OF MANTECA | Manteca FD, City of | George Bravestaz | 290 South Powers Ave. | Manteca | CA | 95336 | |

Fire Contracts

| ALF SRO # | Customer P/O # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 70066 | 0067759 | Hi-Tech | CITY OF SUNNYVALE | Sunnyvale, City of | Tony Vargas, Flt. Mgr. | 221 Commercial Street | Sunnyvale | CA | 94085 | |
| 70069 | 0067759 | Hi-Tech | CITY OF SUNNYVALE | Sunnyvale, City of | Tony Vargas, Flt. Mgr. | 221 Commercial Street | Sunnyvale | CA | 94085 | |
| 70070 | 0067759 | Hi-Tech | CITY OF SUNNYVALE | Sunnyvale, City of | Tony Vargas, Flt. Mgr. | 221 Commercial Street | Sunnyvale | CA | 94085 | |
| 70071 | 0067759 | Hi-Tech | CITY OF SLNNYVALE | Sunnyvale, City of | Tony Vargas, Flt. Mgr. | 221 Commercial Street | Sunnyvale | CA | 94085 | |
| 70221 | 0070547 | Hi-Tech | CONTRA COSTA COUNTY FIRE PROC DIST | Contra Costa County Fire Protection District | Keith Richter | 2010 Geary Road | Pleasant Hill | CA | 94523 | |
| 80010 | | Hi-Tech | San Francisco, City and County | San Francisco FD | Judy Wong | 1 Dr. Carlton Goodlet Place, Room 430 | San Francisco | CA | 94122-4685 | |
| 72210 | 14046 | Johnson Fire | NORTH CHARLESTON FD | North Charleston FD | James Huger | 2836 Fourth Avenue | North Charleston | SC | 29405 | |
| 60474 | | Johnson Fire | ALF CORP DEMO (aka NORTH CHARLESTON) | ALF Corp - Stock / Demo | James Huger | 2836 Fourth Ave | North Charleston | SC | 29405 | |
| 70125 | | Murphy's Fire & Rescue | CITY OF SHAWNEE FD | Shawnee, City of FD | Jef Hudson | 11110 Johnson Drive | Shawnee | KS | 66203 | |
| 70022 | 20416 | NAEU | FRANKLIN FD | Franklin FD | Scott Clarebaugh | 59 West Bow Street | Franklin | NH | 03235 | |
| 60269 | 20129 | NAEU | MALLET'TS BAY FD COLCHESTER FIRE DIST | Malletts Bay FD Colchester F Dist #2 | Robert Young | 844 Church Road | Colchester | VT | 05446-6536 | |
| 60363 | | Performance ALF | AUGUSTA COUNTY FIRE RESCUE | Augusta County Fire Rescue | Bruce Crow | 18 Government Center Lane | Verona | VA | 24482 | |
| 60221 | 1026 | Southeast ALF | BOILING SPRINGS FIRE DISTRICT | Boiling Springs Fire Dept. | Chief Lever | 8020 Pelham Road | Greenville | SC | 29615 | |
| 60425 | | Tinney ALF | CLAY COUNTY | Clay FD | Kenneth Stach | 4383 State Rt. 31 | Clay | NY | 13041 | |
| 70031 | 20403 | Tinney ALF | HASTINGS FIRE | Hastings FD | David Heskins Jr. | 1994 US Route 11 | Hastings | NY | 13076 | |
| 70017 | 00 148010 | Truck Centers | CLIN-CLAIR FIRE PROTECTION DISTRICT* | Clin-Clair Fire Protection District | Brian Hubert, Capt. | 406 West State Street Highway 161 | Albers | IL | 62215 | |
| 70016 | | Vogelpohl Fire | THE VILLAGE OF POMEROY | Pomeroy, Village of | Rick Blaettner | 320 East Main Street | Pomeroy | OH | 45769 | |
| 70282 | | Vogelpohl Fire | TRI-COMMUNITY JOINT FIRE DIST, OH | Tri-Community Joint Fire District | Randy Wilson, Asst. FC | 46 Main Street | Greenwich | OH | 44837 | |
| 60612 | | Vogelpohl Fire | SOUTHWEST EMERGENCY RESPONSE TEAM | Southwest Emergency Response Team | Bernie Benedict | 15800 Bagley Road | Middleburg Heights | OH | 44130 | |
| 60506 | 20312 | Vogelpohl Fire | CITY OF WINCHESTER | Winchester, City of | Daniel Castle | PO BOX 42, 32 Wall Street | Winchester | KY | 40392 | |

Fire Contracts

| ALF SVO # | Customer PID # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| T0187 | 122827 | Vogelsoft Fire | CITY OF WEST CARROLLTON, OH | West Carrollton, City of | Jack Kestler | 300 E. Central Ave. | West Carrollton | OH | 45449 | |
| 70219 | | West Virginia T&T | OCEANA, WV | Oceana West Virginia FD | Rickey Hicks Asst Ch | Cook Parkway | Oceana | WV | 24870 | |
| 70051 | 54016 | | Watertown New York | City of Watertown | Robert Cleaver | 245 Washington Street | Watertown | NY | 13601 | |
| 60367 | | Campbell Supply | Rush VFD | Rush VFD | | 180 Talmadge Road | Edison | NJ | 08818 | |
| 60383 | | ALF Aerials | ALF Corp - Aerial Stock / Demo | ALF Corp - Aerial Stock / Demo | | 1000 Newton Way | Summerville | SC | 29483-7430 | |
| 60386 | | ALF Aerials | ALF Corp - Aerial Stock / Demo | ALF Corp - Aerial Stock / Demo | | 1090 Newton Way | Summerville | SC | 29483-7430 | |
| 60388 | | First Out | Duall VFD | Duall VFD | | 213 Moon Clinton Road | Moo Township | PA | 15108 | |
| 60457 | | Campbell Supply | Tappan Fire District | Tappan Fire District | | 181 Talmadge Road | Edison | NJ | 08818 | |
| 60471 | | ALF AZ | Lake Havasu City FD | Lake Havasu City FD | | 8900 W ROOSEVELT ST | NCOLLESON | AZ | 85353 | |
| 60476 | | ALF of SNE | South Windsor, Town of | South Windsor, Town of | | 199 ROBERT'S ST | E HARTFORD | CT | 06108 | |
| 60557 | | ALF Corp | North Charleston FD | North Charleston FD | | 1090 Newton Way | Summerville | SC | 29483-7430 | |
| 60562 | | ALF NM | Pueblo of Laguna | Pueblo of Laguna | | 1 Capital Drive Administration Bldg | Laguna | NM | 87026 | |
| 70035 | | Hi-Tech | Richmond FD, City of | Richmond FD, City of | | 444 West Gregar Street | Oakdale | CA | 95361 | |
| 70034 | | Fire Service | US Steel - Clairton Plant | US Steel - Clairton Plant | | 9545 Industrial Drive | St. John | IN | 46373 | |
| 70035 | | Fire Service | US Steel - Fairfield Plant | US Steel - Fairfield Plant | | 9545 Industrial Drive | St. John | IN | 46373 | |
| 72065 | | ALF LLC | Bekwin, S.A. PDVSA Services, Inc. | Bekwin, S.A. PDVSA Services, Inc | | 1090 Newton Way | Summerville | SC | 29483-7430 | |
| 70069 | | Atlanta Freightliner | Clayton County FD | Clayton County FD | | 5864 FRONTAGE RD | CLAYTON | GA | 30050 | |
| 70081 | | Atlanta Freightliner | Clayton County FD | Clayton County FD | | 5864 FRONTAGE RD | CLAYTON | GA | 30050 | |
| 70082 | | Atlanta Freightliner | Clayton County FD | Clayton County FD | | 5864 FRONTAGE RD | CLAYTON | GA | 30050 | |
| 70074 | | ALF LLC | Rush VFD | Rush VFD | | 1090 Newton Way | Summerville | SC | 29483-7430 | |
| 70079 | | Campbell Supply | Oldwick Fire Company | Oldwick Fire Company | | 180 Talmadge Road | Edison | NJ | 08818 | |
| 70092 | | Atlanta Freightliner | Clayton County FD | Clayton County FD | | 5864 FRONTAGE RD | CLAYTON | GA | 30050 | |
| 70120 | | ALF Southwest | Landrum FD | Landrum FD | | PO Box 71 | Landrum | SD | 29356 | |
| 70121 | | ALF NM | Arabela FD | Arabela FD | | PO Box 222 | Arabela | NM | 88351 | |
| 70137 | | ALF of BC | Tofino FD, District of | Tofino FD, District of | | 6570 Financial Drive | Mississauga, Ontario | Canada | L5N7J7 | |

Fire Contracts

| ALF S/O # | Customer PKO # | Dealer Name | Name | Name Review | Fire Chief | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 702'4 | | Campbell Supply | Canton FD | Canton FD | | 180 Talmadge Road | Edison | NJ | 08818 | - |
| 70295 | | ALF BC | CSRD - Shuswap | CSRD - Shuswap | | 6710 Financial Drive | Massasauga Ontario | Canada | L5N7J7 | - |

Fire Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | Address 2 | Address 3 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|
| ALF AZ | FTL AZ LTD | ROBERT CUNNINGHAM | 9604 W ROOSEVELT ST | | | TOLLESON | AZ | 85353 | - |
| ALF GULF COAST | HOUSTON FTL, INC | ROBERT GARWOOD | 8560 NORTH LOOP EAST | | | HARRIS | TX | 77029 | - |
| ALF of Utah | Freightliner of Utah, LLC | Bart Warner | 2240 South 5370 West | | | West Valley | UT | 84120 | - |
| ALF'S NEW ENGLAND | FTL OF HARTFORD | LINDY BIGLIAZZI | 199 ROBERTS ST | | | E HARTFORD | CT | 06108 | - |
| American LaFrance of British Columbia | Freightliner of Vancouver, Ltd. | Freightliner Canada, Ltd. | 6710 Financial Drive | Suite 100 | | Mississauga, Ontario | Canada | L5N7J7 | |
| American LaFrance of Florida | Southern Coach, Inc. | | 3705 St. Johns Parkway | | | Sanford | FL | 32271 | - |
| American LaFrance of Iowa, Inc. | American LaFrance of Iowa, Inc. | Richard Dietrich | 5838 NE 14th Street | | | Des Moines | IA | 50313 | - |
| American LaFrance of Los Angeles | Los Angeles Truck Centers, LLC | | 2429 S. Peck Rd | | | Whittier | CA | 90601 | - |
| Areo-Feu Ltee | Areo-Feu Ltee | Jean-Max Picard | 615 blvd Guimond | | | Longueuil | Quebec | J4G1L9 | - |
| ATL FTL TRUCK SALES & SVC | ATL FTL TRUCK SALES & SVC | JOE CAMERATA | 5884 FRONTAGE RD | | | CLAYTON | GA | 30050 | - |
| BAY FIRE PRODUCTS INC | BAY FIRE PRODUCTS INC | DEWAYNE DEWBERRY | 2400 HWY 31 SOUTH | | | BALDWIN | AL | 36507 | - |
| Campbell Supply Co. Inc. | W. Campbell Supply Co., Inc. | Neal Campbell | 160 Talmadge Road | | | Edison | NJ | 08818 | |

Fire Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | Address 2 | Address 3 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|
| Certified Fleet Services, Inc. | Certified Fleet Services, Inc. | Stephen Wilde | 580 North Michigan Street | | | Elmhurst | IL | 60126 | - |
| DARCH FIRE | DARCH FIRE | JOHN DARCH | 9-402 HARMONY RD | | | AYR | ONTARIO | N0B 1E0 | - |
| Deep South Truck and Equipment Sales | Deep South Truck and Equipment Inc. | Greg Sullivan | 2342 Highway 49 North | | | Seminary | MS | 39479 | - |
| Emergency Vehicles Plus | Holland Motor Homes and Bus Company | John Dykstra | 670 East 16th Street | | | Holland | MI | 49423 | - |
| Empire Truck Sales, LLC | Empire Truck Sales, LLC | G.S. Swanson | 908 Shrewsbury Road | | | Jefferson | LA | 70121 | - |
| Fire Fox EVS, LLC | Fire Fox EVS, LLC | Ken Whitaker | 240 Rope Mill Road | | | Woodstock | GA | 30188 | - |
| Fire Service, Inc. | Fire Service, Inc. | Shawn Junker | 9545 Industrial Drive | | | St. John | IN | 46373 | - |
| Fire Service, Inc. | Fire Service, Inc. | Shawn Junker | 9545 Industrial Drive | | | St. John | IN | 46373 | - |
| First Out Specialty Vehicles and Equipment | First Out Specialty Vehicles and Equipment | Ron Flaherty | 213 Moon Clinton Road | | | Moo Township | PA | 15108 | - |
| Freightliner of Des Moines Inc. | Freightliner of Utah, LLC | Carl Schwab | 3601 Adventureland Drive | | | Altoona | IA | 50009 | - |
| Fyr-Tek | Fyr-Tek, Inc. | Robert W. and Darlene Sholtus | 705 20th Street | | | Gothenburg | NE | 69138 | - |
| GARRISON ALF | GARRISON FIRE & RESCUE CORP | CHESTER GARRISON | 3334 ROUTE 23A | | | PALENVILLE | NY | 12463 | - |
| HOT SHOT FIRE TRUCKS LTD | HOT SHOT FIRE TRUCKS LTD | GARY HOVDEBO | 52101 HWY 21 | | | SHERWOOD PARK | ALBERTA | T8B1J4 | - |
| JOHNSON FIRE & SAFETY SYSTEMS INC | JOHNSON FIRE & SAFETY SYSTEMS INC | BOBBY JOHNSON | 3101 WILLIAMSBURG COUNTY HWY | | | CADES | SC | 29518 | |

Fire Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | Address 2 | Address 3 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|
| JOHNSON FIRE & SAFETY SYSTEMS INC | JOHNSON FIRE & SAFETY SYSTEMS INC | BOBBY JOHNSON | | | | | | | - |
| LONESTAR ALF | ALBUQUERQUE FTL, LP | MALCOLM DUNCAN | 3101 WILLIAMSBURG COUNTY HWY | | | CADES | SC | 29518 | - |
| Murphy's Fire & Rescue | Murphy's Transportation Services, Inc. | Terry Murphy | 12901 US HWY 69 W FRONTAGE RD | | | ALBUQUERQUE NM | | 87121 | - |
| N AMERICAN EQUIPMENT | N AMERICAN EQUIPMENT UPFITTERS INC | MICHAEL DUNCAN | 900 South 85th Terrace | | | Kansas City | KS | 66111 | - |
| N AMERICAN EQUIPMENT | N AMERICAN EQUIPMENT UPFITTERS INC | MICHAEL DUNCAN | 6 SUTTON CIR | | | HOOKSETT | NH | 03106 | - |
| Quality Equipment Sales and Service | Quality Equipment Sales and Service | Ray Belanger | 6 SUTTON CIR | | | HOOKSETT | NH | 03106 | - |
| Truck Centers / American LaFrance | Truck Centers Inc | John Hopkins | 1180 South Gambell Street | | | Anchorage | AK | 99515 | - |
| Vogelpohl Fire Equipment | Vogelpohl Fire Equipment, Inc. | William L Vogelpohl | 747 E. Taylor Ave. | | | St Louis | MO | 63147 | - |
| W VA TRUCK & TRAILER CO | | ERIC JAIN | 2576 Cridepont Dr. | | | Edanger | KY | 41018 | - |
| WESTERN STAR OF AZ | FTL, STERLING, WESTERN STAR OF AZ | DANNY CUZICK | 1 JAIN DRIVE | | | CROSS LANE | WV | 25313 | - |
| | Hi-Tech Emergency Vehicle Service, Inc. | Dan Marchione | 9600 W ROOSEVELT ST | | | TOLLESON | AZ | 85353 | - |
| | | | 444 West Greger Street | | | Oakdale | CA | 95361 | - |

*(handwritten)* • New Marchione's representative
• Dealer [illegible] Agreement
Service Agreement

Condor Truck Contracts

| SERIAL NUMBER | Dealer | END CUSTOMER NAME | Heavy or Medium Duty | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Atlantic Truck | City of Lakeland | HD | Steve Perry | 2565 WEST STATE ROAD 84 | FT. LAUDERDALE | FL | 33312 | - |
| | Atlantic Truck | City of Lakeland | HD | Steve Perry | 2565 WEST STATE ROAD 84 | FT. LAUDERDALE | FL | 33312 | - |
| | Atlantic Truck | City of Lakeland | HD | Steve Perry | 2565 WEST STATE ROAD 84 | FT. LAUDERDALE | FL | 33312 | - |
| | Atlantic Truck | City of Lakeland | HD | Steve Perry | 2565 WEST STATE ROAD 84 | FT. LAUDERDALE | FL | 33312 | - |
| | Boyer | PK Contracting | HD | Lee Walquist | 2500 BROADWAY DRIVE | LAUDERDALE | MN | 55113 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FTL of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FT. of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FT. of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FT. of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| | FT. of Arizona | City of Phoenix | HD | Danny Cuzick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| 250391 | Golden Gate Truck Center | GREENWASTE | HD | Tom Dempsey | 8200 BALDWIN STREET | OAKLAND | CA | 94621 | |
| 270694 | Holcomb | EZ LINER | HD | Doug Batcheller | 4601 HARBOR DRIVE | SIOUX CITY | IA | 51111 | |
| | Hoover & Sons | Toms River Twp | HD | Robert Hoover | 149 Gold Mine Road | Flanders | NJ | 7836 | |
| | Hoover & Sons | Toms River Twp | HD | Robert Hoover | 149 Gold Mine Road | Flanders | NJ | 7836 | |
| | Hoover & Sons | Toms River Twp | HD | Robert Hoover | 149 Gold Mine Road | Flanders | NJ | 7836 | |
| | Hoover & Sons | Toms River Twp | HD | Robert Hoover | 149 Gold Mine Road | Flanders | NJ | 7836 | |
| | Jack's Truck | CITY OF GILLETTE | HD | Jack Charise | 6105 S. DOUGLAS HWY | GILLETTE | WY | 82718 | |
| | Tom Niehl | City of St Augustine | HD | Steve Bacalis | 417 S. EDGEWOOD AVENUE | JACKSONVILLE | FL | 32254 | |
| | Tom Niehl | City of St Augustine | HD | Steve Bacalis | 417 S. EDGEWOOD AVENUE | JACKSONVILLE | FL | 32254 | |
| | Triad | City of Asheville | HD | CFO | 6420 BURNT POPLAR RD | GREENSBORO | NC | 27409 | |
| 258432 | V&H Truck | PUTZMEISTER | HD | Terry Frankland | 1505 S. CENTRAL AVE. | MARSHFIELD | WI | 54449 | |
| 257960 | WEST Vancouver | STOCK SURREY | HD | Gerry Cullen | 9300 - 192ND STREET | SURREY | BC | V4N 3R8 | |
| | WEST Vancouver | Port Coquitlam | HD | Gerry Cullen | 9300 - 192ND STREET | SURREY | BC | V4N 3R8 | |

Condor Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| ALBUQUERQUE FREIGHTLINER LP | Lone Star Truck Group | | 12501 US HIGHWAY 66 WEST FRONTAGE ROAD | ALBUQUER | NM | 87121 | - |
| ALBUQUERQUE FREIGHTLINER LP | Lone Star Truck Group | | 12501 US HIGHWAY 66 WEST FRONTAGE ROAD | ALBUQUER | NM | 87121 | - |
| ALBUQUERQUE FREIGHTLINER LP | Lone Star Truck Group | | 611 S. Carlton | Farmington | NM | 87401 | - |
| ATLANTIC TRUCK CENTER | ATLANTIC FORD TRUCK SALES, INC. | Steve Perry | 2565 WEST STATE ROAD 84 | FT. LAUDERDALE | FL | 33312 | - |
| ATLANTIC TRUCK CENTER | ATLANTIC FORD TRUCK SALES, INC. | Steve Perry | 2565 WEST STATE ROAD 84 | FT. LAUDE | FL | 33312 | - |
| ATLANTIC TRUCK CENTER | ATLANTIC FORD TRUCK SALES, INC. | Steve Perry | 17151 NORTHWEST 7TH AVE | MIAMI | FL | 33169 | - |
| ATLANTIC TRUCK CENTER | ATLANTIC FORD TRUCK SALES, INC. | Steve Perry | 3945 FISCAL COURT | WEST PAL | FL | 33404 | - |
| ATLANTIC TRUCK CENTER | ATLANTIC FORD TRUCK SALES, INC. | Steve Perry | 2840 CENTER PORT CIRCLE | POMPANO | FL | 33064 | - |
| Augusta Freightliner Sterling | FREIGHTLINER OF SAVANNAH, INC. | Jason Williams | 2930 Riverness Drive | AUGUSTA | GA | 30907 | - |
| Badger Truck Center | Badger Truck Center of West Allis, Inc. | Tom Schmidt | 6303 PEPSI WAY | WINDSOR | WI | 53598 | - |
| BADGER TRUCK CENTER OF West Allis | BADGER TRUCK CENTER OF MADISON, INC. | Paul Schlagenhaft | 10915 W. Rogers St. | West Allis | WI | 53227 | - |
| BADGER TRUCK CENTER OF Windsor | BADGER TRUCK CENTER OF MADISON, INC. | Tom Sleeker | 6303 PEPSI WAY | WINDSOR | WI | 53598 | - |
| BAKERSFIELD TRUCK CENTER | FRESNO TRUCK CENTER | | 8140 GOLDEN STATE HIGHWAY | BAKERSFIE | CA | 93308 | - |
| BAKERSFIELD TRUCK CENTER | FRESNO TRUCK CENTER | Randy Moore | 8140 GOLDEN STATE HIGHWAY | BAKERSFI ELD | CA | 93308 | - |
| BARR FREIGHTLINER | BARR INTERNATIONAL, INC. | Richard S. Barr, Jr. | 2407 N. Salisbury Blvd. | Salisbury | MD | 21801 | - |
| BARR FREIGHTLINER | BARR INTERNATIONAL, INC. | | 9067 OCEAN HWY | DELMAR | MD | 21875 | - |
| BAYSHORE FORD TRUCK SALES, INC. | BAYSHORE FORD TRUCK SALES, INC. | Dale Brewer | 4003 N. DUPONT PARKWAY | NEW CASTLE | DE | 19720 | - |
| BAYSHORE FORD TRUCK SALES, INC. | BAYSHORE FORD TRUCK SALES, INC. | Dale Brewer | 4003 N. DUPONT PARKWAY | NEW CAST | DE | 19720 | - |
| Beaumont Freightliner | Houston Freightliner, Inc. | Rick Stewart | 6975 South Major Drive | Beaumont | TX | 77705 | - |
| BIG T'S FTL, STL & WST OF VENTURA COUNTY, INC. | BIG T'S FREIGHTLINER, STERLING & WESTERN STAR OF VENTURA COUNTY, INC. | Torben Frederiksen | 2501 CAMINO DEL SOL | OXNARD | CA | 93030 | - |
| BIG T'S FTL, STL & WST OF VENTURA COUNTY, INC. | BIG T'S FREIGHTLINER, STERLING & WESTERN STAR OF VENTURA COUNTY, INC. | Torben Frederiksen | 2501 CAMINO DEL SOL | OXNARD | CA | 93030 | - |
| BOYER FORD TRUCKS, INC. | BOYER FORD TRUCKS, INC. | Lee Walquist | 2500 BROADWAY DRIVE | LAUDERD ALE | MN | 55113 | - |
| BOYER FORD TRUCKS, INC. | BOYER FORD TRUCKS, INC. | Lee Walquist | 2500 BROADWAY DRIVE | LAUDERD | MN | 55113 | - |
| BOYER TRUCKS DULUTH-SUPERIOR | BOYER FORD TRUCKS, INC. | Lee Walquist | 1202 SUSQUEHANNA AVE. | SUPERIOR | WI | 54880 | - |
| BOYER TRUCKS ROGERS | BOYER FORD TRUCKS, INC. | Lee Walquist | 21701 INDUSTRIAL BLVD. | ROGERS | MN | 55374 | - |

Condor Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| BOYER TRUCKS SAVAGE | BOYER FORD TRUCKS, INC. | Lee Walquist | 8025 HIGHWAY 101 | SAVAGE | MN | 55378 | - |
| BOYER TRUCKS SIOUX FALLS | BOYER FORD TRUCKS SIOUX FALLS, INC. | Lee Walquist | 2101 EAST BENSON ROAD | SIOUX FAL | SD | 57104 | - |
| CAMIONS FREIGHTLINER QUEBEC INC. | CAMIONS FREIGHTLINER QUEBEC INC. | | 2380 RUE DALTON ST. | SAINTE FOY | QC | G1P 3X1 | - |
| CAMIONS FREIGHTLINER QUÉBEC INC. | CAMIONS FREIGHTLINER QUEBEC INC. | | 2380 RUE DALTON ST. | SAINTE FO | QC | G1P 3X1 | - |
| CAMIONS FREIGHTLINER QUÉBEC INC. | CAMIONS FREIGHTLINER QUEBEC INC. | | 865 Rue Andrimede | Llevis | QC | G6V 7M5 | - |
| CHARLOTTE TRUCK CENTER | Virginia Truck Center, Inc. | Russ Elett | 740 S. Military Highway | Virginia Beach | VA | 23464 | - |
| CHARLOTTE TRUCK CENTER, Inc. | Charlotte Truck Center, Inc. | Russ Elett | 4633 EQUIPMENT DRIVE | CHARLOTT | NC | 28269 | - |
| CHRISTOPHER TRUCKS, INC. | CHRISTOPHER TRUCKS, INC. | Scott Christopher | WHITE HORSE ROAD AT I-85 | GREENVIL LE | SC | 29605 | - |
| CHRISTOPHER TRUCKS, INC. | CHRISTOPHER TRUCKS, INC. | Scott Christopher | WHITE HORSE ROAD AT I-85 | GREENVIL | SC | 29605 | - |
| Corey-Wested Freightliner | Lone Star Truck Group | | 998 E. Highway 80 | Abilene | TX | 79601 | - |
| Corpus Christi Freightliner | Houston Freightliner, Inc. | Rick Stewart | 8001 IH-37 | Corpus Chri | TX | 78409 | - |
| D & K TRUCK COMPANY | D & K TRUCK COMPANY | Ed Bennett | 319 E. NORTH STREET | LANSING | MI | 48906 | - |
| D & K TRUCK COMPANY | D & K TRUCK COMPANY | Ed Bennett | 319 E. NORTH STREET | LANSING | MI | 48906 | - |
| DUNCAN FREIGHTLINER LP | Lone Star Truck Group | | 3333 SOUTH INTERSTATE 35 | WACO | TX | 76706 | - |
| FLEET MAINTENANCE, INC. | FLEET MAINTENANCE, INC. | Deborah Ann Gawron and Mary Ann Gawron | 67 RANSIER DRIVE | WEST SENECA | NY | 14224 | - |
| FLEET MAINTENANCE, INC. | FLEET MAINTENANCE, INC. | | 67 RANSIER DRIVE | WEST SEN | NY | 14224 | - |
| Four Star Freightliner | FREIGHTLINER OF SOUTHERN ALABAMA, INC. | Jerry Kocan | 1507 REEVES STREET | DOTHAN | AL | 36303 | - |
| Four Star Freightliner | FREIGHTLINER OF SOUTHERN ALABAMA, INC | Jerry Kocan | 1507 REEVES STREET | DOTHAN | AL | 36303 | - |
| Four Star Freightliner | FREIGHTLINER OF SOUTHERN ALABAMA, INC | Jerry Kocan | 3140 Haynevile Road | Montgomery | AL | 36108 | - |
| Four Star Freightliner | FREIGHTLINER OF SOUTHERN ALABAMA, INC | Jerry Kocan | 4755 Capital Circle NW | Tallahassee | FL | 32303 | - |
| FREIGHTLINER MANITOBA LTD. | FREIGHTLINER MANITOBA LTD. | Ken Talbot, Rob Snyder, and C and K Properties | 2058 LOGAN AVENUE | WINNIPE G | MB | R2R 0H9 | - |
| FREIGHTLINER MANITOBA LTD. | FREIGHTLINER MANITOBA LTD. | | 2058 LOGAN AVENUE | WINNIPEG | MB | R2R 0H9 | - |
| FREIGHTLINER MANITOBA LTD. | FREIGHTLINER MANITOBA LTD. | | 1731 Middleton Ave | Brandon | MB | R7C 1A7 | - |
| Freightliner of Hagerstown | TRANSTECK, INC. | Larry Hufford | 11611 Hopewell Rd. | Hagerstown | MD | 21740 | - |

Condor Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| FREIGHTLINER OF HARRISBURG | TRANSTECK INC. | Larry Hufford | 4303 LEWIS RD. | HARRISBURG | PA | 17111 | - |
| FREIGHTLINER OF HARRISBURG | TRANSTECK INC. | Larry Hufford | 4303 LEWIS RD. | HARRISBURG | PA | 17111 | - |
| FREIGHTLINER OF HARTFORD, INC. | FREIGHTLINER OF HARTFORD, INC. | Lindy Bigiazzi | 222 ROBERTS STREET | EAST HARTFORD | CT | 06108 | - |
| FREIGHTLINER OF HARTFORD, INC. | FREIGHTLINER OF HARTFORD, INC. | Lindy Bigiazzi | 222 ROBERTS STREET | EAST HARTFORD | CT | 06108 | - |
| Freightliner of Lancaster | TRANSTECK INC. | Larry Hufford | 1675 Rohrerstown Rd. | Lancaster | PA | 17601 | - |
| Freightliner of Philadelphia | TRANSTECK INC. | Larry Hufford | 11 Runway Road | Levittown | PA | 19057 | - |
| Freightliner of San Antonio, Ltd. | Freightliner of San Antonio, Ltd. | Paul Kane | 8709 IH-10 East | San Antonio | TX | 78109 | - |
| Freightliner of San Antonio, Ltd. | Freightliner of San Antonio, Ltd. | Paul Kane | 8709 IH-10 East | San Antonio | TX | 78109 | - |
| Freightliner Western Star of Laredo, Ltd. | Freightliner Western Star of Laredo, Ltd. | | 12002 FM 1472 | Laredo | TX | 78045 | - |
| FREIGHTLINER, STERLING, WESTERN STAR OF ARIZONA | FREIGHTLINER, STERLING, WESTERN STAR OF ARIZONA | Danny Cozick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| FREIGHTLINER, STERLING, WESTERN STAR OF ARIZONA | FREIGHTLINER, STERLING, WESTERN STAR OF ARIZONA | Danny Cozick | 9600 W. ROOSEVELT ST. | TOLLESON | AZ | 85353 | - |
| FREIGHTLINER, STERLING, WESTERN STAR OF ARIZONA | FREIGHTLINER, STERLING, WESTERN STAR OF ARIZONA | Danny Cozick | 1230 S. AKIMEL LANE | CHANDLER | AZ | 85226 | - |
| Freightliner of Utah, LLC | FREIGHTLINER OF UTAH, LLC | Bart Warner | 2167 SOUTH 5370 WEST | SALT LAKE CITY | UT | 84120 | - |
| Freightliner of Utah, LLC | FREIGHTLINER OF UTAH, LLC | Bart Warner | 2167 SOUTH 5370 WEST | SALT LAKE | UT | 84120 | - |
| FRESNO TRUCK CENTER | FRESNO TRUCK CENTER | Doug Howard | 2727 E. CENTRAL AVENUE | FRESNO | CA | 93726 | - |
| FRESNO TRUCK CENTER | FRESNO TRUCK CENTER | | 2727 E. CENTRAL AVENUE | FRESNO | CA | 93725 | - |
| FYDA BARKEYVILLE, INC | FYDA BARKEYVILLE, INC | Tim Fyda | 5758 State Rt. 8 | BARKEYVILLE | PA | 16038 | - |
| FYDA CINCINNATI INC. | FYDA CINCINNATI INC. | Tim Fyda | 1 FREIGHTLINER DRIVE | CINCINNATI | OH | 45241 | - |
| FYDA OF COLUMBUS, INC | FYDA OF COLUMBUS, INC | Tim Fyda | 1250 WALCUTT RD. | COLUMBUS | OH | 43228 | - |
| FYDA OF YOUNGSTOWN, INC | FYDA OF YOUNGSTOWN, INC | Tim Fyda | 5280 SEVENTY-SIX DR. | YOUNGSTOWN | OH | 44515 | - |
| FYDA PITTSBURGH, INC. | FYDA PITTSBURGH, INC. | Tim Fyda | 20 FYDA DRIVE | Canonsburg | PA | 15317 | - |
| Fyda Inc. | Fyda Freightliner Cincinnati, Inc. | Dan Rahe | 1 FREIGHTLINER DRIVE | CINCINNATI | OH | 45241 | - |
| Globocam Rive-Sud s.e.c. | Globocam Rive-Sud s.e.c. | Guy Landry | 1900, rue Newton | Boucherville | QC | J4B 5H2 | - |

Page 3 of 8

Condor Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| | Globocam Rive-Sud s.e.c. | | 1300, rue Newton | Boucherville | QC | J4B 5H2 | - |
| GLOVER'S TRUCK PARTS AND EQUIPMENT | GLOVER'S TRANSMISSION AND REAR END, INC. | Ron Cook | 1200 BAUCUM INDUSTRIAL DR. | N. LITTLE ROCK | AR | 72117 | - |
| GLOVER'S TRUCK PARTS AND EQUIPMENT | GLOVER'S TRANSMISSION AND REAR END, INC. | | 1200 BAUCUM INDUSTRIAL DR. | N. LITTLE F | AR | 72117 | - |
| GOLDEN GATE TRUCK CENTER | FRESNO TRUCK CENTER | | 9200 BALDWIN STREET | OAKLAND | CA | 9482* | - |
| GOLDEN GATE TRUCK CENTER | FRESNO TRUCK CENTER | Tom Dempsey | 9200 BALDWIN STREET | OAKLAND | CA | 94621 | - |
| Hans Freightliner of Cleveland | Hans Truck & Trailer Repair, Inc. | Hans Dabbeing | 14520 Broadway Ave. | Cleveland | OH | 44125 | - |
| Hans Freightliner of Cleveland | Hans Truck & Trailer Repair, Inc. | Ilse Daheimg | 14520 Broadway Ave. | Cleveland | OH | 44125 | - |
| HARPER ONTARIO TRUCK CENTRES INC. | HARPER ONTARIO TRUCK CENTRES INC. | John Neijgan | 800 GANA COURT | MISSISSA UGA | ON | L5S 1P1 | - |
| HARPER ONTARIO TRUCK CENTRES INC. | HARPER ONTARIO TRUCK CENTRES INC. | | 800 GANA COURT | MISSISSAL | ON | L5S 1P1 | - |
| HOLCOMB FREIGHTLINER, INC. | HOLCOMB FREIGHTLINER, INC. | Doug Batcheller | 4801 HARBOR DRIVE | SIOUX CITY | IA | 51111 | - |
| HOLCOMB FREIGHTLINER, INC. | HOLCOMB FREIGHTLINER, INC. | | 4801 HARBOR DRIVE | SIOUX CIT | IA | 51111 | - |
| Houston Freightliner, Inc. | Houston Freightliner, Inc. | Rick Stewart | 9550 NORTH LOOP EAST | HOUSTON TX | | 77029 | - |
| Houston Freightliner, Inc. | Houston Freightliner, Inc. | Rick Stewart | 9550 NORTH LOOP EAST | HOUSTON TX | | 77029 | - |
| I-STATE TRUCK CENTER | I-STATE TRUCK, INC. | Gordon Galarneau, Jr. | 4600 S. Frontage Rd. | BILLINGS | MT | 59101 | - |
| I-STATE TRUCK CENTER | I-STATE TRUCK, INC. | don Galarneau, | 4600 S. Frontage Rd. | BILLINGS | MT | 59101 | - |
| I-STATE TRUCK CENTER | I-STATE TRUCK, INC. | don Galarneau, | 2121 VAUGHN ROAD | GREAT FA | MT | 59404 | - |
| JACK'S TRUCK AND EQUIPMENT, FTL, STL, WST | JACK'S HEAVY EQUIPMENT, INC. | Jack Chafee | 6100 S. DOUGLAS HWY. | GILLETTE | WY | 82718 | - |
| JACK'S TRUCK AND EQUIPMENT, FTL, STL, WST | JACK'S HEAVY EQUIPMENT, INC. | Jack Chafee | 6100 S. DOUGLAS HWY. | GILLETTE | WY | 82718 | - |
| JACK'S TRUCK AND EQUIPMENT, FTL, STL, WST | JACK'S HEAVY EQUIPMENT, INC. | Jack Chafee | 6100 S. DOUGLAS HWY. | GILLETTE | WY | 82718 | - |
| KANSAS CITY FREIGHTLINER SALES, INC. | KANSAS CITY FREIGHTLINER SALES, INC. | Mike Westfall | 7800 N.E. 38TH STREET | KANSAS CITY | MO | 64161 | - |
| KANSAS CITY FREIGHTLINER SALES, INC. | KANSAS CITY FREIGHTLINER SALES, INC. | Mike Westfall | 7800 N.E. 38TH STREET | KANSAS CI | MO | 64161 | - |
| KANSAS TRUCK CENTER | OMAHA TRUCK CENTER INC. | Trey Myfty | 1310 S. KANSAS AVE. | LIBERAL | KS | 67901 | - |
| KANSAS TRUCK CENTER | OMAHA TRUCK CENTER INC. | Trey Myfty | 2552 NORTH NINTH STREET | SALINA | KS | 67401 | - |
| KANSAS TRUCK CENTER | OMAHA TRUCK CENTER INC. | Trey Myfty | 2935 S. WEST  STREET | WICHITA | KS | 67217 | - |

Condor Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Curre Amount |
|---|---|---|---|---|---|---|---|
| L & B FREIGHTLINER, STERLING & WESTERN STAR OF MAS | L & B TRUCK SERVICE, INC. | | 910 SOUTHAMPTON Rd. | WESTFIELI | MA | 01085 | - |
| L & B FREIGHTLINER, STERLING & WESTERN STAR OF VER | L & B TRUCK SERVICE, INC. | Luke Bazin | 6243 ROUTE 5 | WESTMIN STER | VT | 05158 | - |
| L & B FREIGHTLINER, STERLING & WESTERN STAR OF VER | L & B TRUCK SERVICE INC. | | 6243 ROUTE 5 | WESTMINS | VT | 05158 | - |
| L & S TRUCK CENTER OF APPLETON, INC. | L & S TRUCK CENTER OF APPLETON, INC. | Jon Stumpf | 330 N. BLUEMOUND DR. | APPLETO N | WI | 54914 | - |
| L & S TRUCK CENTER OF APPLETON, INC. | L & S TRUCK CENTER OF APPLETON. INC. | Jon Stumpf | 330 N. BLUEMOUND DR. | APPLETON | WI | 54914 | - |
| Lee-Smith, Inc. | Lee-Smith, Inc. | Leslie W. Lee, Jr. | 2600 8th Ave. | Chattanoo ga | TN | 37407 | - |
| Lee-Smith, Inc. | Lee-Smith, Inc. | | 2600 8th Ave. | Chattanoog | TN | 37407 | - |
| LINCOLN TRUCK CENTER | OMAHA TRUCK CENTER INC. | Trey Myfty | 5701 AR9KOR RD. | LINCOLN | NE | 68517 | - |
| LONG LEWIS STERLING OF HUNTSVILLE | LONG-LEWIS INCORPORATED | Vaugin Burrell | 16090 ALABAMA HWY. 20 WEST | MADISON | AL | 35756 | - |
| LONG LEWIS STERLING-WESTERN STAR OF BESSEMER | LONG-LEWIS INCORPORATED | Vaugin Burrell | 4200 BESSEMER SUPER HIGHWAY | BESSEME R | AL | 35020 | - |
| LONG LEWIS STERLING-WESTERN STAR OF BESSEMER | LONG-LEWIS INCORPORATED | Vaugin Burrell | 4200 BESSEMER SUPER HIGHWAY | BESSEMEF | AL | 35020 | - |
| Lucini Motors, Inc. | Lucini Motors, Inc. | Jon D'Alessandro | 370 South Main Street, Route 28 | West Bridgewate r | MA | 2379 | - |
| Lucini Motors, Inc. | Lucini Motors, Inc. | | 370 South Main Street, Route 28 | West Bridge | MA | 2379 | - |
| Motor City Trucks, Inc. | Motor City Trucks | William Peters | 39300 Schoolcraft Rd. | Livonia | MI | 48150 | - |
| Motor City Trucks, Inc. | Motor City Trucks | William Peters | 39300 Schoolcraft Rd. | Livonia | MI | 48150 | - |
| NEELY COBLE COMPANY, INC. | NEELY COBLE COMPANY, INC. | Neely Coble | 319 FESSLERS LANE | NASHVILL E. | TN | 37210 | - |
| NEELY COBLE COMPANY, INC. | NEELY COBLE COMPANY, INC. | Neely Coble | 319 FESSLERS LANE | NASHVILL | TN | 37210 | - |
| NEW YORK FREIGHTLINER | DIEHL & SONS, INC. | | 129-01 ATLANTIC AVENUE | RICHMON D HILL | NY | 11418 | - |
| NEW YORK FREIGHTLINER | DIEHL & SONS, INC. | | 129-01 ATLANTIC AVENUE | RICHMONC | NY | 11418 | - |
| Norfolk Truck Center | OMAHA TRUCK CENTER INC. | Trey Myfty | 2801 S. 13TH ST. | NORFOLK | NE | 68702 | - |
| NORTHSIDE TRUCK & EQUIPMENT | NORTHSIDE FORD TRUCK SALES, INC. | Jim McDonough Sr. | 8221 N.E. COLUMBIA BLVD. | PORTLAN D | OR | 97218 | - |
| NORTHSIDE TRUCK & EQUIPMENT | NORTHSIDE FORD TRUCK SALES, INC. | Jim McDonough S | 8221 N.E. COLUMBIA BLVD. | PORTLANC | OR | 97218 | - |
| OKLAHOMA CITY FREIGHTLINER | THE AROUND THE CLOCK FREIGHTLINER GROUP, INC. | | 5201 I-40 WEST | OKLAHOMA CITY | OK | 73128 | - |
| OMAHA TRUCK CENTER INC. | OMAHA TRUCK CENTER INC. | Trey Myfty | 1208 31ST. AVE. | COUNCIL BLUFFS | IA | 51501 | - |
| OMAHA TRUCK CENTER INC. | OMAHA TRUCK CENTER INC. | Trey Myfty | 1208 31ST. AVE. | COUNCIL | IA | 51501 | - |

Condor Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| OMAHA TRUCK CENTER INC. | OMAHA TRUCK CENTER INC. | Trey Mytty | 10710 I STREET | OMAHA | NE | 68127 | - |
| PACIFIC TRUCK CENTER | PACIFIC DETROIT DIESEL-ALLISON CO. | Jerry Tyrrell | 91-825 KALAELOA BLVD. | KAPOLEI | HI | 96707 | - |
| PACIFIC TRUCK CENTER | PACIFIC DETROIT DIESEL-ALLISON CO. | Jerry Tyrrell | 91-825 KALAELOA BLVD. | KAPOLEI | HI | 96707 | - |
| PEACH STATE TRUCK CENTERS | PEACH STATE FORD TRUCK SALES, INC. | Tim Reynolds | 6535 CRESCENT DRIVE | NORCRO SS | GA | 30071 | - |
| PEACH STATE TRUCK CENTERS | PEACH STATE FORD TRUCK SALES, INC. | Tim Reynolds | 6535 CRESCENT DRIVE | NORCROSS | GA | 30071 | - |
| PEACH STATE TRUCK CENTERS | PEACH STATE FORD TRUCK SALES, INC. | Tim Reynolds | 100 STERLING PLACE | MCDONOU | GA | 30523 | - |
| PEACH STATE TRUCK CENTERS | PEACH STATE FORD TRUCK SALES, INC. | Tim Reynolds | 137 Peachtree Pkwy | Byron | GA | 31008 | - |
| PECK ROAD TRUCK CENTER | PECK ROAD FORD TRUCK SALES, INC. | Jeff Jennings | 2450 KELLA AVE. | WHITTIER | CA | 90601 | - |
| PECK ROAD TRUCK CENTER | PECK ROAD FORD TRUCK SALES, INC. | Jeff Jennings | 2450 KELLA AVE. | WHITTIER | CA | 90601 | - |
| Redding Freightliner, Inc. | Redding Freightliner, Inc. | | 4991 Caterpillar Road | Redding | CA | 96003 | - |
| Redding Freightliner, Inc. | Redding Freightliner, Inc. | | 4991 Caterpillar Road | Redding | CA | 96003 | - |
| ROBERT H. HOOVER & SONS, INC. | ROBERT H. HOOVER & SONS, INC. | Robert Hoover | 148 Gold Mine Road | Flanders | NJ | 07836 | - |
| ROBERT H. HOOVER & SONS, INC. | ROBERT H. HOOVER & SONS, INC. | Robert Hoover | 148 Gold Mine Road | Flanders | NJ | 07836 | - |
| ROBERT H. HOOVER & SONS, INC. | ROBERT H. HOOVER & SONS, INC. | Robert Hoover | 1784 ROUTE 9 (LAKEWOOD ROAD) | TOMS RIVE | NJ | 08753 | - |
| ROBERT H. HOOVER & SONS, INC. | ROBERT H. HOOVER & SONS, INC. | Robert Hoover | 7550 N CRESENT BLVD. | PENNSAUK | NJ | 08109 | - |
| ELITE TRUCK AND TRAILER INC. | ELITE TRUCK AND TRAILER INC. | Corey Biggers and Jeanie Biggers | 310 Alaska Frontage Road | BELGRAD E MT | MT | 59714 | - |
| ROCKY MOUNTAIN TRUCK CENTER | ELITE TRUCK AND TRAILER INC. | | 310 Alaska Frontage Road | BELGRAD E | MT | 59714 | - |
| SACRAMENTO TRUCK CENTER | FRESNO TRUCK CENTER | | 100 OPPORTUNITY STREET | SACRAME NTO | CA | 95838 | - |
| SACRAMENTO TRUCK CENTER | FRESNO TRUCK CENTER | | 100 OPPORTUNITY STREET | SACRAME NTO | CA | 95838 | - |
| Savannah Freightliner Sterling | FREIGHTLINER OF SAVANNAH, INC. | Jason Williams | 301 O'LEARY ROAD | SAVANNA H | GA | 31407 | - |
| Savannah Freightliner Sterling | FREIGHTLINER OF SAVANNAH, INC. | Jason Williams | 301 O'LEARY ROAD | SAVANNAH | GA | 31407 | - |
| SMOKY MOUNTAIN TRUCK CENTER | SMOKY MOUNTAIN TRUCK CENTER, LLC | David Humphries | 841 EASTERN STAR ROAD | KINGSPO RT | TN | 37663 | - |
| SMOKY MOUNTAIN TRUCK CENTER | SMOKY MOUNTAIN TRUCK CENTER, LLC | David Humphries | 841 EASTERN STAR ROAD | KINGSPOR | TN | 37663 | - |

Condor Dealer Contracts

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| SOUTHWEST STERLING, INC. | SOUTHWEST STERLING, INC. | Timothy R. Murphy | 1524 N. Carrington | Kansas City | MO | 64120 | - |
| SOUTHWEST STERLING, INC. | SOUTHWEST STERLING, INC. | | 10901 GATEWAY WEST | EL PASO | TX | 79935 | - |
| Southwest Truck Service | LBJ Consulting, LLC | Lyle Oinkle | 3225 E. 46th St | Tucson | AZ | 85713 | - |
| Southwest Truck Service | LBJ Consulting, LLC | | 3225 E. 46th St | Tucson | AZ | 85713 | - |
| Sterling Western Star Trucks Alberta, Ltd | Sterling Western Star Trucks Alberta, Ltd | Kelly Clark | 9115 - 52 Street S.E. | Calgary | AB | T2C 2R4 | - |
| Sterling Western Star Trucks Alberta, Ltd | Sterling Western Star Trucks Alberta, Ltd | Kelly Clark | 9115 - 52 Street S.E. | Calgary | AB | T2C 2R4 | - |
| Sterling Western Star Trucks Alberta, Ltd | Sterling Western Star Trucks Alberta, Ltd | Kelly Clark | 7890 Edgar Industrial Court | Red Deer | AB | T4P 4L2 | - |
| TOM NEHL TRUCK COMPANY | TOM NEHL GMC TRUCK CO. | Steve Bacalis | 417 S. EDGEWOOD AVENUE | JACKSON VILLE | FL | 32254 | - |
| TOM NEHL TRUCK COMPANY | TOM NEHL GMC TRUCK CO. | Steve Bacalis | 417 S. EDGEWOOD AVENUE | JACKSON VILLE | FL | 32254 | - |
| TOM NEHL TRUCK COMPANY | TOM NEHL GMC TRUCK CO. | Steve Bacalis | 508 SW Arrowhead Terrace | LAKE CITY | FL | 32024 | - |
| TRACEY ROAD EQUIPMENT, INC. - E. SYRACUSE | TRACEY ROAD EQUIPMENT, INC. | Gerald Tracey | 6803 MANLIUS CENTER ROAD | EAST SYRACUSE | NY | 13057 | - |
| TRACEY ROAD EQUIPMENT, INC. - E. SYRACUSE | TRACEY ROAD EQUIPMENT, INC. | Gerald Tracey | 6803 MANLIUS CENTER ROAD | EAST SYR | NY | 13057 | - |
| TRANSCHICAGO TRUCK GROUP | PATSON, INC. | Douglas Cayce | 776 N. YORK ROAD | ELMHURST | IL | 60126 | - |
| TRANSCHICAGO TRUCK GROUP | PATSON, INC. | | 776 N. YORK ROAD | ELMHURST | IL | 60126 | - |
| TRANSCHICAGO TRUCK GROUP | PATSON, INC. | | 4000 N. Mannheim Rd. | Franklin Park | IL | 60131 | - |
| TRIAD FREIGHTLINER OF GREENSBORO, INC. | TRIAD FREIGHTLINER OF GREENSBORO, INC. | Bill Roth | 6420 BURNT POPLAR RD | GREENSBORO | NC | 27409 | - |
| TRIAD FREIGHTLINER OF GREENSBORO, INC. | TRIAD FREIGHTLINER OF GREENSBORO, INC. | Bill Roth | 6420 BURNT POPLAR RD | GREENSBO | NC | 27409 | - |
| TRUCK COUNTRY OF CEDAR RAPIDS | TRUCK COUNTRY OF IOWA, INC. | Bill Roth | 700 29TH AVENUE S.W. | CEDAR RAPIDS | IA | 52404 | - |
| TRUCK COUNTRY OF CEDAR RAPIDS | TRUCK COUNTRY OF IOWA, INC. | Bill Roth | 700 29TH AVENUE S.W. | CEDAR RA | IA | 52404 | - |
| V & H, INC. | V & H, INC. | Terry Frankland | 1505 S. CENTRAL AVE. | MARSHFIELD | WI | 54449 | - |
| Valley Freightliner, Inc. | Valley Freightliner, Inc. | Larry Gordon | 277 Stewart Rd. SW | Pacific | WA | 98047 | - |
| Valley Freightliner, Inc. | Valley Freightliner, Inc. | Larry Gordon | 277 Stewart Rd. SW | Pacific | WA | 98047 | - |
| Valley Freightliner, Inc. | Valley Freightliner, Inc. | Larry Gordon | 524 Jenk's Lane | | | | - |
| VIRGINIA TRUCK CENTER OF Harrisonburg | VIRGINIA TRUCK CENTER, INC. | Ross Ellet | 3243 LEE HIGHWAY | Mount Vern | WA | 98273 | - |
| VIRGINIA TRUCK CENTER OF RICHMOND, INC. | VIRGINIA TRUCK CENTER OF RICHMOND, INC | Ross Ellet | 3617 NINE MILE ROAD | RICHMOND | VA | 23223 | - |
| Virginia Truck Center of Roanoke, Inc. | Virginia Truck Center of Roanoke, Inc. | Ross Ellet | 287 LEE HIGHWAY SOUTH | ROANOKE | VA | 24019 | - |

**Condor Dealer Contracts**

| Dealer DBA | Company Name | Dealer Principal / Guarantor | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| VIRGINIA TRUCK CENTER OF TIDEWATER | VIRGINIA TRUCK CENTER OF RICHMOND, INC. | Russ Eliot | 740 SOUTH MILITARY HIGHWAY | VIRGINIA BEACH | VA | 23464 | - |
| VIRGINIA TRUCK CENTER OF TIDEWATER | VIRGINIA TRUCK CENTER OF RICHMOND, INC. | Russ Eliot | 740 SOUTH MILITARY HIGHWAY | VIRGINIA B | VA | 23464 | - |
| West Carolina Freightliner, Inc. | West Carolina Freightliner, Inc. | Kenneth Maynard | 630 Hwy. 70 SE PO Box 728 | Hickory | NC | 28602 | - |
| West Carolina Freightliner, Inc. | West Carolina Freightliner, Inc. | | 1630 Hwy. 70 SE | Hickory | NC | 28602 | - |
| West Carolina Freightliner, Inc. | West Carolina Freightliner, Inc. | | 100 Highland Center Blvd. | Asheville | NC | 28816 | - |
| WEST TEXAS TRUCK CENTER OF AMARILLO | WEST TEXAS TRUCK CENTER, INC. | | 2210 WHITAKER ROAD | AMARILLO | TX | 79118 | - |
| WEST TEXAS TRUCK CENTER OF AMARILLO | WEST TEXAS TRUCK CENTER, INC. | | 2210 WHITAKER ROAD | AMARILLO | TX | 79118 | - |
| WEST TEXAS TRUCK CENTER OF ODESSA | WEST TEXAS TRUCK CENTER, INC. | | 1100 SOUTH GRANDVIEW | ODESSA | TX | 79761 | - |
| WESTERN STAR AND STERLING TRUCKS OF VANCOUVER, INC | DETROIT DIESEL - ALLISON BRITISH COLUMBIA, LTD | Gerry Cullen | 9300 - 192ND STREET | SURREY | BC | V4N 3R8 | - |
| WESTERN STAR AND STERLING TRUCKS OF VANCOUVER, INC | DETROIT DIESEL - ALLISON BRITISH COLUMB | Gerry Cullen | 9300 - 192ND STREET | SURREY | BC | V4N 3R8 | - |
| WESTERN STAR AND STERLING TRUCKS OF VANCOUVER, INC | DETROIT DIESEL - ALLISON BRITISH COLUMB | Gerry Cullen | 380 RIVERSIDE ROAD | ABBOTSFO | BC | V2S 7M4 | - |
| WICHITA FALLS FREIGHTLINER, LP | Lone Star Truck Group | | 2901 JACKSBORO HIGHWAY | WICHITA F | TX | 76302 | - |
| Winacott Spring Western Star Trucks | Winacott Spring Western Star Trucks | Corey Butnick, Laura Butnick, Robert Winacott and Trevor Winacott Regina | 3002 Faithfull Ave. | Saskatoon | SK | S7K 0B1 | - |
| Winacott Spring Western Star Trucks | Winacott Spring Western Star Trucks | | 3002 Faithfull Ave. | Saskatoon | SK | S7K 0B1 | - |
| Winacott Spring Western Star Trucks | Winacott Spring Western Star Trucks | | 485 - 6th Ave. East | Regina | SK | S4N 5A3 | - |
| Winacott Spring Western Star Trucks | Winacott Spring Western Star Trucks | Terry Frankland, Robert Wakenchan, and Doug Schumacher | 485 - 6th Ave. East | Regina | SK | S4N 5A3 | - |

| ALF S/O # | Customer P/O # | Name | Address 1 | City | State | ZIP | Cure Amount |
|---|---|---|---|---|---|---|---|
| 070261 | Municipalite de Coteau-du-lac | Stephane Massicotte | 191 Rte 338 | Coteau-du-lac | QB | JOP 1B0 | - |
| 080026 | ALF Sterling Tanker Demo/ALF Sterling Tanker Demo | Michael Gordon | 1090 Newton Way | Summerville | SC | 29483 | - |
| 070009 | ALF Corp - Stock / Demo | Michael Gordon | 1091 Newton Way | Summerville | SC | 29483 | - |
| 070095 | St. Lucie County Fire District | Jay Sizemore | 5160 NW Milner Dr | Port St Lucie | FL | 34983 | - |
| 070110 | St. Lucie County Fire District | Jay Sizemore | 5160 NW Milner Dr | Port St Lucie | FL | 34983 | - |
| 070111 | St. Lucie County Fire District | Jay Sizemore | 5160 NW Milner Dr | Port St Lucie | FL | 34983 | - |
| 070230 | Shallotte Point Vol Fire Dept | Buddy Causey | 4126 Pigott Rd SW | Shallotte | NC | 28470 | - |
| 070278 | City of Bayou Labatre Fire Dept | Chief Wiggins | 13785 South Wintzell Ave. | Bayou La Batre | AL | 36509 | - |

Contracts to be assumed continued

Campbell Supply

| | |
|---|---|
| 1. SO # 60553 Seaside Heights NJ. | Cure amount $0 |
| 2. SO # 80012 North Lindenhurst NY. | Cure amount $0 |
| 3. SO # 70082 Trenton NJ. | Cure amount $0 |
| 4. SO # 70007 Plainfield NJ. | Cure amount $0 |
| 5. SO # 70173 Sea Isle City NJ. | Cure amount $0 |
| 6. SO # 70191 Sea Bright NJ. | Cure amount $0 |
| 7. SO # 80001 Port Authority NJ/NY | Cure amount $0 |
| 8. SO # 80002 Port Authority NJ/NY | Cure amount $0 |

5/23/2008

American LaFrance: Press Releases



ABOUT US

NEWS

PRODUCTS

SUPPORT

EAGLES LANDING

Grand
Opening
Slideshow

## PRESS RELEASES

PRINTABLE PAGE                                                    ◄ BACK TO LIST

**American LaFrance Emerges from Bankruptcy**
(5/23/2008)

AMERICAN LAFRANCE CONFIRMS PLAN OF REORGANIZATION

LOOKS FORWARD TO EMERGENCE FROM BANKRUPTCY

SUMMERVILLE, SC May 23, 2008 – American LaFrance, LLC (the "Company" or "ALF") announced today that Judge Brendan L. Shannon entered the Order confirming ALF's Chapter 11 Plan of Reorganization ("Plan") allowing the Company to emerge from bankruptcy.   The Company has been in bankruptcy for fewer than 17 weeks and is emerging with almost 90% of its creditors supporting its Plan.

Lynn Tilton, CEO of Patriarch Partners, stated "This is just another milestone in the long history of this epic 175 year old manufacturing company.   With many of its legacy difficulties now in its past , this great American legacy is prepared to move forward continuing its build of the best known truck brands in the industry.   By having obtained an extension of $40 million of new credit in connection with its exit from bankruptcy, ALF is in a strong financial position to well service its customers."

American LaFrance, LLC, through its predecessor entities, is one of the oldest fire, rescue, and EMS vehicle manufacturers in the United States, dating back to its founding in 1832.   The Company operates 8 manufacturing/ servicing facilities and two company-owned vehicle dealerships.

American LaFrance: Press Releases

◀ BACK TO LIST

©1999-2007 American LaFrance, LLC

NATIONAL FALLEN
FIREFIGHTERS FOUNDATION